# EXHIBIT A

Deposition of Plaintiff Margaret Brantley

1       U.S. DISTRICT COURT FOR DISTRICT OF COLUMBIA

2

3

4   In the Matter of:

5   MARGARET R. BRANTLEY

6              Complainant                    CIVIL ACTION #:

7       v                                     06-1137 (ESH)

8   DIRK KEMPTHORNE, SECRETARY,
    U.S. DEPARTMENT OF THE INTERIOR

9              Respondent

10

11

12

13

14  Deposition of:

15              MARGARET ROBERTA BRANTLEY

16  was held at 501 3RD Street, 4th Floor, Washington, DC, on

17  Thursday, October 18, 2007, at 10:25 a.m.

18

19

20

21

22

23

24

25

2

1                        A P P E A R A N C E S

2    On Behalf of the Agency:

3        ALEXANDER SHOAIBI
         555 4th Street, NW
4        Washington, DC 20530
         (202) 514-7236
5

6    On Behalf of the Deponent:

7        JASON WEISBROT
         PHYLLIS LESLIE
8        104 Church Lane
         Suite 100
9        Baltimore, MD 21208
         (410) 653-9061

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>I N D E X</u>

2

| Witness: | Examination by: | Page: |
|---|---|---|

3

| Margaret Brantley | Mr. Shoaibi - Direct | 4 |

4

5

<u>E X H I B I T S</u>

6

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|

7

| D-1 | Complaint filed by Ms. Brantley | 54 |

8

| D-2 | Letter from Attorney Morrison | 146 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                                              (1:25 p.m.)

3            ¹MR. SHOAIBI:  You can swear her in.

4    (Whereupon,

5                    MARGARET ROBERTA BRANTLEY

6    was called as a witness and, after having been first duly

7    sworn, was examined and testified as follows:)

8                        EXAMINATION

9            BY MR. SHOAIBI:

10       Q.   Good morning, Ms. Brantley.  My name is

11   Alex Shoaibi.  I am the Assistant U.S. Attorney, who is

12   representing the Department of Interior in this case. I'm

13   going to be asking you some questions about the lawsuit

14   that you filed in U.S. District Court, and if you don't

15   understand any of my questions, please let me know, and I

16   will rephrase them to make them as understandable as I

17   can.  Everything that we are doing here is going to be

18   transcribed by the court reporter, everything that we

19   say.  So you, if you give me an answer with a nod of the

20   head or shake of the head, that has to be accompanied by

21   saying something or else it's not going to be on the

22   transcript, and we're not going to have a record of it.

23   Do you understand everything so far?

24       A.   Yes.

25       Q.   Okay.  Did you recently consume any alcohol,

1    drugs or medication that would affect your testimony?

2         A.    No.

3         Q.    And you understand your testimony is being

4    recorded and is under oath?

5         A.    Yes.

6         Q.    All right.  I mentioned this earlier in terms

7    of break.  That goes for everybody here and especially

8    you.  So if you need a break to go to the restroom or for

9    any reason at all, let me know and we'll stop.  Have you

10   ever had your deposition taken before?

11        A.    Yes.

12        Q.    And how many times?

13        A.    I don't recall.

14        Q.    More than five?

15        A.    Maybe less.

16        Q.    Okay.  Well, tell me the times that you recall

17   having your deposition taken one-by-one.  Why don't we

18   start with the most recent, if you can do it that way.

19        A.    I just had one taken the third, you know.

20        Q.    The 3rd of October?

21        A.    No.  I just had one taken.

22        Q.    Okay.  You just had one taken?

23        A.    Yes.  I --

24        Q.    Okay, just --

25        A.    -- can't remember the date.

6

1    Q.    You just had your deposition taken.    When you

2  say just, I just want to make sure I understand that

3  term.   Do you mean within the last month?

4    A.    This month.

5    Q.    This month.   Okay.   And what was that

6  deposition?   Was that in conjunction with a lawsuit?

7    A.    Yes.

8    Q.    And what case is that that you had your

9  deposition taken in?   Do you know the name of the case?

10 The name.   This case is Margaret R. Brantley versus Dirk

11 Kempthorne, Secretary, Department of the Interior.

12 What's the name of the case that you had your deposition

13 taken in just recently?

14   A.    Margaret R. Brantley versus Dirk Kempthorne.

15   Q.    Okay.   So you had your deposition taken in

16 another case against the Department of Interior?

17   A.    Right.

18   Q.    And where is that case pending?   Where is that

19 case filed?

20   A.    Within EEO.

21   Q.    Okay, EEO.   It's at the EEO level.   It's not

22 filed in a court?

23   A.    Right.

24   Q.    And who took your deposition?   Do you recall?

25   A.    Kerry Creighton.

1       Q.   Is that a man or a woman?

2       A.   It's a female.

3       Q.   What are you claiming in the Brantley v.

4    Kempthorne case pending before the EEO, in which you just

5    had your deposition taken?

6            MR. WEISBROT:   Objection to the extent it's not

7    likely to lead to discoverable evidence in this case.

8            BY MR. SHOAIBI:

9       Q.   Go ahead and answer it.

10      A.   Minimally successful rating, promotion.

11      Q.   Okay.   You had a minimally successful rating,

12   and you were not promoted, those are the claims?

13      A.   Basically the minimally successful rating.

14      Q.   And when did you file this complaint?

15      A.   In '05.

16      Q.   And tell me specifically what you're claiming

17   was done to you?   That you didn't get a -- you got a

18   minimally successful rating, is that correct?

19      A.   Correct.

20      Q.   When did you get this minimally successful

21   rating?

22      A.   In '05.

23      Q.   Okay.   And who gave it to you?

24      A.   Debbie Clark.

25      Q.   And what are you alleging?

1      A.    Because of this case that we are here today

2  for, and she is cited within this case, she gave me a

3  minimally successful rating because as stated, no one has

4  ever said anything negative about my work prior to the

5  reason why I haven't been promoted thus far.  So that's

6  what I feel she gave me the rating because of this,

7  citing things that wasn't true.

8      Q.    Okay.  So basically it's a retaliation claim?

9      A.    Exactly.

10      Q.    Because you filed this case 06-1137 in U.S.

11  District Court, you're being retaliated against and being

12  given a minimally successful rating?

13      A.    Yes.

14      Q.    And it's your testimony that you've never had

15  any negative evaluation of any kind before this one?  I

16  thought that's what you just said, that you said that

17  nobody ever said anything bad about you before?

18      A.    Correct.

19      Q.    Okay.  So prior to getting this minimally

20  successful rating, which is the basis for your EEO cases

21  pending right now.  You had never received anything that

22  was critical of your work prior to that, is that correct?

23      A.    Correct.

24      Q.    Other than that deposition, what other

25  depositions have you had taken?

1    A.    Prior to filing in 2003.

2    Q.    Okay.    In the EEO level of this case?    Prior

3  to filing the lawsuit that is pending right now that

4  we're in?

5    A.    That we're in now.

6    Q.    Okay.  You had your deposition taken, and that

7  was taken also on the EEO level, administrative level?

8    A.    Correct.

9    Q.    Okay.  And before that?

10    A.    There were several before that.

11    Q.    There were several before that.  Okay.  Try to

12  tell me about the one that was prior to the one that was

13  an EEO level of this case.

14    A.    There -- from, from 1989 I had been filing

15  periodically cases, retaliatory cases, until up to 2005.

16  And between -- the number of cases I filed, I -- the

17  majority of them, when it got to the EEO level and

18  Interior made a ruling, I did not appeal it.  So that's

19  what --

20    Q.    So you filed a number of cases prior to this

21  case?

22    A.    Exactly.

23    Q.    Beginning in 1989?

24    A.    Beginning in '89, '90, around in that time

25  frame.

1    Q.    Okay.  And you said for the most part you did

2  not appeal these.  Did you appeal any of them?  Did any

3  of them result in lawsuits filed in a court?

4    A.    No.

5    Q.    So you didn't appeal any of them?

6    A.    No.

7    Q.    Okay.  And can you tell me -- we're talking

8  about the time period between 1989 and 2002, 2003.

9  That's about 13 years.  During that time period, can you

10  give me your best recollection of how many claims you

11  have filed that resulted in depositions being taken?

12    A.    I need to ask a question.

13    Q.    Go ahead.

14    A.    Does the EEO counselor represent when she asks

15  me questions, is that a deposition with her?

16    Q.    Let's say a deposition for the purposes of my

17  question is when there is a reporter that is transcribing

18  your answers and your answers are supplied under oath.

19  That's a deposition.  I'm not --

20    A.    And --

21    Q.    -- about an interview.  I'm talking about

22  something where there's a transcript that has the

23  questions and the answers and it's verbatim.

24    A.    Then I haven't prior to '03.

25    Q.    Okay.  So there was the '03, one we're in right

1  now, and the one just recently?

2        A.    Right.

3        Q.    Okay.  Give me your full name.

4        A.    Margaret Roberta Brantley.

5        Q.    Have you used any other names during your

6  lifetime?

7        A.    Last name Brantley.

8        Q.    Used any other names, okay, other than

9  Brantley.

10       A.    McDowney.

11       Q.    Brantley is your married name?

12       A.    Yes.

13       Q.    And are you presently married?

14       A.    No.

15       Q.    How long were you married?

16       A.    12 years.

17       Q.    And when did your marriage end?

18       A.    '94.

19       Q.    Do you have any children?

20       A.    One.

21       Q.    And how old is that child?

22       A.    40.

23       Q.    Man or woman?

24       A.    Female.

25       Q.    Does she live locally?

1     A.   Not far from me.

2     Q.   What's your address?

3     A.   2601 Holly Drive, Port Washington, Maryland.

4 The ZIP is 20744.

5     Q.   What's your daughter's name?

6     A.   Michelle.

7     Q.   And her last name?

8     A.   Steele.

9     Q.   S-t-e-e-l?

10    A.   E.

11    Q.   And where does she live?

12    A.   Her address?

13    Q.   You don't have to give me her address.  Just

14 give me her location.  What town or city?

15    A.   Port Washington.

16    Q.   What's your home telephone number, your home

17 telephone?

18    A.   (301) 265-5327.

19    Q.   And where are you presently employed?

20    A.   U.S. Department of the Interior.

21    Q.   What is your present title?

22    A.   Administrative officer.

23    Q.   What is your grade level?

24    A.   GS-11.

25    Q.   Who is your supervisor at the present time?

1      A.   Mary Jane Miller.

2      Q.   Describe for me, if you would, what are your

3  duties at work?

4      A.   Calling employees and reminding them to take

5  mandatory training.

6      Q.   Okay.

7      A.   And have them give me a certificate showing

8  that they took it.  Making, keeping track of whether or

9  not they had their supervisor sign their bank statement,

10 the government bank statement for each month for the

11 year.  Assisting with moves, office moves.  If they need,

12 if the staff needs an office cleaning, they would tell me

13 or they'll call down and have someone come up and clean

14 it.  And that's basically it.

15     Q.   Okay.  What's your step, GS-11 step?

16     A.   10.

17     Q.   And what is your annual salary at the present

18 time?

19     A.   72.

20     Q.   72 and --

21     A.   72.

22     Q.   -- and something?  And does that include

23 locality pay?

24     A.   Yes.

25     Q.   What other positions have you held at the

1    Department of the Interior?

2         A.    Staff assistant, secretary, personnel

3    management specialist.  Just those.

4         Q.    Staff assistant, secretary, personnel

5    management specialist.  Let me ask some questions about

6    your education.  Where did you attend high school?

7         A.    Spingarn High.

8         Q.    Where is that located?

9         A.    24th and Benning Road, Northeast.

10        Q.    Okay.  And when did you graduate?

11        A.    1966.

12        Q.    Did you attend college or take --

13        A.    UDC.

14        Q.    -- any college courses?

15        A.    UDC, University of the District of Columbia.

16        Q.    Okay.

17        A.    At the time was Federal City College.

18        Q.    Federal City College?

19        A.    Yes.

20        Q.    Did you graduate?

21        A.    No.

22        Q.    How long did you attend?

23        A.    I guess a year.

24        Q.    Did you have any field of specialty in that

25    year that you were there?  Did you focus on anything?

15

1      A.    Business management.

2      Q.    But you didn't receive any type of degree?

3      A.    No.

4      Q.    Have you since your year at Federal City

5  College, received any type of degree?

6      A.    No.

7      Q.    Have you since that year of college taken any

8  other type of education?

9      A.    Yes.

10      Q.    What have you done?  What have you had?  Lots

11  of courses, lots of training, lots of seminars, that type

12  of thing?

13      A.    One particular year-long -- the Women's

14  Executive Leadership Program.

15      Q.    Okay.

16      A.    A year-long program.

17      Q.    Where, where was that held?

18      A.    Agriculture, United States Department of

19  Agriculture.

20      Q.    And what year did you attend that?

21      A.    '99, '98 '99.

22      Q.    And how did that work?  Was that something you

23  did full-time or did you do it after work or weekends or

24  how did that work?

25      A.    It was basically full-time.  I would go to the

1    office periodically, but basically it was all training.

2        Q.    Okay.    Something that the Interior worked out

3    with Agriculture that you could go for a year and get

4    this training?

5        A.    Yes.

6        Q.    And did you have to qualify for it or -- sounds

7    like a kind of a nice thing to be able to do.

8        A.    It is.

9        Q.    How were you allowed to do that?

10       A.    I applied for it, and the supervisor, we both

11   had to do a summary on my worth, I'll put it that way, as

12   to whether or not I should be able to enter into this

13   training, and that entailed my writing up a statement and

14   my supervisor writing up a statement.

15       Q.    Who was your supervisor who did this

16   recommendation?

17       A.    I believe it was Jerry Fiely.

18       Q.    Spell his last name for me. Interior

19       A.    F-i-e-l-y.

20       Q.    Okay.    And as a result of that one-year

21   training, did you receive any type of certificate of

22   accomplishment, anything indicating that you had

23   completed this class or anything like that?

24       A.    Yes, I did.

25       Q.    What was that?    Do you remember?    Just

 1  basically a certificate saying you had done it?  Because

 2  I asked you earlier did you receive --

 3      A.    I got a plaque.

 4      Q.    Okay.

 5      A.    I got a star, and I got a certificate.

 6      Q.    You were asked earlier -- maybe my question

 7  wasn't phrased correctly, had you gotten any -- I guess

 8  it's not a degree like a college degree, but it is a

 9  certificate of completing a year-long, you know --

10      A.    Right.

11      Q.    -- executive training course at Department of

12  Agriculture.  So it sounds substantial.  Okay.  Other

13  than the Women's Executive Leadership Program that you

14  attended from '98 to '99, and the one year of college

15  that you had Federal City, Federal City College prior

16  name of UDC, any other education?

17      A.    Yes.

18      Q.    What else?

19      A.    I took Contracting Officers Representation

20  Course.  Completed that, got a certificate.

21      Q.    Contracting Officers Represention Course, you

22  say?

23      A.    Yes.

24      Q.    When did you take that?

25      A.    Probably '01, 2001.

1    Q.    And how long was that course?

2    A.    That was a 40-hour course, I believe.

3    Q.    And did you take that while doing your regular

4    job responsibilities?

5    A.    Yes.

6    Q.    Is that something you did on line or in the

7    evening

8    or --

9    A.    No. I attended the class.

10   Q.    So it was during work hours or?

11   A.    During work hours.

12   Q.    It was something that your job authorized you

13   to do?

14   A.    Yes.

15   Q.    Did you have to apply and be approved for it?

16   A.    Yes.

17   Q.    And who approved you?

18   A.    I'm sorry.  I had so many supervisors.

19   Q.    Okay.

20   A.    I don't recall which person did it, and I'm not

21   recalling now if '01 was the proper date.

22   Q.    Okay.  Was it, was it Kay Keeley (ph.)?

23   A.    Kay Keeley wasn't my supervisor.

24   Q.    Linda Richardson?

25   A.    She was.

1      Q.    Could it have been her?

2      A.    So I -- either her or Jerry Fiely.

3      Q.    ¹Or Jerry Fiely.

4      A.    Uh-huh.

5      Q.    It wouldn't have been Juan Price?

6      A.    Juan was never my supervisor.

7      Q.    How about Daphne Berwald?

8      A.    ·She was never my supervisor.

9      Q.    Okay.  And it wasn't Debbie Clark?

10     A.    No.

11     Q.    So it was either Jerry Fiely who recommended

12  you for the year-long Women's Executive Training Course

13  or Linda Richardson?

14     A.    Right.

15     Q.    Okay.  Other than the Women's Executive

16  Leadership, the Contracting Officers Representation

17  Course and the year at Federal City College, did you

18  receive any other education or training?

19     A.    Yes.

20     Q.    What else?  Is this a long, long list of --

21     A.    Yes, it is.

22     Q.    -- courses that you took?

23     A.    Yes.

24     Q.    In the course of your job.

25     A.    Yes.

1        Q.    That would have been -- were these things

2   required at work or --

3        A.    It was --

4        Q.    -- you did on your own?

5        A.    -- something I asked to have.

6        Q.    And when you asked to have these courses, you

7   had to get approval from the supervisor to do them?

8        A.    Yes.  And I received certificates for all of

9   them.

10       Q.    For all of them.  So you basically would

11  request education from the Department of Interior in the

12  course of your job, got approval, did the training and

13  got your certificates?

14       A.    Correct.

15       Q.    Okay, all right.  Let me ask you some questions

16  about employment other than Department of Interior.  When

17  you start at Interior?

18       A.    1977.

19       Q.    And between 1977 and 30 years later, today, did

20  you work for anyone other than Department of Interior?

21       A.    Yes.

22       Q.    Was this during a period of time that you

23  weren't working for Interior or while also working for

24  Interior?  You look at me like I'm --

25       A.    I need you to back up and tell me the timeframe

1  again.

2      Q.    Okay.  I asked you when you started Interior.

3  You said 1977.

4      A.    Correct.

5      Q.    I know you work at Interior now.  I want to ask

6  you about work you did that was not with the Department

7  of Interior, and my question was -- well, let's just,

8  let's just do it chronologically.  You finished up at UDC

9  in 1966, is that right?

10     A.    No.

11     Q.    I'm sorry.  When did you, when did you --

12     A.    That was in '70s.  '70, '71.

13     Q.    Oh, that's right.  I -- you finished high

14  school in '66.  Tell me where you worked, where you've

15  been employed other than at the Department of Interior

16  beginning with your finishing of high school.

