# EXHIBIT C

Deposition of Jerry Fiely

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x

MARGARET R. BRANTLEY,                :

      Plaintiff,              :

   vs                               :  CIVIL ACTION NO.
                            06-1137 (ESH)
DIRK KEMPTHORNE, Secretary,          :
United States Department
of Interior,                         :

      Defendant.              :

- - - - - - - - - - - - - - - -x

July 2, 2007

PURSUANT TO NOTICE, the following deposition of

JEROME E. FIELY was taken before me, Nancy S.

Trueheart, Notary Public, in and for the State of

Maryland, at Snider & Associates, 104 Church Lane,

Baltimore, Maryland, commencing at 11:57 a.m., when

were present on behalf of the respective parties:

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

APPEARANCES

      JASON I. WEISBROT, ESQUIRE
      Snider & Associates, Inc.
      104 Church Lane, Suite 100
      Baltimore, Maryland, 21208
      (410) 653-9060

          On Behalf Of The Plaintiff


      JUDITH A. KIDWELL, ESQUIRE
      United States Attorney's Office
      555 4th Street, NW
      Washington, D.C., 20530
      (202) 514-7250

      PHYLLIS LESLIE, ESQUIRE
      Department of the Interior
      1849 C Street, NW
      Washington, D.C., 20240

          On Behalf Of The Defendant

3

I-N-D-E-X

<u>WITNESS</u>

<u>JEROME E. FIELY</u>

Examination by Mr. Weisbrot          Page    4

Examination by Ms. Kidwell           Page   35

Examination by Mr. Weisbrot          Page   36

<u>EXHIBITS</u>

<u>FIELY DEPOSITION</u>                          <u>MARKED</u>

No. 1  Personnel Documents                   28

(Attached)

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

4

1                  P R O C E E D I N G S

2    Whereupon,

3                    JEROME E. FIELY

4    a witness, having been called for examination by

5    Counsel for the Plaintiff, and after having been

6    duly sworn according to law, was examined and

7    testified as follows:

8                    EXAMINATION

9         BY MR. WEISBROT:

10        Q.    Good morning.

11        A.    Good morning.

12        Q.    My name is Jason Weisbrot and I'm

13    representing Ms. Brantley in her complaint against

14    the Agency.  Have you ever been deposed before?

15        A.    No, sir.

16        Q.    Okay.  So, I'm just going to explain the

17    basics to you briefly.  I'm going to ask you a

18    series of questions, you're going to have to

19    respond.  You have to give verbal responses because

20    the Court Reporter is going to listen to the tape

21    and then transcribe it into a written record.  She

5

1  has to be able to hear your responses to do that;

2  understood?

3      A.   Yes.

4      Q.   Perfect.  You're under oath, so obviously

5  tell the truth.  If you want to take a break that's

6  fine.  I just ask that you don't take a break when

7  a question -- in the middle of a pending question,

8  you answer the question and then take your break.

9          You  have  to  answer  all  questions.

10  Occasionally Ms. Kidwell will be objecting, I just

11  ask that you allow her an opportunity to state her

12  objection for the record and then you can respond.

13  If she tells you not to respond then we can deal

14  with that lawyerly stuff when the time comes.

15          If you don't understand the question, I

16  just ask that you ask me to repeat it, or rephrase

17  it, otherwise if you give a verbal response, I'll

18  assume that you understood the question when it was

19  asked.

20          Are you on any medications at this time

21  that would affect your ability to answer truthfully

6

1    and honestly?

2        A.   No, sir.

3        Q.   Did you prepare for this deposition in any

4    way?

5        A.   I just discussed it with the attorneys.

6        Q.   Okay.  Did you have any discussions with

7    anyone other than the attorneys?

8        A.   No, sir.

9        Q.   Have you reviewed any documents?

10       A.   I did go through and looked at my time

11   sheets and some E-mails just to get a familiarity

12   with dates.

