# EXHIBIT E
Deposition of James McDivitt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x

MARGARET R. BRANTLEY,                    :

       Plaintiff,                      :

    vs                                   :    CIVIL ACTION NO.
                               06-1137 (ESH)
DIRK KEMPTHORNE, Secretary,          :
United States Department
of Interior,                          :

       Defendant.                        :

- - - - - - - - - - - - - - -x

July 2, 2007

PURSUANT TO NOTICE, the following deposition of
JAMES H. McDIVITT was taken before me, Nancy S.
Trueheart, Notary Public, in and for the State of
Maryland, at Snider & Associates, 104 Church Lane,
Baltimore, Maryland, commencing at 10:32 a.m., when
were present on behalf of the respective parties:

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

APPEARANCES

    JASON I. WEISBROT, ESQUIRE
    Snider & Associates, Inc.
    104 Church Lane, Suite 100
    Baltimore, Maryland, 21208
    (410) 653-9060

        On Behalf Of The Plaintiff


    JUDITH A. KIDWELL, ESQUIRE
    United States Attorney's Office
    555 4th Street, NW
    Washington, D.C., 20530
    (202) 514-7250

    PHYLLIS LESLIE, ESQUIRE
    Department of the Interior
    1849 C Street, NW
    Washington, D.C., 20240

        On Behalf Of The Defendant

3

I-N-D-E-X

WITNESS

JAMES H. McDIVITT

Examination by Mr. Weisbrot          Page     4

Examination by Ms. Kidwell           Page    45

Examination by Mr. Weisbrot          Page    47


EXHIBITS

(None)

4

1               P R O C E E D I N G S

2    Whereupon,

3                   JAMES H. McDIVITT

4    a witness, having been called for examination by

5    Counsel for the Plaintiff, and after having been

6    duly sworn according to law, was examined and

7    testified as follows:

8                      EXAMINATION

9         BY MR. WEISBROT:

10        Q.   Good morning.  My name is Jason Weisbrot,

11   I represent Ms. Brantley in her complaint she filed

12   against the Agency.

13             Have you ever given a deposition before,

14   have you ever been deposed?

15        A.   I don't believe I have.  I have done

16   numerous declarations, but I don't believe I've ever

17   been put under oath.

18        Q.   Just to explain the basics a little bit,

19   I'll be asking you a series of questions.  You're

20   required to answer the questions.  Periodically Ms.

21   Kidwell well have some objections.  I just ask that

5

1  you give her an opportunity to make any objections

2  she wants to make before you respond to the

3  question.

4      A.  Okay.

5      Q.  All of your responses have to be verbal

6  responses because the Court Reporter needs to be

7  able to hear the response to transcribe it for the

8  record later.

9      A.  Okay.

10     Q.  If you want to take a break, that's fine.

11  I just ask that you don't take a break in between a

12  pending question.  So if you answer any pending

13  question, and then we can take a break after that.

14     A.  Fine.

15     Q.  If you don't understand a question, I'd ask

16  that you have me repeat it or rephrase it.  If you

17  answer a question then we go and use it in the

18  record later, I'll assume you understood a question

19  if you give a response, okay?

20     A.  Okay, yes.

21     Q.  And what is your name?

**ELITE REPORTING COMPANY**
**67 Saint Andrews Road**
Severna Park, Maryland  21146
410-987-7066    800-734-3337

6

1    A.    Jams H McDivitt.

2    Q.    Are you currently on any medication that

3    would affect your ability to answer questions

4    truthfully and honestly?

5    A.    No.    I'm taking high blood pressure

6    medications, but that shouldn't bother.

7    Q.    Okay.    Did you prepare for the deposition

8    today?

9    A.    Define prepare?

10    Q.    Did you review any documents in preparation

11    for the deposition today?

12    A.    The only thing I reviewed was a copy of a

13    statement that I had done for -- and I'm not sure

14    what the correct title was, but it would be an EEO

15    investigation, back in 2004.

16    Q.    Is this the statement your referring to?

17        (Witness viewing a document.)

18    A.    Yes.

19    Q.    So, you reviewed a copy of that statement

20    in preparation for today.  Did you review any other

21    documents?

7

1     A.   None.

2     Q.   Did you meet with anyone other than counsel

3   to discuss anything?

4     A.   No.

5     Q.   Okay.

6     A.   My counsel you mean?

7     Q.   Other than these two individuals, because

8   I can't ask you -- well, I can ask you but you're

9   not required to answer.   Where are you currently

10  employed?

11    A.   I'm retired from the Federal Government.

12  I work part-time as an independent government

13  consultant.

14    Q.   For what Agency?

15    A.   For myself, independent, oh, for what

16  Agency?

17    Q.   Correct.

18    A.   The majority is with the Department of

19  Homeland Security, occasionally with Health and

20  Human Services.   And those are the only ones

21  currently.

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland   21146*
*410-987-7066    800-734-3337*

8

1    Q.    Okay.  When did you retire?

2    A.    June of 2003.

3    Q.    What was your position in the Agency at

4    that time?

5    A.    I was the Deputy Assistant Secretary for

6    Management, under the Secretary of Indian Affairs.

7    Q.    How long had you been in that position?

8    A.    I believe it was December 2000 when I went

9    there.

