# EXHIBIT F
Deposition of Debbie Clark

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - x

MARGARET R. BRANTLEY            :

       Plaintiff            :

      vs            :    CIVIL ACTION NO.
                                    06-1137 (ESH)

DIRK KEMPTHORNE, SECRETARY    :
UNITED STATES DEPARTMENT
OF THE INTERIOR            :

      Defendant            :

- - - - - - - - - - - - x

July 16, 2007

PURSUANT TO NOTICE, the following Deposition of DEBBIE CLARK, was taken before me, Daniel Wilson, Notary Public, in and for the State of Maryland, at the offices of Snider & Associates, LLC, 104 Church Lane, Suite 100, Baltimore, Maryland 21208, commencing at 10:28 a.m., when were present on behalf of the respective parties:

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

2

APPEARANCES

    JASON I. WEISBROT, ESQUIRE
    Snider & Associates, LLC
    104 Church Lane, Suite 100
    Baltimore, Maryland  21208
    (410) 653-9060

       On Behalf Of The Plaintiff


    JUDITH A. KIDWELL, ESQUIRE
    Assistant U.S. Attorney
    Department of the Interior
    Office of the Solicitor
    Division of General Law
    1849 C Street, N.W.
    Room 7321, MS: 7308
    Washington, D.C.  20240
    (202) 208-6848

       On Behalf Of The Defendant


ALSO PRESENT

    Phyllis Leslie


*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

3

I-N-D-E-X

<u>WITNESS</u>

<u>DEBBIE CLARK</u>

Examination by Mr. Weisbrot                 Page 4

Examination by Ms. Kidwell                  Page 88

Examination by Mr. Weisbrot                 Page 91


<u>EXHIBITS</u>

(None)

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

4

1    Whereupon,

2                          DEBBIE CLARK,

3    was called as a witness by counsel for the

4    Plaintiff, Margaret R. Brantley, and after having

5    first been duly sworn by the Notary Reporter, was

6    examined and testified as follows:

7              THE REPORTER:  Would you state your name

8    with your address and ZIP Code for the record

9    please?

10             THE WITNESS:  Debbie Lynne Clark; address

11   3701 Lakota Road, Alexandria, Virginia 22303.

12             THE REPORTER:  Is that L-a-c-o-d-a?

13             THE WITNESS:  L-a-c -- oh, L-a-k-o-t-a.

14             THE REPORTER:  Counsel.

15                          EXAMINATION

16        BY MR. WEISBROT:

17        Q.   Good morning.  My name is Jason Weisbrot.

18   I'm representing Ms. Brantley in her case against

19   the Agency.  Have you ever been deposed before?

20        A.   Yes.

21        Q.   Okay.  So you're familiar with the rules.

5

1   I'm just going to go over a few basics for today.

2   One is you have to give verbal responses, no head

3   nods.  That way, the court reporter can transcribe

4   the responses later on.  You understand that?

5        A.  Yes.

6        Q.  And you're under oath, so please answer

7   honestly.  If you'd like to take a break, that's

8   no problem.  I'd just ask that you answer any

9   pending question before we take a break so you

10  don't take a break while a question is posed.

11       A.  Okay.

12       Q.  You have to answer all questions.

13  Periodically, counsel will object.  I'd just ask

14  that you allow her the opportunity to make her

15  objections.  That way, she can get paid for being

16  here today.  If you don't understand the question,

17  just ask that you ask me to repeat it or rephrase

18  it.  If you answer a question and it's transcribed

19  in the record as a response, I'll assume you

20  understood the question as asked.

21       A.  Okay.

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

6

1      Q.   Are you currently on any medications that

2   would affect your ability to answer truthfully or

3   honestly?

4      A.   No.

5      Q.   And did you prepare for the deposition

6   today?

7      A.   Yes.

8      Q.   And what did you do to prepare?

9      A.   I just went over the case file relative

10  to, you know, what I had done in -- stated in

11  prior investigations that had been done in this

12  case.

13     Q.   So did you review specific documents?

14     A.   Yes, the report of investigation relative

15  to my statement in that.

16     Q.   Okay.  Any other documents, other than

17  your statement?

18     A.   No.

19     Q.   Did you have any discussions with anyone?

20     A.   No, just with my counsel.

21     Q.   Other than counsel, did you have any

7

1    discussions with anyone else?

2        A.  No.

3        Q.  And where are you currently employed?

4        A.  U.S. Department of Interior.

5        Q.  In what position?

6        A.  I'm the Deputy Assistant Secretary for

7    Management in the Office of the Assistant

8    Secretary of Indian Affairs.

9        Q.  How long have you been in that position?

10       A.  I believe two-and-a-half years.

11       Q.  And what are the primary duties and

12   responsibilities?

13       A.  I essentially have responsibility for

14   anything administrative within the Indian Affairs

15   organization; the Information Systems, Finance,

16   Human Resources, Construction, Maintenance,

17   Homeland Security, Emergency Management -- a whole

18   host of things like that.

19       Q.  Do you supervise employees?

20       A.  Yes.

21       Q.  How many?

8

1    A.  I probably have around six to 700 people
2  in my piece of the organization.
3    Q.  How many are you first-line supervisor
4  of?
5    A.  Probably around eight -- eight to ten.
6    Q.  How long have you been employed with the
7  Agency?
8    A.  Six-and-a-half years I guess; since
9  November of 2000.
10    Q.  And what position were you in then?
11    A.  When I first came to the organization, I
12  was the Chief Financial Officer.
13    Q.  How long did you serve in that position?
14    A.  Until September of 2004.
15    Q.  What position did you work in then?
16    A.  Then I moved to my current position.
17    Q.  Your current position.  Where did you
18  work prior to 2000 -- November, 2000?
19    A.  I worked for the Department of Veteran
20  Affairs in Austin, Texas.
21    Q.  What position were you in then?

9

1      A.   I was the Director of the Financial
2  Services Center.
3      Q.   Did you supervise employees there?
4      A.   Yes.
5      Q.   How many?
6      A.   There were approximately 200 people at
7  the Center.
8      Q.   How long had you been in that position?
9      A.   Two years.
10     Q.   Where did you work prior to that?
11     A.   The Federal Energy Regulatory Commission.
12     Q.   How long did you work there?
13     A.   Since 1993 to 2000, so about seven years.
14     Q.   And what was your position?
15     A.   I was the Chief -- Deputy Chief Financial
16 Officer for four or five of those years, and then
17 I became the Chief Accountant.
18     Q.   All right.  You just said you worked
19 there from '93 to 2000.  Do you mean '93 to '98?
20     A.   Well, I had two positions there.  The
21 first position I had was the Deputy Chief

10

1    Financial Officer, and that was from, I believe,

2    October of '93, and then, actually, May of 2000 --

3    or May in 1996, I became the Chief Accountant at

4    that point and then stayed there until November of

5    -- no, February of 1999.

6         Q.   All right.  And you supervised employees

7    in that position?

8         A.   Yes.

9         Q.   Did you have any positions prior to that?

10        A.   Yes.  I worked with the Naval Audit

11   Service.

12        Q.   How long did you work there?

13        A.   From '87 to '93.  There was a period of

14   time I went and worked somewhere else, and then I

15   had worked at the Naval Audit Service, went and

16   worked somewhere else, and then worked at the

17   Naval Audit Service, so working backwards kind of

18   in reverse order, so I had two times that I worked

19   at the Naval Audit Service.

20        Q.   All between 1987 and 1993?

21        A.   No, between 1984.

11

1      Q.   Okay.  Did you work for the federal

2   government in the in-between job?

3      A.   Yes.

4      Q.   Where was that?

5      A.   It was the Naval Military Personnel

6   Command.

7      Q.   Were you in the military?

8      A.   Not at that point in time, but I did

9   spend four years in the military.

10     Q.   In what service?

11     A.   I was in the Navy.

12     Q.   Navy.  But that was after you worked --

13     A.   Well, it was after --

14     Q.   But that was prior to working at the

15   Naval Audit Service?

16     A.   Right out of high school, I went into the

17   Navy.

18     Q.   Okay.  But you were no longer in service

19   at the time?

20     A.   Uh-uh.

21          THE REPORTER:   I'm sorry.  Could you

12

1  repeat your answer?

2          THE WITNESS:  I was -- right out of high

3  school, I went into the Navy.

4          THE REPORTER:  I'm sorry.  The "no" is

5  the part I wanted -- I didn't --

6          BY MR. WEISBROT:

7      Q.  And then I had said, "And you were no

8  longer in the service at the time you worked for

9  the Naval Audit Service?"

10      A.  That's correct.  I was no longer in the

11  service.

12          THE REPORTER:  Thank you very much.

13          BY MR. WEISBROT:

14      Q.  Okay.  So prior to 1984, did you have any

15  other positions?

16      A.  Yes.  I worked with the U.S. Army

17  Military District of Washington.

18      Q.  How long did you do that?

19      A.  I believe from '83 to '84, when I went to

20  the Naval Audit Service.

21      Q.  So that was a short stint?

13

1       A.   About a -- a little over a year.

2       Q.   Okay.  Anything prior to that?

3       A.   Yes.  Actually, two positions; one where

4    I worked at the Naval Medical Research Institute

5    in Bethesda.  Again, I was only there for three

6    months.

