# EXHIBIT H

Transcript of Woodrow Hopper

WOODROW WILSON HOPPER, JR.

Page 1

1   IN THE MATTER OF:

2   _____

3

4   MARGARET R. BRANTLEY

5       Complainant,

6
                                    COMPLAINT NO.
7
                                    OS-03-017
8   vs.

9

10  OFFICE OF THE SECRETARY, ASSISTANT SECRETARY OF

11  INDIAN AFFAIRS

12      Respondent.

13  _____,

14

15

16                      AFFIDAVIT

17

18

19      TRANSCRIPT OF PROCEEDINGS in the above-entitled

20  cause of action, of the examination of

21  Woodrow Wilson Hopper, Jr., before the EEO Investigator,

22  Eddie Neal, on the 30th day of August, 2005, beginning

23  at the hour of 2:08 p.m.

24

25  BY: Sandy Oddone

Page 2

PROCEEDINGS

BY: Mr. Eddie Neal

Good afternoon, my name is Eddie Neal and I'm the EEO investigator assigned to investigate the allegations of discrimination filed by Miss Margaret R. Brantley.
For the record, today is Tuesday, August 30th, 2005, and the time is approximately 2:08 p.m.
The claims that I will be investigating are being read from an acceptance letter, which is date-stamped July 6th, 2005, consisting of seven allegations. Her primary allegation is that she was discriminated against on the basis of race, African-American, color, black, sex, female and her age at the time was 55 and reprisal for prior EEO activity when seven incidents occurred, but what I'll do, is I'll go through the oath, one by one to give you the opportunity to respond.
What I'd like to do before we proceed any further, is to first allow you an opportunity to identify yourself for the record and spell your name as well.
A. My name is Woodrow Wilson Hopper, H-O-P-P-E-R, Jr.
Q. Okay.

Page 3

A. My first name is W-O-O-D-R-O-W, middle name is Wilson, W-I-L-S-O-N, last name is Hopper, H-O-P-P-E-R, Jr.
Q. Okay. Mr. Hopper let me also administer an oath. Do you swear or affirm, under the penalty of perjury, that the information you are about to provide will be the truth, the whole truth and nothing but the truth, to the best of your ability or recollection?
A. I swear.
Q. Okay. What is your official title, series and grade?
A. I do a one GS15, Deputy Director for Human Resources Policy, Office of the Assistant Secretary of Indian Affairs, Department of the Interior, Washington, DC.
Q. Okay. And because Miss Brantley alleged certain basis, I have to obtain comparable information from anyone I speak with.
Q. What is your race and your skin color?
A. I'm a mixed race and my skin color is brown.
Q. Okay. Well, since you said you're mixed race, half of that, are you African-American?
A. No, I'm not.
Q. Okay. All right. Your gender is male. And what is your age and date of birth?

Page 4

A. I'm 62 years old and my birthdate is 19th of August, 1943.
Q. Okay. Now do you have any knowledge of any prior EEO activity that Miss Brantley was involved?
A. Only what I told you about that somebody contacted me over a year ago about this same subject.
Q. Okay. Now, also, now is probably an appropriate time probably to put it in the record. While we were off the record, you were saying that you didn't want to give a conflicting statement. That you had previously given a statement and that statement is not available to you. Is that correct?
A. That's correct.
Q. Okay. All right. Well, her first allegation, for those of you that have no knowledge, you can just say that was before your time and you have no knowledge. She alleged that she was denied a promotion since 1989 -- well, before I even get into that, how long have you been in your current position?
A. I've been in my current position for eleven months.
Q. Okay. Now at any time were you ever in a position where you had supervisory authority over Miss Brantley?
A. Yes.

Page 5

Q. And what period of time was that?
A. From June of '04 until September of '05. Wait a minute, we're in '05 now. So it'd be June of '03 until September of '04.
Q. Okay.
A. Although she was not in direct report.
Q. Okay. Where was she in your supervisory chain at that time?
A. She was an administrative person. You know, several layers down in the organization.
Q. Okay. All right. Her first allegation dates back to 1989. She says she was denied a promotion since 1989, while others who worked for the Assistant Secretary's Office were higher grades. And --
A. As you can see, I, you know, she didn't work for me until '03. So, my knowledge of anything that happened beginning in '89 --
Q. Okay. Now she said that also part of her promotions were during the period of 2005 that she was requesting promotions. In 2003, up through the present that she was requesting promotions, as well. Do you have any knowledge of any promotions that she sought while under -- while in your supervisory chain?
A. Nothing came to me, that I recall.
Q. Okay. Now, specifically she mentioned a position

WOODROW WILSON HOPPER, JR.

