# EXHIBIT J
Diane Murth Affidavit

# AFFIDAVIT

City of:        Washington, DC           )
                                         )
                                         )
County of:                               )
                                         )
                                         )
State of:                                )

I, Diane Murth, race (*Indian*), color ( *Red* ), sex (*Female* (male)), age *55* and reprisal (prior EEO activity), make the following statement freely and voluntarily to William Conley, who identified himself to me as a Contract Investigator, with the firm of CompuCon Incorporated, on contract with the Complaints Processing and Adjudication Unit, Office of Equal Opportunity, U.S. Department of the Interior, investigating a complaint of discrimination. Knowing that this statement may be used in evidence, I understand it is not confidential and may be shown to any interested party who has a right to know. I hereby swear that the following answers are true and correct to the best of my knowledge and belief.

This statement is given in relation to a complaint of discrimination filed by Margaret R. Brantley (Complainant) on July 2, 2003, and amended on August 25, 2003, against the U.S. Department of the Interior, File number OS-03-017. Below are the issues accepted for investigation.

The Complainant alleges that she was discriminated against on the basis of her race (African American), color (black), sex, (female), age, (55) and reprisal (prior EEO activity) when she was subjected to the following incidents of harassment:

    a)    On July 22, 2003, in a meeting held with the Directors you were informed by your supervisor that you would not be receiving a computer that would enable you to perform your daily duties. *Does not apply to me, but...*

    b)    On August 4, 2003, you were removed from your position and your work was disbursed among three other employees, you were placed in a division under another supervisor, and disallowed to communicate with clients or go the Main Interior building to complete your work.

Initials *[signature]*

91

  c) On August 8, 2003 you were asked about an assignment that was given to someone else to do.

  d) On August 12, 2003, you were asked by your supervisor to submit copies of all e-mails you received that you responded to and no other staff member was asked to submit their e-mails.

Please provide responses to the following to the best of your knowledge and belief.

1. Please state the organization, complete address, the title, series and grade of the position to which you were assigned on July 22, 2003.

Response



2. Please explain whether or not you attended a meeting on July 22, 2003, in which Margaret Brantley (Complainant) also attended. If so, please explain who arranged the meeting, the purpose and the subject of the meeting and please identify others who also may have attended the meeting.

Response



3. Please explain whether or not on July 22, 2003, you were the Complainant's immediate supervisor and whether you informed her that she would not be getting a computer to do her daily duties? If you were not her immediate supervisor, please list the date you became the Complainant's immediate supervisor.

Response



Initials ___

P. _ _ _

92


5. Please explain whether or not the Complainant already had a computer to perform her daily duties and the reason she needed another computer.

Response


6. Please explain whether or not you had any role in the August 4, 2003, decision to: 1) remove the Complainant from her Administrative Officer GS-341-11 position; 2) disburse her work among three other employees; 3) place her in another Division under another supervisor; 4) disallow her to communicate with clients or go to the main Interior Building to complete work. Also, please explain whether or not it was necessary for the Complainant to go to the Main Interior Building to complete her work.

Response


7. Please clarify whether or not the Complainant was "removed" as in terminated from her Administrative Officer GS-341-11 position, or was reassigned to a different position, office or division under another supervisor.

Response


8. Please explain whether you supervise other Administrative Officers performing the same duties as the Complainant. If so, please identify by name and state the GS grade level for each.

Initials___

F

93

Response

9. Please explain whether or not on August 8, 2003, you asked or you instructed someone to ask the Complainant about an assignment that was given to someone else. If so, please identify the assignment, your concern(s) about the assignment, and the person you instructed to ask the Complainant about the assignment.

Response

10. Please explain whether or not on August 12, 2003, you asked or you instructed someone to ask the Complainant to submit copies of e-mails that she received to which she responded. If so, please explain the purpose for the request and state whether or not other employees were asked to submit copies of e-mails to which they responded. If not, please explain the reason they were not asked to submit copies of their e-mails.