17     A.    The Government Printing Office was my first --

18  well, I  had a summer job at the VA.

19     Q.    You can leave out summer jobs, I guess.

20     A.    Okay.  Government Printing Office, then the

21  General Accounting Office.

22     Q.    Government Printing Office from when to when?

23     A.    '67, 1967 to 1969.

24     Q.    Okay.  What was your job title at GPO?

25     A.    Clerk, I believe.

1    Q.    And you were there for about two years?

2    A.    Yes.

3    Q.    What were your duties there?

4    A.    Clocking cards.

5    Q.    And --

6    A.    For books.

7    Q.    Okay.  And why did you leave?

8    A.    To better myself.

9    Q.    Get a better job?

10   A.    Yes.

11   Q.    Were you ever fired or asked to resign?

12   A.    No.

13   Q.    And do you recall the names of any bosses,

14   supervisors at that job?

15   A.    Willie Taylor.  I don't recall --

16   Q.    Long time ago.  After you worked at Government

17   Printing Office, what was your next job?

18   A.    General Accounting Office.

19   Q.    And what years did you work there?

20   A.    '69 until '77.  No.  Yeah, to '77.

21   Q.    And what was your job title or titles when you

22   were there?

23   A.    Secretary.

24   Q.    You were a secretary the entire time, eight

25   years or so?

1          A.    No.

2          Q.    I'm sorry.

3          A.    I was a secretary, yes.

4          Q.    Okay.

5          A.    I was a secretary.

6          Q.    You were a secretary from '69 to '77.  And

7    duties as secretary were?

8          A.    Typing, filing, answering the telephone.

9          Q.    I asked it because I've known secretaries who

10   practice law for all practical purposes.  Okay.  Who are

11   your supervisors there at GAO?

12         A.    I see her face, but I can't recall her name.  I

13   don't recall.

14         Q.    Just one major supervisor the whole time you

15   were there?

16         A.    No.  Ghar.  I had Mr. Ghar, William Ghar, one

17   other supervisor.

18         Q.    William Ghar?

19         A.    Yeah, G-h-a-r.

20         Q.    G-h-a-r.  And he's the one whose name you

21   recall?

22         A.    Yes.

23         Q.    And you were a secretary.  Now were you

24   secretary to a particular person or people or how did

25   that work?

1      A.   I was the -- I had some employees.  I mean it

2  was the staff, it was a number of staff members.  I'm not

3  sure how many.  It's probably about -- I really couldn't

4  tell you at the time.

5      Q.   Okay.  Now, you left in '77.  Were you fired?

6      A.   No.

7      Q.   Asked to resign?

8      A.   No.

9      Q.   At any point during '69 to '77, when you worked

10 at GAO, were you ever asked to move from one section to

11 another because of negative --

12     A.   No.

13     Q.   -- assessment?  Okay.  When you worked at GAO,

14 what was your grade level when you left in '77?

15     A.   Probably four or five.

16     Q.   And were you located back there right up here

17 on --

18     A.   Yes.

19     Q.   After working at GAO from '69 to '77, what was

20 your next job?

21     A.   National Center for Productivity and Quality of

22 Working Life.

23     Q.   And what were the years you were there?

24     A.   I need to change the '77 year.

25     Q.   Okay.

```
 1      A.   To -- I guess it stays '77.

 2      Q.   Okay.

 3      A.   Yeah.  From 1977 to 1977, I guess.

 4      Q.   Okay.  So you were there for a short period --

 5      A.   Yes.

 6      Q.   -- at GAO.  Okay.  And your -- what was your

 7 title there?

 8      A.   Secretary.

 9      Q.   Supervisor?  Did you have a supervisor there?

10 You recall the name of?

11      A.   Beasley.  Roy Beasley.

12      Q.   And were your duties as secretary at the

13 National Center for Productivity and Quality Working Life

14 the same as they were at GAO?

15      A.   Yes.

16      Q.   Basically.

17      A.   Basically.

18      Q.   After you finished at that organization, what

19 was your next job?

20      A.   Department of Interior.

21      Q.   And you started in Department of Interior what

22 year?

23      A.   1977.

24      Q.   And after starting to work at the Department of

25 Interior in 1977, did you work anywhere else up to the
```

1   present time?

2       A.   Other than the Department, no.

3       Q.   Okay.  So that was an uninterrupted work of 30

4   years at the Department of Interior?

5       A.   Yes.

6       Q.   And when you started at Department of Interior,

7   you gave me the jobs you have had.  What was your first

8   job at Department of Interior in '77?

9       A.   Secretary.

10      Q.   How long were you secretary?

11      A.   Up until 1987.

12      Q.   About 10 years.  And who is your supervisor?

13      A.   In the beginning, it was -- when I was with the

14  Geological Survey.  I don't recall that supervisor's

15  name.

16      Q.   Let me ask you this because I don't think I

17  asked this previously.  First of all, I have to ask

18  certain questions, okay.  I don't mean to imply anything

19  when I ask them, but I have to ask them.  When you left

20  GAO in '77, were you fired?

21      A.   No.

22      Q.   Not asked to leave?

23      A.   No.

24      Q.   Nothing like that.  Okay.  Left on good terms?

25      A.   Correct.

1      Q.    What about the National Center for

2   Productivity and Quality of Working Life?  Did you leave

3   that place on good terms or were you fired?

4      A.    I wasn't fired, but I didn't leave on good

5   terms.

6      Q.    What happened?  Why did you leave?

7      A.    Well, again, my color wasn't correct.  I was

8   hired by a black supervisor, and the black supervisor

9   wasn't there when the supervisor hired me -- white

10  supervisor is the higher of the group.  George was his

11  name.  I forgot -- the white supervisor's name was

12  George.  Roy Beasley hired me, and he told me my

13  qualifications were the best qualifications in the whole

14  area that we were working.  Then when the white

15  supervisor came, Mr. Beasley -- none of my work was good

16  there, and George, Mr. Beasley told me that George was so

17  mad that he kicked a hole in one of the offices walls to

18  see me there.  Everyone there was light skin and/or

19  white.  Mr. Beasley, he was black, okay.  And he actually

20  showed me the hole in the wall that he actually -- that

21  George kicked.  Then of course my work wasn't any good,

22  so I asked to give -- be given time to look for another

23  job.  And then I -- they transferred me out of Roy's

24  office and put me up in the front office.  I wrote a

25  letter to George.  I can't think of his last name.  And

1    told him how Roy had said my qualifications were the

2    best in the, in the office, and now he's saying that, you

3    know, my work is not any good.  Anything I did wasn't any

4    good any more.  And I told him that he told George too

5    that Roy also stated that he was mad because I was there

6    and because of my color; that he kicked a hole in the

7    wall.  He even showed me the hole in the wall.  And I

8    gave it to him.  And so Roy came up into the front

9    office, and he start -- I was sitting up there working,

10   and he came ranting and raving and saying you'd better

11   take this back.  So I asked for a transfer out of there,

12   and so they let me have administrative leave to find

13   another job, and I got it.

14       Q.   And did you withdraw your letter?

15       A.   No.

16       Q.   National Center for Productivity and Quality of

17   Working Life, what is that?

18       A.   That was like a private agency, excepted

19   service, and they can let you go if they didn't like your

20   hair.

21       Q.   Was it government-affiliated?

22       A.   It's government-affiliated, yes.

23       Q.   So you were paid there on the GS scale?

24       A.   Yes.

25       Q.   And you were there for how long?

1       A.    Oh, less than a year.

2       Q.    And did you receive -- you said that, you know,

3   George said your work wasn't any good.  Did he put it in

4   the form of an evaluation?

5       A.    No.

6       Q.    And then during that period of time of

7   administrative leave, how long were you on administrative

8   leave?

9       A.    Until I found the Geological Survey position, in

10  '77 as well.

11      Q.    Okay.  So was it a month --

12      A.    A short, yeah, few months.

13      Q.    And that's where you found the job that you're

14  in?

15      A.    Correct.

16      Q.    All right, Interior, you started as a secretary

17  there.  You were there until '87.  And who were your

18  supervisors when you were a secretary until '87?

19      A.    I don't recall Geological Survey.  Richard

20  Steele and Arthur Love, those two.

21      Q.    For that entire period, that 10-year period?

22      A.    No.  As secretary.  Yes.

23      Q.    As secretary?

24      A.    Yes.

25      Q.    I understand you were a secretary from '77 to

```
 1   '87.  I'm scaling over your, your supervisors.  And what

 2   were your duties?

 3        A.   Basically running the office.

 4        Q.   Why did you stop being a secretary in '87?

 5        A.   I had filed an AE, a discrimination suit and in

 6   '87 there was a settlement agreement, and I was

 7   transferred to another office to become an administrative

 8   assistant in 1987.

 9        Q.   Okay.  So you were transferred in '87 pursuant

10   to a settlement.

11        A.   Correct.

12        Q.   Was that case ever filed in court?

13        A.   Yes.

14        Q.   So it went to the EEO level and then it went to

15   court?

16        A.   Correct.

17        Q.   What court was it filed in?

18        A.   The District.

19        Q.   District Court.

20        A.   District Court.

21        Q.   And at what point was it settled?

22        A.   Day before we were to appear before the judge.

23        Q.   The day before.  Was it the day before trial or

24   the day before -- you know there was a hearing scheduled

25   -- something scheduled in front of the judge the next
```

1  day?

2      A.   Yes.   It was scheduled for a judge the next

3  day.

4      Q.   And what were the terms of the settlement?

5      A.   That I'm a nine right away.

6      Q.   A GS-9?

7      A.   Yes.

8      Q.   And what had you been?

9      A.   I was a seven for the secretaries -- top of the

10  secretaries.

11      Q.   Okay.

12      A.   I had to file within, within a case.  So I had

13  two cases going simultaneously in between the 1980 case.

14  After the 1980 case was filed, then I had to file another

15  one, because I was a secretary working for a director at

16  a GS-7, and all of the directors' secretaries were GS-9.

17  I was the only African-American at the time working for a

18  director.  So they were 9's and I was a 7.  So I had to

19  file for that.  I got an eight out of that.  And then a

20  week later, my settlement came through so they gave me

21  the nine.  And a year later I got the 11.

22      Q.   Okay.  Okay.  When did you get the, the nine?

23  In 1987?

24      A.   Right.

25      Q.   Okay.  And then the 11 you got in 1988?

1     A.   Correct.

2     Q.   And one of the cases that you filed was because

3  you were the only GS-7 working for a director and

4  everybody else was a nine, correct?

5     A.   Correct.

6     Q.   And you were the only African-American?

7     A.   Correct.

8     Q.   And, and what was the other case that you

9  filed?  You said there was a second case right in that

10  time period.

11     A.   The first one?

12     Q.   The first case.  Yeah, what was the first case?

13     A.   -- I was doing administrative office's work,

14  and I was not -- and the person that had the title was

15  fraternizing with the supervisor, and she was getting

16  promoted while I was doing her work.  So that's why I --

17     Q.   Person being promoted was fraternizing.  What

18  do you mean by fraternizing?

19     A.   Well, they ended up getting married.

20     Q.   And what was the basis of your claim?  Wasn't a

21  race claim, was it?

22     A.   It was all of it?

23     Q.   What -- I mean your, your complaint was that

24  the boss preferred somebody over you.

25     A.   Promotions basically.  I wanted a promotion.

1     Q.    Okay.  You wanted a promotion.  But what was

2   your allegation as to why you weren't getting a

3   promotion?  Because the boss was fraternizing with the

4   person who was getting the promotions?

5     A.    The basis of my wanting the promotion is

6   because I'm doing the work.

7     Q.    Okay.

8     A.    And she's getting promoted.

9     Q.    Okay.

10     A.    And I felt that I should be promoted as well.

11     Q.    Okay.  And my question again is, as I was

12   trying to understand, was it a discrimination type case

13   or was it

14   a --

15     A.    Discrimination.

16     Q.    It was a discrimination?

17     A.    Yes.

18     Q.    So, so your allegation was that the reason this

19   was happening was because you are black?

20     A.    Exactly.

21     Q.    Okay.  It wasn't because he was having a

22   relationship with this woman?

23     A.    It's a combination of everything.

24     Q.    All right.  And, and just so I'm -- I'm a

25   little confused in terms of these two claims.  But the

1    claim in which you were alleging that you were the only

2    African-American who was a seven, that was the second

3    claim.   The first claim was the claim that there was

4    another person who was getting promoted who was

5    fraternizing with the boss while you were doing the work,

6    is that right?

7         A.    Yes.

8         Q.    Okay.

9         A.    Richard Steele was the first person -- was the

10   first claim.   The second claim Richard Steele left, and I

11   was secretary to Arthur Love, and he had -- it was prior

12   to that it was other supervisors, but Love was the, the

13   main person.   And while I was working under Richard

14   Steele, I was doing administrative work.   When Richard

15   left, I had filed prior to Richard leaving.

16        Q.    And filed because he was fraternizing and --

17        A.    No.   I filed because I wasn't getting promoted.

18        Q.    All right.

19        A.    I'm doing the work and I'm not getting

20   promoted.

21        Q.    And that's, that's when the nine, everybody

22   else had a nine but you?

23        A.    No.

24        Q.    Okay.

25        A.    Then -- this young lady that was dating the

1  supervisor.

2       Q.    And who is the supervisor?

3       A.    Richard Steele.

4       Q.    Okay.

5       A.    The young lady that was dating the supervisor,

6  her title was administrative officer, and I was doing

7  that administrative work.  When Richard Steele left,

8  Arthur Love came in, and they put me doing secretarial

9  work again.  Now, all directors at the time, they had GS-

10 9 secretaries, and I'm a seven because I haven't been

11 promoted from secretarial position I was officially under

12 Richard Steele.  So since I'm back doing secretarial work

13 I, you know, said, okay, I need a higher grade, and I

14 didn't get it.  So I swore desk audits and --

15      Q.    And then it was a result of these two claims,

16 kind of a combination that resulted in you getting an 11?

17      A.    Correct.

18      Q.    And that occurred when?  '87?

19      A.    '88 is when I got the 11.

20      Q.    Settlement agreement was in '87?

21      A.    I got the eight, the 11 in '88.

22      Q.    Okay.

23      A.    About a year later.

24      Q.    Okay.  So '87 resulted in what?  There were two

25 settlement agreements, is that correct?

1        A.    No.   There's one settlement agreement.

2        Q.    Okay.   You told me earlier there was a

3   settlement agreement in 1987.   Is that not right?

4        A.    That was the main settlement agreement.

5        Q.    Okay.

6        A.    Yes.

7        Q.    Okay, and that was for -- and that resulted in

8   what?

9        A.    That resulted in me becoming a 9 and an 11.

10       Q.    Okay.   And what happened in '88?

11       A.    That's when I got the 11.   That was part of the

12  settlement agreement.

13       Q.    Okay.   So just to be totally clear.   There was

14  a settlement agreement in 1987, right?

15       A.    Right.

16       Q.    You got a nine as a result of that?

17       A.    Exactly.

18       Q.    And then in '88 you got an 11?

19       A.    Correct.

20       Q.    Okay.   And that was as a result of the same

21  settlement agreement?

22       A.    Correct.

23       Q.    The settlement agreement said by its terms

24  you're going to get a 9 in '87 and an 11 in '88?

25       A.    Correct.

1          Q.    Okay.  And this was based on the allegations

2   that you told me about, about the fraternizing with the,

3   the woman that he ended up marrying and with the Love

4   coming onboard and giving you secretarial work after you

5   had been doing administrative work?

6          A.    Exactly.

7          Q.    Okay.

8          A.    Well, Love's part is not part of Steele's part.

9   It's two separate.  The other one I just did aquition

10  [sic] of duties.  Not aquition [sic] of duties.  I did

11  the desk audit, and they came and said, yes, it was

12  higher grade.  But before, and then they came, and so I

13  got a higher grade then.  I never got the nine as a

14  secretary.  I got the nine as an administrative

15  assistant.

16         Q.    Okay.  And these claims were wrapped up in the

17  case of a settlement prior to going to District Court?

18         A.    Correct.

19         Q.    Okay.  And it settled the day before?

20         A.    Correct.

21         Q.    Before something happened in court?  Okay.

22  That's totally resolved.  Okay.  All right.  What was

23  your title the first -- what was your title as a GS-9?

24         A.    Administrative assistant.

25         Q.    And what was your title as a GS-11?

1        A.   Administrative assistant.

2        Q.   Okay.

3        A.   I'm sorry.  I'm sorry.  It's not assistant.

4   Administrative specialist.  It was created for me.

5        Q.   And you began working as an administrative

6   specialist in 1988?

7        A.   Correct.  '87.

8        Q.   '87.  Okay.  I thought you told me that the GS-

9   11 came in '88?

10       A.   Correct.

11       Q.   Okay.  But you were an administrative

12  specialist as a nine and then came up an 11 in '88?

13       A.   Correct.

14       Q.   Got it.  So administrative specialist

15  assistant.

16  So --

17       A.   No.  Administrative --

18       Q.   No.  That was wrong.  Okay.  So administrative

19  specialist went from a 9 to an 11.

20       A.   Correct.

21       Q.   All right, and your supervisor -- when did

22  Steele leave?

23       A.   I don't recall.

24       Q.   But Love, was Love your supervisor at the time

25  of the settlement?

1        A.    I believe so, yes.

2        Q.    And who was your supervisor at the time you

3    became the administrative specialist?

4        A.    Nancy Davis.

5        Q.    And she was the next supervisor you had after

6    Love?

7        A.    Correct.

8        Q.    And what were your duties as administrative

9    secretary?

10        A.    I did the budget.  I assisted individuals.  I

11    did personnel space, office spacing.  Telecommunications.

12    Liaison between these individuals and the Department.

13    Department is in the offices -- now.  Like I said,

14    telecommunications, offices space, budget, facilities.

15        Q.    Okay.  And --

16        A.    Et cetera.

17        Q.    All right.  And the supervisor there was?

18        A.    Nancy Davis.

19        Q.    Nancy Davis.  And how long were you

20    administrative specialist, GS-11?  From '88 until when?

21        A.    Until 1995.  Yeah, 1995.

22        Q.    Okay.  How long was Nancy Davis your

23    supervisor?

24        A.    For a year.

25        Q.    Until when?

1       A.    1988.

2       Q.    Until '88.   Okay.   And then your next

3    supervisor was?  Was it Albert Camacho?