13       Q.   Are those documents that you provided to

14   Ms. Kidwell?

15       A.   No, I have not.

16       Q.   Okay.   If requested you'd be able to

17   provide those documents?

18       A.   Yes.

19       Q.   And specifically what is it?  What were

20   those documents that you were looking at?

21       A.   It was just a couple of e-mails to really

7

1    refresh in my mind, when we moved to 1800 G Street.

2    Really when I started with the Office of Audit and

3    Evaluation.

4        Q.   We'll get to that later, but that is the

5    office that you worked with Ms. Brantley in?

6        A.   Yes.

7        Q.   What was that called again?

8        A.   Office of Audit an Evaluation.

9        Q.   Audit and Evaluation.   Where are you

10   currently employed?

11       A.   I'm currently employed in the Office of the

12   Assistant Secretary of Indian Affairs, Office of the

13   Chief Financial Officer.

14       Q.   That is a mouthful huh?

15       A.   Yes.

16       Q.   How long have you been in that office?

17       A.   Since about 2001, maybe about 2000.

18       Q.   Have you been in the same position that

19   entire time?

20       A.   Yes.

21       Q.   What was that?

8

1    A.    I am Director of the Office of Audit and
2  Evaluation.

3    Q.    What are your primary duties?

4    A.    We handle audit liaison duties with Indian
5  tribes that perform single audit reports.

6    Q.    That is what the office does?

7    A.    Yes.

8    Q.    What are your primary duties?

9    A.    I am the Director of the office, so I
10  oversee the operations.

11    Q.    You supervise employees?

12    A.    Yes.

13    Q.    How many?

14    A.    Presently four.

15    Q.    That's changed throughout the time period?

16    A.    Yes.   I mean it was never more than, I
17  guess at the maximum when I had the Denver office it
18  was three.   It was at maximum seven.

19    Q.    Okay.  So anywhere between three and seven?

20    A.    Correct.

21    Q.    Where did you work prior to 2001?

9

1    A.   Well, I was with the Office of Audit and

2   Evaluation since 1997.

3    Q.   So, the office that you most recently said

4   you worked for, the long named Office of Assistant

5   Secretary is a sub-division of the Audit and

6   Evaluation?

7    A.   Well no, Audit and Evaluation is a

8   sub-division of that office.

9    Q.   Okay.  So, that's the larger whole?

10    A.   Correct.

11    Q.   So, from 1997 though on, you were

12   specifically with the Office of Audit and

13   Evaluation?

14    A.   Correct.

15    Q.   What was your -- did you have more than one

16   position during that time period?

17    A.   I was hired as the Deputy Director.

18    Q.   That means you worked right under the

19   Director?

20    A.   Correct.

21    Q.   Who was that at the time?

10

1      A.   Linda Richardson.

2      Q.   When did she leave?   Or she left in 2001

3  when you became the Director?

4      A.   She left the office before then, I don't

5  really recall when she left the office.

6      Q.   So, some time after 1997, before 2001?

7      A.   Correct.

8      Q.   You took her position immediately?

9      A.   I became Acting Director of the office.

10  And then in the reorganization that we had when we

11  actually moved underneath of the office of the Chief

12  Financial Officer I became the Director of the

13  office.

14      Q.   Do you remember when that reorganization

15  was?

16      A.   It was some time probably in 2000, I would

17  say, maybe 2001, 2000-2001.

18      Q.   So that was a non-competitive placement

19  though?

20      A.   Into the director's position?

21      Q.   Correct.

11

1    A.    Yes.

2    Q.    Okay.  Prior to 1997 were you still working

3    with Interior?

4    A.    Yes, I was with the Office of Inspector

5    General.

6    Q.    How long?

7    A.    Since 1974.

8    Q.    Did you work in more than one position

9    during that time period?

10    A.    I was an auditor.  My position was auditor

11    but I had served from a auditor all the way through

12    a Regional Audit Supervisor.