10    Q.    Was that a management level position?

11    A.    Yes.    I'm not sure what you mean by

12    management, but by almost any definition, yes.

13    Q.    What was your grade level during that time

14    period?

15    A.    Senior Executive ES-4.

16    Q.    Did your duties change during that time

17    period?  Did you always do the same thing?

18    A.    For the most part it was always the same

19    thing.  There was a transition from the end of one

20    administration to another.  During that time period

21    I served as the Assistant Secretary for Indian

9

1   Affairs.

2       Q.   But other than that transition period you

3   were doing the same work?

4       A.   Yes.

5       Q.   The same --

6       A.   Yes, I mean the work changes depending upon

7   which politicals are supervising and what it is they

8   want you to do.

9           I mean I always had the responsibility of

10  the Deputy Assistant Secretary for Management, but

11  there were other duties that I would get assign by

12  politicals that had -- that weren't just management

13  related.

14      Q.   Like what were your duties?

15      A.   Well, what were my primary duties?

16      Q.   Correct.

17      A.   I was the supervisor for the Chief

18  Financial Officer; the Chief Information Officer;

19  the Chief of Personnel, Human Resources; the

20  Director of an Office for Policy Analysis.   And

21  under the -- there were some smaller offices having

10

1    to do with records, and Mail Operation came under

2    me, that sort of thing.

3        Q.   So you supervised day-to-day activities

4    that went on in the office?

5        A.   I   predominantly   supervised   senior

6    executives and GS-15's that were responsible for

7    those offices.   Now the other duties as assigned

8    during the time period of the Bush Administration,

9    from January 2001 on, I spent a considerable amount

10   of time on the Indian Trust Issues, known as the

11   Cobell Litigation.  And that occupied a large amount

12   of my time.

13       Q.   How long were you employed by the Agency in

14   total?

15       A.   Interior?

16       Q.   Yeah, in all?

17       A.   Interior?

18       Q.   Correct.

19       A.   I went to Interior in September of 1995.

20       Q.   You left in 2003, June 2003?

21       A.   Yes.

**ELITE REPORTING COMPANY**
**67 Saint Andrews Road**
**Severna Park, Maryland   21146**
**410-987-7066    800-734-3337**

11

1    Q.    Where did you work prior to that?

2    A.    Prior to that I worked for the Office of

3    Management and Budget, in the Executive Office of

4    the President.

5    Q.    During what time period?

6    A.    Well, I'm not exactly sure and the reason

7    was I spent the better part of a year on detail over

8    there before I actually was -- but I will say

9    September of 1990 I think is what the personnel

10   records would show.

11   Q.    Up until when you joined Interior?

12   A.    Interior, yes.

13   Q.    Did you have any work anywhere else prior

14   to that?

15   A.    Yes, prior to O&B I worked for the Forest

16   Service in the Department of Agriculture.  I worked

17   for the Forest Service -- this is interesting I

18   remember this, March 8, 1981 was my reporting date.

19   Until September, yeah.  Prior to that I worked for

20   Economic Research Service in the Department of

21   Agriculture.

12

1    And I don't remember exactly when I -- well

2  I started when I was a sophomore in college working

3  part-time.    I worked for them on and off all the

4  time I was going to college so.

5    Q.    When did you graduate college?

6    A.    I completed an MBA in June of '72.    My

7  Bachelors was in June '68.   In between there I spent

8  two years in the U.S. Army, or 21 months.

9    Q.    Just out of curiosity, how did you know the

10  March 8th date, that was pretty good.

11    A.    That was pretty good.    The reason I

12  remember that one, was because I came in and I

13  interviewed for the job the day before Ronald

14  Reagan's first inauguration.    So that was January

15  19th.    March 8th was when I had to show up, when I

16  agreed to show up.   I couldn't sell my house, but I

17  ended up showing up any way on due date.

18    And March 8th was the day Howard Stern

19  first came in the D.C. market.   I came into D.C. and

20  I punched the button for the station I'd listened to

21  back home, and who do I get, a brand new disc

13

1   jockey.

2       Q.   Got yah.

3       A.   Well, I remember the day I retired too,

4   June 14th.

5       Q.   That's Flag Day, that is much easier.

6       A.   The reason that I remember is that's a

7   Saturday, that's what the paperwork shows, Friday

8   the 13th was the last day I was on the job.

9       Q.   Okay.  I'm a little more impressed though

10  with remembering a date from 1981 than 2003.

11      A.   It was one of those -- there was enough

12  discussion within my family about that date that I

13  will never forget it.  I was leaving them.

14      Q.   Got yah.  When you left until June 2003,

15  who was your first line supervisor?

16      A.   It was the Acting Assistant Secretary at

17  the time, Aurene, A-U-R-E-N-E, I believe, it is an

18  unusual name.  Her last name was Martin.

19      Q.   And she would have been right under the

20  Secretary of the office?

21      A.   Yes.  She was working directly for -- well

14

1   yeah, for the Secretary, or the Secretary's Chief of

2   Staff, depending on how you want to look at it.

3       Q.   Have you ever filed a formal or informal

4   complaint of discrimination?