7       Q.   Okay.

8       A.   Okay.  And prior to that, I was out in

9    California with the Naval Air Station in Lemoore,

10   California, and I was there from 1981 to 1983.

11      Q.   Okay.  Anything else prior to that?

12      A.   I went to school and did odd jobs while I

13   went to school.

14      Q.   So focusing on your jobs at Interior,

15   what grade level did you start as?

16      A.   Senior executive.

17      Q.   So you were always SES?

18      A.   Yes.

19      Q.   And starting with your position in

20   November of 2000, the CFO position, who was your

21   first-line and second-line supervisor?

1

14

1     A.   My first-line supervisor was James

2     McDivitt.

3          Q.   Okay.

4          A.   And my second-line supervisor was the

5     Assistant Secretary.  At one point, it was Neal

6     McCaleb; and at another point, it was Aurene

7     Martin.

8          Q.   Okay.  Was James McDivitt your first-line

9     during the entire time you served as the CFO?

10         A.   No.  Woody Hopper was my supervisor for a

11    period at that time.

12         Q.   Anyone else?

13         A.   No.

14         Q.   Okay.  And who was your first-line in the

15    Assistant Secretary -- is that the correct title -

16    - the position after 2004?

17         A.   Deputy Assistant Secretary.

18         Q.   Deputy Assistant Secretary.  Who was your

19    first-line supervisor when you were in that

20    position?

21         A.   The Assistant Secretary for part of the

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland   21146
410-987-7066    800-734-3337

15

1    time, and then there was a reorganization that

2    made the Principal Deputy Assistant Secretary.

3        Q.  And who was your second-line supervisor

4    during that time period?

5        A.  When I reported directly to the Assistant

6    Secretary, I guess I would have to say the Deputy

7    Secretary was the second-line supervisor,

8    although, in fact, you didn't interact with him or

9    anything like that.

10       Q.  So you didn't --

11       A.  He didn't sign your performance appraisal

12   or anything like that.

13       Q.  Okay.  So you had no interaction with

14   your second-line?

15       A.  Right.

16       Q.  Have you ever filed a formal or informal

17   complaint of discrimination?

18       A.  No, I have not.

19       Q.  Have you ever had a formal or informal

20   complaint of discrimination filed against you?

21       A.  Yes.

16

1    Q.  Okay.  Other than this complaint -- and I

2  know there's another complaint that's recently

3  been filed that involves Ms. Brantley and a

4  performance appraisal issue, but I'm not going to

5  ask about that one -- any other formal or informal

6  complaints of discrimination filed against you?

7    A.  Yes.

8      MS. KIDWELL:  I'm going to object on

9  relevancy grounds.

10      BY MR. WEISBROT:

11    Q.  Okay.  When was the most recent complaint

12  that you know of filed against you, again, other

13  than the three?

14    A.  There was a person by the name of Rheadia

15  Hill.

16    Q.  That's a female?

17    A.  Yes.

18    Q.  Do you know her race?

19    A.  African-American.

20    Q.  Do you know what the complaint was?

21    A.  I can't recall specifically.

17

1      Q.  And when was that?

2      A.  I'm going to say the early part of this

3  year.

4      Q.  Any others you remember?

5      A.  Keith Burwell.

6      Q.  That's a male?

7      A.  Yes.

8      Q.  Do you know his race?

9      A.  African-American.

10     Q.  Do you know what the complaint was?

11     A.  Not specifically, no.  Both he and Ms.

12  Hill I terminated during their probationary

13  period.

14     Q.  Any others?

15     A.  Ada Gregg-Martin.

16     Q.  That's a female?

17     A.  Yes.

18     Q.  Do you know her race?

19     A.  Native American.

20     Q.  Do you know what the complaint was?

21     A.  That because she was Indian -- I'm not

18

1    sure if there was another aspect to it or not.

2        Q.  Do you know what the adverse action was

3    she was complaining about?

4        A.  There really to me wasn't an adverse

5    action, but she was moved to another position.

6        Q.  So she argued her reassignment was

7    discriminatory?

8        A.  Right.  Right.

9        Q.  When was that?

10        A.  I'm going to say probably in the August

11    time frame of last year.

12        Q.  Do you remember any others?

13        A.  There was a group of people that were

14    moved from Albuquerque to the Washington, D.C.

15    area, and there were several -- I think there were

16    five people that have filed complaints.  I don't

17    know the status of them at this point.  And they

18    were all Native American.

19        Q.  Any others?

20        A.  Not that I can recall off the top of my

21    head.

19

1    Q.  How did you come to meet Ms. Brantley?

2    A.  Ms. Brantley worked for an individual who

3  worked for me when I first came to the Department

4  of Interior, and just during the course of

5  business, I, you know, had occasion to work with

6  her during that time.

7    Q.  So you were her second-line supervisor?

8    A.  Yes.

9    Q.  And who was the individual that was

10  supervising her?

11    A.  Jerry Fiely.

12    Q.  And this was when you were the CFO?

13    A.  Yes.

14    THE REPORTER:  What was that last name?

15    THE WITNESS:  Fiely, F-i-e-l-y.

16    BY MR. WEISBROT:

17    Q.  How long was Jerry Fiely her first-line

18  supervisor?

19    A.  That I don't know.

20    Q.  How long were you her second-line

21  supervisor?

20

1      A.   From November of 2000, when I came to the

2  organization, and I'm going to say, again, off the

3  top of my head, sometime close to, you know,

4  March, April of 2003, when a reorganization

5  happened.

6      Q.   So November, 2000 until about March or

7  April of 2003?

8      A.   Correct.

9      Q.   And what was the reorg?

10     A.   It reorganized the Office of the

11  Assistant Secretary and Bureau of Indian Affairs.

12     Q.   That was an official reorg?

13     A.   Yes.

14     Q.   Do you know who Donna Brannon is?

15     A.   Yes, I do.

16     Q.   Do you know anything about an incident in

17  which Donna Brannon had a cash award denied

18  because of Ms. Brantley?

19     A.   No, I don't.

20     Q.   You never discussed that with Ms.

21  Brannon?

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066   800-734-3337

21

1    A.  Could you, I guess, restate your

2    question.  I'm not sure I understand it.

3    Q.  Were you Ms. Brantley's second-line

4    supervisor when James McDivitt was her first-line

5    supervisor?

6    A.  I don't know, or you'd have to give me

7    the dates.

8    Q.  I'm sorry.  Strike that.  You had said

9    James McDivitt was your first-line supervisor,

10   correct?

11   A.  Correct.  Correct.

12   Q.  So you were under James McDivitt at all

13   times?

14   A.  Yes.  Yes.

15   Q.  Was there a period of time when Ms.

16   Brantley was working directly under James

17   McDivitt?

18   A.  I don't know.

19   Q.  It's possible?

20   A.  It's possible.

21   Q.  So during that period of time though,

22

1     then you wouldn't technically have been her

2     second-line supervisor?

3         A.  Correct.

4         MS. KIDWELL:  I'm going to object.  The

5     fact's not in evidence.

6         BY MR. WEISBROT:

7         Q.  Was Ms. Brannon -- did Ms. Brannon ever

8     work for James McDivitt?

9         A.  Not that I know of.

10        Q.  Did she ever work for you?

11        A.  No.  No.

12        Q.  Is it possible she worked for James

13     McDivitt?

14        A.  Before I got there in a whole different

15     capacity, it's possible.

16        Q.  Was Donna Brannon a GS employee?

17        A.  I would have to say yes, my understanding

18     is she was.  She is not now.

19        Q.  Okay.  Why isn't she now?

20        A.  She's a contractor.

21        Q.  But at some point she wasn't a

23

1    contractor?

2        A.  Not during the time that I've been with

3    the Department.

4        Q.  In other words, since November, 2000,

5    she's been a contractor?

6        A.  Yes.

7        Q.  Can contractors receive cash awards?

8        A.  I don't believe so.

9        Q.  Do you know of a situation in which Mr.

10   McDivitt wanted to give Donna Brannon a cash

11   award?

12       A.  No, I don't.

13       Q.  He never discussed that with you?

14       A.  No, he didn't.

15       Q.  Have you ever witnessed the relationship

16   between Donna Brannon and Ms. Brantley?

17       A.  No, I have not.

18       Q.  You've never seen them interact together?

19       A.  No, I have not.

20       Q.  You've never had any discussions with

21   either about the other?

24

1    A.  Yes, I've had discussions with Donna

2    about Margaret.

3        Q.  Okay.  What was discussed?

4        A.  What we discussed were awards.

5            MS. KIDWELL:  Objection.  Hearsay.

6            THE WITNESS:  Also discussed moving her

7    from one position to another position.

8            BY MR. WEISBROT:

9        Q.  When was that?

10       A.  It's probably been more than one time,

11   but over -- I'm going to say in the 2004 time

12   frame, 2005, and probably 2007.

13       Q.  I'll focus on the 2004 and 2005 times.

14   What specifically was discussed with moving her

15   into another position?

16       A.  When I became the Deputy Assistant

17   Secretary, I created a -- well, actually, when the

18   reorganization happened, there was an

19   administrative support function that was created,

20   and I moved Ms. Brantley under the supervision of

21   Diane Murth.

25

1      Q.  So that was one of the discussions you

2  had with Ms. Brannon?

3      A.  Right, was to effect that reassignment.

4      Q.  Let me back up a second.  What does Ms.

5  Brannon do?

6      A.  Ms. Brannon is the HR Specialist who

7  helps us with personnel actions.