Page 6

1  that -- let's see - she mentioned that it was Debra
2  Clark had told her about a position.
3     A. Debra Clark worked for me, but, you know, I don't
4  know anything about the position.
5     Q. Okay. Did you ever hire -- let me just call some
6  names that she mentioned here, Daphne Berwald?
7     A. No, I did not.
8     Q. Dianne Murth?
9     A. No, I did not.
10    Q. Karen Needy?
11    A. No, I did not.
12    Q. Okay. Did you ever detail them into any
13 positions?
14    A. I lumped all the -- in my direction there was a
15 group of people, including Berwald and Needy and Murth,
16 as well as Brantley, were all assigned to the
17 administrative functions so that we could consolidate
18 the administrative activities. It was an unofficial --
19 I don't believe there was any actual, official
20 documentation on that. I'm not sure. (Inaudible) would
21 have to look in the records. The people didn't work
22 directly for me.
23    Q. Okay. All right. Well, let me go to a
24 particular allegation she says does pertain to you. She
25 said at one point, you accused her of nepotism when her

Page 7

1  daughter was hired under Dr. Velma Mason. Do you have
2  any knowledge of that?
3     A. Yes, I do.
4     Q. Okay. Can you share that with me, please?
5     A. I found out that she had worked with Velma Mason
6  in order to hire her daughter. Her, meaning Brantley,
7  to hire her own daughter. She actually even wrote the
8  position description and worked with Mason to bring her
9  daughter onboard. I felt that that was inappropriate
10 influence, given the fact that she was an administrative
11 person within the office of the Assistant Secretary and
12 should not be attempting to create positions for her own
13 daughter.
14    Q. Okay. Now, did you ever -- well, let me make a
15 statement first and then I'll ask questions. She
16 indicated that she had disclosed to Dr. Mason that it
17 was her daughter. Did you ever have any conversation
18 with Dr. Mason?
19    A. The only conversation I had with Mason to ask
20 her. What happened, Mason explained to me that it was
21 Brantley's desire, as I recall, it was Brantley's desire
22 to have her daughter hired.
23    Q. Okay. Now, is there a policy in the Department
24 of Interior that two relatives cannot work together?
25    A. No, but there's a policy against nepotism. It's

Page 8

1  a federal law.
2     Q. Okay. Now --
3     A. If it is, in fact, proven to be nepotism.
4     Q. Okay. Now, tell me in this particular case,
5  because nepotism was the word she said that she was
6  accused of. Why -- what would put this more in the
7  category of nepotism versus anybody else working
8  together, relatives working together?
9     A. Well, I don't know that it meets the test of
10 nepotism, but what it does indicate to me, that she is
11 actively involved in creating a job for her daughter and
12 getting someone to hire her. That's just not the way
13 that you're supposed to do business. It's a merit
14 system. You should not be influencing the hiring of
15 another -- of one of your relatives. That's my belief.
16    Q. Okay. So what became of that situation; what
17 happened to the daughter?
18    Q. Well, the daughter was terminated. She was on a
19 temporary appointment, as I recall.
20    Q. Okay. Now, what about Miss Brantley; was
21 anything done to Miss Brantley?
22    A. I don't believe so, but, I'm not -- I don't
23 recall.
24    Q. Okay. Now what about Dr. Mason; was anything
25 done to Dr. Mason?