Response

11. Please state whether or not you are aware of the Complainant's involvement in prior EEO activity and how and when you became aware of her involvement.

Response

Initials___

94

1) On July 22, 2003, I was assigned to the Office of the Chief Financial Officer; Assistant Secretary–Indian Affairs (Department of the Interior) located at the G Street, NW. Office location. My title was: Special Assistant, GS-301-15..

2) I do not recall attending the Director's meeting on July 22, 2003. I had heard there was meeting prior to my arrival where many issues including administrative services came up. My formal assignment began August 4, 2008 (see attached memorandum). I believe I attended a small meeting on August 4th at which time we were informed of the creation of our office and that I was the lead of it.

3) I became Ms. Brantley's supervisor on August 4, 2003. On July I do not believe I told her that she would not be getting a computer

4.) Ms. Brantley had a computer, but it was an older model. I successfully identified and gave her an up-to-date computer shortly after my appointment as her supervisor. One of my first assignments on August 4th was to assist Ms. Brantley to establish "internal e-mail" connection, which she had not attained since moving to the G Street building over a year before. All of the other G Street employees had been using E mail for some time there, but Ms. Brantley did not desire to have it. Without access to E mail, none of our clients and customers within the AS-IA were able to contact Ms. Brantley for services. Much frustration and many complaints were being received by the first and second level supervisors about their inability to contact Ms. Brantley who was not often available by phone because she had to walk 4 blocks to the Main Interior building to perform some of her duties. .

Our service provider, the National Business Center, where we obtained acquisition, property, financial management and travel services was not accessible by email to any AS-IA employee because of the court-ordered internet shutoff to all Indian Affairs. Therefore, Ms Brantley, as did all of the G Street employees, had to walk back and forth to the main Interior Building to do business with them.

The issue referred to in the complaint regards a **second** computer. Background: All AS-IA and BIA employees were shut off from internet access due to the Cobell trust fund litigation for about 1-1/2 years; however the court recently permitted the AS-IA to have access to the internet for limited purposes through an outside service provider, such as America On Line. One computer terminal was to be set up for use by all of the G Street employees (20 or so). Ms. Brantley desired to have her own computer terminal so that she could have uninterrupted sole access to the Internet because she felt her work load required it.

After all of the conversation and unhappiness surrounding this issue, the terminal could not provide access to the information and people we needed to access. It just wasn't technically possible to do without major construction. It also turned out that 20 people could easily share the computer because it just wasn't used as much as anticipated.

95

5) I did not make the decision to establish the administrative support function, nor did I ask for the job. I was requested by my supervisor to head up the newly established function as a result of a major reorganization within the Assistant Secretary's office wherein the office was rapidly expanded from 25 employees to over 120 employees. The reorganization formally took effect on July 27, 2003. I had supervisory administrative experience as a GS-15 in the Bureau of Indian Affairs Office of Management and Administration. There was an immediate need to organize and establish a function to provide daily administrative services to handle the increased staff and workload.

Upon my appointment I obtained all of the position descriptions of all of my employees and reviewed them to see what their job functions were. Ms. Brantley was formally assigned to the Office of Self Governance as an administrative officer, GS-11. (Copy of PD attached). Without any paperwork, or official personnel action, Ms. Brantley was working with the former Deputy Assistant Secretary–Management, Mr. Jim McDivitt, to begin planning for the reorganization and the needs of the newly expanded AS-IA office. Mr. McDivitt suddenly retired and Mr. Hopper was named as the "acting" DAS-Management. Ms. Brantley was not removed from her job, but formally reassigned to work in the newly formed Administrative Services Office under my supervision. She did not lose her title or her grade.