4       A.    No.   That was before.

5       Q.    It was?  Okay.  That's not what I have.

6       A.    I --

7       Q.    I have he was your supervisor at the time you

8    got the promotion to the GS-11 on December 4, 1988.  Is

9    that wrong?

10      A.    Yes.

11      Q.    It is wrong?

12      A.    1994, 1991, if you go back to 1991, I was --

13   that was Camacho, and Camacho was over Richard Steele and

14   Love.  And I was with Steele in '77, '77, '78.  Yeah.

15      Q.    If I may again, I'll just --

16      A.    Camacho is the head person over Richard Steele

17   and over Arthur Love.

18      Q.    Okay.  I mean I believe, what I got out of your

19   thing, this -- I mean if you go over this, I think

20   Camacho was our supervisor pretty much from '88 until

21   about half-way through '91.  Is that not true?

22      A.    If he was over Nancy, I don't think he was over

23   Nancy, but he was -- he's the top person, Camacho was.

24   So the chain, yes.

25      Q.    Ultimately he would have been.

1          A.    He would have been, yes.  Ultimately he is my

2    -- he was my supervisor.

3          Q.    All right.  Okay.  So administrative

4    specialist, GS-11, Nancy Davis in '88.  And then what was

5    your next -- and you did that job through 1995.

6          A.    Nancy -- Hayman, Phil Hayman was my supervisor

7    after Nancy Davis.

8          Q.    Who, who -- was the person's name?

9          A.    Phil Hayman, Phillip Hayman.

10         Q.    Phil Hayman.  When was Hayman your supervisor?

11         A.    After Nancy Davis.  I was split from -- the

12   office split, and I was training to be on the same level

13   as Nancy Davis to take over serving Phil Hayman's office.

14         Q.    All right.  And when was that?  When did you

15   work for Hayman?

16         A.    1988 until A76 out -- A76 contracting, to '90,

17   1990, I believe.

18         Q.    And after that, you did a detail?

19         A.    Yes.  I had a few details.

20         Q.    CFC campaign?

21         A.    Correct.

22         Q.    And who was your supervisor there?

23         A.    My supervisor, that one was the Secretary of

24   the Interior, Manual Lujan.

25         Q.    And you were there for how long?

1      A.    About a year, about a year myself, was longer

2   than a year I think.

3      Q.    And then you did a term detail at the Office of

4   Administrative Services, is that right?  February 1,

5   1991.

6      A.    Yes.  Okay.  That was when I was -- after I

7   left the CFC, I was sent to the Executive Secretariat

8   Office for a few months or a month, and then I went down

9   to National -- it's called National Center for --

10  Business Center now.  But it probably was the Service

11  Center, the Administrative Service Center then.  And I

12  worked in graphics, yes.

13     Q.    That wasn't until '95?

14     A.    No.

15     Q.    Oh, really?

16     A.    No.  1991, I was working, that's when I became

17  under Vick Trillings and Camacho was the supervisor over

18  Vick, and then Pat Rogers was my supervisor at that time.

19     Q.    Pat Rogers was the supervisor --

20     A.    Right.

21     Q.    -- when you were doing the visual communication

22  services?

23     A.    Exactly.

24     Q.    Okay.  And that was a detail.  That wasn't

25  until '95?

1        A.    No.    That was in '91, when I came back from --

2    when I came back from the CFC, I went to exec sec for

3    about a week or a month and then I was sent down to Pat

4    Rogers office to work there as an administrative person,

5    administrative, administrative specialist.    Then, from

6    there, I went to -- I was on detail while working in

7    Pat's office to a couple of places, and that was Sandra

8    McCrary and Robert Fafel.

9        Q.    When was this?

10       A.    It was during a period from 1990 -- from 19 --

11   in '95 I was, I was finishing up with Robert Fafel, and

12   Sandra McCrary, I worked with her for a year and a half

13   on detail over there.    Pat Rogers was '91.    So from '91

14   to '95, I was officially under Pat Rogers and Camacho and

15   Vick Trillings.

16       Q.    At that point you were an administrative

17   specialist --

18       A.    Right.

19       Q.    -- Office of Administrative Services.

20       A.    Correct.

21       Q.    The Division of Printing and Publications?

22       A.    Correct.

23       Q.    And then after that went on the detail to

24   Visual Communications Services.

25       A.    Not after that.

1        Q.    You went prior to that?

2        A.    No, no, no.  All of that is the --

3        Q.    It's all the same --

4        A.    -- same --

5        Q.    -- thing?

6        A.    Yes.

7        Q.    So, so the Printing and Publications --

8        A.    Is the --

9        Q.    -- is the same as Visual Communications

10   Services?  It's all --

11       A.    Right.  It's one group of people have annexed

12   graphics side.

13       Q.    All right.  And, and at this point, we're up to

14   '95, right?

15       A.    Right.

16       Q.    Okay.  Now in these positions that you held

17   post the settlement of 1987 until 1995, were you ever

18   fired from a position or reassigned, any bad terms or

19   anything like that?

20       A.    I was RIF'd.

21       Q.    You were RIF'd.  Okay.

22       A.    The only one RIF'd.

23       Q.    Okay.  And that took place?

24       A.    In '95.

25       Q.    So '95, you were RIF'd.

1      A.   From the Graphics Office.

2      Q.   RIF'd from the Graphics Office and assigned to

3  work in the Office of the Secretary of the Interior?

4      A.   Correct.

5      Q.   Okay.  You just told me that, okay.  And you

6  were there for how long?  About a month?

7      A.   Yes.

8      Q.   And then you were assigned to work where?

9      A.   With Linda Richardson.

10     Q.   In the Office of Audit Evaluation?

11     A.   Correct.

12     Q.   All right.  What did you do for Linda

13  Richardson?  What was your job title?  Administrative

14  specialist?

15     A.   My title changed.

16     Q.   Okay.

17     A.   And when I was RIF'd up to go to work with the

18  fourth largest person in the department.

19     Q.   Okay.  Who is?

20     A.   My title --

21     Q.   Who is?

22     A.   B.J. Thornberry.  My title then was staff

23  assistant -- staff, staff assistant.  And then I was

24  transferred from her office to Linda Richardson's office

25  and became administrative officer.

1    Q.    So you worked for -- how long did you work for

2    B.J. Thornberry?

3    A.    About a month.

4    Q.    Okay.  And then for Linda Richardson, and your

5    title changed to -- back to administrative specialist?

6    A.    Officer.

7    Q.    Officer.  What were your duties there?

8    A.    Budget, handling space allocation,

9    telecommunications.  You -- it was vast.  Anything and

10    everything that an administrative officer did, I

11    performed the duties.

12    Q.    Okay.  And how long did you work for Linda

13    Richardson?

14    A.    Linda retired.

15    Q.    2002?

16    A.    2001.  Or -- 2000 or 2001.

17    Q.    I have it as 2002.

18    A.    Well, okay.

19    Q.    All right, whatever.  Okay.  So you worked for

20    Richardson from approximately '95 until '02?

21    A.    Right.  Jerry Fiely -- Linda left before '02, I

22    think.  I think she did.  But anyways, because '01 we

23    ended up moving  Audit and Evaluation up to G Street.  So

24    then Jerry was there.  So she left in '01 or 2000 or

25    2001, she left.

 1        Q.   All right.  All right.  During that time that

 2   you worked for Richardson, that you say was '95 until

 3   about 2001, you changed positions, didn't you, during

 4   that time period?

 5        A.   No.

 6        Q.   So -- well, you mentioned the short period that

 7   you were called staff assistant, correct?

 8        A.   Yes.

 9        Q.   Okay.  Then you became -- back to

10   administrative officer or you became administrative

11   officer.

12        A.   Exactly.

13        Q.   And that was the position the whole time?

14        A.   Exactly.

15        Q.   All right.  What was your next position after

16   the administrative officer?

17        A.   I'm still an administrative officer.

18        Q.   Okay.  Did you after Linda Richardson retired,

19   who did you work for?

20        A.   For Jerry Fiely.

21        Q.   And how long did you work for him?

22        A.   Well, Jerry was Linda's deputy for a portion,

23   period of time.  I don't know when he came onboard, but

24   in 2000, parts of 2000, I worked with Jerry.  2001 -- I

25   don't know when Linda left, to be honest with you.

```
 1        Q.   Let's just say, let's just say, let's just

 2   operate under --

 3        A.   Yeah.

 4        Q.   -- the assumption that she left in September

 5   '02, okay.

 6        A.   I can't.

 7        Q.   You can't because you don't think that's right?

 8        A.   I know that's not right because in '02, I'm

 9   working with McDivitt and Jerry Fiely.

10        Q.   Okay.

11        A.   And -- in '02 we sent them up to 1800 G Street.

12   So and Linda wasn't there.  So when did Linda leave?  Oh,

13   Linda went up to the Assistant Secretary's Office to

14   work.

15        Q.   Okay.

16        A.   I mean, yeah, the Assistant Secretary's Office

17   to work.  They really had her doing a lot of that work.

18   So that's why Jerry was there overlapping the period of

19   time before she retired probably.

20        Q.   I just want to get this chronology right in

21   terms of your job.

22        A.   Uh-huh.

23        Q.   So, so you worked for, for Linda, then switched

24   to work for Fiely?

25        A.   Correct.
```

1       Q.    Okay.  And same job --

2       A.    Correct.

3       Q.    -- same title --

4       A.    Correct.

5       Q.    -- and then who was your next supervisor after

6    Fiely?

7       A.    McDivitt, James McDivitt.

8       Q.    Okay.  And approximately when was that?  2004?

9       A.    2001.

10      Q.    2001.  Okay.  And again we're talking about the

11   same title, the same job?

12      A.    Correct.

13      Q.    And how long did you work for McDivitt?

14      A.    Until he retired, oh, gosh.

15      Q.    June of '03?

16      A.    Yes.  June or July.

17      Q.    And then who did you work for after that?

18      A.    Woodrow Hopper.

19      Q.    Okay.  And how long did you work for Harper --

20   Hopper, rather?

21      A.    A short period of time.  '03, '03.

22      Q.    Okay.  And then after Hopper, for who?

23      A.    Debbie Clark.

24      Q.    And Debbie Clark from when until when?

25      A.    Debbie until officially because -- okay,

1  officially until '06, January of '06.

2      Q.    Why did you emphasize the word officially?

3      A.    Because Debbie was -- Debbie is -- Debbie,

4  Debbie assistant -- she's the Deputy Assistant Secretary

5  for Indian Affairs.  I worked directly with -- Mr. Hopper

6  put me under Debbie because he didn't want me to work

7  with him.  Debbie ended up putting me under Diane Murth

8  in the position I was to hold.

9      Q.    And then Diane Murth you began working for

10  when?

11      A.    In '03.

12      Q.    And worked for her for how long?

13      A.    Until '04.

14      Q.    And then who did you work for?

15      A.    Debbie, Debbie again, and then it went back to

16  Beth Journova (ph.) and then Sally Hampton.

17      Q.    And when did -- when was Beth Journova?

18      A.    She was only there for a short period of time.

19      Q.    What year?

20      A.    In '04 to -- '04, I guess.

21      Q.    And then?

22      A.    And then Sally Hampton from '04 up until '05, I

23  would -- '05.

24      Q.    And then Sally Hampton, after Sally Hampton?

25      A.    Mary Jane Miller.

1      Q.   Okay.

2      A.   Then it went back to Debbie.

3      Q.   After, after Miller?  No.

4      A.   No.  After Sally Hampton.

5      Q.   After Sally Hampton.  Then, then Miller.

6      A.   Then Miller.  But I was detailed to Miller in

7 between while I was working with Sally, and by Debbie.

8 Debbie was, Debbie was -- I don't know what she was.

9      Q.   And Mary Jane Miller until when?

10     A.   The detail?

11     Q.   Yeah.

12     A.   I was detailed November.  I was detailed to the

13 Office of Budget Management who was Dick Christensen at

14 the time.  He was acting.  And then Mary Jane Miller took

15 Dick's place.

16     Q.   Okay.

17     A.   Until '05.  Until March of '05.

18     Q.   Okay.

19     A.   That was the end of the detail.  So I went --

20 that was it.

21     Q.   And then after the detail in '05, where did you

22 go?

23     A.   To Robert Middleton.

24     Q.   Miliden?

25     A.   Middleton.

1  Q. Middleton. Okay. You were with him from when

2 to when?

3  A. I was with him from March until -- March,

4 around March 5th until April 27th or something like that.

5  Q. Of?

6  A. '05.

7  Q. '05. And then after that, who did you work

8 for?

9  A. Sally Hampton, Debbie Clark again.

10  Q. Okay. And that was until when?

11  A. Up until January the 22nd of '06.

12  Q. And then after that, who did you work for?

13  A. I'm still there. I'm still there.

14  Q. You're still there.

15  A. With Mary Jane Miller.

16  Q. In answer to one of your interrogatories, you

17 said you've been a party to a lawsuit, is that correct?

18 That's the one case we talked about earlier.

19  A. Yes.

20  Q. Okay. And that's the one that was settled just

21 prior to going to court in 1987.

22  A. Right.

23  Q. Prior to this case, have you ever filed a claim

24 of discrimination with any other agency or private

25 employer?

1    A.    Yes.    Prior to this case?

2    Q.    Prior to this case and not including the case

3  that we've already talked about that you settled against

4  Interior.

5  Prior to this case.    And again we've already discussed

6  the case that is pending presently in the EEO.    Other

7  than those we've already discussed, have you ever filed a

8  claim of discrimination with any other agency or private

9  employer?

10    A.    Yes.

11    Q.    Okay.    Who?

12    A.    General Accounting Office.

13    Q.    When did you do that?

14    A.    In '70 something.    1970 something.

15    Q.    Some point in the '70s.    You don't know whether

16  it was close -- you started -- you were there from '69 to

17  '77.    Do you remember was it early, late, middle?

18    A.    Probably latter part.

19    Q.    And what was the nature of your claim?    Where

20  did you, where did you file it?    Did you file it in

21  court?

22    A.    EEO.

23    Q.    Did it ever get to court?

24    A.    No.

25    Q.    What did you allege in that case?

1       A.    I was doing administrative work, and I was not

2  -- I wasn't -- I got a low rating on a different form

3  than the form I should have been rated on.  So it was

4  settled that I got a different -- I got the best rating

5  on the form I was working on administrative work.  On the

6  secretarial form, I would have got a lower rating, but on

7  the administrative form, I got a higher rating.  So I got

8  a decent rating, that's what I got.

9       Q.    Okay.  So basically your rating changed.  Did

10  you get any other result from that claim other than the

11  rating change?

12  Cash, promotion, anything like that?

13      A.    I don't think so.

14      Q.    Okay, all right.  Other than that claim at GAO

15  at some point in the '70s, have you filed any other claim

16  of discrimination?

17      A.    No.

18      Q.    Have you ever filed any actions with the MSPB?

19      A.    No.

20      Q.    Showing you what I marked as Deposition Exhibit

21  1.

22                              (Whereupon, the document

23                              referred to as Deposition 1

24                              was marked for

25  identification.)

```
 1                 BY MR. SHOAIBI:

 2         Q.    Can you take a look at that document and tell

 3    me if you know what it is?

 4         A.    It's an action.

 5         Q.    Okay.   Is that the complaint that you filed in

 6    this case?

 7         A.    Yes.

 8         Q.    Why don't you go ahead and go through the

 9    document.   Have you seen this before?

10         A.    Yes.

11         Q.    And just to be, you know, clear, does this

12    contain the allegations of discrimination that you're

13    making in this case against the U.S. Department of

14    Interior?

15         A.    Yes.

16         Q.    And did you contact an EEO counselor concerning

17    these allegations on March 26, 2003?

18         A.    Yes.

19         Q.    And that was the first time you contacted an

20    EEO counselor concerning the allegations in that

21    complaint?

22         A.    I doubt it.

23         Q.    Why do you say you doubt it?

24         A.    Because the counselor, it took awhile before

25    the counselor came.   I contacted someone else, and actual
```

```
 1  counselor came much later.  But I contacted another

 2  counselor, who referred me to another counselor and

 3  another counselor, so.

 4      Q.   So there were counselors that you spoke with

 5  after March 26, 2003?

 6      A.   Before.

 7      Q.   Before.  Okay.  Well, explain that to me or

 8  tell me -- March 26, 2003, you spoke with an EEO

 9  counselor about this case, correct?  You contacted a

10  counselor.  How did you make that contact?

11      A.   I went to the EEO Office.

12      Q.   Okay.

13      A.   And told them what I wanted.

14      Q.   Uh-huh.

15      A.   And I got a list of counselors.

16      Q.   When did you go to the EEO Office and tell them

17  that's what you wanted?

18      A.   I don't recall what date that was.

19      Q.   Okay.  What did you tell them exactly?

20      A.   That I'm being discriminated against or

21  retaliated against again.

22      Q.   Okay.  Where was the EEO Office that you went

23  to?

24      A.   In the Department.

25      Q.   Did you specify exactly -- you made a number of
```

1    allegations of discrimination in the past.  Did you tell

2    them exactly what allegations you were making at the time

3    that you went?

4        A.    To the counselor?

5        Q.    Yes.

6        A.    I told her everything.

7        Q.    Okay.  And that was -- again, I'm just trying

8    to clear this up -- on March 26, 2003?

9        A.    I guess so, yes.

10       Q.    Take a look at Paragraph 18.

11       A.    What page?

12       Q.    -- five.

13       A.    Sorry.

14       Q.    All right, I just want to clarify this.  We've

15   talked about it generally.  But when exactly -- read that

16   paragraph.

17       A.    Aloud?

18       Q.    No, you read --

19       A.    Okay.

20       Q.    When did you work for Mr. Camacho with respect

21   to Paragraph 18?

22       A.    Again, Mr. Camacho was the head person over all

23   of us.  He was like the director over all of us.  So it

24   was, it was 1987.  It was prior to that.  You said when I

25   worked with him.

1    Q.    I'm asking you -- just to be really clear

2  here.

3    A.    During this period of time --

4    Q.    Paragraph 18.  I'll read it.  Okay.  It says

5  when plaintiff began working for Mr. Camacho, Director of

6  Acquisition and Property Management, she requested a

7  promotion to the GS-12 level because she was performing

8  the same duties as Ms. Davis, a similarly-situated

9  employee outside the plaintiff's protected class was

10  performing for her supervisor.  My question is, here you

11  state when plaintiff began working for Camacho, she

12  requested a promotion.  When did you begin working for

13  Camacho in relation to this paragraph?

14    A.    In '87.

15    Q.    Okay.  When in '87?

16    A.    The date of the settlement agreement, 1987.

17    Q.    That was the time that you requested a

18  promotion?