13    Q.    What grade level did that range from?

14    A.    I started as a GS-7 and the Regional Audit

15    Supervisor was a GS-14.

16    Q.    Did you work anywhere prior 1974?

17    A.    Just odd jobs in college.

18    Q.    When did you graduate?

19    A.    1974.

20    Q.    I'm going to focus on the time period

21    between 2001 and the present I guess.  Who is your

12

1    first line supervisor?

2        A.    Presently?

3        Q.    Between 2001 and the present, if it has

4    changed --

5        A.    It was Debbie Clark for a period of time

6    and then when Grayford Payne became the OCFO, he

7    became -- and he is my present supervisor.

8        Q.    Who is that?  Do you know who your second

9    line supervisor was?

10       A.    When it was Debbie Clark it would have been

11   Jim McDivitt.  And when it was Grayford Payne it us

12   now Debbie Clark.

13       Q.    Have you ever filed a formal or informal

14   complaint of discrimination?

15       A.    No, sir.

16       Q.    Have you ever had a formal or informal

17   complaint of discrimination filed against you?

18       A.    No, sir.

19       Q.    When did you meet Ms. Brantley?

20       A.    When I started with the Office of Audit and

21   Evaluation in 1997.

13

1    Q.    How did you come to meet her?

2    A.    She was serving as Administrative Officer

3    for the Office of Audit and Evaluation.

4    Q.    Do you know who she reported to directly?

5    A.    You mean when I started?

6    Q.    When you first met her in 1997.

7    A.    She was reporting to Linda Richardson, but

8    I was the Deputy and I provided her direction for

9    the office.

10    Q.    So, Linda Richardson would have been her

11    supervisor of record?

12    A.    Linda Richardson was the Director of the

13    office, it was a small office and she supervised

14    everyone.   I prepared her performance appraisal and

15    prepared her performance standards.

16    Q.    For how long did you do that?

17    A.    I prepared them all the way through 2001.

18    Q.    Okay.  Could you briefly just describe what

19    her day-to-day job duties were during that time

20    period?

21    A.    She served as Administrative Officer for

14

1    the Office of Audit and Evaluation.  The office of

2    Self  Governance;  the  Office  of  American  Indian

3    Trust, and for the immediate Office of the Assistant

4    Secretary of Indian Affairs.

5            And  she  was  the  sole  Administrative

6    Officer,  or  only  Administrative  Officer,  so  she

7    dealt with procurement; property; personnel; budget;

8    accounting, basically any issues other than IT.

9        Q.   Where did you physically work between 1997

10   and 2001?

11       A.   We were in the main Interior building.

12       Q.   During that entire time period?

13       A.   Yes.

14       Q.   And what floor did you work on?

15       A.   Always the second floor.

16       Q.   At  some  point  in  time  your  offices  were

17   moved to the G Street offices?

18       A.   Correct.

19       Q.   When did that occur?

20       A.   March-April 2002.

21       Q.   How did that come about?

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

15

1      A.   The   reorganization   that   took   place   in

2   2000-2001, I guess it was probably more like 2001,

3   brought more people into what was called the Deputy

4   Assistant   Secretary   for   Management,   which   was   Mr.

5   McDivitt,   and   he   wanted   to   have   all   of   his   staff

6   that   reported   to   him   co-located   in   one   place.   And

7   there wasn't any room in the main Interior Building,

8   so we moved up to the G Street office.

9      Q.   How many employees were moved?

10     A.   Probably 20 some, I don't know the exact

11   number.   Plus there were people being hired.

12     Q.   Did   you   ever   have   a   discussion   with   Ms.

13   Brantley prior to the move about whether or not she

14   would have to be moved?

15     A.   Yes, we talked about it.   I mean we talked

16   about the move, and whether or not she would move.