5       A.   No.

6       Q.   Have you ever had a formal or informal

7   complaint of discrimination filed against you?

8       A.   Only one that I know of.

9       Q.   What was that?

10      A.   Margaret.   And I don't know about the

11  formality of it.

12      Q.   What is your understanding of the complaint

13  Margaret filed against you?

14      A.   My understanding was that it was in June,

15  within a week or two of when I retired.   That the

16  complaint was that she was in a position that

17  warranted a higher level of pay than she was

18  receiving.

19      Q.   Did she ever discuss that with you?

20      A.   Discuss it with me?

21      Q.   Did she ever discuss her belief that she

15

1   was in a position that deserved the high level of

2   pay?

3        A.   Yes.

4        Q.   What were those discussions like?  When did

5   they happen?

6        A.   They happened on a number of occasions.  I

7   have no idea how many, but she believed the position

8   that she was currently occupying deserved a higher

9   grade than it was currently graded.

10       Q.   Do you remember what her position was at

11  that time?

12       A.   No, not by title.

13       Q.   What was your response when she had these

14  discussions?

15       A.   Well, first of all, I didn't think that the

16  position that she was in was unfairly graded.  But

17  then in addition there was always the issues of, we

18  were in sort of a constant reorganization mode,

19  from, I will say 1999 through all the time I was --

20  the rest of the time I was there.  We were in the

21  process reorganizing the offices.

16

1    Q.   So, how did that affect the issue?

2    A.   Because there was going to be a new

3    structure that was going to be dealing with the

4    issues that Margaret had dealt with, the budget

5    activities, predominantly what Margaret worked on

6    was budget execution activities in the Assistant

7    Secretary's office.

8    Q.   Okay.   At some point in time did Ms.

9    Brantley ever discuss an accretion of duties with

10   you?

11   A.   Yes.   That's what I'm talking about, an

12   additional, higher level, higher graded job.  Or the

13   job that she was in deserved a higher level of pay.

14   Q.   Okay.   Do you remember what you told her

15   specifically with regard to her request for an

16   accretion of duties?

17   A.   No.  I know when the topic first came up my

18   view was that the positions were going to get

19   reorganized, rehoused, put into different locations.

20   But I always assumed, well that's not.  I assumed to

21   begin with that that was going to happen fairly

17

1    quickly.

2          But every time you have a change in --
3    every time you have a change in the political
4    hierarchy, then all those reorganization activities
5    go on hold.

6          So what was started in '99 we got the shell
7    of the offices set up.  We hired some of the people
8    for the senior positions, but then when the
9    administration changed, then everything went on
10   hold.

11         It just freezes hiring, and the
12   reorganizing activities until the new political
13   structure gets in place.  And so in the case of this
14   Administration, the current Administration that came
15   in in 2001, they did not hire an Assistant Secretary
16   until July of 2001.  The person didn't really get on
17   the job and doing anything until the Fall.  And so
18   from December of 2000 through essentially about
19   September 2001 we didn't do anything with the
20   reorganization.

21         Then he proposed that we go ahead then and

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

18

1    proceed with the reorganization as it had been

2    planned.  And I don't know exactly what the dates

3    are, but that was only good for, I think a couple of

4    months.  Then the Cobell litigation, there were some

5    points in time in there where the activities sort of

6    blew up, and all the attention got focused on the

7    Cobell litigation.    Then they decided that we

8    wouldn't reorganize just the management activities

9    or Interior, we were going to reorganize all of the

10   Bureau of Indian Affairs, and so that went on.

11           That's what I was doing the week before I

12   retired was going out to the field and explaining to

13   employee and constituents what the reorganization

14   plan was.

15      Q.    Okay.  Let me show you, this is in the ROI

16   Tab F-1, page 14 of 16, so you'll be able to go back

17   to it.  Do you recognize this E-mail chain?

18           MS. KIDWELL:  Excuse me are you having it

19   marked as an exhibit for the purposes of the

20   deposition?

21           MR. WEISBROT:  No, not at this time.    He

19

1  hasn't even identified whether he recognizes it or

2  not.

3          MS. KIDWELL:  I was just asking, I wasn't

4  sure. .

5      A.   Okay.

6          MS.  KIDWELL:     Excuse  me,  prior  to

7  answering any questions may I review it, since  I

8  don't have a copy?

9          MR. WEISBROT:  Oh yeah.

10     A.   Just  let  me  see  if  I  can  recall  what

11  --Okay.

12          (Counsel reviewing document.)

13          MS. KIDWELL:  Okay.

14     A.   Okay.

15     Q.   Well, I just want to know, do you recognize

16  this E-mail chain?

17     A.   Recognize it?

18     Q.   Well, I'll start --

19     A.   I mean, okay, this is clearly, it's to me

20  from Margaret.  This is clearly from me to Margaret.

21  It's  the  form  that  I  recall  for  BIA,  Assistant

**ELITE REPORTING COMPANY**
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7006    800-734-3337*

20

1    Secretary Office E-mail, yeah.

2        Q.   Do you recall sending that E-mail, that

3    specific E-mail?

4        A.   Not specifically, but this is exactly what

5    I was saying, is that Margaret wanted to take the

6    position that she had and do an accretion of duties.