8      Q.  So that's why you'd be discussing them

9  with Ms. Brannon?

10     A.  Right.

11     Q.  So you needed to know the procedure for

12 having Ms. Brantley changed over under the

13 supervision of Diane Murth?

14     A.  Well, that plus, again, I would be giving

15 the direction for that to happen.

16     Q.  Okay.

17     A.  Ms. Brannon doesn't decide that herself.

18     Q.  So you have to sign off on paperwork.

19     A.  Right.

20     Q.  Did you ever have any discussions with

21 Ms. Brannon about moving Ms. Brantley into a

26

1    higher graded position?

2        A.   No.

3        Q.   Okay.  Do you have any knowledge about a

4    nepotism incident involving Ms. Brantley?

5        A.   No, I don't.

6        Q.   Is there a nepotism policy at the Agency?

7        A.   I couldn't tell you for sure whether

8    there is or not.  I think in the federal

9    government generally there is.

10       Q.   Do you know what the policy is?

11       A.   Again, my limited knowledge is that you

12   can't hire or, you know, effect personnel actions

13   that affect family members, and my understanding

14   is that the family members go to the cousin level.

15       Q.   Do you know any sets of family members

16   that work at the Department of Interior?

17       A.   Yes.

18       Q.   Any in the same office?

19       A.   I don't know in the same office.

20       Q.   It's possible?

21       A.   Anything's possible.

27

1        Q.  You never had any discussions with Woody

2    Hopper about an investigation involving Ms.

3    Brantley and nepotism?

4        A.  Not involving nepotism, no.

5        Q.  Did you know that at one point Ms.

6    Brantley's daughter was employed at the Agency?

7        A.  No, I don't.

8        Q.  Do you know if Ms. Brantley has ever

9    received a formal reprimand for nepotism?

10        A.  Not to my knowledge.

11        Q.  Any discipline or --

12        A.  Not that I'm aware of.

13        Q.  Are you -- do you have knowledge of an

14    incident involving a Lotus Notes connection with

15    Mr. Hopper and Ms. Brantley?

16        A.  Not that specifically, no.

17        Q.  What do you know generally?

18        A.  Again, I don't know anything about a

19    Lotus Notes connection.  I know that there was an

20    issue relative to a Department of Interior

21    connection.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

28

1  Q.  What was that?

2  A.  Ms. Brantley, after the -- Indian Affairs

3  was shut off the Internet in December of 2001, and

4  after that time, I know Ms. Brantley wanted to be

5  on the Department computer system, and that was

6  not approved.

7  Q.  So she made a formal request?

8  A.  I don't know what you would consider

9  formal.

10  Q.  Well, who didn't approve it?

11  A.  It was asked of me on more than one

12  occasion, and I denied that request.

13  Q.  For her to have connections of the

14  Department's --

15  A.  Yes, because really almost nobody in

16  Indian Affairs had a connection.  There were a few

17  senior people -- principally, senior executive

18  people on the Assistant Secretary's quarter that

19  had OS connection.

20  Q.  And these are all employees that were

21  working at the G Street building?

29

1    A.    No.    Nobody -- to my knowledge, nobody at

2  the G Street office had Office of the Secretary

3  connection.

4    Q.    Did Ms. Brantley have a need to be

5  connected to the Department?

6    A.    The need wasn't any greater than anybody

7  else's.

8    Q.    Were any computers ever sent to G Street?

9    A.    Computers for BIA and the Assistant

10 Secretary's office, yes.

11    Q.    How many?

12    A.    I couldn't tell you an exact number.    I

13 would guess 20 or so.

14    Q.    And they had connection?

15    A.    Not to the Office of the Secretary; to

16 BIA.

17    Q.    To BIA.

18    A.    Right.

19    Q.    Did Ms. Brantley have connection to BIA?

20    A.    Yes, she did, or at least she should

21 have.

30

```
1        Q.   Do you know if she did?

2        A.   I could not say.

3        Q.   Did she ever complain to anyone that she

4   didn't have connection?

5        A.   Not to BIA; to OS, yes.

6        Q.   So you know she made complaints about not

7   having connection to OS.

8        A.   Yes.

9        Q.   Do you recall a meeting that occurred

10  approximately July of 2003?

11       A.   You'd have to give me more specifics?

12       Q.   It involved the reorganization.

13       A.   Again, you've got to give me more here.

14  I have lots of conversations everyday.  You have

15  to give me some specifics about it.

16       Q.   Did you ever have a meeting with Beth

17  Terranova, Allison Beard, and Ms. Brantley on July

18  22nd, 2003?  If I had a time, I'd give it to you.

19  I can't get more specific than that.

20       A.   My recollection of my statement is that I

21  was actually on travel at that time.
```

**ELITE REPORTING COMPANY**
**67 Saint Andrews Road**
**Severna Park, Maryland  21146**
**410-987-7066    800-734-3337**

31

1    Q.  Right.  Is that accurate?

2    A.  I believe so, yes.

3    Q.  So if Beth Terranova remembered you being

4    there, she'd be wrong?

5    A.  To the best of my knowledge, yes.

6    Q.  Shortly around that time period or after

7    that meeting, Ms. Brantley was transferred --

8    that's when she was transferred to the supervision

9    of Ms. Murth; is that correct?

10   A.  I can't recall that.  I mean, I don't

11   know the exact time frame or anything like that.

12   Q.  Okay.  Why was she transferred to Diane

13   Murth's supervision?

14   A.  As I recall, Beth was moved over into HR,

15   and again, it was part of the time when we were

16   working through the reorganization and, you know,

17   personnel that were, you know, kind of misplaced,

18   if you will, in the reorganization, which Diane

19   Murth was one of those people.  Diane was put in

20   charge of the admin group as a GS-15 person.

21   Q.  So you put Diane Murth in charge of that

32

1    group?

2        A.   Yes.

3        Q.   How many employees were there?

4        A.   I'm going to say probably seven or eight,

5    something along that line.

6        Q.   And where were they physically working at

7    this time?

8        A.   Again, I can't say for sure, but I do

9    believe that most of them, if not all, were in the

10   main Interior building in the 2700 corridor.

11       Q.   Okay.  Is it possible they were still at

12   G Street when this transfer occurred?

13       A.   Again, it's possible.

14       Q.   Did you ever work at G Street?

15       A.   No, I did not.

16       Q.   You were always at the main building?

17       A.   Yes.

18       Q.   Do you know if Diane Murth ever worked at

19   G Street?

20       A.   I don't know for sure if she ever did or

21   not.  There's something in my head that she

33

1    didn't, but I don't know that that -- it could be

2    either way.

3         Q.  All right.  At some point in time, Ms.

4    Murth disbursed the duties of Ms. Brantley to

5    other employees in that area; is that correct?

6         A.  I don't know exactly what you mean by

7    that.  I mean, Margaret had duties and other

8    people had duties.  As we went through the

9    reorganization and the organization changed, the

10   number of people in the Assistant Secretary's

11   Office changed, and there were multiple people

12   doing similar sorts of things, of which Margaret

13   would have been one of those people.

14        Q.  So all the employees were doing the same

15   duties?

16        A.  They were doing similar duties, not

17   necessarily all exactly the same.

18        Q.  Who were the employees at this time?

19        A.  In that group, Daphney Berwald was in

20   there; Matt Cravatt was in there.

21             THE REPORTER:  Cravatt?

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland   21146
410-987-7066    800-734-3337

34

1          THE WITNESS:  Yeah.  Sean Malloy.  I'm

2     drawing a blank here -- Iris Winston, Hughann

3     Walls.

4          THE REPORTER:  Who was that?

5          THE WITNESS:  Hughann Walls.

6          BY MR. WEISBROT:

7          Q.  And all of these employees were there in

8     July, 2003?

9          A.  I couldn't say 100 percent in July of

10    2003 that all those people were there.  I think

11    the majority of them were.

12         Q.  Do you know what was the grade level --

13    what GS level is Daphney Berwald?

14         A.  At that time, I believe that Daphney was

15    a GS-11.

16         Q.  Do you know what she is now?

17         A.  Daphney is a GS-13 now.

18         Q.  She was recently promoted?

19         A.  She's been promoted within the past year.

20         Q.  But she didn't jump from an 11 to a 13;

21    at some point she was a 12?

35

1    A.   Yes, when she went up to the Assistant

2   Secretary's Office as the Assistant Secretary's

3   personal assistant, and at that point she became a

4   GS-12.

5    Q.   When was that?

6    A.   I'm going to say 2004.  It could have

7   been late 2003.  Essentially, Dave Anderson was

8   the person she worked for.  He was the Assistant

9   Secretary.

10    Q.   Okay.  Is that when she replaced Denise

11   Desederio?

12    A.   No, I don't consider that Daphney ever

13   replaced Denise Desederio.

14    Q.   She moved to her work location?

15    A.   No, I don't believe that that is true.

16   Again, I don't know -- I mean, Daphney sat up

17   outside the Assistant Secretary's office door.

18   There may be a period of time that she sat in

19   another office, perhaps the office that Denise sat

20   in, but, again, that didn't mean she replaced

21   Denise.

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

36

1      Q.   Okay.   What about Matt Cravatt; do you

2   know what GS level he was?

3      A.   Matt, I believe, was a GS either 11 or

4   12.