Page 9

1     A. No. As far as I can recall, nothing was done --
2  officially, nothing was done with either one.
3     Q. Okay. Now this is reading from her statement,
4  she says, "he asked if I knew what nepotism was and I
5  told him and asked was there another meaning that I knew
6  nothing about and he did not answer. He fired my
7  daughter and ordered her to leave the building and told
8  me if I don't leave, we would take it to McDivitt, so I
9  told Mr. Hopper, let's go."
10    A. She never said that, but we was goin' to. Maybe
11 we did. I don't recall. Well, let me back up. I don't
12 recall her saying that. Perhaps we did go to McDivitt.
13 I don't remember. Talk to McDivitt, he'll tell ya'.
14    Q. Now she also said something about you indicated
15 that she had to leave the building, as well?
16    A. No.
17    Q. So, it was just her daughter?
18    A. Correct. You've also got to remember her
19 daughter became very confrontational.
20    Q. Okay. No, I didn't -- tell me a little bit about
21 that. This is the first I've heard of that.
22    A. I spoke with her daughter too, as I recall. She
23 got extremely belligerent. I had told her, that you
24 know, she was to leave the building.
25    Q. Okay. Now --

Page 10

1    A. And, by the way, she was on a temporary
2 appointment. She could've been terminated. You can
3 terminate anybody anytime you want, that's on a
4 temporary appointment. Either a temporary or emergency
5 leave, I can't remember which one.
6    Q. Okay. Now she said something about after that
7 point, her duties were removed from her?
8    A. Incorrect.
9    Q. Okay. Did anything change in her work situation,
10 after that date?
11    A. No.
12    Q. Was her office moved?
13    A. Perhaps, because eventually she was up on G
14 Street. Her office had to move eventually, because it
15 moved down to the main interior because we were closing
16 out the lease on G Street.
17    Q. Okay. Let me read what she wrote in her
18 statement. She says, "Mr. James McDivitt retired in
19 July, 2003. Mr. Hopper was put as acting Deputy
20 Assistant Secretary for management, now, my immediate
21 supervisor. He moved me from under his supervision, to
22 under Debbie Clark.
23    A. Well, that may have well happened. I know you'll
24 have to check and see what it — what the paper says. I
25 don't recall.

Page 11

1    Q. Okay. Now, assuming that she's telling the
2 truth, is that typically done that when someone, when a
3 new manager comes in, they move the employees from under
4 their supervision?
5    A. I don't know what's typical and what's not
6 typical. If I did, well then, that's because I want it
7 done that way.
8    Q. Okay. And, all right, well let's just ask you
9 then, if — if you did it that way, what authority would
10 you have had to do something like that?
11    A. Because I'm the manager of the organization.
12    Q. Okay. So, the manager of the organization can
13 come in and just move anybody they want, any time they
14 want, for any reason they want?
15    A. Correct.
16    Q. Okay. Are there any specific regulations that
17 allow managers to do that?
18    A. No, there's none that don't allow them to do
19 that, either.
20    Q. Okay. All right. Now, at that time, what
21 position did Dianne Murth hold, if you can recall?
22    A. At one point, she was — I don't recall exactly
23 what position she held, to be quite honest with you.
24 She was in a position that would've better been utilized
25 if she, you know, having her oversee a group of

Page 12

1 administrative people to provide support for the Office
2 of the Assistant Secretary. I don't recall exactly what
3 position that she was in. I mean she pulled fifties.
4 So fifty's a little steady, but I dont' have access to
5 those.
6    Q. Okay. Now, one of the other things she said, she
7 said that, "because of the incident of nepotism, I did
8 not receive a cash award for that year, but Daphne
9 Berwald did."
10    A. I, you know, I don't recall, perhaps Berwald did.
11    Q. Okay. Did her accusal of nepotism have anything
12 to do with her not receiving an award for that year?
13    A. No.
14    Q. Okay. Now, she says that she was placed under
15 Dianne Murth's supervision. Then she goes on to say, "I
16 had to teach Dianne Murth how to perform the tasks."
17    A. Well, I find that a little hard to believe.
18 Dianne Murth is a GS15.
19    Q. Okay. She goes further and says, "Woody and
20 Debbie would ask Daphne to do assignments and Daphne
21 would have to ask me to tell her with whom to speak and
22 how to go about getting the information she needed to
23 get the job done."
24    A. I doubt that, too. Since Daphne has been
25 employed by the Indian Affairs for over a decade. I