After my appointment on August 4th, I had the challenge of organizing 3 employees, who all had desires of their own, into a cohesive unit in order to provide service to almost 120 employees. The first thing I did was try to identify the current workload. As the supervisor, I requested that my staff let me know of all incoming tasks or requests that had to be done, so I could assign the work. I asked my staff to let me know what they were working on, and when calls came in, to refer them to me. Prior to this change, Ms. Brantley was the only person our customers had known to contact. It was a challenge to get a handle on the workload, the assignment of tasks and the equitable distribution of work assignments. After a few days, I decided to split the workload by function to each of my two employees so that each had to serve about 50 - 60 employees individually. Ms. Brantley was not happy about all of these changes, because she had visions of herself being the head administrative officer. The situation was further complex because, I had to deal with Ms. Brantley's disappointment and her anger in the first days of my new job.

To do my job, I had to suggest that all employees limit their time out of the office so that we could be near our phones and be responsive to our email, which was the primary means of communication between us and our customers. As explained earlier, Ms. Brantley, as well as all of the other G Street employees had to perform many tasks in the Main Interior building every single day, which required them to walk four blocks two to four times a day. I asked my staff to try to plan their work and their trips so they wouldn't be gone too long.

6. Ms Brantley was reassigned from her position of record, the Office of Self Governance which was within the Assistant Secretary–Indian Affair's Office, to the newly established office, working under my supervision. The change was officially done by means of a personnel action, and an amendment to her existing position description. (See amendment attached to PD herein).

7. At the time of this complaint, I supervised 3 employees, Daphne Berwald–GS-301- 11 Secretarial Assistant (not clerical); Ms. Brantley, GS-341-11 Administrative Officer, Karen Needy, GS-318-7 Secretary.

I have since been assigned additional staff, including another administrative officer, GS-12; and a GS-13 and a GS-9 Space Management Specialist.

8. I do not recall the particulars of this complaint. I was a new manager in the job for 4 days, trying to get a handle on the workload. Quite easily, I may have assigned something twice, or couldn't recall who I assigned it to. After a few days, I realized I had to divide the workload in half, organized by functional areas to the two staff assigned to me. This made it clear to everyone who was responsible for what.

9. Yes, I did ask Ms Brantley to submit copies of e-mails because I needed to grasp what our workload was in those early days of my assignment. As a manager, it was necessary to know this information, and Ms. Brantley did not readily advise me. My other employee was totally cooperative and advised me constantly, forwarding her email to me, giving me copies of information.. I had to specifically ask Ms. Brantley to forward information to me, or to let me see her email work assignments that were coming to her directly. She complied but made such an issue of it, I did not press the matter after that. It was difficult dealing with Ms Brantley in those early days as her supervisor.

10. I was not aware of Ms. Brantley's involvement in prior EEO activity. She told me that she was not able to work with Woodrow Hopper very well. I tried to advise her how to handle the situation, by rebuilding credibility, repairing negative perceptions, etc. We had a private conversation about it, she seemed to appreciate it. I did not know she had filed a formal EEO complaint until Mr. Conley asked me to come to a meeting with him on December 16, 2003.

11. Additional comments: I believe that Ms. Brantley is doing a good job; but early on in the re-assignment, it was very difficult for her to accept that she was not chosen as the head of the new administrative organization, and she was very reluctant to help me. I believe we have established a better working relationship since that time, and that she is now more accepting of the changes made. She is dependable and on time each day; and she is courteous to me and all of the staff.

12. Please provide additional comments, if any, that you feel are relevant to the accepted issues/allegations that will assist the agency in disposing of this matter.

Response

I have reviewed this statement consisting of ___ pages, and hereby swear by my signature that it is true, correct, and complete to the best of my knowledge and belief. I have initialed each page and signed the statement below. I understand that this statement may be used in evidence, and that it is not confidential and may be shown to anyone who has an official need to know.

_____     _____1/7/04_____
Signature                                                    Date

SUBSCRIBED TO AND SWORN BEFORE AT:

__Washington, D.C._____
(City, County, State)

ON THIS __7__ DAY OF __January__ 2004 ~~2003~~

_____
EEO Investigator/~~Notary~~

Initials___

98