19    A.    During this period of time when I was switched

20  from Nancy to Philip Hayman, I asked for a promotion.

21  Philip Hayman -- Camacho at this time was Hayman's boss

22  too.

23    Q.    Okay.

24    A.    So during that period of time, 1988 to --

25  because of the fact that I was being switched, Nancy was

 1  a 12.

 2      Q.    Okay.

 3      A.    And I was trained to be equal to her.  So when

 4  I was switched from Nancy then went to Philip Hayman, I

 5  wanted to be promoted.

 6      Q.    Does your initial contact with the EEO

 7  counselor mention Mr. Camacho?

 8      A.    No.

 9      Q.    Okay.  And does your formal complaint mention

10  Mr. Camacho?  It's not your question.  I'm just trying to

11  understand the complaint.

12      A.    Well, the thing is or the question is -- can

13  you rephrase it?

14      Q.    Let me rephrase it.  Does your, does your --

15  did your initial complaint with the EEO counselor -- you

16  already answered that.  Does your -- did your informal

17  complaint, your informal complaint mention Mr. Camacho?

18      A.    Probably not.

19      Q.    And did your formal complaint, did your formal

20  complaint mention Mr. Camacho?

21      A.    Yes, because it go all the way back to --

22  during the settlement, '88 and '89.

23      Q.    Oh.  So you did mention Mr. Camacho in the

24  formal complaint?

25      A.    Most likely.

1    Q.   Okay, but you're not sure of that?

2    A.   No.   I'm almost positive for this --

3    Q.   Okay.   We're not talking about that.   We're

4  talking about your EEO complaint.

5    A.   Which EEO complaint?

6    Q.   The EEO complaint that forms the basis for the

7  claims in this case.

8    A.   The one we're here today for?

9    Q.   Exactly.

10   A.   Then no.

11   Q.   Let me ask you -- with respect to Paragraph 20,

12  it says in or about 1990 plaintiff was assigned to

13  Graphics Office.   When she asked for promotion she was

14  again told because she was in a division she could not be

15  promoted.   When did you work in Graphics Office?

16   A.   1990.

17   Q.   And you left that office in 1995?

18   A.   Yes.

19   Q.   And who did you ask for promotion in the

20  Graphics Office?

21   A.   That was Pat Rogers and Vick Trillings and

22  Camacho.

23   Q.   You asked all three of them for a promotion?

24   A.   Yes.

25   Q.   And when did you ask that promotion?

1      A.    During that period of time from 1990 to 1995

2    within that timeframe.   I don't know the exact date.

3      Q.    So you can't tell me when during that period

4    you asked for promotion?

5      A.    Not the exact date, no.

6      Q.    I don't want the exact date.   We're talking

7    about a five to six-year period.   Can you tell me when

8    during that period you asked -- you mentioned three

9    different people.   You asked all three of them for the

10   same promotion?   Were they all together at once?   Did you

11   ask them individually?

12     A.    I asked Pat Rogers.   Vick Trillings was Pat's

13   boss.   She was to approach him, and never got back with

14   me, so I asked Camacho.

15     Q.    And, and again, you don't remember when that

16   was during that period of time?

17     A.    No, I don't.

18     Q.    But this happened, this, this -- what you just

19   described to me happened in a very short period of time

20   over the course of how long?   A week?

21     A.    No.

22     Q.    How long?

23     A.    In the course of the five years I was there

24   with them.

25     Q.    Okay.

1          A.    I asked them more than once.

2          Q.    Was it -- is there anything you can refer to,

3     to tell me when you asked for promotion in the Graphics

4     Office the first time?

5          A.    I can refer to the duties I was doing, the

6     reason why I was asking for the promotion.

7          Q.    But right now as I understand your answer you

8     asked -- you've already answered who you asked, and in

9     terms of the time, you don't know when it was.

10         A.    No, not specifically.

11         Q.    Okay.  All right.  You allege in the complaint

12    that between 1989 and 2005, you were denied a promotion

13    while other similarly-situated employees who worked for

14    the ASO were graded -- were at a higher grade level, is

15    that correct?

16         A.    That's correct.

17         Q.    Please name these individuals.

18         A.    Pat Watkins.  I don't know all their names.

19    Pat is one of them I know.  They worked with different

20    offices within Interior.  My position as administrative

21    officer --

22         Q.    I'll tell you what, we could be here for days.

23    Just answer the questions I ask.  So what I want you to

24    do is --

25         A.    Pat Watkins.

1      Q.    -- you made an allegation.  Give me the names.

2      A.    Pat Watkins is the only one I know right now.

3      Q.    So the only individual that you can tell me now

4  in your deposition that was denied a promotion -- that,

5  that was at a higher grade level than you and was

6  similarly situated while you were denied a promotion from

7  the years '89 to 2005 is Pat Watkins.

8      A.    Pat Watkins and other individuals within the

9  Department that had the same duties I had.  I don't know

10  their names, but they were there.

11          MR. WEISBROT:  Would you like to take a break

12  now?  It's almost 12?

13          MR. SHOAIBI:  Well, we -- I thought this was

14  going to take longer than it is, this particular inquiry,

15  but if that's the only person you name, that's it.

16          BY MR. SHOAIBI:

17      Q.    When did this person receive a promotion and

18  you did not, Pat Watkins?  When did Ms. Pat Watkins

19  receive a promotion you did not?

20      A.    That I could not tell you.

21      Q.    Do you know what division or section Pat

22  Watkins worked in at the time she received the promotion

23  and you did not?

24      A.    She worked at Water and Science.

25      Q.    Water and Science.  Okay.  And did you contact

1    an EEO counselor about this promotion that you did not

2    get and somebody else got, Ms. Watkins got?

3        A.    No.

4        Q.    Did you file a complaint with the Agency

5    concerning this promotion that you were denied while a

6    similarly-situated individual you've named Ms. Watkins

7    did get one?

8        A.    Yes.    I mentioned them.    Not just Ms. Watkins.

9        Q.    Okay.    So you contacted an EEO counselor about

10   Ms. Watkins?

11       A.    I contacted -- no.

12       Q.    In other words, you're not -- I'm not -- so far

13   you've given me one name.

14       A.    Exactly.

15       Q.    Of a person --

16       A.    But I --

17       Q.    -- that was similarly situated who got a

18   promotion who worked at ASO at a higher level while you

19   were denied.    And let me ask about that one person since

20   that's the only person you've named.    You did contact an

21   EEO counselor about that person, is that correct?

22       A.    I, I would have to say yes and no.

23       Q.    Well, I need you to tell me specifically.    I

24   can make the question as simple as you want me to.    Did

25   you contact an EEO counselor about your failure to be

1    promoted while Pat Watkins, a similarly-situated

2    employee did receive a promotion?

3        A.   ¹Yes.

4        Q.   You did.  Okay.  When?

5        A.   When I spoke to McDivitt, when I spoke with

6    Harry Fiely, when I spoke with Linda Richardson, when I

7    spoke with Woody Hopper, when I spoke with Kevin Gover,

8    when I spoke -- when I spoke with all the high officials

9    about my position being that of an 11 and everybody else

10   has an administrative, in an administrative position I

11   worked in as the administrative officer for the Assistant

12   Secretary of Indian Affairs.  The others, Pat Watkins is

13   an administrative officer for an assistant secretary as

14   well.

15       Q.   I'm not, I'm not making myself clear.  I'm

16   asking you about when you contacted an EEO counselor, not

17   about these other people, when you contacted an EEO

18   counselor about the one similarly-situated person that

19   you've mentioned in this deposition today that got a

20   promotion you did not, Pat Watkins.  When did you do

21   that?

22       A.   Each time I did that.  She's not, she's --

23       Q.   You can't tell me when?

24       A.   No.

25       Q.   Did you file a complaint with the Agency

1    concerning Pat Watkins promotion and your failure to be

2    promoted?

3        A.    No.

4        Q.    Did you file a complaint with the Agency over

5    your failure to be promoted while any other similarly-

6    situated people, who you presently cannot name, were

7    promoted between '89 and 2005?

8        A.    I mentioned them in my complaints, yes.

9        Q.    Okay.  When?

10       A.    2003 up until 2005.

11       Q.    No, from '89 to 2005.  I'm going through the

12   allegations --

13       A.    Each time, each -- from Pat Watkins came during

14   the period of time of 1995 to present.  Okay.  That is

15   when as an administrative officer I mentioned the other

16   administrative officers of other people that was doing

17   similar duties that I was doing that were higher grades

18   than I.

19       Q.    You, you named other individuals.  You can't

20   name them today though?

21       A.    No, I can't today.

22       Q.    And you can't tell me when they received

23   promotion and you did not?

24       A.    No.  They're with a different office than I

25   was.

1    Q.    And you can't tell me what division or section

2    they worked in?

3    A.    I, yes, I can tell you some of those.    I can

4    tell you Water and Science, Fish and Wildlife, National

5    Park Service, Reclamation.    Each office within a

6    department had an administrative officer.

7    MR. S:    We need to take a break.    I need to spend

8    some time with this because I've got a right to get the

9    answers to these questions.    Okay.    You can be vague if

10    you want, but I'm going to ask specific questions about

11    each of these individuals.

12    DEPONENT:    Okay.

13    MR. WEISBROT:    All right, I'm going to object.

14    That's not a question, and there's no need to badger her.

15    She's trying to give you as much information as she can.

16    But we'll take a break now.    There's no need for you to -

17    - I mean she understands.    She's under oath.    She's

18    answering honestly.    You don't need to explain to her

19    that she's being vague.    She's giving you the responses

20    she can give you.

21    MR. SHOAIBI:    Okay.

22    MR. WEISBROT:    You have a right to ask as many

23    questions as you want.    We're not going to prevent you

24    from doing that, but I don't think you need to explain

25    that to her.

1      MR. SHOAIBI:  Well, I thought I did at this

2  point.  I wasn't getting responsive answers.  I think,

3  you know --

4      MR. WEISBROT:  I think her answers have been

5  very responsive.

6      MR. SHOAIBI:  Fine.  We'll --

7      MR. WEISBROT:  You asked for names. She said I

8  don't remember the names.  That's a responsive answer.

9      (Off the record.)

10      (On the record.)

11      BY MR. SHOAIBI:

12      Q.  Ms. Brantley, before our break, I was asking

13  you about the allegations you made between, between '89

14  and 2005 you have been denied a promotion while other

15  similarly-situated employees who worked for the ASO were

16  at a higher grade level.  I asked you to name those

17  individuals, and you provided me with the name of Pat

18  Watkins.  And I apologize if I am asking you questions I

19  asked before the break, but when did Ms. Watkins get a

20  promotion and you did not?

21      A.  I do not know.

22      Q.  Okay.  And at the time that she received the

23  promotion, you did not, what division or section did she

24  work in?

25      A.  Office of Water and Science.

1       Q.    Okay.  And did you contact an EEO counselor

2  about her promotion and your denial of a promotion?

3       A.    Yes.

4       Q.    When?

5       A.    In -- I don't recall the date, but it was when

6  I filed the first case I had after '89.

7       Q.    Okay.  And did you file a complaint with the

8  Agency concerning the promotion of Ms. Watkins while you

9  were not promoted?

10       A.    No.

11       Q.    What was the age of Ms. Watkins at the time of

12  her promotion?

13       A.    I don't know.

14       Q.    What was your age at the time of Ms. Watkins'

15  promotion?

16       A.    I do not know.

17       Q.    What is Ms. Watkins' race?

18       A.    African-American.

19       Q.    And what is -- clearly is a woman.  Was she in

20  the same office as you?

21       A.    No.

22       Q.    Did she have the same supervisor at the time of

23  her promotion as you?

24       A.    No.

25       Q.    Did Ms. Watkins receive her promotion as a

1   result of applying for a position that had been

2   advertised?

3       A.   'I do not know.

4       Q.   And -- okay.  Again, we took a break after I

5   had started asking these questions regarding your denial

6   of a promotion, your allegation of a denial while other

7   similarly-situated employees were at a higher grade

8   level.  And, at that time, you were only able to recall

9   or the only person you could name, rather, was Ms.

10  Watkins.  Can you presently think of anybody else who was

11  similarly situated to you and who was at a higher grade

12  level while you were denied a promotion?

13      A.   Nancy Davis.

14      Q.   Nancy Davis.  Anyone else?

15      A.   Just the other offices.

16      Q.   Other offices?  Okay.  When did Nancy Davis

17  receive a promotion and you did not?

18      A.   .I do not know.

19      Q.   At that time, what division or section did she

20  work in?

21      A.   Office of Management and Budget.  I don't know

22  the exact title.

23      Q.   Did you contact an EEO counselor about Nancy

24  Davis' promotion while you were denied a promotion?

25      A.   No.

1     Q.   What was the age of Nancy Davis at the time of

2 her promotion?

3     A.   I do not know.

4     Q.   What was your age at the time of her promotion?

5     A.   I do not know.

6     Q.   What is Nancy Davis' race?

7     A.   White.

8     Q.   And she is a woman, obviously, is that correct?

9     A.   Yes.

10     Q.   Was she in the same office as you?

11     A.   No.

12     Q.   Did she have the same supervisor at that time

13 as you, at the time of her promotion when you were not

14 promoted?

15     A.   Yes.

16     Q.   She did have --

17     A.   No, no.

18     Q.   Did not have the same supervisor?

19     A.   No.

20     Q.   Okay.  Did Nancy Davis receive her promotion as

21 a result of applying for a position that had been

22 advertised?

23     A.   I do not know.

24     Q.   And am I correct in wrapping this up that the

25 only individuals you can name who were at a higher grade

 1  level than you while you were denied a promotion and

 2  were similarly-situated to you between '89 and 2005 are

 3  Pat Watkins and Nancy Davis?

 4      A.    That's all I can name right now.

 5      Q.    What positions did you apply for from 2003 to

 6  2005?

 7      A.    Administrative officer, budget analyst,

 8  contracting specialist.

 9      Q.    Okay.  You applied for all three of these

10  positions?

11      A.    Yes.  And then management analyst.

12      Q.    Did you get any of those positions?

13      A.    No.

14      Q.    Who received the position of administrative

15  officer that you applied for?

16      A.    I do not know.

17      Q.    Are you alleging there was discrimination in

18  your not getting that position and somebody else getting

19  the position of administrative officer?

20      A.    No.

21      Q.    Who received the position of budget analyst

22  that you applied for between 2003 and 2005 you did not

23  get?

24      A.    I don't know.

25      Q.    Are you alleging discrimination in your not

1   getting that position?

2        A.   No.

3        Q.   Who received the position of contracting

4   specialist when you applied for that position between

5   2003 and 2005?

6        A.   I do not know.

7        Q.   Are you alleging there was discrimination in

8   that person receiving it and your not receiving it?

9        A.   No.

10        Q.   Who received the position of management

11   analyst, the position that you applied for between 2003

12   and 2005 and did not receive it?

13        A.   I don't know.

14        Q.   And you're alleging that you did not receive it

15   and that person received it because of discrimination?

16        A.   No, I'm not.

17        Q.   So as I understand it, you're not alleging that

18   there was any discrimination with regard to any of the

19   positions you applied for from 2003 to 2005?

20        A.   Correct.

21        Q.   With regard to Pat Watkins, did you contact an

22   EEO counselor within 90 days of the alleged

23   discrimination?

24        A.   No.

25        Q.   Did you file suit with the Agency prior to 2003

```
 1   regarding Pat Watkins' being paid at a higher grade

 2   level while you were denied promotion?

 3        A.   No.

 4             MR. WEISBROT:  Objection.  Asked and answered.

 5             MR. SHOAIBI:  It might have been.  I was trying

 6   to cover this --

 7             BY MR. SHOAIBI:

 8        Q.   Did you contact an EEO counselor within 90 days

 9   of Nancy Davis receiving a promotion while you did not?

10        A.   No.

11        Q.   In response to Interrogatory 11, you allege

12   that you applied for numerous vacancies, but you didn't

13   provide any further information.  Let me ask you now,

14   when did you apply for these vacancies?

15        A.   I don't recall.

16        Q.   Who got the positions that you -- for the

17   numerous vacancies that you did apply for, that you say

18   you applied for?

19        A.   I don't know.

20        Q.   Are you alleging that you were discriminated

21   against on each of these occasions?

22        A.   No.

23        Q.   On which occasions are you alleging you were

24   discriminated against?

25        A.   I'm alleging that as an administrative officer
```

1    working for the Assistant Secretary of Indian Affairs,

2    and they, the other employees at the Department know

3    their names.  I don't.  They were doing similarly-

4    situated work that I was doing, and they got promoted,

5    and I did not.

6        Q.    Okay, but you, you cannot provide me with the

7    names of these people, correct?

8        A.    No.  I cannot.  The Department can.

9        Q.    How do you know they were similarly situated?

10        A.    Because of the positions in which they were

11    doing.  We all went to the same meetings and everything

12    else, did the same work.

13        Q.    Did you contact an EEO counselor about these

14    vacancies you applied for that others got?

15        A.    No.

16        Q.    Did you file a complaint with the Agency about

17    these vacancies referenced in your response to

18    Interrogatory 11?

19        A.    No.

20        Q.    Did you file a complaint with the Agency?  Did

21    I already ask you that?

22        A.    Yes, you did.

23        Q.    And the answer is no?

24        A.    Correct.

25        Q.    Okay.  Let's look at -- complaint, Paragraph

1    21.   You say between 1989 and 2005 complainant was

2    eligible for the GS-12 position from the Office of

3    Personnel Management and other similarly situated

4    employees outside of her protected class were promoted to

5    the GS-12 level and higher.  With reference to that

6    allegation in your complaint, what are the names of the

7    individuals that were promoted to the GS-11 or higher?

8            MR. WEISBROT:  Objection.  Asked and answered.

9            BY MR. SHOAIBI:

10      Q.    You can answer.

11      A.    That was the -- that was Pat Watkins, Nancy

12   Davis and the others that worked in the Department.

13      Q.    All right, and, and so the people that you can

14   name for me again are Pat Watkins and Nancy Davis,

15   correct?

16      A.    Correct.

17      Q.    What job series did Pat Watkins have?

18      A.    341.

19      Q.    What was her title?

20      A.    Administrative specialist.

21      Q.    Did she get promoted by applying for positions

22   that had been posted through vacancy announcements?