17     Q.   What was discussed?

18     A.   I   mean   basically,   we   discussed   that   I

19   believe   that   she   was   going   to   move,   because   the

20   whole   staff   was   going   to   move   up   there.   It   wasn't

21   my   decision   to   make.   But   that   at   the   time   we   were

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland   21146*
*410-987-7066    800-734-3337*

16

1  not connected -- well we still can't.  In Indian

2  Affairs you could not send E-mails outside of Indian

3  Affairs.

4          And when she was in the main Interior

5  building she would have access to the Office of the

6  Secretary's server, and she could communicate with

7  some of the people that she inner-acted with.

8          At the G Street location we would no longer

9  have that capability.

10      Q.   Did that affect Ms. Brantley's ability to

11  do her job?

12      A.   It made it more difficult, yes.

13      Q.   What did she have to do in order to do her

14  duties?

15      A.   Well, we are under the Office of the

16  Secretary.  The Office of the Assistant Secretary of

17  Indian Affairs is actually part of the office of the

18  Secretary.  And she was in her day-to-day job she

19  inter-acted with the Office of the Secretary's

20  budget people, their personnel people, excuse me,

21  their procurement people, and obviously it is much

17

1   easier to do your job if you have E-mail
2   capabilities.
3       Q.   Do you know if Ms. Brantley had to travel
4   between the offices to do her work?
5       A.   She had to travel between.
6       Q.   The main office?
7       A.   The main Interior building and the G Street
8   office, yes.
9       Q.   Do you know how often she would make that
10  commute?
11      A.   At least daily, if not more.  I mean it was
12  what, four blocks?  I mean she walked -- she had to
13  walk between the buildings.
14      Q.   You were explaining that that was due to
15  the software issues.  Can you explain that a little
16  bit more?  The connectivity.
17      A.   It was connectivity -- I mean, I'm not an
18  IT person.  When we were in the main Interior
19  building, she was able to have her computer
20  connected to the Office of the Secretary network,
21  and therefore be able to send e-mails.  When she was

18

1  up at the G Street building she was not able -- we

2  did not have the capability of connecting to the

3  Office of the Secretary's network.  And she would be

4  on the BIA network.  And the BIA network could not

5  send E-mails outside of BIA.

6      Q.  You're saying that affected all the

7  employees that went to G Street?

8      A.  Yes.  We're not connected to the internet.

9  And the internet would be the way that you would

10  send your E-mails, my understanding, you send your

11  E-mails between offices that are not on your own

12  network.  And yes, so it affects all of us not being

13  on it.

14      Q.  Do you know of any employees who had to

15  have access or communications with employees on OS

16  server?

17      A.  Well we all -- I mean all of us would have

18  access with the Office of the Secretary employees.

19  I mean we would all -- at some point in time we all

20  sent e-mails to the people in the Office of the

21  Secretary.  Again, they were, we were part of the

**ELITE REPORTING COMPANY**
*67 Saint Andrews Road*
*Severna Park, Maryland 21146*
*410-987-7066   800-734-3337*

1

19

1    Office of the Secretary.

2           So, if I wanted to send something to my

3    Personnel Office I would send them an e-mail, you

4    know.

5           Q.   Right.   Okay.   My question though more

6    focuses on the requirement.  In other words for your

7    day-to-day  activities  did  you  have  to  have

8    day-to-day interaction with employees through the OS

9    server?

10          A.   No, not my job.  Well, I probably would

11   communicate maybe -- well, it probably wasn't daily

12   that I would send out an E-mail to the Office of the

13   Secretary.

14          Q.   But  Ms.  Brantley's  job  required  more

15   frequent interaction?

16          A.   Ms.  Brantley's  job  required  more

17   interaction with the Office of the Secretary of

18   Personnel than mine did.

19          Q.   Okay.  Did you ever hear anything about Ms.

20   Brantley being rift to the Secretary of Interior's

21   office?

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

20

1    A.   I do not recall, no, I do not recall

2    hearing it.

3    Q.   Do you remember if she ever worked for B.J.

4    Thornsberry?

5    A.   No, I do not recall.  I do not recall her

6    working for him.

7    Q.   Did you ever have any discussions with

8    Linda Richardson about how Ms. Brantley was assigned

9    to the office?