7             MS. KIDWELL:   I'm going to object at this

8    point.  There is no proper foundation if he doesn't

9    remember the E-mail.

10       A.   Well, I got hundreds of E-mails a day.

11       Q.   You can still answer the question.  I think

12   the foundation has been established.  He said it is

13   the format of E-mails.

14       A.   Yeah.  Well, but Margaret was looking for

15   accretion of duties.

16       Q.   Right.

17       A.   We were in the process or reorganizing the

18   entire office.  So, what I'm saying here is that we

19   will have -- they have all these PD's for all the

20   new positions in the office will be developed, and

21   that is what Donna Brandon, I believe that is the

21

1    Donna that we referred to, that would be her job, to

2    review and make sure that all of those positions

3    were proper in terms of personnel terms.

4         Then she would also propose what the grades

5    for the positions would be.  That's all I'm saying

6    here is that I did not want to proceed with an

7    accretion of duties ones, I wanted to go ahead and

8    complete all of those positions.  But before we got

9    to doing these positions, administrative positions,

10   then we're going to finish getting all of the

11   management positions in place.

12        Q.   Then I believe you're also explaining then

13   that that got delayed, due to the time periods of

14   the transition, the administration?

15        A.   Yes.

16        MS. KIDWELL:  Objection.  Improper form of

17   question.

18        Q.   Again, I just wanted to make sure though

19   that this is the -- this E-mail is around the time

20   and speaks of the events that you were just

21   testifying about before?

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

22

1    A.   Yes.

2    Q.   Okay.   At the end here you told her that

3 you would work on an administrative position under

4 DAS.   What was DAS?

5    A.   Deputy Assistant Secretary.

6    Q.   Did you ever do that?

7    A.   I don't recall.   I don't recall.

8    Q.   Okay.

9    A.   Because I'm not sure what 'work on' means.

10 I wrote it, but I don't know what it means.

11    Q.   Did you ever meet with Ms. Brantley after

12 this to take further steps?

13    A.   I met with Ms. Brantley frequently, so I

14 don't sort of -- specifically related to --

15 specifically after this, I mean, I don't recall.

16    Q.   Did you ever do an accretion of duties

17 though when the delay occurred with the new

18 organization?

19    A.   No.   No.   In part because I didn't believe

20 that the position that she was currently occupying

21 would ever justify an accretion of duties.

23

1      Q.   Had Ms. Brantley ever discussed with you

2   other administrative officers in the other offices

3   of the Secretary?  In the other Secretary's offices?

4      A.   I would say, yes.

5      Q.   What did she say?

6      A.   Well, that there were other people who were

7   performing the budget duties that had significantly

8   higher grades, but they also had significantly

9   different descriptions of their responsibilities of

10  duties.

11          I mean, there were some that were doing the

12  function Margaret did that were graded as high as

13  GS-14 or 15, but that was only the function.  The

14  things that Margaret was doing was only a relatively

15  small part of their job.

16     Q.   Was Margaret doing any other work other

17  than the budget execution work?

18     A.   I don't know.  I don't know.  The dealings

19  I  had  with  Margaret  related  to  the  budget.

20  Predominantly budget execution, but there was also

21  in the preparation portion of the budget there was

**ELITE REPORTING COMPANY**
**67 Saint Andrews Road**
**Severna Park, Maryland  21146**
**410-987-7066    800-734-3337**

24

1   materials that Margaret would prepare to go on up to

2   the Department of Budget Office.  But predominantly

3   the work was budget execution.

4        Q.   And the budget work that Ms. Brantley did

5   was the same budget work that other higher graded

6   administrative officers were doing as part of their

7   duties?

8        A.   I don't know that.  I mean I don't know how

9   they did their work, whether they -- the work that

10  Margaret was doing relative to execution, in terms

11  of the entry into the budget system for Memorandum

12  of Understanding, and that sort of stuff, I don't

13  know that those other budget officers were doing

14  that.   They  could  have  been  giving  it  to  an

15  administrative assistant for them to do.  But they

16  had the responsibilities.

17       Q.   Have you ever seen this before?

18            (Counsel handing the witness a document.)

19       A.   I don't know that I've seen it.  It doesn't

20  have a date on it.  It's got my signature block, but

21  it is not signed, so I don't know.  There is no way

25

1    to tell if I have seen it.  I mean, you know, when

2    you -- there were like, I'll give you a number.

3              MS. KIDWELL:  Excuse me, may I see a copy?

4              MR. WEISBROT:  Yeah, go ahead.

5              (Counsel reviewing document.)

6              MS. KIDWELL:  Thank you, okay.

7              Mr. Weisbrot, go ahead with your questions

8    whatever it is.

9         A.   Well I mean --

10             MS. KIDWELL:  I'm sorry, could you repeat

11   the question, I apologize.

12        Q.   There actually was no pending question,

13   though I'll pend it now, you were about to say

14   something and I want to now give you the opportunity

15   to say it.