5      Q.   At that time?

6      A.   Uh-huh.

7      Q.   Do you know what he is now?

8      A.   He's a GS-13 now.

9      Q.   You said Sean Malloyd (phonetic)?

10      A.   Sean Malloy.

11      Q.   Malloy.   Do you know -- is that a male or

12   a female?

13      A.   It's a male.

14      Q.   Do you know what GS level he was?

15      A.   At the time -- he was either a 12 or a 13

16   at the time.   I think he came in as a 12/13

17   position as a Budget Analyst.

18      Q.   Do you know what he is now?

19      A.   He's a GS-14.

20      Q.   Iris Winston; do you know what GS level

21   she was?

37

1      A.   At that time?

2      Q.   Correct, in approximately July of 2003

3  when --

4      A.   I'm going to say she probably was a GS-

5  11.

6      Q.   Do you know what grade she is now?

7      A.   She's a GS-13.

8      Q.   She was recently promoted?

9      A.   She's been promoted within the last year

10  I think, something along that line.

11      Q.   But she didn't jump from 11 to 13?

12      A.   No.

13      Q.   So she got a promotion to a 12 at some

14  point in between there too?

15      A.   Right.  She applied for a job and was

16  selected for the job.

17      Q.   Do you know what job she applied for?

18      A.   She applied for a job as a Management

19  Analyst; I believe it was at a 12/13.

20      Q.   And I believe you said Hughann Walls?

21      A.   Right.

38

1    Q.  Was she in the group in July, 2003?

2    A.  I am not exactly sure of when Hughann --

3   she moved over from the Chief Information

4   Officer's organization to my organization, and I

5   don't know if it was July of 2003 or a date past

6   that.

7    Q.  Do you know what grade level she was when

8   she moved over?

9    A.  I don't.  She was either a 12 or 13.  I

10  think she was a 12 in a job that was a 12/13, and

11  subsequently, I think, was promoted to the 13.

12    Q.  So now she's a 13?

13    A.  Yes.  Again, she's either a Management/

14  Analyst or a Budget Analyst.

15    Q.  Do you know how many African-American

16  employees were in the Secretary's office at the

17  GS-11 level and above in July, 2003?

18    MS. KIDWELL:  Objection.  Relevancy.

19    THE WITNESS:  I'm going to say Daphney

20  may have been the only GS-11.  Iris Winston may

21  have been one also, you know, at the GS-11.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

39

1  Again, trying to match up grade levels and time is

2  a little difficult.

3       BY MR. WEISBROT:

4       Q.  Okay.  And how long did Ms. Brantley work

5  for Ms. Murth?

6       A.  I don't know for sure.  It was several

7  months, but Ms. Murth eventually retired within a

8  year of moving into that job, so I don't know the

9  exact -- you know, it could have been a year; it

10  could have been, you know, eight months.  I'm not

11  sure.

12       Q.  Sometime in 2004 though --

13       A.  Yes.

14       Q.  -- Ms. Murth retired?

15       A.  Yes.

16       Q.  Who became Ms. Brantley's first-line

17  supervisor then?

18       A.  I moved Sally Hampton into that position.

19       Q.  So how many employees was Sally Hampton

20  supervising at that time?

21       A.  She was supervising the same people that

40

1    Diane would have been supervising.

2        Q.   Do you know how many were there then?

3        A.   Five or six.  And I also believe that at

4    around that time, that Sally was also supervising

5    the people that were on the front office.  We

6    ended up hiring a person to supervise the very

7    front office that -- administrative support on the

8    Assistant Secretary's hallway, and that would have

9    been Juan Price.

10       Q.   When did you hire Juan Price?

11       A.   I didn't hire Juan Price.  Mr. Jerry

12   Gidner hired Juan Price.

13       Q.   Who's Jerry -- I'm sorry --

14       A.   Jerry Gidner.

15       Q.   Gidner?

16       A.   He was the Chief of Staff to the

17   Assistant Secretary.

18       Q.   Was that position posted?

19       A.   Yes, it was.

20       Q.   Do you know if Ms. Brantley applied?

21       A.   I do not believe she did.

41

1    Q.  Was she told about the position?

2    A.  Probably not.  Mr. Price wasn't told

3  about the position either.  It was posted on USA

4  Jobs, and people would go out there and look and

5  find the job.

6    Q.  How do you know Mr. Price wasn't told

7  about the position?

8    A.  Because Mr. Price came from someplace

9  completely outside the organization.  He was new

10  to the government.

11    Q.  He could have had a friend who told him

12  about the position being posted.

13    A.  He could have.  It wasn't management --

14        MS. KIDWELL:  Objection.  Lack of

15  foundation.

16        THE WITNESS:  It wasn't management who

17  told him.

18        BY MR. WEISBROT:

19    Q.  But Mr. Price never told you that no one

20  told him about the position?

21    A.  No.  No.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066   800-734-3337

42

1    Q.   What grade level was he hired into?

2    A.   GS-11.

3    Q.   Did it have promotion potential?

4    A.   To the GS-12.

5    Q.   So it was a GS-11/12?

6    A.   Yes.

7    Q.   Do you know what grade level he is now?

8    A.   He is not with the organization.  I

9    believe he -- when he left our organization, he

10   was a GS-12.

11   Q.   So he had been promoted into that 12?

12   A.   Yes.  Yes.  Again, he had supervisory

13   responsibilities.  That position was a supervisory

14   position.

15   Q.   Okay.  Well, who gave him those

16   supervisory responsibilities?

17   A.   That's what the job announcement was for,

18   was for a supervisory administrative officer who

19   would supervise the administrative staff on the

20   Assistant Secretary's hallway to --

21   Q.   Who was his first-line supervisor?

43

1        A.   His first-line supervisor at the time, I

2   believe, was Mr. Gidner.

3        Q.   So Mr. Gidner was giving him supervisory

4   responsibilities then, correct?

5        A.   Yes.   They came with the job.

6        Q.   I mean, in other words, Mr. Gidner could

7   have done those duties himself.

8        MS. KIDWELL:   Objection.   Improper

9   foundation, relevancy.

10       THE WITNESS:   He could have.   Anybody

11  could.

12       BY MR. WEISBROT:

13       Q.   Right.

14       A.   Mr. Gidner was a Senior Executive.   It

15  was unlikely he was going to do that.

16       Q.   So he then hired an individual and gave

17  them the authority -- the supervisory

18  responsibilities and authority to do that?

19       A.   Yes.

20       Q.   Did you ever give Ms. Brantley

21  supervisory authority?

44

1    A.  I did not, no.

2    Q.  Did you give her any duties or tasks that

3  would be supervisory in nature?

4    A.  No.

5    Q.  Any training to be a supervisor?

6    A.  No.

7    Q.  At some point in time, do you have any

8  knowledge of a conversation between Ms. Murth and

9  Ms. Brantley in which Ms. Murth indicated that Ms.

10  Brantley shouldn't contact clients without running

11  it by her first?

12    A.  I know there was a conversation like that

13  that took place.

14    Q.  Why did that conversation occur?

15    A.  That conversation occurred because I

16  either heard or read something that I did not

17  believe was accurate and I went to Ms. Murth and

18  told her that, and from there -- I believe that it

19  was actually an e-mail -- I believe that Ms. Murth

20  told Ms. Brantley that she was to tell her before

21  she contacted or sent an e-mail to the customers.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

45

1    Q.  Is that normal for a supervisor to ask an

2  employee to do that?

3    MS. KIDWELL:  Objection.  Improper

4  foundation.

5    THE WITNESS:  It's normal if the employee

6  has done something that is inaccurate or wrong.

7    BY MR. WEISBROT:

8    Q.  What did Ms. Brantley do that was

9  inaccurate or wrong?

10    A.  Again, I would have to refresh relative

11  to the e-mail, but I think that there were

12  problems in the e-mail, not only factually but

13  grammatically.

14    Q.  Okay.  This was an incident involving

15  food and beverages being sold at a conference --

16  being served at a conference; is that correct?

17    A.  I believe that's correct.

18    Q.  And you said you had heard or read

19  somewhere; you don't remember which one it was

20  though?

21    A.  I'm mostly sure that it was an e-mail.

46

1    Q.  Was it an e-mail to you?

2    A.  I don't know if it was to me or to Ms.

3    Murth.  I'm not exactly sure how I came into the

4    picture.

5    Q.  And what was the factual inaccuracy?

6    A.  Again, without seeing the e-mail, I don't

7    recall.

8    Q.  Okay.  But your understanding of the

9    event was that you saw this factually and

10   grammatically incorrect e-mail, told Ms. Murth

11   about it, and then Ms. Murth made this request to

12   Ms. Brantley.

13   A.  That's my understanding, yes.

14   Q.  Do you know where Ms. Brantley worked

15   between 1987 and 1990?

16   A.  No, I do not.

17       MS. KIDWELL:  Objection.  Relevancy.

18       THE WITNESS:  No, I don't.

19       BY MR. WEISBROT:

20   Q.  Do you have any knowledge of her working

21   at the Office of Personnel Management and Budget?

47

1    A.  No, I do not.

2    Q.  Do you have any knowledge regarding Ms.

3  Brantley prior to November of 2000?

4    A.  No, I do not.

5    Q.  Had you heard about any of her prior EEO

6  complaints?

7    A.  No, I had not.

8    Q.  When was the first time you learned of a

9  prior EEO complaint involving Ms. Brantley?