Page 13

1 dont' have any way of knowing that Daphne did that. I
2 would just find it surprising to me if that's correct.
3    Q. Okay. So, Dianne Murth is retired; is that
4 correct?
5    A. I guess.
6    Q. Okay. It says, "after Dianne's retirement, Mr.
7 Hopper called Daphne Berwald and told her to bring all
8 her belongings and work in the office, where Denise
9 Desidero sat. Daphne would do some work for him and run
10 the front office. Do you ever recall that?
11    A. Yes.
12    Q. Okay. Tell me a little bit about that.
13    A. I just asked Daphne to come down and provide some
14 assistance to me and the Office of the Assistant
15 Secretary because we were having trouble with the
16 clerical staff that we had on board, at that time.
17    Q. Okay. Now, did she receive a promotion or an
18 increase in grade from that?
19    A. I don't recall. I don't think so, but, you know
20 — I didn't — I don't recall promoting her.
21    Q. Okay. Let me tell you why I asked that.
22    A. Just check the fifties, I don't recall.
23    Q. Okay.
24    A. Ask Berwald. Maybe she remembers.
25    Q. Okay. Okay. Let me see if there's any place

WOODROW WILSON HOPPER, JR.

Page 14

1  else that she mentions here, so I can give you an
2  opportunity to respond to that, as well. Okay. She
3  later says that she was detailed and she said, "I asked
4  Debbie Clark why was I being detailed, and she stated,
5  "Karen Needy who was now assigned as Secretary of the
6  Budget Office was out with her sick mother and Juanita
7  Mullin, who left and was that of an adminstrative
8  officer and it was felt that I would be best qualified
9  to do the job."
10  A. You'd need to ask Debbie Clark that one.
11  Q. Okay. So, that's Miss Clark's?
12  A. Well, I don't recall asking Debbie to move Miss
13  Brantley to the Budget Office.
14  Q. Okay. All right. Now, did you have any other
15  involvement with anything else involving Miss Brantley?
16  A. Not that I recall.
17  Q. Okay. Did she ever come to you at any point and
18  ask you for a promotion?
19  A. I don't believe so, but, perhaps she did. I
20  don't know. I don't recall whether she did or didn't.
21  Q. Okay. All right. There's nothing else where I
22  can see anything else. I'll also try to retrieve a copy
23  of that statement. If I get a copy, I'll try to get a
24  copy to you.
25  A. Yeah, I'd like to see it because some of the

Page 15

1  questions are the same or similar. And again, you know,
2  I don't know when, I mean I left there a year ago. The
3  things that she is alleging happened, I think, a year
4  before that. So, you know, I'm trying to reconstruct
5  some things from memory that would have been fresher in
6  my mind when they were asked early on. I don't want to
7  say something that's in conflict with something else.
8  Q. Okay.
9  A. Trying to, you know, reconstruct something that
10  happened as much as two years ago.
11  Q. Okay. If you can recall approximately when you
12  gave that statement, I'll try to track it down and see
13  if I can get you a copy of that.
14  A. Well, you can, I mean all you have to do is look
15  and see when she filed initially. It would be, I'm
16  sure, fairly soon after that. I thought there was an
17  actual formal investigation, again, I'm trying to
18  reconstruct. I know I talked to at least one person, so
19  it had to have been shortly after her initial complaint.
20  Nothing to do with '89. I wasn't even around in '89. I
21  didn't even come to work here until '02. So, I don't ,
22  that's only, the closest I can narrow it down. It was
23  some time in '03, I guess.
24  Q. Okay. Yeah, I'll try to track that down. If I
25  track it down, I'll give you a call and get a copy of it

Page 16

1  for you.
2  A. Yeah, I'd like give you a fax number because I'd
3  like to look at it before I finalize the other one
4  because as I said earlier, the last thing that I wanted
5  is conflicting statements because I'm trying to recall
6  something that happened quite some time ago. I had
7  actually minimal contact with Miss Brantley, really
8  other than the issue regarding her daughter and then to
9  pull them together of an administrative function to
10  support the entire office of the Assistant Secretary.
11  Q. Okay. All right. Well, is there anything else
12  you'd like to add that maybe I didn't ask that you think
13  may be of assistance to me during my investigation?
14  A. No.
15  Q. Okay. Well, based upon that comment, the time is
16  now approximately 2:29 p.m. and that will conclude this
17  portion of the interview. I'd like for you to hold and
18  make sure the tape took.