23      A.    I do not know.

24      Q.    And was she an Indian-American?

25            MR. WEISBROT:  Objection.  That calls for

 1   speculation.

 2           MR. SHOAIBI:  Okay.

 3           BY MR. SHOAIBI:

 4      Q.   You can answer.

 5      A.   Repeat the question.

 6      Q.   Was she an Indian-American?

 7      A.   No.

 8           MR. WEISBROT:  Same objection.

 9           DEPONENT:  No.

10           BY MR. SHOAIBI:

11      Q.   So you don't need to speculate.  You know the

12   answer?

13      A.   I don't know for sure.

14      Q.   Okay.

15           MR. SHOAIBI:  Interesting objection.  How do

16   you know she doesn't know?

17           MR. WEISBROT:  I don't know.

18           MR. SHOAIBI:  Oh.

19           MR. WEISBROT:  I just don't want her

20   speculating if she doesn't.

21           MR. SHOAIBI:  Why don't you object to

22   speculative to every question I ask.

23           BY MR. SHOAIBI:

24      Q.   What was Nancy Davis' job series?

25      A.   341.

1   Q. What was her title?

2   A. Administrative officer.

3   Q. Did she get promoted by applying for a position

4 that had been posted through vacancy announcements?

5   A. I don't know.

6   Q. And is she an Indian-American?

7   A. No.

8   Q. Is there an Indian preference that applies to

9 positions within the Bureau of Indian Affairs?

10   A. Yes.

11   Q. And does that preference also apply to

12 positions within the Assistant Secretary's Office for

13 Indian Affairs?

14   A. No.

15   Q. Are you eligible to be considered for a

16 position under the Indian Preference Statute?

17   A. No.

18   Q. With respect to Paragraph 24, when you say

19 other directorate administrative personnel outside of

20 plaintiff's protected class were working at the GS-12

21 level and perform the same job duties as plaintiff.  Who

22 are the administrative personnel to whom you refer?

23   MR. WEISBROT:  Objection, asked and answered.

24   DEPONENT:  Nancy Davis, Pat Watkins and all the

25 other administrative offices in the Department.

1              BY MR. SHOAIBI:

2        Q.    Do you disagree with the preference given to

3   American Indians?

4        A.    No.

5        Q.    Do you think it's discrimination?

6        A.    No.

7        Q.    What about preferences given to veterans?

8        A.    No.

9        Q.    Okay.  Look at Paragraph 25.  In or about 2000,

10  this is what it says.  It says in or about 2000, the

11  Agency switched the LAN computer system from the Office

12  of Secretary network to the BIA, Bureau of Indian Affairs

13  network.  Is it true that numerous employees of the

14  Agency lost use of the Internet because of the -- what's

15  known as the *Cobell* litigation?

16       A.    Correct.

17       Q.    Turn to page 7 of the complaint, actually 7 and

18  8.  Why don't you, to yourself, read Paragraphs 45

19  through 49.

20             MR. WEISBROT:  I'm sorry, which one?

21             MR. SHOAIBI:  49 through 49.

22             MR. WEISBROT:  Through 49.  Okay.

23             BY MR. SHOAIBI:

24       Q.    Let me know when you're done.

25       A.    Finished.

1      Q.   Having read those paragraphs, let me ask you

2  this.  Were other employees required to pack up their

3  offices?

4      A.   No.

5      Q.   Was any action taken against you because you

6  told Ms. Hampton that she could not come in until Monday

7  to pack up her office?

8      A.   Repeat it again.

9      Q.   Was any action taken against you because you

10  told Ms. Hampton that she could not come in until Monday

11  to pack up her office?

12      A.   No.

13      Q.   I think I misstated that.  Did I?  Let me ask

14  it again, because I don't think the record is going to be

15  clear.  Was any action taken against you because you told

16  Ms. Hampton that you could not come in until Monday to

17  pack up your office?

18      A.   No.

19      Q.   All right, let's go to Paragraph 50.  Let me,

20  let me just go back to Paragraphs 45 and 49 for a second.

21  Are you alleging that being asked to pack up your office

22  by Hampton under the election of Ms. Clark despite

23  knowing that you were on leave, injured and under

24  doctor's care, are you alleging that that was

25  discrimination?

1      A.    No.

2      Q.    Paragraph 50.  Have you read that?  January 24,

3  2005, plaintiff was denied a private office and was

4  denied a key to her office because it was turned into a

5  conference room.  You have read that?

6      A.    Yes.

7      Q.    Do all other employees have private offices?

8      A.    They do.

9      Q.    They did?

10     A.    Yes.

11     Q.    And what is discriminatory about your not

12  having a private office?

13     A.    Nothing.

14     Q.    So it's not discriminatory.  So your not having

15  a private office is not discriminatory.  Let's look at

16  Paragraphs 51 to 58.  Why don't you read those to

17  yourself, and let me know when you're done.

18     A.    Okay.

19     Q.    Okay.  Didn't you request to go on detail from

20  Mr. Middleton?

21     A.    No.

22     Q.    Did not get Mr. Middleton's approval to build a

23  wall, did you?

24     A.    No.

25     Q.    Did Mr. Middleton sign anything indicating that

1  he had approved this renovation?

2      A.    No.

3      Q.    Isn't it standard practice in an agency to get

4  approval for renovation?

5      A.    Yes.

6      Q.    When were you RIF'd?

7      A.    1995.

8      Q.    Did you contact an EEO counselor within 90 days

9  of that action?

10     A.    No.

11     Q.    Did you file a complaint with the Agency

12 concerning the RIF prior to filing one in 2003?

13     A.    Repeat the question.

14     Q.    Did you file a complaint with the Agency

15 concerning the RIF prior to filing one in 2003?

16     A.    Yes.

17     Q.    Okay.  When?

18     A.    I don't know.  I don't know the date.

19     Q.    So you're alleging that you filed a formal

20 complaint with the Agency?  I'm not talking about the one

21 in 2003.  I'm talking about between the RIF in '95 and

22 2003, did you actually file a formal complaint with the

23 Agency?

24     A.    No.  I don't recall.

25     Q.    Are you alleging as part of this suit that you

1    were terminated by the Agency?

2          A.    No.

3          Q.    Now in your response to Interrogatory 8, you

4    state that the following people have discriminated

5    against you.  I'm going to go through them one-by-one.

6    Linda Richardson.  We've already talked about the fact

7    that she was your supervisor, correct?

8          A.    Correct.

9          Q.    How and when did Linda Richardson discriminate

10   against you?

11         A.    She denied me training.  She didn't give me a

12   cash award like she gave to others.  That's about it.

13         Q.    When did she deny training?

14         A.    I don't remember the year.

15         Q.    So you don't know when?

16         A.    No.

17         Q.    And when did she not give you cash awards while

18   she was giving them to others?

19         A.    A couple of years.

20         Q.    What years were those?

21         A.    I don't recall.

22         Q.    Albert Camacho is also on this list as a person

23   who discriminated against you.  What was your

24   relationship with him?

25         A.    He was my superior.

1      Q.    Supervisor?

2      A.    He was my superior.

3      Q.    Superior, okay, superior, but not supervisor.

4      A.    Not immediate supervisor.

5      Q.    And how did he discriminate against you?

6      A.    I asked him would he assist me in getting a

7    promotion, and he said why should he help me.

8      Q.    Which promotion?

9      A.    To the 12.

10     Q.    And when did he say why should he help you in

11   response to your asking him to assist your getting a

12   promotion to a 12?

13     A.    I don't recall the date.

14     Q.    Victor Trillings.  What's your relationship to

15   him?

16     A.    He is my superior.  He was my superior.

17     Q.    And how did he discriminate against you?

18     A.    By not allowing me to get promoted.

19     Q.    When?

20     A.    During the timeframe I worked with -- under him

21   under Pat Rogers.

22     Q.    When was that?

23     A.    From 1991 or 1990 through 1995 or '94.  I don't

24   know what time when he left.

25     Q.    And he discriminated against you by -- by not

1   promoting you, is that it?  I'm sorry.

2       A.    By not allowing me to be promoted.

3       Q.    How did he not allow you to be promoted?

4       A.    The work in which I was doing should have

5   merited a promotion, and I can only assume.  Pat Rogers

6   said she went to him and he didn't promote me.

7       Q.    Okay.  So he discriminated against you because

8   Pat Rogers went to him and he didn't promote you, is that

9   correct?

10      A.    I'm having problem with the word discriminate.

11  I'm alleging basically retaliation on these cases.

12      Q.    Discrimination is -- retaliation is a form of

13  discrimination.

14      A.    Well, then, yes, I'm alleging that.

15      Q.    And tell me again how he discriminated against

16  you.

17      A.    He didn't allow me to get promoted.

18      Q.    And, I'm sorry, when did this happen?

19      A.    Between '90 and '95, whenever he left.

20      Q.    And how did he not allow you to get promoted?

21      A.    He refused to sign the papers or allow Pat to

22  do the papers.

23      Q.    And why was that discrimination?

24      A.    Because I was doing the work, and he allowed

25  Lisa, a friend of his, to be promoted.

1    Q.   And Lisa was similarly-situated to you?

2    A.   She worked in the office with me.  Lisa, Vick

3  and Al Camacho were very close friends.

4    Q.   Does she have the same grade level, the same

5  series?

6    A.   She may have had the same grade level, but not

7  the same series.

8    Q.   She didn't have the same series, okay.  And who

9  is B.J. Thornberry?

10    A.   She was the fourth largest person in the

11  Department of the Interior.

12    Q.   How did B.J. Thornberry discriminate against

13  you?

14    A.   She didn't want me to work with her.  When I

15  was RIF'd, I had to go there.  Prior to my coming there,

16  I was told that they didn't want me there, and they asked

17  if the person they had could stay, and I asked them

18  whether or not I had a choice in the matter of where I

19  could go, if I didn't go directly to B.J.  They told me,

20  no.  So I said let the process continue to go.  A month

21  after that from being there, that's when they sent me to

22  Linda Richardson.  They just told me pack your things up

23  and go down to Linda without any ifs, ands and buts about

24  it.

25    Q.   When did they discriminate against you?

1        A.    During that period of time.

2        Q.    Rather, when did B.J. Thornberry discriminate

3  against you?

4        A.    During that period of time.

5        Q.    And what was that time period of time?

6        A.    From '95 to '95.

7        Q.    Sometime in '95.  Do you know when?

8        A.    December, November, December when I went to

9  Linda Richardson.

10        Q.    How did Philip Hayman discriminate against you?

11  What was your relationship with Philip Hayman?

12        A.    He was my immediate supervisor.

13        Q.    How did he discriminate against you?

14        A.    I didn't get promoted with him either.

15        Q.    And when did he discriminate against you?

16        A.    From 1988 -- no, 1987.  I forgot when I went to

17  him.  Until when we got RIF'd, A76, got RIF'd to A76.

18        Q.    When was that?

19        A.    1990, probably, 1990, I believe.

20        Q.    What -- why was your not getting promoted

21  discrimination?

22        A.    Because I was doing the duties of the same as

23  everybody else, and they knew it because I told them.

24        Q.    What was your relationship to Diane Murth?

25        A.    She was my immediate supervisor.

1    Q.    How did she discriminate against you?

2    A.    Again, she did not allow me to get promoted.

3    Q.    When did she do that?

4    A.    During the period of time she was there.

5    Q.    When is that?

6    A.    2003 to 2004, I believe.

7    Q.    What was your relationship to Donna Brannon

8  (ph.)?

9    A.    She's the personnel specialist for the, the

10 Office of the Assistant Secretary of Indian Affairs.

11   Q.    How did she discriminate against you?

12   A.    She, she assisted individuals to not promote

13 me.

14   Q.    How did she do that?

15   A.    That I can't tell you, but I know she did it.

16   Q.    And when did she assist individuals to not

17 promote you?

18   A.    Since 1995 when she was -- I think she was

19 there in 1995 when Linda Richardson was there.  But I do

20 know 2003 to present.

21   Q.    What's your relationship to Robert Middleton?

22   A.    I was on detail to him.

23   Q.    When?

24   A.    March 5th, I think to -- of '05 to April 22nd or

25 something like that of '05.

1    Q.    How did he discriminate against you?

2    A.    He did not believe anything that I said.  He

3    was looking for an outing in the beginning.  I can only

4    assume that he was trying to get in good with Debbie

5    Clark.  Because when I first got there on a detail, he

6    used the terminology trust with me, because I was going

7    to go on jury duty, and then with the incident of the

8    wall, that's when he used that as a trust issue, and

9    that's how -- and I think because of the, the fact that

10   he was trying to get in good with Debbie, he used me to

11   try to get brownie points with her.

12   Q.    What's your relationship with Debbie Clark?

13   A.    She was my immediate supervisor.

14   Q.    And how did she discriminate against you?

15   A.    By promoting others and not me.

16   Q.    Specifically who did she promote while you

17   weren't promoted?

18   A.    She promoted Daphne Berwald.  She promoted Iris

19   Winston.  She promoted Matt Cravatt, Shawn Malloy, Donna

20   Gill, Juan Price, and some others.

21   Q.    And how was the promotion of these people over

22   you discriminatory?

23   A.    Because I worked very hard and I worked just as

24   well as they did, and she promoted them and not me.

25   Q.    Were each of them similarly-situated to you?

1      A.    Juan Price may have been, but no.

2      Q.    Okay.  Describe your relationship to Woody

3  Hopper.

4      A.    He was my immediate supervisor.

5      Q.    And how did he discriminate against you?

6      A.    He accused me of nepotism, and then he didn't

7  want me to work under him when Mike Divitt left.  That

8  was -- why McDivitt was my boss, and then when Mike

9  Divitt left, he became my boss, and he didn't want me to

10  work with him.  So he transferred me to Debbie who vice-

11  versa took -- they put me under someone else, Diane Murth

12  in the position in which I was holding.  I was the head

13  personnel or would have been the head personnel for.

14      Q.    And when did he discriminate against you?

15      A.    When he took me from under him.

16      Q.    When was that?

17      A.    2003.

18      Q.    Who are you referring to when you state among

19  others in response to Interrogatory 8?

20      A.    Would you let me know what you're saying,

21  Interrogatory 8?

22      Q.    Oh, you don't have it in front of you.  I'm

23  sorry. I thought you were looking at -- I apologize.  I

24  started my question by saying that in responding to

25  Interrogatory 8, you stated that the following people had

1   discriminated against you, and I went through the list

2   of those people.  And you said those people had

3   discriminated against you among others, okay.  And I'm

4   asking you to who you're referring when you stated among

5   others?

6       A.   All the ones prior to that.

7       Q.   Okay.  Well, can you tell me specifically who

8   it was who discriminated against you in addition to the

9   list of people I just read?

10          MR. WEISBROT:  Objection to the extent you're

11  asking about discriminating officials from prior case

12  that was settled.  Not likely to lead to discoverable

13  evidence.

14          You can answer.

15          DEPONENT:  Richard Steele, Art Love, Al -- all

16  the supervisors I had had after the settlement case,

17  basically.

18          BY MR. SHOAIBI:

19      Q.   Can you -- I'm asking you to -- that answer all

20  of them to me does not specify to the extent I would like

21  it specified.  If you can give me more, please do.  In

22  other words, I'm looking for the list of people who

23  comprise the group among others -- in this case.

24      A.   That would be it then in this case.

25      Q.   Okay.  So you're not alleging that James

1    McDivitt discriminated against you?

2        A.    Yes.

3        Q.    You are.

4        A.    That's this case.

5        Q.    Did you just list that as his name?

6        A.    You don't have down there?  I thought you did.

7        Q.    No.  He wasn't on that list.

8        A.    Well, yes.

9        Q.    So he is also in the among others group?

10       A.    Right.

11       Q.    Okay.  How did he discriminate against you?

12       A.    He did not allow me to be promoted as well, and

13   he, he made the statement that he gave me an audit

14   because he thought I had filed against him.  So it was

15   reprisal type thing he was doing.

16       Q.    Isn't it true that he requested a desk audit be

17   performed in order to justify a higher grade for you?

18       A.    No.  Not according to what he said.

19       Q.    Wasn't that desk audit performed by an employee

20   from Fish and Wildlife Services --

21       A.    It wasn't really a desk audit.

22       Q.    Why not?

23       A.    Because a desk audit means a person -- a

24   personnel person comes to you at your desk and sit there

25   and listen to and see everything that you do.  I had to

1  leave my office, which, which was in one building and

2  come to the main building and talk to this person, and I

3  didn't have any of my paperwork or anything to show her.

4  So it wasn't really a desk audit.

5      Q.    Okay.  Upon what do you base your statement

6  that Mr. McDivitt did not request a desk audit in order

7  to justify a higher grade for you?

8      A.    Because the individual that did the audit first

9  told me that it was to see whether or not my position to

10 stay under him, stay up there at the Assistant Secretary

11 level.

12     Q.    When did the person who did the audit tell you

13 this?

14     A.    Doing the audit.

15     Q.    Say it again.

16     A.    Doing the audit.

17     Q.    Who was that person?

18     A.    I can't remember her name right now.

19     Q.    You also just stated, I believe, that Mr.

20 McDivitt discriminated against you in failing to promote

21 you.

22     A.    Correct.

23     Q.    How did he do that?

24     A.    He failed to promote me.

25     Q.    When?

1        A.    While I was working with him.

2        Q.    And did he promote others above you?

3        A.    I was the only one working with him.

4        Q.    So the answer to that is no?

5        A.    Correct.

6        Q.    In the list of people that you provided in

7   response in our Interrogatory 8, and in the list of among

8   others people, people in the among others list that we

9   just went over, you just provided me, do you contend that

10  any of these individuals ever made race, sex or age-

11  related remarks?

12       A.    No.

13       Q.    I'm going to go through this list and I want

14  you to answer my question about each of these people.