10    A.   I don't recall how she said that she was

11    assigned to the office.

12    Q.   Did you have any knowledge of Ms.

13    Brantley's prior EEO activities?

14    A.   Prior, I'm sorry?

15    Q.   Any prior EEO activities?

16    A.   No.

17    Q.   You don't know if Ms. Brantley had ever

18    filed an EEO complaint?

19    A.   Oh, I know that she had filed an EEO

20    complaint, but I don't know how.

21    Q.   Other then the instant complaint?

21

1    A.   Yes.   I know that she had filed an EEO

2  complaint before then.

3    Q.   You don't know how you know though?

4    A.   Well, I know that she had filed -- I know

5  that her coming to the office was a part of an EEO

6  complaint, but I don't know what the action was, or

7  how that came about.

8    Q.   Did you ever have any discussion with Ms.

9  Brantley about her receiving a promotion?

10   A.   We talked about promotions but -- could you

11  repeat the question?

12   Q.   The question was I believe, did you ever

13  have any discussions with Ms. Brantley about her

14  receiving a promotion?

15   A.   We discussed -- but I mean, we discussed

16  about promotion potential.   It wasn't my decision.

17   Q.   Okay.   What did she tell you?

18   A.   She   had   talked   about   how   other

19  administrative officers were of higher grades than

20  hers.

21   Q.   Do you know if that is true?

22

1    A.    Only to the extent that she would indicate

2    that this administrative officer was a 12, this

3    administrative officer was 13.  I do know that the

4    administrative officer that we had in the Officer of

5    the Inspector General was a higher grade.

6    Q.    That was when you left in 1997?

7    A.    Correct.

8    Q.    They were at the higher grade?

9    A.    Well yeah, I mean when I first started with

10   the Office of Inspector General we only had one

11   person acting as our administrative officer.  When

12   we left in 1997 that function was being handled by

13   other people.  We had taken over our own personnel

14   shop, for example.  We had developed an Office of

15   Inspector General Personnel Shop instead of relying

16   upon the Office of the Secretary.

17   Q.    How many AO's were there in the Office of

18   Audit and Evaluation?

19   A.    Just one.

20   Q.    Ms. Brantley?

21   A.    Yes.

23

1    Q.   I believe you had said that it wasn't your
2    decision to make?

3    A.   I would not be my decision to promote her.

4    Q.   At any time between 1997 and 2001?

5    A.   No.

6    Q.   Whose decision was it?

7    A.   Well, it would have been Linda Richardson's
8    decision.   And then when Linda Richardson left it
9    would be Debbie Clark's.

10   Q.   Did you ever have any discussions with
11   Linda Richardson regarding Ms. Brantley's claims, or
12   desire to want a higher graded position?

13   A.   No.

14   Q.   Why not?

15   A.   I just didn't feel it was my position.   I
16   mean it was a small organization.   It wasn't as if
17   I had to present something that Linda Richardson
18   wasn't fully aware of so if Linda believed that she
19   should be promoted, or should be promoted she could
20   take that action.   She had day-to-day knowledge of
21   Ms. Brantley's activities.

24

1      Q.   Did Linda Richardson ever indicate to you,

2  one way or another, how she felt about the issue?

3      A.   I don't think she felt that Margaret should

4  be promoted.

5      Q.   Did she ever tell you why?

6      A.   I don't think that she felt that the job --

7          MS. KIDWELL:    Objection, relevancy and

8  improper foundation, and competency.

9      Q.   You can answer.

10     A.   Can you repeat?

11     Q.   I was just asking you, I believe I had

12 asked you if Linda Richardson ever indicated to you

13 one way or another how she felt about the issue of

14 Ms. Brantley receiving a promotion, and you said she

15 didn't think that she deserved one.   Then I asked

16 you if she explained why she felt that?

17     A.   She didn't believe that the duties deserved

18 it.

19     Q.   So, you never put in for an accretion of

20 duties of Ms. Brantley's position?