16        A.   Well, I was saying, in the reorganization

17   I saw hundreds of, there were probably 400 different

18   positions I'm not sure if that is exactly the right

19   number, but it is in that order of magnitude.  So,

20   I saw lots of them.  Just -- that doesn't have any

21   signature.  But --

26

1          MS. KIDWELL:  Objection relevancy.

2      Q.    You can continue.

3      A.    You'll find at least dozens, if not

4    hundreds that have my signature on it, and the

5    reason was that we had gone through a reduction in

6    force back in '96.  We did away with the Personnel

7    Office.  We contracted out personnel functions.  So,

8    I was the only -- because I sat at the top over

9    management, I was the one who signed these things

10    for Indian Affairs.

11          So, without having a manager's signature on

12    it, they weren't valid.

13      Q.    Do you remember ever writing up a position

14    description for Ms. Brantley at the GS-12 and 13

15    level?

16      A.    No, I didn't write position descriptions.

17      Q.    Do you ever recall working with Ms.

18    Brantley to write a position description?

19      A.    I talked with Ms. Brantley about position

20    descriptions a number of times, yes.

21      Q.    Specifically though about rewriting a

27

1    position description for her Administrative Officer

2    position to the GS-12 and 13 level?

3        A.   Right, that's how you would get an

4    accretion of duties, by re-writing the position

5    description so it included duties that warranted the

6    higher grade.

7        Q.   Do you know if a drafted position

8    description for the Administrative Officer at the

9    GS-12 and 13 level was ever given to Ms. Donna

10   Brandon for review?

11       A.   Say that again, please?

12       Q.   Do you know if a position description for

13   an Administrative Officer GS-12-13 that Ms. Brantley

14   had worked on was ever given to Ms. Donna Brandon

15   for review?

16       A.   Okay, do I know -- if you're saying, do I

17   know with certainty the answer is, no, I do not know

18   with certainty.  The probability is quite high that

19   yes, it was.  But I don't know with certainty that

20   it was

21       Q.   In other words, you didn't give it to Ms.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

28

1   Brandon?

2       A.   I even could have, but I don't remember it.

3   I mean I dealt with Donna on a daily basis too,

4   because she was my contact for personnel activities.

5       Q.   Is it possible that this is the PD that Ms.

6   Brantley drafted and gave to Ms. Brandon?

7           MS. KIDWELL:  Objection, relevance, it is

8   hearsay.  Improper foundation.

9       A.   What am I supposed to do?

10      Q.   You can answer.

11      A.   Possible.  My alternative is to say it is

12  not possible, and there is no -- I have no basis for

13  saying it is not possible.

14      Q.   Did Ms. Brantley ever get an accretion of

15  duties?

16      A.   I do not believe that she did while I was

17  there.  When she brought the complaint against me

18  that's what I proposed was that they do an audit of

19  her position.  That they bring in a personnelist

20  from outside of Indian Affairs, we didn't have any,

21  outside of MMS who was doing our servicing.  And

29

1   that they, you know, do a desk audit. And then find

2   out what the proper grade was for the position that

3   she occupied.

4       Q.   Did that ever happen?

5       A.   I do not know for sure. I was told that it

6   was happening the last week that I was there.

7       Q.   Who told you that?

8       A.   I believe the EEO counselor.

9       Q.   But you never met anyone that conducted the

10  audit?

11      A.   I do not know, I may have. I mean she

12  brought people, or a person, or maybe more than one

13  to meet me, but I don't specifically recall.

14      Q.   Do you know what the result of that desk

15  audit was?

16      A.   No. I know that there was not a report.

17  I was told, either the day that I left or the day

18  before that, that there would not be a report

19  written before I left. It was going to be

20  supposedly be written the following week, but I

21  don't have any knowledge of that.

30

1     Q.   Did you ever have any discussion with Donna

2    Brandon about Ms. Brantley's promotion?

3     A.   Again, I'm bothered by the use of the word

4    "promotion".

5     Q.   Her request for promotion, the issues that

6    were cental to this?

7     A.   I do not have a specific recollection

8    probability is high, yes, I did.

9     Q.   Do you know -- what was the relationship

10   like between Ms. Brantley and Ms. Brandon?

11     A.   I don't know.

12     Q.   Did Ms. Brandon ever discuss Ms. Brandley?

13     A.   Yes. But Ms. Brandon had the same problem

14   that I had in terms of, if we were going to

15   reorganize this operation, then in the interim it is

16   sort of like you try to hold everything in place.

17   And so doing accretion of duties, if you have a

18   vacancy that somebody can move into, that you need

19   filled, and that warrants a promotion for them, then

20   fine.    When you're preparing new position

21   descriptions then you're trying to get the whole

31

1   office to be organized cleanly and you don't, as a

2   general rule do accretion of duties and change the

3   plan in the interim.

4       Q.   Did   you   have   any   knowledge   of   Ms.

5   Brantley's prior EEO activities?

6       A.   You   know,   yes,   but   I   recall   Linda

7   Richardson telling me that that was how Margaret

8   ended   up   in   that   office   was   part   of   an   EEO

9   settlement.   But I remember Linda saying that, but

10  I   don't   remember   anything   else.   I   don't   know

11  anything about the details of it.

12      Q.   Linda   Richardson   was   Ms.   Brantley's

13  supervisor prior to you?

14      A.   Again, Linda Richardson was the Director

15  for the Office of Audit and Evaluation.   The Office

16  of   Audit   and   Evaluation   was   the   office   that   Ms.