10    A.  I couldn't tell you when.  I learned

11  about it -- my guess is it was probably quite

12  awhile after I had been at Indian Affairs.  You

13  know, I'm talking about years -- two, three years

14  afterwards.

15    Q.  Well, what did you learn about her prior

16  EEO complaints at that time?

17    A.  I didn't learn very much.  I just know

18  that Ms. Brantley had filed an EEO complaint

19  prior.

20    Q.  Do you know who it was against?

21    A.  No, I do not.

48

1    Q.  Do you know when it was filed?

2    A.  No, I do not.

3    Q.  Do you know if she ever settled an EEO

4  complaint?

5    A.  No, I do not.

6    Q.  Even today you don't know if she's ever

7  settled an EEO complaint?

8    A.  No, I don't.

9    Q.  Do you have knowledge of interactions

10  between Ms. Brantley and Mr. McDivitt to get a

11  promotion?

12    A.  Yes.

13    Q.  What do you know about that?

14    A.  Again, what I know is what Mr. McDivitt

15  told me.

16    Q.  And what was that?

17    A.  That --

18    MS. KIDWELL:  Objection.  Hearsay.  Lack

19  of foundation.

20    THE WITNESS:  It was that Mr. McDivitt

21  indicated that Ms. Brantley thought she should be

49

1    a GS-12.  My understanding from him is that he had

2    a desk audit done and that the desk audit didn't

3    support that.  And that's all I know.

4            BY MR. WEISBROT:

5        Q.  Did he ever tell you that he had drafted

6    a position description with Ms. Brantley --

7        A.  No.

8        Q.  -- formulated a new position description

9    for the GS-12 level?

10       A.  No.

11       Q.  Did he ever tell you that he gave it to

12   Ms. Brannon for her review?

13       A.  No.

14       Q.  Do you know what Ms. Brantley's current

15   grade is?

16       A.  I believe she's a GS-11.

17           MR. WEISBROT:  Can you stop the tape for

18   a second?

19           (Whereupon, there was a discussion off

20   the record.)

21           BY MR. WEISBROT:

50

1      Q.   So if I understand you correctly, it's

2   your understanding that Mr. McDivitt conducted a

3   desk audit to determine if Ms. Brantley's position

4   could receive an accretion of duties promotion; is

5   that fair?

6      A.   I don't know that it was an accretion of

7   duties promotion or not.   I just know that he had

8   someone come in and evaluate her duties to see if

9   they were GS-12 duties.

10      Q.   Do you know who that individual was that

11   conducted the audit?

12      A.   I do not know who the person was.   I know

13   they were with the National Parks Service.

14      Q.   Have you ever conducted an audit or had

15   someone conduct an audit?

16      A.   No, I have not.

17      Q.   Are you familiar with the procedures for

18   an audit?

19      A.   I would go to Personnel and ask them to

20   do it, and that would be what I would do, and it

21   would be up to them to carry that out.

51

1      Q.  Do you know if they meet with the

2  employee?

3      A.  I have no idea.  I can only assume that

4  they do.

5      Q.  Do you know if this individual met with

6  Ms. Brantley when she conducted her audit?

7      A.  My understanding from Mr. McDivitt is,

8  yes, they did.

9      Q.  What else did Mr. McDivitt tell you about

10  the audit?

11      A.  That --

12          MS. KIDWELL:  Objection.  Hearsay.

13          THE WITNESS:  Mr. McDivitt said that the

14  investigator told him that the position did not

15  warrant a GS-11 and questioned whether it really

16  was a GS-11 position.

17          BY MR. WEISBROT:

18      Q.  Did you take any -- did the Agency take

19  any action?

20      A.  Not to my knowledge.

21      Q.  Did they rewrite her PD?  Did they give

52

1    her duties -- I'm sorry.  Did they rewrite the PD?

2           A.   Again, not to my knowledge.

3           Q.   Did they add any duties on to her -- to

4    the list of duties she was already performing?

5           A.   Not to my knowledge.

6           Q.   Did they reduce her pay?

7           A.   Not to my knowledge.

8           Q.   Do you know if an audit report was ever

9    issued?

10          A.   No, I do not.

11          Q.   Did you ever see an audit report?

12          A.   No, I did not.

13          Q.·  Do you know if it's normal procedure for

14   an audit report to be issued?

15          A.   I would think that it would be.  I do not

16   know if it's normal procedure.

17          Q.   Just going back again, you said you did

18   know that Ms. Murth had asked Ms. Brantley to run

19   all e-mails by her, correct?

20          A.   That's correct.

21          Q.   And why was that again?

53

1    A.  It was to insure the factual and

2  grammatical accuracy of the communication.

3    Q.  Is that what Ms. Murth told you?

4      MS. KIDWELL:  Objection.  Hearsay.

5      THE WITNESS:  Yes.

6      BY MR. WEISBROT:

7    Q.  Would it surprise you if Ms. Murth said

8  that it had nothing to do with accuracy of e-

9  mails, but just so that she could get an

10  understanding of the workload that Ms. Brantley

11  had?

12      MS. KIDWELL:  Objection.  Improper

13  foundation.

14      THE WITNESS:  I don't know that it would

15  surprise me.

16      BY MR. WEISBROT:

17    Q.  But your understanding of why she did it

18  was because of that e-mail?

19    A.  That's correct.

20    Q.  Do you have a copy of that e-mail?

21    A.  I'm sure I do.  Again, assuming that it

54

1    was sent to me or, you know, generated from me or

2    was involved with me, yes, I would have a copy of

3    that e-mail.

4        Q.  Well, you saw the e-mail.

5        A.  Yes.

6        Q.  So, I mean, in some capacity you would

7    have had a copy.

8        A.  I would still have a copy, yes.

9        Q.  And, again, you had no knowledge of Ms.

10   Brantley's EEO in 1987?

11       A.  No.

12       Q.  The settlement and --

13       A.  No.

14       Q.  You know nothing about the case she filed

15   in 1995?

16       A.  No.

17       Q.  Who's Kathy Kogat?

18       A.  Kathy used to work for Indian Affairs in

19   an HR capacity -- Human Resources capacity.

20       Q.  How long did she work there?

21       A.  She was there when I got there, I

55

1    believe, and I'm going to guess left in the

2    2004ish time frame.

3         Q.   She was there in July of 2003 though,

4    when the reorg occurred?

5         A.   I'm pretty sure she was.

6         Q.   Who's Deborah Maddox?

7         A.   Deborah Maddox was the head of Management

8    and Administration in the Bureau of Indian

9    Affairs.

10        Q.   Did she supervise employees?

11        A.   Yes, she did.

12        Q.   What was her grade level?

13        A.   She was a Senior Executive.

14             (Whereupon, there was a discussion off

15    the record.)

16             BY MR. WEISBROT:

17        Q.   Did she do the same job duties for BIA

18    that Ms. Brantley did for the Assistant

19    Secretary's office?

20        A.   Absolutely not.

21        Q.   They didn't do any of the same job

56

1   duties?

2        A.   No.

3        Q.   What did Ms. Maddox do?

4        A.   Ms. Maddox oversaw the CFO organization

5   on the BIA side.  She was responsible for putting

6   financial statements together, essentially doing

7   financial operations for an organization of 10,000

8   people.

9        Q.   Did she have any employees working for

10  her?

11       A.   She had probably 200 people working for

12  her.

13       Q.   Who's Allison Beard?

14       A.   Allison Beard is an HR person.

15       Q.   Did she ever work at the G Street

16  offices?

17       A.   Yes, she did.

18       Q.   Did she ever receive a dumb terminal

19  internet hookup?

20       A.   I don't know.

21       Q.   Did she ever a promotion in the past --

57

1    since -- between 2000 and 2004?

2        A.  I don't know that.

3        Q.  At some point in time, did you ever

4    inform Ms. Brantley and Ms. Berwald of a GS-12/13

5    vacancy being posted?

6        A.  You'd have to give me more specifics than

7    that.

8        Q.  At the time, I believe you told them that

9    Denise Desederio was moving and her seat at the

10   front office was going to open up and they were --

11   you were going to post the GS-12/13 administrative

12   support position to sit at that front office?

13       A.  I can't say how that came about in terms

14   of did I say that or did I do it.  Again, it

15   wasn't because Denise Desederio left, because

16   Denise Desederio was not in admin within the

17   Assistant Secretary's office; she worked for the

18   Assistant Secretary doing policy sorts of things.

19       Q.  I understand.  We're just using Denise

20   Desederio to describe the actual physical work

21   location that the new job was going to be working

58

1   at; is that fair to say?  No one was replacing

2   Denise Desederio, but the new job was going to

3   work at that spot where she was no longer

4   physically sitting.

5        A.   Yes.

6        Q.   Okay.  I understand then.  So it's fair

7   to say that that position was posted?

8        A.   Yes.

9        Q.   And you discussed that position with Ms.

10  Berwald?

11       A.   I don't know if I discussed it with her.

12  I posted that position.

13       Q.   Did she have knowledge of that position

14  being posted?

15       A.   I don't know whether she did or not.

16       Q.   Did she apply?

17       A.   Yes.

18       Q.   Then she had to have knowledge of it.

19       Q.   Well, again, the point is the time she

20  had knowledge.