15  What is the race and age of Linda Richardson?

16       A.    White.  I don't know the age.

17       Q.    What is the race and age of Albert Camacho?

18       A.    White.  I don't know the age.

19       Q.    What is the race and age of Victor Trillings?

20       A.    White.  I don't know the age.

21       Q.    What is the race and age of B.J. Thornberry?

22       A.    White.  I don't know the age.

23       Q.    What is the race and age of Philip Hayman?

24       A.    White.  I don't know the age.

25       Q.    What is the race and age of Diane Clark?

```
 1      A.    Indian.  I don't know the age.

 2      Q.    What is the race and age of Donna Brandon.

 3      A.    White.  I don't know the age.

 4      Q.    What is the race and age of Robert Milton?

 5      A.    White.  I don't know the age.

 6      Q.    What is the race and age of Betty Clark?

 7      A.    White.  I don't know her age.

 8      Q.    And what is the race and age of Woody Hopper?

 9      A.    Indian.  I don't know his age.

10      Q.    What is the race and age of James McDivitt?

11      A.    White.  I don't know the age.

12      Q.    Okay.

13            MR. SHOAIBI:  I'm amenable to taking a break

14  now.  I'm moving faster than I thought.  Do you guys want

15  to take a break or do you want to keep going?

16            DEPONENT:  I'd rather keep going.

17            MR. WEISBROT:  I thought -- yeah, especially if

18  you're moving faster than you thought.

19            MR. SHOAIBI:  Well --

20            MR. WEISBROT:  If you were moving slower than

21  you thought, I'd --

22            MR. SHOAIBI:  I guess I, you know --

23            MR. WEISBROT:  Like I said --

24            MR. SHOAIBI:  I know I can wrap up.  I know I

25  can wrap up today at some point.  I was concerned about
```

```
 1   not being able to finish today, but I know I can.  Maybe
 2   take a break.
 3              (Off the record.)
 4              (On the record.)
 5              BY MR. SHOAIBI:
 6       Q.    Okay, Ms. Brantley, we're back on the record
 7   after taking a lunch break, about 40 minutes; and your
 8   counsel now informs me that you have some information
 9   regarding responses to some of my questions.  What is
10   that?
11              MR. WEISBROT:  Do you mind if I proffer?
12              MR. SHOAIBI:  Well, yes, I do.
13              BY MR. SHOAIBI:
14       Q.    You heard the questions that we went over prior
15   to the break, correct?
16       A.    Correct.
17       Q.    And they all, you know, stated -- you
18   understood all of them, you heard all of them correctly,
19   is that right?
20       A.    I heard them, yes.
21       Q.    Okay.  And have you had any conversation with
22   your counsel during lunch today that's caused you to
23   reconsider your answer to any of those questions?
24       A.    Yes.
25       Q.    Okay.  What were those conversations?
```

1      A.    It was just --

2            MR. WEISBROT:  Objection.  First of all, you're

3      asking her about attorney/client privileged

4      conversations, and that will be my main objection.    So

5      you do not have to respond to that answer.

6            MR. SHOAIBI:  Okay.

7            MR. WEISBROT:  Well, a side note though, there

8      weren't any conversations.  She indicated to me that she

9      --

10           MR. SHOAIBI:  Okay.

11           MR. WEISBROT:  That she needed to change her

12     response.

13           MR. SHOAIBI:  Okay.

14           BY MR. SHOAIBI:

15     Q.    So you unilaterally told your lawyer.  He

16     didn't, he didn't speak to you first.

17     A.    No.

18     Q.    You just --

19     A.    I did.

20     Q.    And what caused you to realize that you needed

21     to change your answers?

22     A.    You did.

23     Q.    I did?  How did I do that?

24     A.    By -- looking at retaliation and

25     discrimination, I was not linking them together until you

1  said they were the same, and then you asked the

2  questions of at home, when I was at home with the back

3  problem, and when Sally called me whether or not I felt

4  that was discrimination, and I said no, but it's

5  retaliation, yes.  So and the other questions you asked

6  regarding the same type of issue, the answer is yes to

7  all of those questions of whether or not they, they

8  discriminated against me.  Yes.

9      Q.    Okay.  Well, I'm not going to re-take the

10  deposition, you know.  Your interrogatory answers were

11  stated and signed by you as, as your responses to

12  questions that you were asked.  I asked you questions

13  regarding Interrogatory 8, in which you stated that

14  people discriminated against you, and you were asked a

15  number of questions, I don't know how long, 45 minutes,

16  an hour, about that interrogatory.  So I'm not going to

17  go through all that again.  Do you want to just tell me

18  how your answers would be different generally speaking?

19  Specifically, how would you change your answers?

20      A.    Because the discrimination, I was separating

21  discrimination from retaliation.

22      Q.    Okay.

23      A.    And you said retaliation and discrimination are

24  the same.  So then, yes, I have been discriminated

25  against on all the issues.

1       Q.    Okay.  Well, okay.  Tell me how you would

2  change your answer to my question specifically?

3       A.    I would say, yes, I have -- that I was

4  discriminated against.

5       Q.    Okay.  By whom?

6       A.    By all the supervisors that you called off.

7       Q.    Okay.  How were you discriminated against by

8  each of them?

9       A.    Because each of them knew of my prior EEO case,

10  and they discriminated against me therefore thereafter.

11       Q.    I'm going to tell you what.  I asked the

12  questions.  Your lawyer was sitting here with you.  Your

13  lawyer assumedly prepped you for this deposition, and

14  assumedly went over your interrogatory answers with you.

15  If -- and your interrogatories were provided.  I, I'm not

16  going to re-ask four hours of questions because you

17  weren't prepped properly for deposition.  I'm going to

18  continue --

19            MR. WEISBROT:  Objection to that

20  characterization.  What are you doing?

21            MR. SHOAIBI:  What am I doing?

22            MR. WEISBROT:  Why are you even explaining

23  anything to my client?  Either ask another question and

24  move on or we can drop this issue.  If you really want a

25  clarification of it, I was trying to help you.

1          MR. SHOAIBI:  Oh, you were?

2          MR. WEISBROT:  To clarify the response.

3          MR. SHOAIBI:  You'll have your chance to ask

4   questions when I'm done.  And then if there's any of it,

5   of her questions, answers you want to clarify, you can do

6   that.  But, you know, I'm not going to go through every

7   single question again.

8          MR. WEISBROT:  I don't think there's a need to

9   go through every question again.  You're right.  Don't go

10  through every question again.

11         BY MR. SHOAIBI:

12     Q.  Your answers, as far as I'm concerned, stand.

13  Going to --

14         MR. WEISBROT:  Okay, I'd like it noted for the

15  record that Ms. Brantley has provided edits to responses

16  that she provided previously, specifically with regard to

17  questions of whether she was discriminated against in

18  which she responded no, she did not think she was

19  discriminated against, she now would like to change that

20  response to, yes, she was discriminated against, with the

21  understanding that retaliation is discrimination.  You

22  can continue.

23         BY MR. SHOAIBI:

24     Q.  Going to your move to G Street, Paragraph 31,

25  you state in 2001 plaintiff was removed from her office

 1  in the main building and forced into an office in the G

 2  Street Building.  Is that true?

 3       A.   True.

 4       Q.   How long were you at G Street?

 5       A.   I believe we came back in 2004 or around in

 6  that time.

 7       Q.   How long were you at G Street?  Answer that

 8  question, please.

 9       A.   About three years.

10       Q.   Where was your office located after you left G

11  Street?

12       A.   In the main Interior Building.

13       Q.   Where is your office now?

14       A.   Main Interior Building.

15       Q.   Isn't it true that about 50 employees were

16  moved to

17  G Street as a result of the reorganization/renovation?

18       A.   No.

19       Q.   What incident or incidents do you claim was

20  retaliatory?

21       A.   Every action that they took against me.

22       Q.   Okay.  I've got a lot of time.  Tell me

23  specifically what incident or incidents do you claim were

24  retaliatory?

25       A.   Not being promoted.  Being called at home to

1  pack my bags when they know that I was home sick.  Not

2  having training when I requested.  Some training when I

3  requested.  Not given cash awards.  Being lied upon.

4  Others I can't think of right now.

5      Q.   When were you retaliated against by not being

6  promoted?

7      A.   From 1989 up until present.

8      Q.   Okay.  So specifically you -- can you tell me

9  specifically?  The mere fact that you weren't promoted

10 from '89 to the present was retaliatory?

11     A.   Correct.

12     Q.   Okay.  And are you alleging this was a

13 retaliation for filing complaints in 1988?

14     A.   Correct.

15     Q.   Okay.  Was there any retaliation for filing

16 complaints in 1997?

17     A.   Correct, there is.

18     Q.   Is there any retaliation for anything other

19 than filing the complaints in 1988 and 1997?

20     A.   No.

21     Q.   You sure?  You don't -- do you want to have

22 time to talk to your counsel about that answer?

23          MR. WEISBROT:  Objection.  Stop badgering the

24 witness.

25          MR. SHOAIBI:  I'm not badgering.  I just want

1  to make sure. I don't want, I don't want to -- I've got

2  four hours of depositions this morning, and you're

3  telling me at break, oh, by the way, all those answers

4  are different. It's not badgering. I'm just irritated.

5      MR. WEISBROT: It's not all those answers.

6  There were three questions. There were three questions,

7  and I think --

8      MR. SHOAIBI: Let's go over, let's go over the

9  three questions then. What were the three questions.

10     MR. WEISBROT: I asked you if you wanted me to

11 proffer and you told me you didn't want me to proffer.

12 So now you want me to proffer?

13     MR. SHOAIBI: I want you to -- well, go ahead.

14     MR. WEISBROT: Proffer what the three questions

15 were.

16     MR. SHOAIBI: Yeah, go ahead and proffer.

17     MR. WEISBROT: You asked her about four

18 positions that she applied for since 2003, an

19 administrative officer position, a budget analyst

20 position, a contracting specialist position, a management

21 analyst position. With regard to each position, you

22 asked her if she felt that her not receiving the position

23 was discriminatory. She said no. She now says yes.

24 With regard to packing up the office, you asked her if

25 Ms. Sally Hampton calling her at home when she was on

1  leave and sick was, was discrimination.  She answered

2  no.  She now says yes.  With regard to not having a

3  private office, you asked her if not having a private

4  office was discrimination.  She said no.  She now says

5  yes.  That's it.  Three questions.

6          BY MR. SHOAIBI:

7      Q.   Okay.  With respect to the packing up of your

8  office, on what basis do you say that this was

9  discrimination?

10     A.   Because when Mary Jane came into our office,

11 the Office of Budget Management, she did not want me -- I

12 was on detail to her office when she came onboard under

13 Vick Trilling.  I'm sorry, Vick Christenen.  And Mary

14 Jane didn't want me to work with her.  So she was telling

15 me to get out of my office, the office I was in next to

16 hers, directly next to hers, and pack my things up and

17 move into another office with another person.  And we

18 already had -- and she was saying that she wanted to use

19 it as a conference room, but the conference room

20 -- we already had a conference room.  So we didn't need

21 another conference room.

22     Q.   And is that the basis upon which you believe

23 that being told that you could not come in until Monday

24 to pack up your office was discrimination?

25     A.   The fact that they called me?  No.  That --

1    your answer is no.  But the question it -- yes, it was

2    retaliation for her to do that.

3        Q.  ¹By Ms. Trilling?  What is the name?

4        A.   No.  Sally Hampton called.

5        Q.   By Sally Hampton.  Okay.  And why do you

6    believe that was retaliation?

7        A.   They were just being nasty.

8            MR. SHOAIBI:  Let me take a break.  Off the

9    record.

10           (Off the record.)

11           (On the record.)

12           MR. SHOAIBI:  Yeah, I'm ready.

13           I need to understand specifically what, what

14   your claiming.  I didn't understand from the morning

15   because I'm, I'm not clear on --

16           Counsel, tell me again your proffer that it --

17   regarding my questions regarding Interrogatory 11, what

18   specifically is she changing her answers on or is she

19   trying to change her answers on?

20           MR. WEISBROT:  I don't know anything about

21   Interrogatory 11 or any interrogatories, but I do know

22   that you asked her with regard to the positions she

23   applied for since 2003.  She listed positions.  With

24   regard to each position, you asked her if her not

25   receiving that promotion and the other individual

1  receiving that position was discrimination for each

2  position; and for each position, she says no, I did not

3  think it was discrimination.  And I will proffer that

4  when we went into break, Ms. Brantley approached me and

5  suggested that she needed to change those responses if

6  retaliation was discrimination, which I think is another

7  area that you had discussed with her later on in the

8  deposition, and she in fact had asked you is retaliation

9  the same thing as discrimination, and you said yes, they

10 all fall under one.  And I think it was at that point

11 that she realized then her previous responses as to no

12 discrimination were therefore then incorrect because

13 retaliation was what she was claiming.  So again

14 specifically with regard to those four questions for

15 those positions.  And then you also asked the exact same

16 question when you addressed in the complaint Paragraphs

17 45 to 49 regarding her having to pack up her office.  You

18 asked her if she felt that was discrimination.  She said

19 no.  Again she wasn't including retaliation in that

20 response because she didn't believe retaliation and

21 discrimination were the same.  And then, lastly, you

22 asked her about the private office, Paragraph 50, 51 in

23 the complaint, and you asked her if she felt that was

24 discrimination.  She said no.  She's now changing her

25 response to yes, that was discrimination, and once again

1   I'll state that that's specifically because she now

2   understands fully that retaliation includes -- is

3   included in discrimination.  And those are the only three

4   questions that responses are being changed.  Quite

5   frankly, I don't think it should surprise you that much

6   that she's claiming discrimination for all those issues.

7   They were in the initial complaint.

8            MR. SHOAIBI:  All right.  All right, just to be

9   clear.  I believe this issue begins when I asked what

10  positions did plaintiff apply for from 2003 through 2005.

11  Is that correct?

12           MR. WEISBROT:  That is correct.

13           MR. SHOAIBI:  Okay.

14           MR. WEISBROT:  That's my understanding.

15           BY MR. SHOAIBI:

16      Q.   Who received the positions?

17      A.   I don't know.

18      Q.   Still -- yeah, that hasn't changed, okay.  And

19  are you alleging that there was discrimination?

20      A.   Yes.

21      Q.   Okay.  And who are you alleging discriminated

22  against you in these instances?

23      A.   My supervisors at the time.

24      Q.   Okay.  All right.  You answered that you don't

25  know what positions you applied for from 2003 to 2005?

1  What positions did you apply for from 2003 to 2005?

2       A.   I said contracting.

3       Q.   Let's go through this again.  I'm just --

4  there's two ways of doing this.  Let's just do it this

5  way.  This deposition may have to go into another day.

6  Go ahead.

7       A.   Contracting, management analyst, budget

8  analyst, and administrative officers.

9       Q.   Okay.  Who received these positions?

10           MR. WEISBROT:  Objection, asked and answered.

11           MR. SHOAIBI:   Okay.  I'm going through this

12  again, piece-by-piece.

13           MR. WEISBROT:  Okay.  I'm still going to note

14  my objections for the record.

15           MR. SHOAIBI:  How dare you make an asked and

16  answered objection after what just happened here.  Every

17  single one of these questions was asked and answered.

18           MR. WEISBROT:  Well, actually you already asked

19  that question about three questions ago too.

20           MR. SHOAIBI:  Okay.

21           MR. WEISBROT:  So now --

22           MR. SHOAIBI:  Every, every one of these

23  questions was asked and answered, okay.  Every single one

24  this morning.  Because, because this is outrageous that I

25  take a break and a person comes back from the break and

1  unilaterally tells me that four hours of depositions has

2  meant nothing because she's changed her mind after single

3  question after she spoke with her attorney.  Okay, two

4  questions.

5          MR. WEISBROT:  And first of all --

6          MR. SHOAIBI:  It's not, it's not two questions.

7          MR. WEISBROT:  It wasn't after she spoke to me.

8  It was prior to her even talking to me.  And once again -

9  -

10          MR. SHOAIBI:  Let's move on.

11          MR. WEISBROT:  Wait.  You don't believe --

12          MR. SHOAIBI:  Let's move on.

13          MR. WEISBROT:  Are you claiming that, that I

14  had a conversation with my client?

15          MR. SHOAIBI:  Let's move on, sir, okay?

16          MR. WEISBROT:  Well, no.  I don't want to move

17  on.  I want to understand what it is that you're

18  claiming.

19          MR. SHOAIBI:  Take -- off the record.  Off the

20  record.

21          (Off the record.)

22          (On the record.)

23          BY MR. SHOAIBI:

24      Q.  With regard to the position, I have management

25  analyst, budget analyst, administrative officer.  What

```
 1   was the first one that you mentioned?

 2        A.   Contracting officer.

 3        Q.   ¹Contracting officer.  Okay.  Who received the

 4   contracting officer position that you applied for between

 5   2003 and 2005?

 6        A.   I don't know.

 7        Q.   Okay.  But you are alleging that there was

 8   discrimination in not receiving that position and others

 9   being promoted?

10        A.   Yes.

11        Q.   And who are you alleging discriminated against

12   you in the instance of not getting the contracting

13   officer position?

14        A.   The supervisor I had at the time and I --

15        Q.   Okay.  With regard to the management analyst

16   position which you applied for between 2000 and 2005, who

17   received that position?

18        A.   I don't know.

19        Q.   Are you alleging there was discrimination in

20   that position?

21        A.   Yes.

22        Q.   And who are you alleging discriminated against

23   you in that -- with regard to that position?

24        A.   The supervisor I had at the time.

25        Q.   And who was that person?
```

1  A. I don't know.

2  Q. Okay.  And how did that person discriminated

3 against you?

4  A. I did not get the promotion.

5  Q. With regard to the budget analyst position that

6 you applied for between 2000 to 2005, who received that

7 position?

8  A. I don't know.

9  Q. Okay.  Are you alleging there was

10 discrimination in that position, your not getting that

11 position and somebody else getting the position?

12  A. Yes.  Yes, I am.

13  Q. And who are you alleging discriminated against

14 you in this instance?

15  A. The supervisor in question at the time.

16  Q. Do you know who that person is?

17  A. No.

18  Q. And how did that person discriminate against

19 you?

20  A. I didn't get the job.

21  Q. Anything else you want to add to that answer?

22  A. No.

23  Q. And how about with regard to the administrative

24 officer position official?

25  A. I --

1      Q.    You applied for that between 2003 and 2005,

2  correct?

3      A.    Correct.

4      Q.    Who received that position?

5      A.    It's not one position.

6      Q.    Okay.  Well, who -- you're alleging that you

7  applied for certain positions from 2003 to 2005, and that

8  you were discriminated against when others got them and

9  you did not.  Tell me about every administrative officer

10 position that you applied for one-by-one.  Who received

11 the first one that you applied for and didn't get?

12     A.    I don't know how many I applied for during that

13 time, but there was one in particular that I applied for,

14 and they ended up canceling the job after I applied for

15 it.

16     Q.    They ended up canceling the job?

17     A.    They ended up canceling the job.

18     Q.    Okay.  So nobody received it.  It was just

19 cancelled?