21     A.   No, sir.

25

1    Q.    Did you ever issue Ms. Brantley a cash

2    award?

3    A.    Yes.

4    Q.    Do you know how many times?

5    A.    I would say definitely more than once.  I

6    would say probably three times, maybe four.

7    Q.    What were those based on?

8    A.    Her performance.

9    Q.    She was a good worker?

10    A.    Yes.

11    Q.    Do you recall there being a position

12    available in Alcohol and Substance Abuse Prevention

13    around 2001?

14    A.    Yes, I remember that the office was formed

15    and that Margaret was working over there.  Again,

16    the Office of Alcohol and Substance Abuse was formed

17    and it was formed underneath, as an office within

18    the Assistant Secretary of Indian Affairs.  So when

19    that office was formed Margaret would have began

20    serving, or performing the administrative duties for

21    that office.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

26

1    Q.   Because Ms. Brantley served as a AO for

2    various offices within that division?

3    A.   Yes; that's correct.

4    Q.   It was called a division?

5    A.   It was called an office.

6    Q.   An office.  So, other offices within that

7    office?

8    A.   Right.

9    Q.   Was there ever an AO permanent position

10   posted for that office, the Alcohol and Substance

11   Abuse Office?

12   A.   Not that I'm aware of.

13   Q.   Do you remember ever telling Ms. Brantley

14   that she should only take that job if it is a GS-14?

15   A.   No, I do not.

16   Q.   I'm going to show you this.

17        (Counsel handing witness a document.)

18        MR. WEISBROT:  This is actually a full copy

19   the one I gave you is only a half copy.

20   Q.   Have you ever seen a document like this

21   before?

27

1    A.    It looks like a print screen from PPS.

2    Q.    What is PPS?

3    A.    Our Federal Personnel System.

4    Q.    Okay.   If you could turn to the second

5    page?

6          MS. KIDWELL:  Let the record reflect there

7    are no numbers on these pages.

8    Q.    Is that your name as the authorizing

9    official on this document?

10   A.    Yes.

11   Q.    Do you recall taking this action?

12   A.    Yes.

13   Q.    What exactly was it?

14   A.    I believe it was for her cash award.

15   Q.    This was a notation that as added for the

16   record?

17   A.    I believe, yeah.  I mean we had to put in

18   the justification for it, and I either gave this to

19   be typed in there, or I had the capabilities of

20   accessing the system and typed it in there.

21   Q.    But do you recall her completing the USDA

28

1    Women Executive Leadership Program?

2        A.    Yes.

3        Q.    And then you would agree with that second

4    part that while she did that she was able to do her

5    other duties for the other four offices?

6        A.    Yes.   I mean when she was away other

7    people, the administrative assistants would take

8    over or assist her in the duties.   But she always

9    made sure that she was in contact and if there was

10   something that they didn't know how to do that she

11   would make sure that she provided direction in that.

12       Q.    You have done other ones like these?

13       A.    Other?

14       Q.    I mean I believe before you said that you

15   had done at least three or so?

16       A.    Yes.

17           MR. WEISBROT:    I'll have this marked as

18   Exhibit 1.

19           (Whereupon, Fiely Deposition Exhibit No. 1

20   was marked for identification.)

21           MR. WEISBROT:    These documents were

29

1   actually sent as --

2            MS. KIDWELL:  Am I correct that there are

3   22 pages?

4            MR. WEISBROT:  I'm going to do that right

5   now, I'll let you know.

6            MS. KIDWELL:  Thank you.  This is Exhibit

7   1?

8            THE REPORTER:  Yes.

9            MR. WEISBROT:  That is what I count.

10            MR. WEISBROT:  Yes, 22.

11       Q.   So, you testified before that you were not

12   the decision maker on whether or not Ms. Brantley

13   would receive her promotion?

14       A.   Yes.

15       Q.   That's why you didn't take any further

16   steps when you had a discussion with her?