17  Brantley was in, that was where her position was.

18  Whether she worked directly for Ms. Richardson, or

19  whether she worked for Ms. Richardson's deputy, I

20  don't know.   It could have been either.

21      Q.   How   did   you   become   Ms.   Brandley's

32

1  supervisor?

2      A.    Well,  see,  I'm  not  sure  I  ever  was  Ms.

3  Brantley's  supervisor  of  record.    I  mean,  I  don't

4  have  any  recollection  of  ever  having  her,  having

5  paperwork  responsibility.    I  don't  remember  ever

6  doing  a  performance  appraisal.    I  don't  remember

7  doing  any  of  those  things.

8          Now,  while  I  don't  remember  ever  being  her

9  supervisor  of  record,  then  after  Linda  Richardson

10  left,  then  yes,  she  reported  to  me  on  issues  related

11  to  budget  on  a  regular  basis.

12          When  Ms.  Richardson  was  the  Director,

13  Richardson  had  been  a  Budget  Officer  before  I  had.

14  So,  she  knew  the  budget.    When  Linda  retired,  then

15  Jerry  was  the  Acting  Director  for  the  office.    And

16  Jerry's  expertise  has  been  on  the  audit  finance

17  side,  not  budget.

18          And  so,  at  that  point  in  time  I  was

19  providing  advice,  counsel,  direction,  she  would  come

20  into  me  with  reports  on  what  was  going  on.

21      Q.    Was  she  a  good  performer?

33

1    A.    She    was    adequate,    you    know,    not
2    outstanding.    I mean there were -- but she was not
3    a poor performance.    There was nothing you would
4    ever say that Margaret did that would warrant a poor
5    performance evaluation.
6         Q.    Did you give her any awards?
7         A.    I don't recall.
8         Q.    Did you approve any quality step increases?
9         A.    I do not recall.
10        Q.    At some point in time there was a -- .
11   employees were moved to the G Street offices, do you
12   recall that?
13        A.    Yes.
14        Q.    When did that?
15        A.    G Street?
16        Q.    Am I wrong?
17        A.    I don't know, I thought it was H.
18        Q.    Okay.    The street offices they were moved
19   out of the main building offices?
20        A.    Correct.
21        Q.    When did that happen?

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

34

1      A.   I don't know for sure.  I don't know, I

2    mean it was when the Clinton Administration was

3    still hearing, so I'm guessing it was probably in

4    '99.

5      Q.   Where did you physically work?

6      A.   Where did I physically work, I worked in

7    the main Interior Building.

8      Q.   In your entire career at Interior?

9      A.   Yes.

10     Q.   Ms. Brantley worked in the other offices?

11     A.   Which other offices?

12     Q.   I want to say G Street, but if I'm wrong --

13     A.   Whatever.

14     Q.   G Street offices?

15     A.   She did when we had the offices there

16   because she was part of the audit and evaluation

17   staff and that was where her supervisor and she were

18   located.

19     Q.   She was reporting to you on a daily basis?

20     A.   Not then.

21     Q.   When did she start reporting to you?

35

1      A.   After Linda retired.

2      Q.   When was that?

3      A.   2002 some time, I would guess.

4      Q.   By that time Ms. Brantley had moved back

5  into the main building?

6      A.   I think so, yes.

7      Q.   Do you know if Ms. Brantley had computer

8  connectivity problems?

9      A.   Yes.

10      Q.   Okay.

11      A.   We all had computer connectivity problems.

12      Q.   Why?

13      A.   Well --

14      Q.   Or how so?

15      A.   Because starting back in, back to this

16  Cobell litigation.   There were always issues about

17  Indian Trust records, and the ability to get access

18  to them.   And so the solution, and it came and it

19  went depending upon the position that the court

20  took.   The solution was to isolate Indian Affairs

21  from everything else.   Everything else meaning that

36

1  they couldn't get out into the internet.  Everything

2  else  meaning  that  they  couldn't  get  onto  the

3  departmental network.   They were isolated only to

4  themselves.  They could talk to one another, but not

5  to anyone else.

6     Q.  How  did  employees  access  --  how  did

7  employees do their work that they needed to on the

8  internet?

9     A.  They didn't.

10    Q.  What is the difference between the Bureau

11 Lan and the OS Lan?

12    A.   The Bureau Lan was what was isolated, what

13 was separated, segregated out.  The OS Lan was the

14 Office  of  the  Secretary.   The  Office  of  the

15 Secretary was  not  under  the  --  was  not  being

16 directed by the court as to what it could and could

17 not do.

18    Q.  So, employees had access through the OS

19 Lan?

20    A.   Yes, the way that you could have access

21 when we were under those restrictions was, you

37

1    literally had to have air space, you could not be

2    common wired.  You could have a separate computer

3    that had access, but you could never put an Indian

4    record on that computer.  Then you had the other

5    computer that was viewed as contaminated and it was

6    part of the BIA Lan.

7        Q.   So, other employees had that OS access?

8        A.   Not very many.

9        Q.   Did you?

10       A.   No.

11       Q.   So, you had no access during that time

12   period?