21       Q.   Okay.  But she applied for the position?

59

1    A.   Right.

2    Q.   Did Ms. Brantley apply for the position?

3    A.   Not to my knowledge.

4    Q.   Was Ms. Berwald selected?

5    A.   Yes, she was.

6    Q.   That's when she got the GS-12 promotion?

7    A.   That was the 12/13, I believe, but I

8    can't say for sure.  In fact, I'm going to

9    completely retract that statement.  I don't know.

10   Q.   When Ms. Brantley found out that Ms.

11   Berwald had received that promotion, did she ever

12   have a conversation with you about her receiving a

13   promotion?

14   A.   I don't know whether she did or not.

15   Q.   Did Ms. Brantley ever have discussions

16   with you about a promotion?

17   A.   I would say yes, over some period of time

18   she may, on more than one occasion, have asked me

19   for a promotion.

20   Q.   And what did you say?

21   A.   I told her I didn't have a position.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

60

1    Q.   What about that 12/13 that you had

2    posted?

3    A.   Again, you would have to look at the

4    timing of that and when she may have asked me.

5    So, again, I can't say.

6    Q.   Well, if Ms. Brantley had asked you for a

7    position and at that time you didn't have a

8    position, but then a position opened up like four

9    months later, would you go back to Ms. Brantley

10   and say, "Oh, by the way, now I have that

11   position"?

12   A.   Not necessarily.  I wouldn't do that for

13   anybody.  I would post the job on USAJobs.com --

14   or .gov.

15   Q.   Were you there -- do you know any -- do

16   you have any knowledge about a request by Dr.

17   Mason to have Ms. Brantley work for her?

18   A.   I don't know if I do or not.  Nothing

19   rings a bell that she did or didn't.

20   Q.   Have any employees at Interior ever come

21   to you and indicated that they had a higher graded

61

1   administrative position open?

2          MS. KIDWELL:  Objection.  Improper

3   foundation.

4          THE WITNESS:  Not to my knowledge.

5          BY MR. WEISBROT:

6      Q.  Who's Victor Christianson?

7      A.  Victor Christianson worked in the -- he

8   was the Acting Director of the Office of Budget

9   Management.

10     Q.  When was that?

11     A.  I'm going to say from sometime in 2003

12  until 2004.

13     Q.  And you said that was in the Office of

14  Management and Budget, correct?

15     A.  It was in the Office of Budget

16  Management.

17     Q.  I'm sorry.  Office of Budget Management.

18  That's my dyslexia kicking in.  Office of Budget

19  Management.  Did Ms. Brantley ever work for him?

20     A.  Yes.  She was detailed into a position

21  there.

62

1    Q.   When was that?

2    A.   Sometime during the time he was there.   I

3    don't know exactly when.

4    Q.   How long of a detail was it?

5    A.   I couldn't even tell you that either.

6    Q.   But at some point in time his Acting

7    Director position was posted competitively?

8    A.   Yes.

9    Q.   Do you know when that was?

10   A.   It was probably posted in the late 2003,

11   early 2004.   I believe the Budget Director -- the

12   person that was selected started in 2004, in the

13   Aprilish time frame.

14   Q.   That was Mary Jane Miller?

15   A.   Yes.

16   Q.   Did Victor Christianson apply for that

17   position?

18   A.   Yes, he did.

19   Q.   At that point in time, was there a

20   vacancy that had been posted for an administrative

21   support position in that office -- an

63

1    administrative officer in that office?

2        A.   Not to my knowledge.

3        Q.   Was there ever a vacancy posted for an

4    administrative officer position?

5        A.   Not to my knowledge.

6        Q.   Have you heard rumors about a vacancy

7    that was posted in that office?

8        MS. KIDWELL:   Objection.   Improper

9    foundation.

10       THE WITNESS:   No, I haven't.

11       BY MR. WEISBROT:

12       Q.   You were interviewed by an investigator

13   in this case, correct?

14       A.   Yes.

15       Q.   Did you ever discuss with that

16   investigator whether or not a position had been

17   posted by Victor Christianson in that office?

18       A.   I don't recall for sure.

19       Q.   At some point in time, the detail for Ms.

20   Brantley ended at the Office of Budget Management?

21       A.   Yes.

64

1    Q.  Do you remember when that was?

2    A.  It was after Mary Jane Miller came aboard

3  as the Budget Officer.

4    Q.  Immediately after?

5    A.  Probably within a couple of months or

6  something like that.

7    Q.  Why?

8    A.  Ms. Miller just didn't feel that she --

9  in evaluating the office, that she needed an

10  administrative officer.

11    Q.  So what happened to Ms. Brantley at that

12  point?

13    A.  Ms. Brantley went back to the position

14  she was in and working with Sally Hampton.

15    Q.  What was the title of that position?

16    A.  It probably was an administrative officer

17  position.

18    Q.  How long did she work for Sally Hampton

19  then?

20    A.  I don't know exactly.  Several months.

21    Q.  And then she was detailed again?

65

1    A.  She was detailed at some point during

2  that time to Mr. Bob Middleton.

3    Q.  Where does he fall on the -- who's his

4  first-line supervisor?

5    A.  His first-line supervisor is a Deputy

6  Assistant Secretary for Policy and Economic

7  Development.

8    Q.  Who's that?

9    A.  The person who's been acting in that

10  position is George Skibine.

11    Q.  Who's his second-line supervisor?

12    A.  It would be the Principal Deputy

13  Assistant Secretary.

14    Q.  Is that in your chain of command?

15    A.  No, it's not.

16    Q.  And what's Bob Middleton's title?

17    A.  He's the Director of Indian Energy and

18  Economic Development.

19    Q.  So this was sometime near the end of 2004

20  that Ms. Brantley was detailed?

21    A.  Again, I don't know the exact time frame,

66

1    but most likely somewhere in that.

2          Q. Well, you had said a couple of months

3    after Mary Jane Miller took -- got her position in

4    April, so that would take us to about June or

5    Julyish.

6          A. Again, I don't have all the, you know,

7    specific timelines, so, again, I'm just telling

8    you approximately. She went back -- again, my

9    recollection -- to Sally Hampton for a piece of

10   time. Bob Middleton was trying to get his office

11   off the ground, and he asked if Margaret could

12   come over and help him, and so Margaret was

13   detailed over to him to help him.

14         Q. Okay. How long did she work there?

15         A. I don't know for sure. Two to three

16   months; I'm not sure.

17         Q. I'm sorry. You said months?

18         A. Yes.

19         Q. At some point in time, her detail ended

20   with Mr. Middleton?

21         A. At his request.

67

1      Q.   Right.   Why was that?

2      A.   He wasn't satisfied with the work that

3   she was doing.

4      Q.   That's what he told you?

5      A.   That's what he told me.

6      Q.   Did he ever discuss with you a situation

7   regarding a wall?

8      A.   Yes.

9      Q.   What did he discuss?

.10      A.   Again, I don't recall the exact

11   specifics, but what I do recall is that Ms.

12   Brantley was going to have a wall put up that he

13   did not feel that he had authorized, and so, given

14   that, he wasn't interested in having Ms. Brantley

15   keep working with him.

16      Q.   So he told you that was the reason he

17   didn't want her?

18      A.   Well, yeah.

19      Q.   So it had nothing to do with her work

20   performance?

21      A.   Her work performance in that she did

68

1   something that was not authorized by him.  That's

2   work performance, in my view.

3        Q.  That would be more of a conduct issue,

4   no?

5             MS. KIDWELL:  Objection.  Argumentative.

6             THE WITNESS:  Again, my personal view is

7   it was he was not happy with her work because she

8   did something that she had not cleared through

9   him.

10            BY MR. WEISBROT:

11       Q.  Did you ever look into that incident?

12       A.  No, I didn't.

13       Q.  Did you believe Mr. Middleton?

14       A.  I had no reason not to.

15       Q.  In other words, yes, you believed Mr.

16   Middleton.

17       A.  Yes, I believed Mr. Middleton.

18       Q.  But you didn't investigate it at all?

19       A.  No, I did not.

20       Q.  As you sit here today, do you think that

21   Ms. Brantley went around Mr. Middleton to have

69

1    that wall installed?

2        A.  Yes.

3        Q.  Did you ever discuss with Ms. Brantley

4    what actually happened?

5        A.  No, I did not.

6        Q.  Do you know if anyone else applied for

7    the GS-12/13 position that Ms. Berwald received?

8        A.  I don't recall.

9        Q.  Who was the selecting official?

10       A.  I was.

11       Q.  So you selected Ms. Berwald?

12       A.  Right.

13       Q.  You don't remember though if there were

14   any other candidates on the BQL?

15       A.  No, I don't.

16       Q.  Isn't it true she received a

17   noncompetitive promotion?

18       A.  She received a noncompetitive promotion

19   to the GS-12, not to the 12/13.

20       Q.  When did she receive the noncompetitive

21   promotion to the GS-12?

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

70

1    A.   Sometime when she was working for Mr.

2  Anderson, which would have been in the 2004 time

3  frame -- either late 2003, 2004 time frame.

4    Q.   You mean when you transferred her to work

5  for Mr. Anderson?

6    A.   Mr. Anderson requested her to work for

7  him, and so she was reassigned to work at the

8  Assistant Secretary's request.

9    Q.   And received a noncompetitive GS-12?

10    A.   That's correct.

11    Q.   Do you have any knowledge about Ms.

12  Brantley hurting -- reinjuring her back having to

13  pack up her office in 2005?

14    A.   No, I don't.

15    Q.   Were you asked about that by the

16  investigator?