20     A.    Correct.

21     Q.    Okay.  And you're alleging that this was

22 discrimination?

23     A.    Yes.

24     Q.    And who are you alleging discriminated against

25 you?

1      A.    Debbie Clark and Mary Jane Miller.

2      Q.    How did they discriminate against you?

3      A.    They are the ones that cancelled the job.

4      Q.    Why do you believe that this cancellation of

5  this administrative officer position was discrimination?

6      A.    Because Debbie knew about the position.    In

7  fact, she's the one that told me about it.    Then she

8  reigned on letting me, you know, go ahead and have

9  somebody selected, and Mary Jane Miller, she's the one

10 that didn't want me next door to her, and so she moved me

11 from the office I was in and put me with somebody else

12 prior to my finding out that they cancelled the job.

13     Q.    Anything else you want to add to your answer as

14 to how you were discriminated against in not receiving

15 this --

16     A.    No.

17     Q.    -- particular position?    Okay.    So just to be

18 clear, ask you to provide -- you don't know the names of

19 any of the individuals who received promotions, received

20 positions and you did not receive as a result of

21 discrimination, the last series of questions?

22     A.    Correct.

23     Q.    Okay.    And if you do not know the names and

24 titles of these individuals, how can you allege that

25 similarly situated individuals got these jobs?

1       A.    Because I was told.

2       Q.    Who told you?

3       A.    Either I got it in a letter or I was told by

4  personnel.

5       Q.    Can you be any more specific than what you just

6  told me?

7       A.    No.

8       Q.    With regard to the four jobs and possibly more

9  applications for the four jobs that you -- we just

10  discussed with regard -- from 2000 to 2005, did you

11  contact an EEO counselor within 90 days of any of these

12  incidents?

13       A.    No.

14       Q.    Did you file suit with the Agency prior to 2003

15  with regard to any of these positions you applied for

16  between 2003 and 2005 and did not receive as a result of

17  discrimination?

18       A.    Repeat the question again.  I'm sorry.

19       Q.    Okay.  With regard to the positions we've been

20  discussing for the last five minutes or so that you

21  applied for between 2003 and 2005 and did not receive

22  those positions, positions you applied for and did not

23  receive because of discrimination, did you file suit with

24  the Agency prior to 2003?

25       A.    No.

1      Q.    Thank you.  We already went over part of this.

2  Actually, let's go over it again.  Did any of the

3  individuals -- you stated you don't know the names of any

4  of them, but did any of the individuals that received

5  promotions receive those as a result of Indian

6  preference?

7           MR. WEISBROT:  Objection to the extent it calls

8  for speculation.

9           You can answer.

10          DEPONENT:  I don't know.

11          BY MR. SHOAIBI:

12     Q.    And again you don't know the names and titles

13  of any of these individuals anyway?

14     A.    No.

15     Q.    No, you don't know?

16     A.    No, I don't know.

17     Q.    Okay.  In response to Interrogatory 11, you

18  allege that you applied for numerous vacancies, but you

19  cannot provide any further information related to this

20  assertion.  When did you apply for these vacancies?

21     A.    I don't know the dates.

22     Q.    Who got the positions that you applied for and

23  did not get?

24     A.    I don't know.

25     Q.    Are you alleging you were discriminated against

1  on each of these occasions?

2      A.   Yes.

3      Q.   Did you contact any EEO counselor about these?

4      A.   No.

5      Q.   Did you file a complaint with the Agency?

6      A.   No.

7      Q.   With respect to Paragraph 21, what are the

8  names of the individuals promoted to a GS-12 level or

9  higher?

10         MR. WEISBROT:  Objection, asked and answered.

11         You can answer.

12         DEPONENT:  I said there was Pat Watkins and

13 Nancy Davis and others within the Department.

14         BY MR. SHOAIBI:

15     Q.   Okay.  And we went over these, okay.  And, and

16 it might be difficult to remember.  I'm really not trying

17 to be anything but just complete.  You're not changing

18 any of your answers with regard to those questions, are

19 you?  I asked you what job series they had, what were

20 their titles, did any of them get promoted by applying

21 for positions to posted vacancy announcements, were any

22 of them Indian-Americans.  Those questions don't deal

23 with your understanding of discrimination or retaliation

24 --

25     A.   Correct.

```
 1        Q.    -- so those are not going to change.  Okay.  I

 2   used the term discrimination before, so I'll ask this

 3   question again.  Do you believe that the preference given

 4   to American Indians is discrimination?

 5        A.    No.

 6        Q.    What about preferences given to veterans?  Is

 7   that discrimination?

 8        A.    No.

 9        Q.    Was any action taken against you because you

10   told Ms. Hampton you could not come in until Monday to

11   pack up your office?  That answer shouldn't change.

12        A.    No.

13        Q.    Are you -- is there anything retaliatory,

14   discriminatory, in this case meaning retaliatory, about

15   you not having a private office?

16        A.    Yes.

17        Q.    Other than being retaliatory is it in any other

18   way discriminatory?

19        A.    It could be.

20        Q.    Well, I'm asking if you're alleging that it is.

21        A.    Right.

22        Q.    Before you said no, but now you're -- I, I'm --

23        A.    I'm saying yes it was retaliatory.

24        Q.    Retaliatory but not discriminatory in any other

25   way.  Just retaliatory?  Because before when I asked you
```

1  discrimination, you said no, and you --

2      A.    Right.

3      Q.    I'm not, I'm really -- I'm certainly not trying

4  to play games.  I just want to make sure we get this on

5  the record correctly.  So it is retaliatory you didn't

6  have a private office but not discriminatory in any other

7  way, correct?

8      A.    It was retaliatory, correct.

9      Q.    And was it discriminatory in any other way?  In

10 other words you've alleged race, color, sex.  And before

11 your answer was that it was not.  And your counsel has

12 proffered that you -- had a misunderstanding about

13 retaliation.  So I just want to make it clear once and

14 for all.  You only thought it was retaliatory and not

15 discriminatory in any other way, correct?  Or are you

16 changing that answer too?

17     A.    I need to change that answer too.

18     Q.    Okay.  And why are you changing it from an hour

19 ago when it's not simply a matter of not understanding

20 retaliation was discrimination?

21     A.    Because you're -- you lumped the two together

22 just now, and then you separated it again.

23 Discrimination you were saying race, sex and all that,

24 and then you retaliatory they did this because of my

25 prior action, okay.  So the race and the sex and all

1  that, I am a dark individual, of age and sex.  All of

2  this is one person of me, and they did this of me.

3      Q.    Okay.

4      A.    To me, and everybody else is light skin.

5      Q.    Okay, but --

6      A.    That's the discrimination.

7      Q.    -- again, ma'am, I asked you earlier on the

8  record, this is extremely important, okay, so let's just

9  get this one last time.  I asked you earlier if you

10 believed that not having a private office was

11 discriminatory.  Okay.  And you said no.  We had lunch.

12 We came back.  And I understand from your attorney that

13 you didn't know that retaliation was part of

14 discrimination.  So you'd like to change your answer and

15 say that it was retaliatory but not discriminatory as you

16 understood discrimination to be.

17     A.    I'm changing the answer to yes it's retaliatory

18 discrimination.

19     Q.    Okay.  Got it.  But it's not race

20 discrimination or sex discrimination or gender

21 discrimination or age discrimination because that I

22 assume you knew when you earlier said that it wasn't

23 discriminatory, that, that was your understanding of what

24 discrimination was at that time, right?

25     A.    What it -- what I understood during that period

1    of time is that you said discrimination, and now we're

2    just dealing with discrimination.

3        Q.    I I understand that.

4        A.    But if you put retaliatory, retaliation actions

5    to this, you're retaliating against a dark skinned middle

6    age woman, dark in complexion, which is me.  I'm the only

7    one of my color, of my color there.

8        Q.    ·Do you understand, ma'am, that retaliation is,

9    is being subjected to disparate treatment because you

10   have protected activity, not --

11       A.    Exactly.

12       Q.    -- because of your color or your gender?

13       A.    All of this, this is the retaliation portion.

14   I have been retaliated against because of protected

15   activity at --

16       Q.    Understand that.  I understand that, and I

17   think your answer is going to stand from earlier, but

18   again, you're making it a little bit more difficult

19   because you, you have stated that the reason you are

20   changing your answer is because you didn't understand

21   retaliation.  Now you're changing your answer but you're

22   not in my mind anyway, I'm not understanding the

23   difference between before lunch and after lunch with

24   regard to your understanding of race, gender, sex and age

25   discrimination.

1        A.    Then I'm saying because of my race, because of

2   my age, because of my gender, because of everything about

3   me and because I'm under protective action, these things

4   happened to me.  That's what I'm saying.

5        Q.    So this morning when I asked you if you were

6   discriminated against when not allowed to have a private

7   office, what did you think I meant then?

8        A.    I'm not sure what you meant, but I in my head I

9   was saying retaliation at that time, so that's why I said

10  no.

11  But --

12        Q.    Oh, so you weren't retaliated against then?  I

13  thought you were retaliated against?

14        A.    No.    I said I was retaliated against.    You

15  asked about discrimination, and to me that was two

16  different things.

17        Q.    So what --

18        A.    But, yes, discrimination as a hold with

19  retaliation and the person I am as one person.    You

20  discriminated against me and you retaliated against me

21  all in one.

22        Q.    Who retaliated against you in not getting you a

23  private office?

24        A.    Debbie Clark and Mary Jane Miller, I said.

25        Q.    How did they do that?  Why did they do that?

```
 1        A.    I can only assume because they were
 2   retaliating against me because of protective action.
 3        Q.    And didn't you request to go on the detail for
 4   Mr. Middleton?
 5        A.    No, I did not request it.
 6        Q.    You didn't request it?
 7        A.    No.
 8        Q.    How were you placed on the detail then if you
 9   didn't request it?
10        A.    Sally told me about it.
11        Q.    What did she tell you?
12        A.    That he needed someone to work with him, and
13   that she would talk to him.
14        Q.    You didn't get Mr. Middleton's approval to
15   build the wall, did you?
16        A.    No.
17        Q.    Did he sign anything that indicated that he had
18   approved the renovation?
19        A.    No.
20        Q.    Isn't it standard practice in an agency to get
21   approval for renovations?
22        A.    Yes.
23        Q.    Okay.  I'm unclear as to where, you know, where
24   we are because of the changing understanding as you
25   describe it.  What incidents did you claim were
```

 1  retaliatory?

 2      A.   All the, all the incidents that took place

 3  between 2003 and 2005.

 4      Q.   Between 2003 and 2005?

 5      A.   Uh-huh.

 6      Q.   Okay.  I'm talking about this lawsuit.  So all

 7  the incidents took place between 2003 and 2005 were

 8  retaliatory.  Those are, those are what you're saying are

 9  retaliatory in this case?

10      A.   Yes.

11      Q.   What were those incidents?

12      A.   The audit, the so-called audit.

13      Q.   Okay.

14      A.   Non-promotions, non-awards, office being

15  removed, being reassigned to an office that was

16  definitely not going to promote me because it was already

17  stated they weren't.  Duties taken away from me, assigned

18  to other individuals and they getting promoted for the,

19  the duties.  All the things that I have alleged in this

20  claim.

21      Q.   Okay.  Which non-promotions were retaliatory?

22      A.   All I didn't get.

23      Q.   You have to tell me what those were.

24      A.   A 12, a 13, and possibly a 14.

25      Q.   And was this on specific occasions in response

1  to applications or just, or just generally not being

2  promoted?

3      A.    Generally not being promoted.

4      Q.    Over the course of time between 2003 to 2005?

5      A.    Over the course of 1989 up until now.

6      Q.    You just, you just said all -- everything that

7  took place between 2003 and 2005.  Now it's '89.

8      A.    Okay.  All the things that happened between

9  1989 up until present were retaliatory.

10            COURT REPORTER:  Can we break for just a

11  second.

12            (Off the record.)

13            (On the record.)

14            BY MR. SHOAIBI:

15      Q.    Okay.  Were these retaliatory actions in

16  retaliation for your filing complaints in 1988 and 1997?

17      A.    When I filed in 1980, yes.

18      Q.    Okay.  So they were in 1988, 1987 and another

19  time?

20      A.    I filed in 1980.  I settled in '87 and '88.

21      Q.    So you didn't file a complaint in 1988?

22      A.    No.

23      Q.    Okay.  Did you file one in 1997?

24      A.    No.

25      Q.    So these were all in retaliation for your

1   filing a complaint in 1980?

2        A.   Correct.

3        Q.   Were they in retaliation for anything else than

4   filing, your filing the complaint in 1980?

5        A.   Repeat the question.

6        Q.   Were they in retaliation for anything else

7   other than your filing your complaint in 1980?

8        A.   No.

9        Q.   Have you ever received any awards of quality,

10  step increases while working at Interior?

11       A.   Yes.

12       Q.   Who recommended you for these?

13       A.   Various supervisors I worked with.

14       Q.   Isn't it true that you received numerous cash

15  awards throughout your career?

16       A.   (No response.)

17       Q.   That's a question.

18       A.   Yes.

19       Q.   That is true?

20       A.   Yes.

21       Q.   Isn't it true that in 2004 you received $1,000

22  cash award?

23       A.   Yes.

24       Q.   And that award was approved by Debbie Clark?

25       A.   I don't know who it was approved by.

1     Q.   But you did receive $1,000 cash award in .

2  November of '04 approved by somebody.

3     A.   Correct.

4     Q.   It might have been Debbie Clark?

5     A.   Could have been, yes.

6     Q.   Is it true that in 2002 you received a total of

7  $6,900 in cash awards?

8     A.   I have to say yes, if you've got it there.

9     Q.   And is it true that in 2001 you received a

10  total of $6,050 in cash awards?

11     A.   That's a possibility.  Yes.

12     Q.   And isn't it true that Jerry Fiely put in for

13  $2,000 of the $6,050 award?  I think it was a $2,000 cash

14  award, December 31, 2001.

15     A.   Then I would say, yes.

16     Q.   And isn't it true in 2000 you received $13,550

17  in cash awards?

18     A.   Correct.

19     Q.   And isn't it true that one of these -- part of

20  the cash award was put in for by Jerry Fiely?

21     A.   Correct.

22     Q.   And isn't it true that in 1999, you received a

23  total of $2,400 in cash awards?

24     A.   Correct.

25     Q.   And isn't it true that in 1997 you received a

157

1  not over.

2          Q.    You have expended 30,000?

3          A.    Correct.

4          Q.    What do you mean by expended?

5          A.    I what I have given out so far.

6          Q.    For attorneys?  I'm sorry, maybe this is --

7  that's the right answer, I just -- it seems awfully high

8  to me.  You've paid 30,000 out of your pocket for

9  attorneys?

10         A.    Or close to it.

11         Q.    On this case?

12         A.    I have two cases.

13         Q.    Okay.  And the other case is the one that you

14 have the EEO.  Who is representing you on that case?

15 Same lawyer?

16         A.    Snyder and Associates, yes.

17         Q.    Snyder and Associates.  But not Mr. Weisbrot?

18         A.    Yes.

19         Q.    Yes, Mr. Weisbrot.  Okay.  What's your basis

20 for alleging a hostile work environment?

21         A.    Like I said, people not speaking to me and not

22 giving me work, letting me know of other people being

23 given awards and, and it's like a slap in the face when I

24 work hard.  All these things.

25         Q.    Okay.  Again, this --

1      A.    Not speaking to me.

2      Q.    -- is your opportunity to, to on the record

3   tell me, you know, what your claims are.  So if that's

4   your answer, that's fine.  I want to make sure that

5   that's the answer.  Are you done?

6            COURT REPORTER:  I didn't hear an answer.

7            BY MR. SHOAIBI:

8      Q.    I thought -- what is your answer?

9      A.    People not speaking to me.  Supervisors

10  allowing, giving out cash awards in my presence, and my

11  knowing that I have worked hard for one, and I didn't get

12  it.  Not given any work.  Not people like I said speaking

13  and all that.  Just difficulty coming --

14     Q.    Anything else?

15     A.    Not right now.

16     Q.    Okay.  You filed responses to request for

17  admissions, and in response to request for admission

18  number three the admission to the request was other

19  Department of Interior employees were denied access to

20  the Internet because of litigation in federal court

21  during the relevant time period.  Your -- admit that

22  other employees -- this is your answer, admit that other

23  employees were denied access to the Internet due to the

24  *Cobell* litigation, but deny as to the extent that it

25  applies to all other employees.  That was your answer,

1  correct?

2      A.    Correct.

3      Q.    Isn't it true that many supervisors were denied

4  access to the Internet during this period of time?

5      A.    Correct.

6      Q.    And isn't it true that Caucasian under 40 male

7  employees were also denied access to the Internet during

8  this period of time?

9      A.    Correct.

10     Q.    In your Admission 4, Request for Admission 4,

11 states, plaintiff was denied access to the Internet

12 because of litigation in federal court during the

13 relevant time period.  Your response, admits that she was

14 denied access to the Internet due to the Cobell

15 litigation.  Now this is my question for purpose of the

16 deposition.  If you're admitting that you were denied

17 access due to the Cobell litigation, then why -- you can

18 refer to your claim, if you'd like to -- why does it

19 appear that your claim is because of discrimination in

20 your complaint, Paragraphs 25 to 30?

21     A.    Because the -- even though the Cobell

22 litigation took away the Internet for the office, the

23 Bureau of Indian Affairs, the Assistant Secretary for

24 Indian Affairs and the Bureau of Indian Affairs, certain

25 people was given the opportunity to have the OS side of

1   the LAN. I needed the LAN. A lot of the other people

2   didn't need the LAN. I needed the LAN in order to

3   connect with the Department. All my work came from the

4   Department, not the Bureau and not the Assistant

5   Secretary. My work came from the Department, the

6   entities within the Department like space. facilities,

7   budget, all this came to me through that. So LAN, that

8   was my only connection with them or I would have to walk

9   to each of these offices to get my information to do my

10   work. When they allowed certain people to have this, they

11   refused to let me have it.

12       Q.   Okay. And who were the people they allowed to

13   have it? Just to make sure that I understand why it was

14   discrimination.

15       A.   They allowed the people, I don't know exactly

16   who, but they allowed some of the people that was in the

17   main Interior Building, and they sent a computer up to G

18   Street, and I was to have my own personal one for the

19   purpose in which I was to have, but they refused to give

20   it to me.

21       Q.   You used the word they numerous times. Who is

22   they?