17       A.   Yes.

18       Q.   Do you think she deserved a promotion?

19       A.   I think she did her job well.  I would have

20   to do more analysis before I could have made that

21   decision.

30

1    Q.   Do you think her job was properly

2  classified at the GS-11 level?

3    A.   I don't know.   I mean, I don't know how

4  that whole effort is done.

5    Q.   Do you know if there was ever an audit

6  conducted of her position?

7    A.   I believe that there was.

8    Q.   Do you know if a report was ever issued on

9  that audit?

10   A.   I do not.

11   Q.   Do you know why the audit was conducted?

12   A.   I believe it was that at Ms. Brantley's

13  request, but I'm not sure.

14   Q.   Have you ever had any discussion with

15  Debbie Clark about Ms. Brantley's requests to be

16  higher rated?

17   A.   No.

18   Q.   Have you ever had a discussion with Ms.

19  Clark about Ms. Brantley?

20   A.   Just on, you know, basically, ask Margaret

21  to do this, ask Margaret to do that, that type of

31

1    thing.

2        Q.  Ms.  Clark  never  told  you,  has  never

3    indicated to you a personal preference as to whether

4    or not she likes Ms. Brantley?

5        A.  No.

6        Q.  What about Ms. Linda Richardson, did she

7    ever indicate one way or another?

8        A.  Not that I ever recall.

9            MR. WEISBROT:  Can we go off the record.

10           (Off the record.)

11       Q.  I just have a few more questions then we

12   can finish up.  I appreciate your time coming down

13   here answering truthfully.

14           Are you familiar with a nepotism policy at

15   the Agency.

16       A.  Generally.

17       Q.  What is it?

18       A.  Well, I know what nepotism is, you're not

19   allowed to hire your, you know, I couldn't hire my

20   son.

21       Q.  Okay.  Do you know about an incident in

32

1    which Ms. Brantley was accused of nepotism?

2        A.   I am aware of it, yes.

3        Q.   How did you become aware?

4        A.   I had, Margaret had said that her daughter

5    was going to do some work as -- was going to do some

6    work for the office because they needed some work

7    done.  And then I know subsequently that there was

8    a question raised as to whether it was appropriate

9    for her daughter to do it.

10       Q.   Was her daughter going to be working for

11   her?

12       A.   My understanding, no. My understanding was

13   that her daughter was going to perform the duties.

14   She wasn't going to be hired as a federal employee,

15   she was going to be hired as a contractor I believe,

16   or I'm not sure exactly how the whole procurement

17   action was going to take place.

18       Q.   Didn't Ms. Brantley tell you that Velma

19   Macy had asked her to find an employee for her?

20       A.   I don't know that she said to find an

21   employee for her, no.  I do not recall that.

33

1   Q.   Do you recall Velma Macy had an employee

2   quit and another one go on sick leave?

3   A.   I know that Velma Macy needed to have some

4   work done, and this was a way that they were going

5   to be able to get it accomplished.

6   Q.   Did Ms. Brantley's daughter ever start

7   working at the Agency?

8   A.   Yes, I believe she did.

9   Q.   Do you know how long she worked there?

10   A.   Just a short period of time.

11   Q.   More than a day?

12   A.   Yes.

13   Q.   Who was it that had the issue?

14   A.   I do not know.

15   Q.   Did you ever discuss it with Woody Hopper?

16   A.   I don't recall any discussions.

17   Q.   Are you familiar with any other sets of

18   employees in the Department of Interior that are

19   family members?

20   A.   Sets of employees, what do you mean?

21   Q.   In other words, two employees that work at

34

1   Department of Interior that have a relation to each

2   other?

3       A.   Within the Department of Interior?

4       Q.   Correct.

5       A.   Yes.

6       Q.   Any that work in the same office?

7       A.   The ones that I can immediately think of

8   they don't work in the same office.

9       Q.   Who are the ones you are thinking off?

10      A.   Well, I was thinking of Terry Virden and

11  his wife Marlene.  I was thinking of the Martins.