13       A.   No.

14       Q.   No, you had no access?

15       A.   No, I had no access.

16       Q.   What was the contracting work that Ms.

17   Brantley did?

18       A.   Contracting work?

19       Q.   Correct, for DOI?

20       A.   Can you elaborate a bit?  You don't mean

21   she was contracting with DOI?

38

1    Q.   Isn't it true that Ms. Brantley needed

2    access to a connected computer to do contracting

3    work?

4    A.   Oh okay, not to do contracting work, but in

5    order    to    enter    contract    memorandum    of

6    understandings, memorandums of agreement, so that --

7    because the funds that were going to be used to pay

8    those were funds that were within the Assistant

9    Secretary's office.

10         So  yes,  she  was  entering  --  she  was

11   entering the information into the budget execution

12   system.

13   Q.   And was she able to do that work out

14   access?

15   A.   Not without gaining access somehow.

16   Q.   So, how did she do that?

17   A.   We did not have a way.  The only way was to

18   find someone within the Office of the Secretary that

19   would -- had access to the system and could put the

20   information in.

21   Q.   Do you know if Ms. Brantley did that?

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

39

1      A.   You know, no, I don't know.   I don't

2  recall.   I recall that it was a problem.   I can't

3  recall that it was a significant problem.   But I

4  don't recall that it did not get done somehow.   And

5  so I don't know.

6      Q.   In other words, the assignments got done?

7      A.   The work got done.   I do not know whether

8  Margaret did it directly, or whether somebody at the

9  Budget Office did the entries for her.

10     Q.   But the lack of connectivity hampered Ms.

11 Brantley's ability to do her job?

12     A.   Yes, absolutely I would agree with that.

13     Q.   Could I take a short break, I want to make

14 copies of some things?

15          MS.  KIDWELL:   It's your record, that's

16 fine.

17          (Recess.)

18     Q.   I just have a few more questions in areas

19 I just wanted to go over with you.   Do you know of

20 a nepotism policy in the Agency?

21     A.   Yes.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

40

1    Q.    What is it?

2    A.    Okay, I know there is a nepotism policy.

3    No, I don't know what it is.  The reason, part of

4    why I don't know what it is, is that it is different

5    depending or whether you're senior executives or

6    whether you are not.  But I know that there is a

7    difference.

8    Q.    Okay.  Do you know of any family members

9    that worked at the Department of Interior?

10   A.    Many.

11   Q.    When you say 'family members' what are you

12   defining as the relationship that constitutes a

13   family member?

14   A.    Well, family members are, I don't know how

15   far it extends.  I recall having a situation in

16   Indian Education where there was a husband and wife

17   that worked, both of them worked directly for the

18   Director.  And they were forever raising the issue

19   of nepotism and it was only a problem or applicable

20   when the Director would leave and one of them would

21   ascend to be the Acting Director.  Then there was a

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

41

1    supervisory line between the two and that was not

2    acceptable.   That was an issue of nepotism.

3         Q.   Were either of those employees reprimanded?

4         A.   I do not know.   I do not think so.   What I

5    did was I told the Director of Education that he

6    never left one of them in charge of the other.   And

7    that solved the problem, you leave somebody else to

8    be the Acting Director.

9         Q.   Did you ever hear of an incident of

10   nepotism involving Ms. Brantley?

11        A.   Yes.

12        Q.   Who brought that to your attention?

13        A.   I do not remember whether it was Ms.

14   Brantley or whether it was the Director of

15   Personnel, or both.

16        Q.   Who was the Director of Personnel?

17        A.   At that time it would have been, Woodrow

18   Hopper, Woody.

19        Q.   What is it that Woody told you?

20        A.   That there was a claim of nepotism that

21   Margaret was bringing her daughter in to the Bureau

42

1   of Indian Affairs or the Department of Interior.

2       Q.   Was there an investigation into that?

3       A.   I don't know.  My recollection of the issue

4   at the time was that both Margaret and Woody wanted

5   to talk to me about it.  And I didn't want them to

6   talk to me about it, because the position I sat in

7   would be the position that would take an appeal.  If

8   I let them talk to me about it, and tell me all

9   about the case, then I'd have to recuse myself from

10  the appeal.  Which would mean then it would have to

11  go to a political.  It would have gone up to the

12  Assistant Secretary.

13       So, I recall very little or nothing about

14  it.  And what I recall is not wanting to be poisoned

15  so I could still do the appeal.

16      Q.   Was there ever an appeal?

17      A.   Not that I recall.

18      Q.   Do you know when this happened?

19      A.   When it happened, no, I don't.

20      Q.   It was probably closer to 2001 though;

21  right?

**ELITE REPORTING COMPANY**
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

43

1    A.   It would have been later on when -- it

2  would have been moving towards the end of my tenure

3  because I don't remember exactly when Woody was the

4  Personnel   Officer   but   it   was   during   this

5  Administration,   because   I   remember   that   Woody

6  interviewed with Assistant Secretary McCaleb, so it

7  would have been either well into 2001 or in 2002, or

8  even later I suppose, but I don't know.   I don't

9  think so.

10    Q.   Well, probably it wasn't too close to June

11  2003  because  then  you  wouldn't  have  been  too

12  concerned about recusing yourself in appeal?