17    A.   I don't recall.

18    Q.   Did you ever ask Ms. Hampton if that

19  happened?

20    A.   Not that I recall.

21    Q.   At some point in time, Ms. Brantley

71

1   requested to take a training -- the Blacks in

2   Government Conference training?

3       A.  Correct.

4       Q.  You denied that request?

5       A.  Initially, yes.

6       Q.  Eventually, you approved the request?

7       A.  Yes.

8       Q.  When did you approve the request?

9       A.  I told Ms. Brantley if she would give me

10  some additional information on what she

11  specifically thought that she would get out of it

12  that would be of value, that I would reconsider,

13  and she provided that information, and I said

14  okay.  I do believe that this is a situation where

15  I left a voicemail on her cell -- I mean, on her

16  office phone, because she was not in the office.

17      Q.  Okay.  Why wasn't she in the office; do

18  you know?

19      A.  I believe she was going on leave.

20      Q.  Was it approved leave?

21      A.  Yes, it was.

72

1      Q.  When you approve leave, how far in

2   advance do you have to make the request?

3      A.  Again, it depends on the supervisor, the

4   timing of, you know, what else is going on, that

5   sort of thing.  I, personally, don't have any

6   specific requirements by and large.  If someone

7   asks me the day before that they want to be on two

8   weeks' leave, generally I would let them do that.

9      Q.  This conference was in the summer, or

10  this occurred in the summer, correct?

11     A.  As I recall, yes.

12     Q.  Do you know if Ms. Brantley had her

13  approved leaved scheduled for a significant period

14  of time?

15     A.  I don't know that.

16     Q.  You said that you left a voice message

17  for Ms. Brantley?

18     A.  Right.

19     Q.  Do you know if she ever got it prior to

20  the conference?

21     A.  I don't know that.

73

1      Q.  But at some point in time, she gave you a

2    written response?

3      A.  I'm not exactly sure.  She worked with

4    Sally Hampton quite a bit on that, and Sally asked

5    me about it, and I felt that Margaret had higher

6    priority training requirements and so that's when

7    I asked for specifics of what she would get out of

8    the conference.

9      Q.  Right.  I believe you had said that she

10   had deficiencies in other areas that she needed to

11   get training in?

12     A.  Yes.

13     Q.  What other areas were you referring to?

14     A.  Financial aspects of her position.

15     Q.  Was financial a large part of her

16   position?

17     A.  From my perspective it was, yes.

18     Q.  And you felt she had deficiencies in

19   certain areas?

20     A.  Yes.

21     Q.  Did you ever offer training?

74

1      A.  That was what the discussion was with

2  Sally, was that I felt there was more training,

3  and my understanding is that Sally had a

4  conversation with Ms. Brantley about that.

5      Q.  Okay.  How is that your understanding?

6  When you say it's your --

7      A.  From Sally.  That's my understanding from

8  Sally.

9      Q.  So Sally Hampton told you that?

10     A.  Yes, she did.

11     Q.  Do you know if Ms. Brantley ever took any

12  training?

13     A.  No, I don't know.

14     Q.  Did you ever approve any training request

15  for her after that?

16     A.  I couldn't tell you whether I did or

17  didn't.

18     Q.  Did you ever have those discussions with

19  Ms. Brantley, specifically, about training?

20     A.  I don't know.  I may have sent her an e-

21  mail or sent Sally an e-mail with my feelings

75

1    relative to that specific conference.

2         Q.  Do you know what Ms. Brantley's

3    performance appraisals were in 2004?

4         A.  Again, I believe we were on the pass/fail

5    system, and so I believe that they were pass.

6         Q.  How long were you on the pass/fail system

7    at that time?

8         A.  I believe 2005 was our first non-

9    pass/fail appraisal.  It had been pass/fail from

10   the time I got there.

11        Q.  So from November of 2000 at least?

12        A.  Right.

13        Q.  Do you know what Ms. Brantley got in

14   2005?

15        A.  No, I don't.

16        Q.  Do you know what she got in 2006?

17        A.  That would have been the appraisal that I

18   gave her.

19        Q.  Is that the first time you've appraised

20   her?

21        A.  I believe so.

ELITE REPORTING COMPANY
67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066   800-734-3337

76

Q.   You gave her minimally successful?

A.   That's correct.

Q.   I believe, too, you stated that you had
indicated to either Ms. Hampton or Ms. Brantley or
both that they should develop an independent
development plan?

A.   An individual development plan.

Q.   I'm sorry.  Individual development plan.

A.   Yes.

Q.   What is that?

A.   It's essentially where the employee and
the manager would sit down and discuss what their
long-term/short-term goals are and where a person
was, where they wanted to be, and work at how do
they get there; specifically, what training or
specific job assignments would help move them in
that direction.

Q.   Do you know if Ms. Brantley and Ms.
Hampton ever did that?

A.   No, I don't.

Q.   Did you ever check up with Ms. Hampton to

77

1   see if she had done that?

2       A.  No, I didn't.

3       Q.  Why not?

4       A.  I have a lot of things to do.  I asked

5   Sally to do it, and I just assumed that she would

6   do it.

7       Q.  Well, wasn't that a concern of yours,

8   that you had an employee that had deficiencies in

9   areas --

10       MS. KIDWELL:  Objection.  Argumentative.

11       BY MR. WEISBROT:

12       Q.  Just allow me to finish the question

13   please. · I don't mind you making an objection, but

14   at least let me get my objectionable question in.

15   So it didn't concern you enough though to check up

16   to make sure that the IDP had been completed?

17       A.  No, because Sally was managing, and when

18   Sally asked me about her going to the Blacks in

19   Government Conference, I asked her if we had an

20   IDP, and she said "No," and I said, "Well, I'd

21   like to see an IDP for Margaret also, because I

78

1  think she has other deficiencies that are more

2  important than going to that conference." And

3  that was the end of it.

4      Q.  So you never saw an IDP?

5      A.  No, I didn't, but I wouldn't necessarily

6  see it, because Sally -- it's not something that

7  the manager a level above has to see.

8      Q.  Does Sally Hampton still work at the

9  Agency?

10     A.  Yes, she does.

11     Q.  If it turns out she didn't do it, are you

12  going to take a disciplinary action against Ms.

13  Hampton?

14         MS. KIDWELL:  Objection.  Relevancy.

15  Improper foundation.

16         THE WITNESS:  No, I would not.

17         BY MR. WEISBROT:

18     Q.  Have you personally promoted any

19  employees since 2003?

20     A.  Yes.

21     Q.  Who?

79

1      A.  Ms. Berwald, Ms. Winston, Mr. Cravatt,

2  Mr. Victor Hodge.  I've promoted several people to

3  the SES level, to the GS-15; Kathleen Carpenter,

4  Katrina Timmons.  Again, I could go on with a

5  whole list of people.

6      Q.  Yeah.  I'll focus in on these

7  administrative assistants.  You gave Daphney

8  Berwald, in fact, two promotions, correct?

9      A.  Correct.

10      Q.  And Iris Winston two promotions?

11      A.  I may have given Iris three promotions.

12      Q.  Three promotions since 2003?

13      A.  I don't know if they would all be from

14  2003.  There may have been one before that.  I

15  don't know.

16      Q.  Yeah.  I believe one was before, and two

17  were since 2003.  Matt Cravatt you gave a

18  promotion since 2003?

19      A.  Yes.

20      Q.  These were all employees that were

21  performing similar duties as Ms. Brantley?

80

1    A.  Again, I wouldn't say similar; there may

2  have been duties that were -- had some

3  similarities, but they were all different

4  positions.  They were Management Analyst

5  positions, Logistics positions; again, a whole

6  host of different series that had different

7  requirements under them.

8    Q.  Well, those were the positions that those

9  employees were promoted into, correct?

10    A.  That came from other positions that

11  weren't necessarily an administrative officer

12  position.

13    Q.  So they may have had different titles?

14    A.  Yes.

15    Q.  Did you ever have discussions with Ms. --

16  with Mary Jane Miller or Ms. Hampton about not

17  giving Ms. Brantley budget work?

18    A.  Yes.  I had a conversation specifically

19  with Sally about it, and it wasn't me saying,

20  "Don't give her budget work"; it was me telling

21  her she wasn't where she needed to be in terms of

81

1    competency in budget work and that she needed to

2    have additional budget work to become more

3    proficient in that area.

4       Q.  So, in fact, you told them to give her

5    more budget work?

6       A.  I told them to give her more financial

7    sorts of work so that she could get a better grasp

8    of the financial aspects of her job.

9       Q.  And what is it that made you question or

10   doubt her financial acumen?

11      A.  Several instances.  One instance where I

12   had asked her to do a checkbook reconciliation of

13   one of the Assistant Secretary accounts, and she

14   did not present me with the checkbook

15   reconciliation that I asked for.  She just

16   presented me with the statement that came from the

17   Department.  There were times that I brought up

18   errors in the Department accounts that needed

19   review and correction, and it was clear that Ms.

20   Brantley had difficulty in doing that.  I had the

21   Department come to me and tell me to not have her

82

1   come and deal with them on financial matters.

2       Q.  What Department was that?

3       A.  The Department of Interior.

4       Q.  Anything else?

5       A.  Those would be a few.

6       Q.  So that's what you mean when you

7   reference Ms. Brantley not being up to speed on

8   federal personnel -- on the personnel's financial

9   system?