23       A.   I would have to say Woody Hopper.

24       Q.   So if you're alleging discrimination, you're

25   claiming discrimination, and I understand you're claiming

```
 1    it was Woody Hopper who discriminated against you by

 2    allowing these other people access and not allowing you?

 3        A.    Correct.

 4        Q.    Wasn't this in 2000 and 2001?  That's when it

 5    was, right?

 6        A.    It was taken from me in 2001 or --

 7        Q.    Yeah.

 8        A.    -- two, around that time.  They actually made

 9    me go up there.

10        Q.    Okay.

11        A.    Prior to that I had it.

12        Q.    Paragraph 25 says in or about 2000 the Agency

13    switched the computer system.

14        A.    That's different.

15        Q.    In 2002 DUM (ph.) terminal Internet hookups

16    were installed n the Human Resources Office, which

17    allowed access to the Internet.  So it was before that,

18    right?

19        A.    Yes, it was before.

20        Q.    Okay.  And you state after Paragraph 29, when

21    you say in 2002 DUM terminal Internet hookups were

22    installed in the Human Resources Office which allowed

23    access to Internet.  You then state in Paragraph 30,

24    plaintiff was unable to use the DUM terminal hookups

25    because her supervisors would not allow her to have the
```

1    software needed to be placed on the DUM terminal.  That

2    was Woody at that time?

3        A.    It was -- I believe so.  Woody or -- what year

4    was that, 2002?  Oh, I'm sorry.

5        Q.    In your complaint you say that the DUM terminal

6    hookups were done in 2002, and your supervisor would not

7    allow you to have the software needed to be placed on the

8    DUM terminal.

9        A.    That was -- it had to be McDivitt and Woody.

10       Q.    Did you contact an EEO counselor within 90 days

11   of being told that you could not have Internet access?

12       A.    I don't think I did that.

13       Q.    Did you file a complaint concerning this claim

14   prior to July of 2003?

15       A.    I'm not sure.

16       Q.    In number six, Admission 6, the admission is

17   plaintiff was not the only Department of Interior

18   employee who had to walk from the G-Street Building to

19   the Department's main building to perform some of her

20   duties during the relevant time period.  Your response,

21   admits.  Okay.  I just want to confirm.  You're not

22   making any claims under the Rehabilitation Act, is that

23   right?

24       A.    I don't know the Rehabilitation Act.

25       Q.    So you don't know whether you're making any

1    claims under the Rehabilitation Act?

2        A.    Correct.

3        Q.    Okay.  Admission 7, you state that -- or we

4    state that plaintiff was not the only Department of

5    Interior employee who did not have a private office

6    during the relevant period.  You admit that other

7    employees did not have a private office during this time

8    period.  Do you know who these people were that -- some

9    of these people that didn't have a private office?  You

10   admitted that others didn't have a private office.  Do

11   you know who any of them were that didn't have a private

12   office?  I don't want names.  Just want a yes or a no.

13   Did you know any of them?  This is not a trick question.

14   You're furrowing your eyebrow.

15       A.    I, I'm -- what time frame?

16       Q.    Well the time period is the period in which

17   you're saying that there were -- you were denied a

18   private office, which is your allegation I guess in --

19       A.    -- twice.

20       Q.    Yeah.  On January 24, 2005, plaintiff was

21   denied a private office and also denied a key to her

22   office and it was turned into a conference room.  All

23   other administrative officers had their own office.

24   Okay.  And my question was, at that time period, you

25   admitted that you weren't the only Department of Interior

1   employee that didn't have a private office.

2       A.    Correct.

3       Q.    Okay.  And my question is, did you know -- I'm

4   assuming you knew to some extent, maybe not personally,

5   but knew who they were, who some of these employees were

6   who did not have a private office?

7       A.    I -- 2005 everybody had their own private

8   office.

9       Q.    So are you changing your answer to the request

10  for admission?

11      A.    No, no.  In 2005 we were back at main Interior

12  and we shared offices.  Yes.  We did share an office.

13      Q.    And you were not the only Department employee

14  denied a private office?

15      A.    As an administrative officer, I was.  But in

16  the offices itself, we shared an office.  I'm the only

17  administrative officer in Asia (ph.).  I was the only

18  administrative officer in Asia.

19      Q.    Okay, but just let's narrow down to your

20  response and admission, okay.  The question is plaintiff

21  was not the only Department of Interior employee who did

22  not have a private office, and you admit that other

23  employees did not have a private office during this time

24  period.

25      A.    Correct.

1      Q.    Okay.  Did you know who some of these people

2   were who did not have private offices during this time

3   period?  The third time I've asked the question at least.

4      A.    For 2005, it was Shawn, the office I was with.

5   He shared an office with me, Shawn Malloy.  Iris shared

6   an office.

7      Q.    Who?

8      A.    Iris and Joann shared an office.

9      Q.    Iris?

10     A.    Winstead and Hughen (ph.) Walls, they shared an

11  office, Hughen, H-u-h-u-g-h [sic].

12     Q.    Were there any other employees, you might not

13  know them by name, were there any other employees at all

14  that did not have a private office other than the three

15  that you just listed?

16     A.    Yes.

17     Q.    And were any of the Caucasian?

18     A.    Not in 2005.

19     Q.    Okay.  One of the things you listed was Asia

20  correct?

21     A.    Was what?

22     Q.    Asian?

23     A.    Not that I know of.

24     Q.    Okay.  Give me the names of the three people

25  that you just listed again that you said that did not

```
 1   have a private office along with you?

 2        A.    Iris Winston, Hughen Walls and Shawn Malloy.

 3        Q.    Oh.  And all right.  Shawn Malloy is what race?

 4        A.    As far as I know, he's white.

 5        Q.    So three was somebody who was Caucasian who did

 6   not have a private office?

 7        A.    Yes.

 8        Q.    And why did you just tell me that no, none of

 9   the people who didn't have private offices were

10   Caucasian?

11        A.    I made a mistake.

12        Q.    Is -- how old is Shawn Malloy?

13        Q.    I don't know.  Is it possible he's under 40?

14        A.    I don't know.

15        Q.    How old do you think he is?

16        A.    I don't know.

17        Q.    And the only three people that you can think of

18   that did not have private offices you have just listed.

19        A.    For 2005, that's all I can think of.

20        Q.    As Admission 8, you're asked, plaintiff was not

21   the only Department of Interior employee who did not have

22   a key to her old office during the relevant time period.

23   And you admit that other employees did not have a key to

24   their old office.  Who are the other employees that did

25   not have a key to their own office?  Every question that
```

1   I ask you, and this is not badgering, this is I'm trying

2   to -- you appear puzzled to me.  Are these puzzling

3   questions or just maybe --

4       A.    The way --

5           MR. WEISBROT:  I'm going to object and move to

6   strike that comment.  I mean that's your characterization

7   of how she looks.  I think she looks like she's

8   concentrating and trying to respond honestly.

9           MR. SHOAIBI:  All right.

10          MR. WEISBROT:  She's making sure she's thinking

11  about her responses and giving a good response.

12          MR. SHOAIBI:  Fantastic.

13          BY MR. SHOAIBI:

14      Q.    You're, you're concentrating and your thinking

15  is, is there anything I can do to clarify the question?

16  These are your answers to admission.  You, you've stated

17  this already.  I'm simply asking you some follow-up

18  questions on your responses.  You've admitted that other

19  employees did not have a key.  Were any of them white?

20      A.    What I admitted to was the key to the

21  conference room, that's what I'm speaking of here.  You,

22  you're --

23      Q.    Okay.  This is exactly what you said in your

24  request for admission.  Here's the request, number eight.

25  Plaintiff was not the only Department of Interior

1    employee who did not have a key to her old office during

2    the relevant time period. That was the request.  Answer:

3    Admits that other employees did not have a key to their

4    old office.  Not to the conference room.  To their old

5    office.  Okay.  Is that clear?  My question is --

6        A.    It's clear.

7        Q.    Okay.  Were any of these people, these

8    employees who did not have a key, you admitted did not

9    have a key, were any of them Caucasian?

10       A.    No.

11       Q.    No, they weren't.  Okay.  Then tell me exactly

12   who it was who didn't have a key?  Give me a list.

13       A.    I can't give you a list.

14       Q.    But you can remember that none of them were

15   white?

16       A.    I only worked with Indians.

17       Q.    So everybody who didn't have a key to their old

18   office that you knew of were Indians?  That's correct?

19   Yes?

20       A.    That would be correct.  Yes, that would be

21   correct.

22       Q.    But you can't give me the names of the people,

23   employees who didn't have a key to their old office?

24       A.    No, I can't.

25       Q.    Okay.  Can you tell me whether these Indians,

1   who were the only people that you knew of that didn't

2   have a key to their old office other than you were male

3   or female?

4        A.    Both.

5        Q.    And can you tell me whether they were under or

6   over 40 years of age?

7        A.    No.  I cannot tell you that.

8        Q.    Can you tell me -- I assume you have a number

9   then.  You don't know the names, but you know they were

10  Indians.  How many were there that didn't have a key to

11  their old office?

12       A.    That I don't know.

13       Q.    Was it more than three?

14       A.    It could be.

15       Q.    But you're sure that none of them were

16  Caucasians?

17       A.    As far as I know, none of them were Caucasians.

18       Q.    Now you stated that they were both male and

19  female, correct?

20       A.    Correct.

21       Q.    So there's at least two of them, right?

22  Correct?

23       A.    Correct.

24       Q.    Was it -- it was more than one.  Know that for

25  a fact, right?  More than one person didn't have a key of

1    this group of Indians who didn't have a key?

2        A.    Yes.

3        Q.    Okay.  Admission 10, you're asked, plaintiff

4    did not have Mr. Middleton's approval to construct a

5    partition wall in the plaintiff's office space.  And you

6    deny that.  Denies.  You state you believed through Harry

7    Coldo, that you had permission.  And my question is, who

8    is Harry Coldo?

9        A.    Harry Coldclaw.

10       Q.    Coldclaw?

11       A.    He's the one that would have built the, who

12   would have built the wall.

13       Q.    What did Harry Coldclaw tell you?

14       A.    That when he spoke with Mr. Middleton some time

15   ago, he was in agreement with the wall going up.

16       Q.    Isn't it true that you contacted Harry Coldclaw

17   about the partition, and that you knew you didn't have

18   permission from Middleton himself?

19            MR. WEISBROT:  Objection.  Compound question.

20            BY MR. SHOAIBI:

21       Q.    Isn't it true that you didn't have approval

22   from Mr. Middleton himself?

23       A.    Correct.

24       Q.    And isn't it true that you contacted Harry

25   Coldclaw about, about the partition?

1    A.   Correct.

2    Q.   Admission 13, you're asked, plaintiff was not

3  the only Department of Interior employee given new or

4  different duties after the reorganization of components

5  of the Department of the Interior.  And you admit that.

6  Were other Caucasian males under the age of 40 also given

7  different duties?

8    A.   `I assume so.

9    Q.   Admission 14, you're asked, plaintiff has had

10  disputes with other Department of Interior employees who

11  are not her supervisors.  And you deny that.  Is it your

12  testimony under oath today that you never had a dispute

13  with another employee?

14    A.   Correct.

15    Q.   Okay.

16    A.   I take that back.

17    Q.   Admission 15.

18    A.   I'm sorry.

19    Q.   Oh, you're going to change that answer?  Okay,

20  go ahead, change it.

21    A.   What time frame are we talking?

22    Q.   The, the request for admission was, plaintiff

23  has had disputes with other Department of Interior

24  employees who are not her supervisors.  Denies.  There is

25  on timeframe provided.  During your entire career at

1   Department of Interior.  Are you saying now that you

2   have had disputes?

3        A.   There was one.

4        Q.   Okay.  So why did you deny --

5        A.   Because I didn't think about it.

6        Q.   You didn't think of it?

7        A.   I didn't think of it during -- for this case,

8   this timeframe of the case.  I assumed it was only

9   dealing with this case.

10        Q.   What, what's the one dispute that you had and

11   who was it with?

12        A.   It was I was supervising an employee and

13   another supervisor wanted her, and I didn't want her to

14   have her because it was my supervisor and it was taken

15   from me, the employee was taken from me.

16        Q.   Okay.

17        A.   So that was the only dispute.

18        Q.   Okay.  Who was the dispute with?  Was it with

19   the employee or the supervisor?

20        A.   It was with the supervisor.  It was with a

21   supervisor.

22        Q.   It was somebody else's supervisor, but it

23   wasn't your supervisor?

24        A.   Right.

25        Q.   Okay.  Which falls under not your supervisor.

```
1          A.    Correct.

2          Q.    That's the only one?

3          A.    That's --

4          Q.    Who was the supervisor?

5          A.    Sue Ellen Soloka (ph.).

6          Q.    And where, where -- is she still with the

7    Agency?

8          A.    Oh, I don't know.  I haven't seen her.

9          Q.    When did this dispute take place?

10         A.    Back in '80 something, '88, '89.

11         Q.    And that's the only dispute you had with

12   somebody who wasn't your supervisor at  Interior?

13         A.    Except for the nepotism with Woody Hopper, but

14   that wasn't really a dispute.  I mean it was a dispute,

15   but it was -- he was accusing me of nepotism, and it

16   wasn't nepotism.

17         Q.    On that note, Admission 15 states plaintiff

18   attempted to assist her daughter getting hired at the

19   Department of Interior.  You denied that.  Who told your

20   daughter about the position?

21         A.    I did.

22         Q.    Admission 16.  You're asked, plaintiff offered

23   to draft a position description for the position for

24   which her daughter was being considered in order to have

25   her daughter hired at a higher grade.  You deny that.
```

1   Correct?

2        A.   I didn't offer it, no, I didn't.

3        Q.   So what did you do?  You seem to be making a

4   distinction.  You didn't offer it?

5        A.   No, I didn't offer it.

6        Q.   But you did draft it?

7        A.   No.  It wasn't drafted.

8        Q.   How was the position description created?

9        A.   It wasn't.

10        Q.   Okay.  Admission 17, plaintiff drafted the

11   position description referenced above without disclosing

12   the relationship between plaintiff and her daughter.  And

13   you deny.  You said plaintiff did disclose the

14   relationship between herself and her daughter prior to

15   drafting the position description.  That's your answer,

16   right?

17        A.   Yes.

18        Q.   How can --

19        A.   Position description was never drafted.

20        Q.   Okay.  That's my question.  How can you deny

21   Admission 16 that you drafted the position description,

22   and then claim here that you disclosed the relationship

23   before drafting the position description?

24        A.   I didn't have a position description prior to

25   that.  We didn't draft a position description prior to

1  that.

2      Q.    But you state --

3      A.    I know what you're saying was there, but I'm

4  telling you now that it wasn't a position description

5  drafted.

6      Q.    Okay, so --

7      A.    By me.

8      Q.    -- the answer plaintiff did disclose the

9  relationship between herself and her daughter prior to

10  drafting the position description, that's false because

11  despite the fact that you admit here that you did draft

12  the position description, you're saying  now you didn't?

13      A.    The position description was never drafted.

14      Q.    So why did you state in response to Admission

15  17, quote, plaintiff did disclose the relationship with

16  herself and her daughter prior to drafting the position

17  description, end quote?

18      A.    Because I -- when the supervisor accepted her

19  to work with her, that's when I told her it was my

20  daughter.  So that's prior to the position description

21  being draft -- a position description to be drafted was

22  done.  I told her prior to the position description being

23  generated that she was my daughter.  A position

24  description was never drafted by me.

25      Q.    In Paragraph 29 of the complaint, you stated

1  between 1989 and 2005, plaintiff has not been given any

2  meaningful or complex work assignments.  What do you mean

3  by that?

4      A.    The work in which I am accustomed to doing as

5  an administrative officer, a lot of them weren't -- it

6  was taken away during a, a certain period of time.  And,

7  as I described earlier, the only thing I'm doing at this

8  present time is calling individuals up and asking them to

9  give me their statement, and I just put it in a packet

10 and give it to my boss.  That's not anything substantial

11 for my grade level.

12     Q.    Remember those awards we reviewed, those cash

13 awards?

14     A.    Yes.

15     Q.    What were those for?

16     A.    For my work with the other offices going beyond

17 the call of duty.

18     Q.    But they weren't for meaningful or complex work

19 assignments?

20     A.    Yes, they were.

21     Q.    The last award was in November of 2004?

22     A.    Correct.  No.  No.  I got one 2006 for $100.

23           MR. SHOAIBI:  Okay.  Okay.  I think I'm done.

24           MR. WEISBROT:  I have no questions.

25           MR. SHOAIBI:  Okay.

1              COURT REPORTER:  Do you want to have her read

2    and sign or waive signature?

3              MR. WEISBROT:  We'll read and sign.

4              COURT REPORTER:  You want --

5              MR. WEISBROT:  Expedited.

6              COURT REPORTER:  Five-day, one day, two days?

7              MR. WEISBROT:  I think five days.

8              COURT REPORTER:  Five days.  And Mr. Weisbrot.

9              MR. WEISBROT:  Weisbrot.

10             COURT REPORTER:  Weisbrot.

11             MR. WEISBROT:  That's okay.

12             COURT REPORTER:  Do you want a copy of the

13   deposition?

14             MR. WEISBROT:  Yes, I will.  If you just give

15   me an order form now, and I'll --

16             COURT REPORTER:  You know what, I don't have

17   one with me.

18             MR. WEISBROT:  Okay.

19             COURT REPORTER:  But you can call -- or I will

20   call you or fax --

21             MR. WEISBROT:  Yeah.  Let me read you my fax

22   and my

23   -- well, actually you have them both right there.

24             COURT REPORTER:  I have the fax, so I'll fax

25   you over an order.

1         MR. WEISBROT:  Let me just get your name.

2         COURT REPORTER:  Susan --

3         MR. WEISBROT:  Susan --

4         (Whereupon, at 4:30 p.m., the deposition of

5   Margaret Roberta Brantley was thereby concluded.)

6         (Signature and review of transcript by Deponent

7   not waived.  Deponent will sign and review.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3    This is to certify that the attached deposition of

4    MARGARET ROBERTA BRANTLEY, was held on October 18, 2007,

5    and that the proceeding was held according to the record,

6    and that this is the original, complete, and true and

7    accurate transcript of said deposition.

8

9

10                                    _____

11                                    Susan Jelen
                                      Official Reporter

12

     My Commission Expires:

13
     June 30, 2008

14

15

16

17

18

19

20

21

22

23

24

25