12      Q.   Husband and wife also?

13      A.   Yes.  I was thinking of the Clouds.  I was

14  thinking of the Wells'.

15      Q.   Do all of them still work there?  In other

16  words, both sets?

17      A.   Yes.

18      Q.   Why is it that you think Ms. Brantley and

19  her   daughters   situation   was   brought   to   the

20  forefront?

21      A.   I do not know.

**ELITE REPORTING COMPANY**
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

35

1    Q.   Did you think it was odd at the time?  Or

2  what did you think at the time?

3    A.   I didn't know all of the circumstances, so

4  I heard the word nepotism, but I didn't know all of

5  the circumstances under which she was hired and the

6  whole procurement action that was taking it.

7    I did not think that it was nepotism

8  because I did not think she had hired her as an

9  employee.

10   Q.   All right.  I have no further questions.

11              EXAMINATION

12       BY MS. KIDWELL:

13   Q.   Mr. Fiely, are you and Ms. Brantley

14  friends.

15   A.   Yes.

16   Q.   With respect to the time sheets and the

17  E-mails that you looked at, did either I or Agency

18  Counsel ask you to look at those documents?

19   A.   No.

20   Q.   Then what was your purpose in looking at

21  these documents?

36

1       A.    Just to recall memory of dates of when we,

2    you know, one is when I actually did start in the

3    Office of Audit and Evaluation, when we had moved up

4    to 800 G Street, or whatever the address is, I think

5    it was 801 G Street.

6       Q.    That is because you're having a problem

7    with your memory?

8       A.    Yes.

9       Q.    Do these e-mails relate to Ms. Brantley, or

10   to Ms. Brantley's case in any way?

11      A.    No.    I mean e-mails that I looked at was

12   just a search of 800 G Street to find out when we

13   had moved.

14      Q.    Okay.    No further questions.

15                     EXAMINATION

16         BY MR. WEISBROT:

17      Q.    I want to just ask one or two follow ups.

18   When you say you're friends with Ms. Brantley, what

19   do you mean by that?

20      A.    I mean we talk.    I mean it's -- I mean she

21   was an employee of mine and we -- I mean we worked

37

1    together.  I consider her a friend.

2        Q.    Did you ever go out socially?

3        A.    It would have only been like at an office

4    function, maybe a Christmas party that was outside

5    of the office, but I don't recall ever really going

6    out socially.

7        Q.    Have you ever been to Ms. Brantley's home?

8        A.    No.

9        Q.    Has she ever been to the home?

10        A.    No.

11        Q.    Do you call and talk to her regularly on

12    weekends aside from work related?

13        A.    No, I'd never spoken -- I don't recall

14    speaking to her on the weekend, but normally I would

15    not.

16        Q.    Okay.  That's it.

17            (Whereupon, at 12:44 p.m., the deposition

18    was concluded.)

19            (By agreement of counsel and with consent

20    of the witness, signature not waived.)

**ELITE REPORTING COMPANY**
**67 Saint Andrews Road**
**Severna Park, Maryland  21146**
**410-987-7066    800-734-3337**

38

1    State of Maryland, County of Baltimore, to wit:

2    I NANCY S. TRUEHEART, a Notary Public of the

3    State of Maryland, County of Baltimore, do hereby

4    certify that the within-named witness personally

5    appeared before me at the time and place herein set

6    out, and after having been duly sworn by me,

7    according to law, was examined by counsel.

8    I further certify that the examination was

9    recorded stenographically by me and this transcript

10   is a true record of the proceedings.

11   I further certify that I am not of counsel to

12   any of the parties, nor in any way interested in the

13   outcome of this action.

14   As witness my hand and notarial seal this

15   _16th_day of _____July_____ 2007.

16

17   _Nancy S. Trueheart_

18   NANCY S. TRUEHEART, CRI

19   NOTARY PUBLIC

20

21   My Commission expires 8/1/11.