13    A.   No, it probably wasn't real close, but on

14  the  other  hand  if  when  you're  dealing  in  the

15  administrative process in Federal Government, you

16  try very hard to be able to maintain a decision and

17  an appeal within the career ranks, and not giving it

18  up to the politicals.

19         So, even if it had been my last day on the

20  job, I'd of tried to make sure that didn't happen.

21  It wasn't my last day on the job.

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

44

1    Q.   All right.  I'm going to show you what I

2    made a copy of.  Have you ever seen this type of

3    document before?

4            (Witness viewing document.)

5    A.   Have I ever seen this type of document

6    before, probably.  I mean, I don't see it frequently

7    because I don't see the outputs from the Personnel

8    System, payroll system.

9    Q.   Have you ever issued an award to an

10   employee?

11   A.   You know, sure.  But I don't enter it into

12   the system.

13   Q.   Right.  I was going to ask you that, what

14   do you do?

15   A.   Sign a paper copy.  Approval, approval of

16   an award and somebody else enters it into the

17   system.

18   Q.   Then a document like this is put into the

19   employees personnel file?

20   A.   I don't know that for sure either, but I

21   would presume something has to go into the personnel

1

1    file to document that award that was given.

2        Q.   Do   you   remember   in   August   2001   Mrs.

3    Brantley doing this work.

4         .   Who is Mirna Minott?

5        A.   I have no idea.

6        Q.   You don't know what office she worked in?

7.       A.   No, I don't recognize the name at all.

8        Q.   Okay.  I don't have any further questions.

9            MS.  KIDWELL:    I'm  sorry  Mr.  Weisbrot,

10   about this, or about anything?

11           MR. WEISBROT:  About anything.

12           MS. KIDWELL:  I just have a few questions.

13                    EXAMINATION

14           BY MS. KIDWELL:

15       Q.   Mr.  McDivitt,  can  you  explain  why  Ms.

16   Brantley was relocated to this other office either

17   on G or H Street?

18       A.   Okay.   It  was  when  we  were,  again,

19   reorganizing.  We were going to assemble all of the

20   staffs  that  worked  in  the  Assistant  Secretary's

21   Office together in a single location.

46

1       We could not get space within the main
2   Interior Building.  And so we needed to find space
3   someplace else.  I looked at a couple different
4   places.    I was -- the space facility people
5   recommended a couple of different location.  This
6   one was in two or three blocks of main Interior.
7   Other options were off, eight to ten blocks away or
8   to go out to Reston.  We had put people out in
9   Reston.  That meant that their commuting patterns
10  were all disrupted, so I chose a space that was
11  close to main Interior.

12      Q.   Were  there  other  employees  that  were
13  relocated as well then?

14      A.   Yes.

15      Q.   In terms of computer connectivity problem,
16  were there other employees that suffered from that
17  same problems?

18      A.   Yes.  I mean, yes.

19      Q.   In terms of your military service, what
20  branch of the military were you in?

21      A.   U.S. Army.

**ELITE REPORTING COMPANY**
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

47

1      Q.   Did you serve in any wars?

2      A.   Vietnam.

3      Q.   I have no further questions.

4           MR. WEISBROT:   I just want to ask one

5   follow-up.

6                        EXAMINATION

7           BY MR. WEISBROT:

8      Q.   When Ms. Brantley was moved to the G Street

9   offices did you ever tell her that you were going to

10  move her back to the main building?

11     A.   I don't remember.   I remember that when

12  they moved up to those offices, we give up the

13  space, when we move to a new space we give up the

14  space.

15          The Department didn't have any plans to

16  immediately enter, you know, use that space.  So,

17  Margaret did stay down at main Interior for a while

18  after the bulk of the rest of the people moved.  Her

19  supervisor was up there at that time, so she still

20  was in Interior.  But I don't remember about coming

21  back.

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

48

1      Q.   But it is possible that you had told her

2    that as soon as they settle into the G Street

3    offices she'll be moved back to the main building?

4      A.   It's possible, but I have no idea where I

5    would have put her.  I didn't have space.

6      Q.   Where was the Assistant Secretary's Office

7    at that time?

8      A.   It was on the fourth floor of the main

9    Interior.

10     Q.   Isn't that who Ms. Brantley was working

11   for?

12     A.   Yeah, but there's lots of people.  So were

13   all of the people in Audit and Evaluation, and all

14   of the other people who were working for the

15   Assistant Secretary as well.

16          But the space that we had on the fourth

17   floor, the corridor, I mean that's considered prime

18   real estate.  That's political appointees, very

19   senior career people, and meeting space, that's it.

20     Q.   And then just to clarify then you're saying

21   that it was possible, or there was talk that Ms.

49

1    Brandley was going to be sent to a Reston office?

2         A.   No, no.   Not Ms. Brantley, we were moving

3    a whole block of people.   And we were also getting

4    space   for   additional   people   as   part   of   this

5    reorganization.   And so, you know, the issue was

6    where were all of these people going to go?  It had

7    nothing to do with Margaret individually.

8         Q.   I don't have anything else.

9              (Whereupon, at 11:46 a.m., the deposition

10   was concluded.)

11             (By agreement of counsel and with consent

12   of the witness, signature not waived.)