10      A.  I said that I didn't think she was up to

11  speed on the federal financial system, nor the

12  Federal Personnel System.  On the Federal

13  Personnel System, I asked her to run me a query

14  one time while I stood there, and she wasn't able

15  to do that, and I had to come back -- or I

16  actually left and for her to provide me the

17  information later.  That was actually when she was

18  at G Street, specifically.

19      Q.  Yeah.  I was going to get to that.  So

20  this was a request you had made when she was at G

21  Street.  Do you know if she had the capability of

1

83

1    performing that task?

2        A.  My understanding is that we had access to

3    FPS, the Federal Personnel System.

4        Q.  Do you know if Ms. Brantley had access?

5        A.  I believe she did.  She pulled it up on

6    her computer.

7        Q.  Did Ms. Brantley indicate to you that she

8    didn't have access and she couldn't run those

9    reports?

10       A.  No, she did not.

11       Q.  It's your understanding that she had the

12   access to do all the work she needed?

13       A.  Pretty much, yes.

14       Q.  Now, you had talked about the

15   reorganization and forming the administrative

16   support group.  Hadn't that organization already

17   been formed by Mr. McDivitt previously?

18       A.  To me, no.  Mr. McDivitt had some

19   administrative people or loosely defined people

20   who reported directly to him, not as a group, but

21   as individuals.  It was with the reorganization

84

1    that we created an admin support box, if you will,

2    in the organization, where we put all of our

3    administrative support people.

4        Q.  Do you know if Mr. McDivitt had ever

5    discussed with Ms. Brantley that she would be

6    working in that group?

7        A.  I don't know whether he discussed it with

8    her or not.

9        Q.  Did you ever discuss with Mr. McDivitt

10    his plans for Ms. Brantley to work in that area?

11        A.  He indicated to me that he planned for

12    her to work in that group?

13        Q.  At the GS-11 level?

14        A.  Yes.

15        Q.  He never told you that he was going to

16    promote her to the GS-12?

17        A.  Absolutely not.

18            (Whereupon, there was a brief recess.)

19            BY MR. WEISBROT:

20        Q.  I actually am finished.  I just wanted to

21    ask a clarifying question.  You had said someone

85

1    at the Department of Interior came to you and said

2    they didn't want Ms. Brantley coming over there to

3    do budget work?

4        A.   Right.

5        Q.   Who was that?

6        A.   Margaret Kuyumjian.

7        Q.   Margaret who?

8        A.   Kuyumjian.   I'm going to mess it up.

9    It's like K-u-m-a-j-a-n or something to that

10   effect.

11       Q.   Who's she?

12       A.   She's actually a person who works with

13   the Office of the Secretary, Accounts -- Indian

14   Affairs Accounts.

15       Q.   Does she have a title?

16       A.   That I don't know.

17       Q.   Grade level?

18       A.   She is a GS-14.

19       Q.   And did she tell you why?

20       A.   Because she felt Margaret did not know

21   what she was doing.   And here's the spelling of

86

1    her name; K-u-y-u-m-j-i-a-n.

2         Q.  Man, you really butchered that one.

3         A.  Yeah.  That's why I have it in there.

4         Q.  She just said she felt Brantley did not

5    know what she was doing.

6         A.  Yeah.

7         Q.  She didn't give you a specific example?

8         A.  She --

9         Q.  Was there a specific incident?

10        A.  Well, there were some charges, things

11   that had been posted to the --

12            MS. KIDWELL:  I'm going to object to this

13   whole line of questioning.  It's relevant.

14            THE WITNESS:  There were a bunch of

15   transactions that were posted to the Office of the

16   Secretary of Indian Affairs' account that were

17   putting it in the red, and we needed to identify

18   those transactions and correct them, and the

19   corrections were incorrect.  Again, that was kind

20   of like the last straw.  She had come many times

21   before and spoken to me about the accuracy of

87

1   Margaret's work and really didn't think she knew

2   what she was doing in the budget arena.

3           BY MR. WEISBROT:

4       Q.   And when were these conversations?

5           MS. KIDWELL:  Objection.  Relevancy.

6           THE WITNESS:  They were, essentially,

7   probably -- I'd been there probably a year, and

8   continued up until probably a year or so ago when

9   we really took Margaret pretty much out of doing

10  anything budget-related with the Department.

11          BY MR. WEISBROT:

12      Q.   That was between 2001 and --

13      A. ·And 2006.

14          MS. KIDWELL:  Objection.  Relevancy.

15          BY MR. WEISBROT:

16      Q.   Did this factor into your conclusion that

17  Ms. Brantley had not shown ability to perform at

18  the GS-12 level?

19      A.   Yes.

20          MS. KIDWELL:  Objection.  Relevancy.

21          THE WITNESS:  Yes.

88

1          MR. WEISBROT:  I just established it.  I

2    have no further questions.

3          THE REPORTER:  Is there cross?

4          MS. KIDWELL:  Yes, there is.

5          THE REPORTER:  Let's change tapes before

6    we do that.

7          (Brief pause.)

8                      EXAMINATION

9          BY MS. KIDWELL:

10         Q.  Getting back to the discussion with

11   respect to being shut off the Internet, am I

12   correct that that was because of federal

13   litigation in court?

14         A.  Yes.

15         Q.  And were you, yourself, not allowed to

16   have Internet access at one point?

17         A.  Yes.

18         Q.  Did you have any reason to believe that

19   Mr. Middleton was lying to you about the fact that

20   he had not authorized the construction of that

21   wall?

89

1    A.  No, I didn't.

2    Q.  And with respect to Ms. Hampton, do you

3    go to her office everyday checking up on what

4    she's doing or what you've given her to do?

5    A.  No, I do not.

6    Q.  Could you explain to us what is meant by

7    Indian preference, with respect to the Department

8    of Interior?

9    A.  Yes.  Essentially, within the Assistant

10   Secretary offices throughout the Department, there

11   are Bureaus.  The Bureau of Indian Affairs and now

12   the Bureau of Indian Education that came out of

13   the Bureau of Indian Affairs have Indian

14   preference, and that is established through legal

15   precedent, that the positions in those

16   organizations have Indian preference.  However,

17   any position -- any function that moves up to the

18   Assistant Secretary's office moves up with that

19   same Indian preference.  Otherwise, positions in

20   the Office of the Assistant Secretary for Indian

21   Affairs do not have Indian preference.

90

1    Q.   Now to clarify, when you say "legal

2   precedent," am I correct that there's a statute

3   actually?

4    A.   There's a statute plus litigated cases

5   that specifically continue that in place.

6    Q.   And am I correct then to say that there

7   are positions in which Native Americans are given

8   preference over anyone else, including Caucasians,

9   with respect to applications?

10   A.   Yes.  Any position that is in the Bureau

11  of Indian Affairs or the Bureau of Indian

12  Education has absolute Indian preference, if there

13  is an Indian candidate who applies, and that

14  candidate must only need to be minimally

15  qualified.

16   Q.   And Daphney Berwald, what is her race?

17   A.   She's African-American.

18   Q.   What about Winston -- Iris Winston?

19   A.   Is African-American.

20   Q.   And is it your practice to go around

21  giving any of your employees supervisory duties?

**ELITE REPORTING COMPANY**
**67 Saint Andrews Road**
**Severna Park, Maryland  21146**
**410-987-7066    800-734-3337**

91

1      A.  No.  Supervisory duties are established

2  when we establish a position.

3      Q.  Have you ever received any complaints by

4  other employees which are peers of Ms. Brantley

5  about her work?

6      A.  I have received complaints from --

7          MR. WEISBROT:  Objection.  Relevance.

8          THE WITNESS:  I've received complaints

9  from Ms. Winston, Mr. Malloy, and Mr. Cravatt

10 about her performance and that they had to do work

11 for her.

12          MS. KIDWELL:  I have no further

13 questions.

14                    EXAMINATION

15      BY MR. WEISBROT:

16      Q.  Just a few follow-up.  Do you know if Ms.

17 Brantley's ever been nonselected for a position in

18 which she applied and on the BQL there was an

19 applicant with Indian preference?

20      A.  I don't know that.

21      Q.  Have you received any praises, any "She

92

1    did a good job," any remarks like that from

2    coworkers or anyone that Ms. Brantley -- clients

3    or anyone that Ms. Brantley's worked with?

4        A.   Nobody sought me out specifically to tell

5    me that, no.

6        Q.   Has Ms. Brantley ever been awarded a cash

7    award or certificate of recognition or anything

8    like that for her work?

9            MS. KIDWELL:  Objection.  Improper

10   foundation.

11           THE WITNESS:  Yes, she has.

12           (By agreement of counsel and with consent

13   of the witness, signature was not waived.)

14           (Whereupon, at 12:10 p.m., the deposition

15   was concluded.)

ELITE REPORTING COMPANY
. 67 Saint Andrews Road
Severna Park, Maryland  21146
410-987-7066    800-734-3337

93

## CERTIFICATE OF NOTARY REPORTER

I, Daniel Wilson, a Notary Reporter, in and for the State of Maryland, County of Anne Arundel, do hereby certify that the Witness whose testimony appears in the foregoing transcript was first duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said transcript is a true and accurate record of the testimony given to the best of my ability; that I am neither counsel for, related to nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Daniel Wilson
Notary Reporter

My Commission Expires February 1, 2008