# EXHIBIT ONE

MARGARET BRANTLEY

Page 1

1    IN THE MATTER OF:

2    _____

3        MARGARET R. BRANTLEY

4            Complainant,

5                            COMPLAINT NO.

6                            OS-03-017

7    VS.

8

9        OFFICE OF THE SECRETARY,

10       ASSISTANT SECRETARY OF

11       INDIAN AFFAIRS

12           Respondent.

13   _____

14

15

16

17                    AFFIDAVIT

18            TRANSCRIPT OF PROCEEDINGS in the

19   above-entitled cause of the examination of, before the

20   EEO Investigator, Eddie Neal, on the 25th day of August,

21   2005, beginning at the hour of 10:16 a.m.

22

23   BY:  Denise M. Tamayo

24

25

MARGARET BRANTLEY

Page 2

1　Good morning. My name is Eddie Neal, and I am the
2　EEO Investigator assigned to conduct the investigation
3　into the allegations of discrimination filed by Ms.
4　Margaret R. Brantley.
5　For the record, today is Thursday, August 25th, 2005,
6　and the time is approximately 10:16 a.m.
7　The claims that I will be investigating are being
8　read from an acceptance letter which is date-stamped
9　July 6, 2005, consisting of seven allegations. And
10　before I go through the actual allegations, I'll just
11　say that this letter is in further reference to your
12　complaint of discrimination, 0S-03-017.
13　On June 22, 2005, the Office of Civil Rights received
14　an order for investigations, Equal Employment
15　Opportunity Commission from Richard E. Schneider,
16　Administrative Judge, dated June 22, 2005 ordering the
17　department to conduct a supplemental investigation into
18　the claims identified in the August 6, 2003, acceptance
19　letter that were not investigated. And investigate the
20　claims raised in your February and April amendments.
21　So that's actually what I will be doing, and this
22　consists of seven claims. And your primary allegation
23　is that you allege you were discriminated against on the
24　basis of race, African American; color, Black; sex,
25　female; age, 55 and reprisal for prior EEO activity when

Page 3

1　these seven incidents occurred.
2　But what I would like to do before we proceed any
3　further is to first allow you an opportunity to identify
4　yourself for the record. And spell your name as well.
5　My name is Margaret R. Brantley. The "R" is for
6　Roberta. My spelling of my last name is
7　B-R-A-N-T-L-E-Y.
8　Q. Okay. And Ms. Brantley, Let me also administer
9　an oath. Do you swear or affirm, under penalty of
10　perjury, that the information you provide will be the
11　truth, the whole truth and nothing but the truth to the
12　best of your ability or recollection?
13　A. I do.
14　Q. Okay. Now, what is your official Title, Series
15　and Grade?
16　A. My title is Administrative Officer, GS-341-11.
17　Q. Okay. And how long have you been in your current
18　position?
19　A. Since 1988 -- I take that back. I've been in my
20　Grade since 1988. The title I received in 1995 when I
21　started working with the Office of Audit and Evaluation
22　for the Assistant Secretary of Indian Affairs.
23　Q. Okay. Now, did you say since 1998 or since 1988?
24　A. Eighty-eight.
25　Q. Eighty-eight. Okay. Now, who is your current

Page 4

1　supervisor -- your first-line supervisor?
2　A. Debbie Clark.
3　Q. And how long has Ms. Clark been your first-level
4　supervisor?
5　A. Since August of 2003.
6　Q. Okay. Now, since these allegations go back to
7　1989, who was your first-level supervisor in 1989?
8　A. Philip Haymond was my first-line supervisor.
9　Well, Nancy Davis and Philip Haymond. Nancy Davis,
10　first. She was an Administrative Officer GS-12, and I
11　was trained to be on the same lines as she.
12　Q. And how long was she your supervisor?
13　A. About, I guess, a year.
14　Q. So, from 1989 to 1990?
15　A. Yes.
16　Q. And what about Mr. Haymond?
17　A. Mr. Haymond. I was being trained under Nancy to
18　work with Mr. Haymond as his administrative officer.
19　And I worked with him until -- Let's see, when did the
20　library split? I think it was in 1990, the library A-76
21　contracted out. That's A-seventy-six, which is
22　contracting out.
23　Q. Okay. And now, Let's go from 1990 to 2003. Who
24　were your supervisors in between that period?
25　A. I had Patricia Rogers, that's in the Graphics

Page 5

1　Office where I had to file a discrimination suit. Then
2　I went to -- to go to the Immediate Office of the
3　Secretary. Babbitt was in charge at the time, and I
4　worked under BJ Thornbery. And they didn't want me
5　there, so they forced me to work with the Assistant
6　Secretary of Indian Affairs. Let's go back to dates.
7　In 1995, I was -- to go to the Immediate Office of the
8　Secretary working under BJ Thornbery. She's the fourth
9　largest person in the department. She didn't want my
10　services. So, they wanted to keep the person that they
11　had already and told me to take a position in which that
12　girl was taken in officially.
13　That wasn't the way it could happen -- (Mr. Neal)
14　Okay. Well, actually, I'm just trying to get your
15　supervisors. We'll get into -- (Ms. Brantley continues)
16　Okay, BJ Thornberry, Linda Richardson. You got Patricia
17　Rogers -- (Mr. Neal) Yes -- (Ms. Brantley continues) Up
18　to what year -- (Mr. Neal) Up to your present year --
19　(Ms. Brantley continues) Oh, OK. Jerry Fiely -- (Mr.
20　Neal) Okay. I'll tell you what we'll do. As we go
21　through the claims because maybe all these supervisors
22　were not involved. What I'll do, I'll just get them --
23　(Ms. Brantley) No. They all were involved -- (Mr. Neal
24　continues) Okay. Well, it will make it easier as we go
25　through the claims that way I'll know where they were

MARGARET BRANTLEY

Page 6

1 involved because this way, I'm really not sure. Now,
2 you mentioned someone, Linda someone -- (Ms. Brantley
3 continues) Linda Richardson.
4     Q. Okay. Now, do they have your race listed
5 correctly for the record as African American?
6     A. Correct.
7     Q. Now, what is your date of birth?
8     A. Seven, seventeen, forty-seven.
9     Q. Okay. And that makes you how old?
10     A. Today, 58.
11     Q. Fifty-eight?
12     A. Yes.
13     Q. So, this 55 was back three years ago. Okay.
14 Well, let's start with your first allegation which is
15 you have been denied a promotion since 1989 while other
16 employees who worked for the assistant secretary's
17 office were higher grades. Tell me a little about that.
18     A. Well, In 1989 when I was working with Nancy Davis
19 that was the end of my settlement agreement. I had
20 filed third-party sexual harassment and settled with
21 Nancy Davis being my supervisor to train me to be an
22 administrative officer. Like I said, she was a 12 at
23 the time. While I was being trained on the same level
24 as she, I was to take over doing exactly what she was
25 doing with another office. I asked about getting a

Page 7

1 promotion then when I started with Mr. Haymond. They
2 told me since I'm no longer working for a director's
3 office, I am working for a division, I can't get a 12.
4 But yet, I'm sitting there doing the same work.
5         Then, later down the line when we contracted
6 out and I went to work with the Graphics Office in 1990
7 (this was '89-'90 with Nancy Davis), I asked about being
8 promoted. And they ended up putting me within a
9 division so I wouldn't be able to get a promotion.
10 Then, when I was transferred back to a director's office
11 under their Assistant Secretary for Indian Affairs, I
12 asked about a promotion. And they were saying they
13 couldn't give me one which was a lie because I was
14 working for an Assistant Secretary of Indian Affairs.
15 And everyone in the department working for an Assistant
16 Secretary was that of a GS12-13. And now they are
17 13-14. And I have not been promoted still.
18     Q. Okay. In 1989, you mentioned that you had a
19 settlement -- (Ms. Brantley interrupts) In 1988 was my
20 settlement -- (Mr. Neal continues) Okay, in 1988 was
21 your settlement. And what position -- you said you
22 received your current position as a result of that
23 settlement, correct?
24     A. Correct. My current grade.
25     Q. Okay. What was your grade prior to the

Page 8

1 settlement?
2     A. Prior to the settlement, GS-07.
3     Q. Okay. So prior to the settlement, you were a
4 GS-07 -- (Ms. Brantley) Right. Okay. There's two cases
5 here within one. I filed one case. Within that case,
6 it ended up being settled in 1988, there was another
7 case filed within that for the GS-09 because I was a
8 secretary at the time I filed it. My title was a
9 secretary -- (Mr. Neal) So, you were a Secretary GS-07?
10     A. I was a Secretary GS-07.
11     Q. Okay -- (Ms. Brantley) And then by the time I
12 settled the case in 1988, I got the nine. They created
13 the position administrative specialist for me. And I
14 got that nine, and then the following year in 1988 (that
15 was in 1987) I got the eleven -- (Mr. Neal) Okay. So
16 at that time you received a GS-11, and what was your
17 title?
18     A. Administrative Specialist.
19     Q. Okay. So they kept you as an administrative
20 specialist?
21     A. Right.
22     Q. Okay. Now, do you remember when in '88 you
23 became a GS-11?
24     A. November.
25     Q. So, November '88?

Page 9

1     A. Yes.
2     Q. Okay. So, at that time you were in the office
3 with Ms. Davis. And you said that the other - (Ms.
4 Brantley) Either, I think it was Mr. Philip Hayman -
5 (Mr. Neal) Okay. All right. So, you were in the
6 office with one or the other, and you said the other
7 people were 12's. What were their titles?
8     A. They were management assistants and things like
9 that. And once I got the title administrative
10 specialist, then they changed their titles to
11 administrative specialist.
12     Q. Okay. So they - (Ms. Brantley) The department
13 changed the titles - (Mr. Neal) Okay. So they changed
14 them to administrative specialists as well. But they
15 were GS-12s - (Ms. Brantley) Right -- (Mr. Neal) Okay.
16 Now, when we say they, give me some names?
17     A. I don't know the names. The administrative
18 officers that worked for the assistant secretaries --
19 everyone that worked for an assistant secretary, not
20 those directors or anything, but assistant secretaries.
21 You would be able to find the names of those. Laura
22 Curlett is one.
23     Q. Okay. Spell that name.
24     A. Laura L-A-U-R-A Curlett C-U-R-L-E-T, I think it
25 is. She worked directly with the Secretary's Office.

MARGARET BRANTLEY

Page 10

1  Pat Watkins, she worked with Water and Science and
2  Minerals Management with the Secretary.
3      Q. Okay. Let me back up a little bit. Let's make
4  sure I can some more clarification on this. In November
5  1988, that is when you first received your GS-11?
6      A. Right.
7      Q. So, I'm assuming that typically it takes a year
8  before you are eligible for the next grade. Is that
9  correct?
10     A. Exactly.
11     Q. So, when you say in 1989, you were denied a
12  promotion, did you apply for a job in 1989, or did you
13  ask for an increase in the duties? What type of
14  promotion did you apply for in 1989 is what I'm trying
15  to get to.
16     A. Well, I asked for the accretion of duties from
17  the supervisor. The work in which I was doing was that
18  equal to the other administrative officers, so I asked
19  for a promotion from my supervisor.
20     Q. Okay. And which supervisor did you go to?
21     A. Philip Haymond.
22     Q. Okay. So, you went to Mr. Haymond, and you asked
23  for a promotion based on an accretion of duties?
24     A. Right. Also, I am 99 3/4% sure that it was Al
25  Camacho, too, in charge. And I spoke with him as well.

Page 11

1      Q. Okay. You are going to have to spell that name
2  for me also.
3      A. C-A-M-A-C-H-O, Albert.
4      Q. Okay. Albert. Spell that last name for me one
5  more time for me, slowly.
6      A. C-A-M-A-C-H-O.
7      Q. Okay. So you spoke to Mr. Haymond and Mr.
8  Camacho?
9      A. Right.
10     Q. Okay. And what did the two of them say?
11     A. That I was not working in a Director's Office. I
12  was working for a division.
13     Q. Okay. Now, what about these other women that
14  were GS-12. Were they working for a Director or were
15  they working for a division?
16     A. They were working for a Director.
17     Q. Okay. Now, was there anyone that was working for
18  a division similar to yourself that was a GS-12 that was
19  also an administrative specialist?
20     A. No. No. Not that I know of.
21     Q. Okay. Now, so once Mr. Haymond and Mr. Camacho
22  told you that the others were GS-12 because they were
23  working for a director versus a division, did that help
24  you any or was there a reason that you felt that that
25  was not believable?

Page 12

1      A. That was believable because of knowing that I
2  thought there was a way it would go. If you're working
3  for a Director you are a higher grade, like a secretary.
4  I was a secretary working for a director, and I was a
5  GS-07. So that's why I filed again within a case for a
6  GS-09 because of the people you actually work for. So
7  directors, yes, I would say they should be GS-12, but
8  doing the same thing I am doing. That is why I was
9  saying, since I was trained on Nancy's level, I felt I
10  should be able to get my GS-12.
11     Q. Okay. So, Let me help understand this again.
12  So, they worked for the director, and you worked for the
13  division. So you felt that they should have been a
14  higher grade than you because they worked for the
15  director where you worked for the division?
16     A. After they put me in with a division, yes. I
17  felt it, I mean, I understood it, but I didn't feel it.
18  I understood what they were saying. You are working for
19  a division which is a lower person than a director. So,
20  therefore, you can't get the grade.
21     Q. Okay. Now, help me. If that was the case, now
22  help me with the basis of your complaint because you are
23  saying you've been denied a promotion since 1989 where
24  others who worked for the assistant secretary's office
25  were higher grades. So, now I am trying to understand

Page 13

1  the basis of your complaint in allegation #1.
2      Okay. What I am saying is, I am doing the
3  same work as they are doing. Even though I was working
4  in a division at the time in 1989, I should have been
5  promoted. They could have changed the title or given me
6  -- Not change the title, but I could have been a
7  management analyst and still had the same work. Do you
8  see what I am saying?
9      A. Okay. Not really. They could have switched your
10  title from administrative specialist to management
11  analyst?
12     A. Right.
13     Q. Okay. And how would that have helped you?
14     A. Then I would have been able to move up in grade
15  because even though I was working for a division, they
16  have management analysts, they have program analysts at
17  higher grades than an administrative specialist. They
18  were sort of like pinpointing that particular series.
19  No, we couldn't do that either. Then I would have to
20  just go back and say I should have been promoted to that
21  of a GS-12 because I was doing the work of a GS-12.
22  Irregardless of whether or not it was a division or in a
23  director's office because I'm doing the work.
24     Q. Okay. Now, let's talk about in your division.
25  Was there anyone else in your division that was doing

MARGARET BRANTLEY

Page 14

1  similar work to someone who worked for a director and
2  was an equal grade as the person working -- (Ms.
3  Brantley) Nancy Davis -- (Mr. Neal) Okay. So Nancy
4  Davis was -- what grade was Nancy Davis?
5      A. GS-12.
6      Q. So, she was a GS-12. And what was her title?
7      A. Administrative Officer.
8      Q. Okay. Now, was there an administrative officer
9  at the director's level.
10     A. She was it.
11     Q. Oh, so she worked for the director?
12     A. Right. And I was working with her. She was
13 training me to do exactly the same thing she was doing.
14 In no deviations whatsoever. I'm working, doing
15 exactly, identical, the same duties she was performing.
16     Q. Okay. So she was training you to replace her?
17     A. Yes because she was handling the libary's duties
18 and then once I replaced her, she no longer had to do
19 that. I had the library in its entirety then.
20     Q. Okay. So now I am understanding a little bit.
21 So when did you replace her?
22     A. They contracted out, I'll say, in 1989.
23     Q. Okay. So you replaced Nancy Davis in 1989?
24     A. In 1988 I replaced Nancy because in 1987 is when
25 I started working with Nancy. In 1988, I got the grade

Page 15

1  and started working with Philip Haymond. So that's when
2  it was.
3      Q. Okay. Now, when you replaced Nancy Davis, did
4  they change your title to administrative officer?
5      A. No. It stayed administrative specialist. I
6  understood they were doing away with administrative
7  officer titles.
8      Q. Okay. So what became of Nancy Davis? When you
9  say you replaced her, what became of Ms. Davis?
10     A. She continued to do the same duties as I.
11     Q. So, let me help. So, if she continued to do her
12 duties, and I don't want to play with symantics, so how
13 could you have replaced her if she was still doing
14 similar duties as yourself?
15     A. Okay. She was doing them for the director's
16 office, and I was doing them for the division chiefs.
17     Q. Okay. So now let me go back to this again
18 because I keep hearing division versus director. So, if
19 she was doing them for the division director, that means
20 she was doing it for a level higher than the level you
21 were doing it for. Is that correct?
22     A. Yes.
23     Q. Okay. Now, would that have been a reason why she
24 was a GS-12 and you were GS-11. I'm just asking. I'm
25 not sure. So I don't know.

Page 16

1      A. That's the reason they are going to use, interior
2  would use. At that particular time, they used that on
3  me. Then when I began working for a director's office,
4  then they used some other kind of excuse.
5      Q. Okay. At some point, you started working for a
6  director?
7      A. Exactly.
8      Q. Okay, and when was that?
9      A. In 1995.
10     Q. Okay. In 1995, you started working for a
11 director. And who was the director you were working
12 for?
13     A. But let me say this, too. I was housed under a
14 director because they said that their assistant
15 secretary's office didn't have the funds to accommodate
16 the salary for me. So, I was housed under Linda
17 Richardson, the Director of Audit and evaluation, but I
18 serviced their Assistant Secretary for Indian Affairs
19 Office. And all the officers under him were GS-11.
20 That's what I was doing therefore and thereafter up
21 until August of 2003.
22     Q. Okay. So you were housed under Linda Richardson
23 which was a director, but you actually didn't serve as
24 director. You actually served as the assistant
25 secretary.

Page 17

1      A. Right. And Audit and Evaluation and all the
2  other offices. Linda was Audit and Evaluation, -- was
3  -- and Elizabeth Homer, I'd say she was Indian Trust.
4  All the officers under the assistant secretary and the
5  assistant secretary's office, I handled.
6      Q. Okay. So who did you go to at that time to ask
7  about a promotion?
8      A. Linda Richardson.
9      Q. Okay. So, you went to Linda Richardson in 1995.
10 And what did she say?
11     A. In 1995. I went to her in 1995 to work. But
12 later what happened with her, I didn't get to ask Linda
13 Richardson. Okay? Let me tell you what happened.
14 While working in 1995 with Linda, like another case that
15 I had with the Office of Graphics came up. Linda found
16 out about my case with the Graphics Office. And
17 therefore, she started treating me bad, wouldn't let me
18 go to training and stuff like that. And then later down
19 the line retire. So, I never got to ask her because
20 I am still battling the case from the Graphics Office.
21 That is Patricia Rogers' office. So, I went to
22 Haymond's office, and they sent me to various places.
23 And then I ended up in Pat Rogers Office. I represented
24 the department -- (Mr. Neal) Okay. Well, let me ask
25 this. And I don't want to cut you off. I want to stay

MARGARET BRANTLEY

Page 18

1  on that particular question. So, did you ever speak to
2  anyone? You said you didn't speak to Ms. Richardson --
3  (Ms. Brantley) Yes -- (Mr. Neal) Okay. So, who did you
4  speak with in reference to being promoted at that time?
5      A. James McDivitt. That was in 2000.
6      Q. Okay. Spell that name.
7      A. M-C-D-I-V-I-T-T. He's on the list I sent over to
8  you.
9      Q. Okay. So you spoke to James McDivitt in 2000.
10      A. Yes. And he was working with me to get me the
11  position of administrative officer GS12-13.
12      Q. So, he was working with you?
13      A. So I thought. Yes.
14      Q. Okay. Now, when you say he was working with you,
15  what did he do?
16      A. We generated a position description for the
17  GS12-13, and he submitted to Donna Brannen, who did not
18  work with us, and James McDivitt was under the
19  impression that she was going to work with us. She was
20  our personnel. She didn't work with us. She just gave
21  it back to him and told him that it was too vague. And
22  nothing ever happened from it. And I didn't know about
23  it until I called to find out what was the status on it.
24      Q. Okay. Now, tell me, when did you file your claim
25  of discrimination because it doesn't say here when you

Page 19

1  filed about the promotion in 1989. When did you file
2  that claim?
3      A. That claim. I don't know when I filed that one.
4  I'll have to go back in my records.
5      Q. Okay. Was Mr. McDivitt included in that
6  allegation?
7      A. In 1989? No.
8      Q. Okay. But did you mention the 2000?
9      A. Yes. That is the one I'm talking about now. The
10  one for 2003. All that is coming up now.
11      Q. Okay. So the 2000 was part of that?
12      A. Right.
13      Q. Okay. So Mr. McDivitt took it to Donna Brannen
14  said it was too vague. How do you spell Brannen?
15      A. B-R-A-N-N-E-N.
16      Q. Okay. So now once Ms. Brannen said it was too
17  vague, what happened then?
18      A. Nothing. They didn't follow through. By that
19  time, I'm being harassed, accused of nepotism by Donna
20  Brannen.
21      Q. Hold up. Let's follow this promotion thing
22  through first before we get to the nepotism.
23      A. Well, the promotion thing is going all the way up
24  until today.
25      Q. Okay. So, let's follow that through.

Page 20

1      A. Well, then if you follow that through, then we
2  got to go all the way through Donna Brannen and
3  everybody else as well.
4      Q. Okay. So, Donna Brannen said it was too vague.
5  When did you find out that she said it was too vague?
6      A. I found out about 2002. In 2002, I found out
7  that she said it was too vague. What month, I don't
8  know.
9      Q. And how did you find out?
10      A. By calling Donna and asking her what was the
11  status on the position.
12      Q. Okay. So, tell me why do you feel that Mr.
13  McDivitt discriminated against you in some type of way
14  if he actually submitted it for you to be promoted or
15  upgraded?
16      A. Because he is now my supervisor. After all these
17  other people. And I am trying to get this position, and
18  I'm working doing this position. He is the Deputy
19  Assistant Secretary for Indian Affairs. Okay? And I'm
20  directly under him. I'm explaining to him that I am the
21  only GS-11 working for an assistant secretary. And he
22  discriminated against me by not pursuing it by not
23  working with me any further on it. He is what I
24  consider a passive person. He just goes where the wind
25  blows, I guess.

Page 21

1      Q. Okay. Now, when do you think he found out about
2  Donna Brannen indicating that it was too vague?
3      A. I don't know. But Donna has told me that she had
4  told him that. Although, he didn't come back to me and
5  tell me.
6      Q. Okay. So, now let's follow it up a little
7  further. Once you found out that she felt that it was
8  too vague, what was then done?
9      A. Nothing.
10      Q. Okay. Did you go back to Mr. McDivitt and tell
11  him that it was too vague?
12      A. Yes. I went back to him. And I told him that
13  what Donna had said and can we work on it. And he said,
14  "Well, no. Let's just wait." And so then I had
15  mentioned about a desk audit a long time ago. I am
16  being shipped all over the place. Its not a straight
17  pattern like you are trying to get it to be, but because
18  of the fact that I'm being shipped all over the place.
19      I am now up in what 1800 G Street at this point.
20  After I found out they said it was too vague, I am now
21  shipped to 1800 G Street to work. My office was taken
22  from me. And I was sent to 1800 G, and my office was
23  given to a GS-non secretary. I am made now to walk
24  three blocks. So, while I'm there, and Mr. McDivitt
25  gives me a call and said come on over to the main

MARGARET BRANTLEY

Page 22

1  interior because I want an audit done. I said, "Audit?"
2  If I am going to have an audit, then I need to have the
3  audit at my desk.
4      No, come on over here. So I came on over, and
5  there was somebody there by the name of Pearl. I don't
6  know. She was with Fish and Wildlife Service Personnel
7  Office. I don't know her last name. And I never got a
8  copy of the report today, and I have been asking for it
9  for a long time. In that discussion with Pearl,
10 McDivitt told Pearl that I would be handling all the
11 offices. And they were reorganizing Assistant Secretary
12 of Indian Affairs, all the offices under the Assistant
13 Secretary for Indian Affairs.
14     And it was in the records that I would have a
15 staff as well, of three people. So there would be a
16 total of four of us. And I would have the staff, and I
17 would hire them. So, that wasn't an audit because I
18 never got to show her any of the work I did or anything.
19 And the position description that McDivitt and I
20 generated wasn't the one that Pearl had. Then I talked
21 with Pearl and told her about the position description
22 that he and I generated. So, we pulled that out, and
23 McDivitt said yes, this is the description. And Pearl
24 said, Oh, great. This is the one we should be using. I
25 really honestly don't understand what took place, but

Page 23

1  they are telling me, and when I say they Debbie Clark.
2  Woody Hopper is another person who is involved in this
3  because he got the results I understand. But later I
4  found out it was to be whether or not my position was to
5  stay under Mr. McDivitt. And the answer was yes, I
6  should stay under McDivitt, the Assistant Secretary.
7  But like I said, I haven't seen a report. There is a
8  report out there that is supposed to be, some were
9  saying, that it was an audit and some saying that there
10 was just no where the position should be. I don't know
11 what it is. It could not have been an audit because the
12 audits you normally have at your desk. And I was not at
13 my desk nor was I given the opportunity to show the
14 young lady what I did.
15 Q. Okay. So, with that, was there any mention of
16 your promotion?
17 A. No.
18 Q. When speaking with Pearl, was there any mention
19 of your promotion or an alleged promotion or anything
20 like that?
21 A. No.
22 Q. Okay. So, after that, did you have any other
23 conversations with anyone else about being promoted?
24 A. Yes.
25 Q. When and with whom?

Page 24

1  A. Debbie Clark. I was detailed to the Budget
2  Office. Prior to that, I had a discussion with Debbie.
3  Q. Okay. When was that?
4  A. Let me see if I have it on this paper. It was
5  probably, the beginning, what is this month? This is
6  August. I'll say February. No. I have to say in
7  January. I think it was January.
8  Q. Of 2005?
9  A. 2005.
10 Q. Okay. So, let me get this straight. So,
11 McDivitt said something to you in 2000. He submitted
12 something. The next discussion was in 2002. And then
13 you didn't have another discussion until 2005?
14 A. No. I have been asking for them all along. All
15 along between that period of time I have been asking for
16 a promotion. But no, I have not just been dormant.
17 Q. Okay. Now, what reason did Debbie Clark?
18 A. Well, let me explain this to you. Debbie came
19 down, let's say in January/February of -- when did Diane
20 Murth leave -- 2003 when McDivitt ending up leaving and
21 Diane Murth came over and took over my job. Okay?
22 Woody Hopper put her in my place. I was accused of
23 nepotism by Woody Hopper and Donna Brannen.
24 Q. Okay. We're going to get to those. See, if we
25 start mixing and matching it's going to be hard for

Page 25

1  someone to decipher your allegations. And that's why I
2  am trying to keep them. I know they go together one
3  way, but I'm trying to keep your promotion stuff
4  together. Like right now, we're really on your
5  allegation #4 because it says on February 11, 2005, you
6  were denied a promotion, so it looks like -- (Ms.
7  Brantley)Now that one was another one. That is not what
8  you're talking here -- (Mr. Neal) See, we are still
9  trying to get through others with higher grades with
10 your promotion, so I don't really want to deal with the
11 nepotism right now, the other allegations. Let's just
12 stick with your promotions.
13 A. Well, Okay. If we can. Okay. I know what
14 you're saying. You don't want to, but the point is we
15 may have to in order for me to get the situation in hand
16 for you to understand because you're saying from 2003 or
17 2002 to 2005 you didn't ask for promotions then? And
18 that is not true. So, the point is all along these
19 periods of time, I am being shifted. I am not sitting
20 at one particular place. I'm not just dormant.
21 Q. No, no. It's fine to say you were shifted, but I
22 don't want to digress into why you were shifted.
23 A. Okay. Keep me on the track. Okay. So, in 2000
24 is when I first approached McDivitt. 2002 is when we
25 talked again and we started generating the PD. 2003 I'm

MARGARET BRANTLEY

Page 26

1 taken out of my status position. Okay? Someone else is
2 put over top of me. It was 2004. In 2004, Debbie came
3 down and told us that, when I say "us" (Daphne Berwald
4 and myself) that a position is being advertised at a
5 GS12-13 administrative officer, and she wanted both of
6 us to apply for it. And by that time, Woody Hopper had
7 already told Daphne Berwald that he wanted her to come
8 up there, lock, stock and barrel. And it said in the
9 position that Denise Desidero was sitting in and run the
10 front office and work a little for him. Debbie came
11 down and said she wanted us to apply for this
12 administrative officer position sitting in the position
13 that Denise Desidero was sitting in and running the
14 front office. So, I asked Debbie then, I said, "Since
15 you already gave the position to Daphne, are you still
16 going to promote me." She says, "There is only one
17 position." I said I understand that. But since you
18 already gave it to Daphne, Can I still be promoted? And
19 she said, "Nobody is going to hold your hand." Okay.
20 So that was in 2004. What month, we are going to have
21 to always find out when Daphne went upstairs. Okay.
22    Q. Okay. Now, let me make sure I am understanding
23 this. Debbie Clark same down in 2004 and told you and
24 Daphne to apply for the administrative officer GS-12-13.
25 Did the two of you apply?

Page 27

1    A. No because it didn't come up. They sent Daphne
2 on up there.
3    Q. So the announcement never came out. And they
4 moved Daphne into the position that was alleged to be
5 announced?
6    A. Right.
7    Q. So, when she went upstairs, they moved her into
8 an administrative officer GS-12 position?
9    A. They changed her title. They gave her another
10 title. It wasn't administrative officer and gave her a
11 GS-12.
12    Q. Okay. Now, what was her race?
13    A. Indian.
14    Q. And approximately how old was she?
15    A. She was fifth something.
16    Q. Do you know whether she had any prior EEO
17 activity?
18    A. She had a problem, but I don't know if she ever
19 filed.
20    Q. So, now when you say they put her in that
21 position, you are talking about Debbie Clark and who
22 else?
23    A. Woody Hopper.
24    Q. Okay. Did they give you an opportunity to apply?
25    A. No. I was then, later (let's say some months

Page 28

1 later) detailed to the Office of Budget. And Debbie
2 told me -- they just forced the detail on me -- to the
3 point I had to ask why was I being detailed. Debbie
4 stated that I was being detailed because the
5 administrative officer GS-12 left, she said her name
6 Juanita Mullen left and Karen Needy, the secretary,
7 GS-07 was out with her mother's illness, and the
8 administrative officer left to go to another job. And
9 it was best thought that I would be able to handle the
10 position. An announcement is being done, and if I
11 wanted the position, I can apply for it like everyone
12 else.
13    Q. Okay. And what grade was that position?
14    A. GS-12.
15    Q. Okay. Did you apply?
16    A. Yes I did.
17    Q. Okay. Before I ask you any more about it, is
18 that the one where we are down here, you were denied a
19 promotion?
20    A. Right.
21    Q. Okay. All right. Now, before we get to that,
22 are we finished with?
23    A. No.
24    Q. Okay. Let's go further with that then -- (Ms.
25 Brantley) With the other promotions -- (Mr. Neal) Yes.

Page 29

1    A. Okay. Let's see. Jerry Fiely. Let's see.
2    Q. Let me ask, how is Jerry Fiely spelling that
3 name?
4    A. F-I-E-L-Y.
5    Q. F-I-E-L-Y?
6    A. Right.
7    Q. And how about Jerry?
8    A. J-E-R-R-Y.
9    Q. Okay. Now, you mentioned a Karen Needy. How is
10 Needy spelled in that last name?
11    A. N-E-E-D-Y.
12    Q. You mentioned a secretary also. I can't remember
13 her name?
14    A. She's a secretary. The other one was an
15 administrative officer, and that was Juanita Mullen.
16    Q. Okay. How does she spell her name?
17    A. M-U-L-L-E-N.
18    Q. Okay -- (Ms. Brantley) And Daphne Berwald. She
19 was a secretary before -- (Mr. Neal) Okay. How is she
20 spelling her first and last name?
21    A. D-A-P-H-N-E, B-E-R-W-A-L-D.
22    Q. W-A-L-Z?
23    A. No. W-A-L-D as in "dog".
24    Q. Okay. Okay. Okay. Tell me about the rest of
25 the promotions in that chain.

MARGARET BRANTLEY

Page 30

1 A. Okay. Dr. Mason, she is the Office of Alcohol
2 and Substance Abuse Prevention. She had wanted me to
3 work with her at a higher grade. And they wouldn't
4 allow me to go and work with her. That is one. That
5 was back in -- Let's see, when was this? This was
6 around 2000, I'm not sure when I set up her office. But
7 I can find that out or you could talk with her, too,
8 because that was one of the people I wanted you to talk
9 with. When was it? It would have to be back in between
10 2000, I guess 2000/2002 or 1999 or something like that.
11 Around in there.
12 Q. Okay. And she wanted you to work in her office?
13 A. Right. And they wouldn't allow it. We asked
14 McDivitt, and we asked -- who was that other person?
15 Q. Okay. Now, how does that relate to promotions?
16 A. That would have been a promotion.
17 Q. So, she was asking you to work in her office as a
18 GS-12?
19 A. Yes.
20 Q. Now, was there a vacancy? Or how were you going
21 to take the FTE over to her office?
22 A. Well, that is something they would have worked
23 out. They were looking at. And then later on after all
24 this came down, Woody said, "You want to go work with
25 Dr. Mason's office? Like that, you know. And by that

Page 31

1 time they had sent her from the Office of the Secretary
2 to the Bureau and Woody is Indian. I said, I am not
3 Indian. She said, oh, oh, yes. Like that. So while
4 she was with the Office of the Secretary, which I could
5 have easily done, they wouldn't hear of it. Then when
6 they sent her to the Bureau, and now he is going to ask
7 me if I want to go work with her. And I cannot do that
8 because I was not Indian, and it is Indian preference.
9 Q. Okay. All right. Anything else in that chain.
10 A. Okay. Yes. Let's go back to the budget person.
11 I think that is it until I think of something else in
12 between that, Okay? -- (Mr. Neal) Okay -- (Ms. Brantley
13 continues) Now we are at the Office of Budget and Debbie
14 is saying, "Do you want the job? Apply for it." I
15 applied for the position on-line. You have to go
16 through the computer to do it.
17 Q. Hold up. I thought you said the announcement
18 never came out. Or are we talking about a different
19 position?
20 A. No. This is a different one. This is after they
21 took Daphne upstairs. I am now being detailed to the
22 Office of Budget with Juanita Mullen and Karen Needy.
23 Juanita left to go to another agency. Karen Needy was
24 out with her mother's illness. Okay -- (Mr. Neal) Okay
25 -- (Ms. Brantley continues) And Debbie instructed that I

Page 32

1 could apply for the position along with everybody else,
2 and if I wanted the job. I applied for the job on-line.
3 And Victor Christensen, he was the Acting Director of
4 the budget office when I went to work with him. Okay?
5 He had applied for the Budget Directorship of
6 that office. I applied for the Administrative Officer
7 position of that office. He did not get the
8 directorship for that office. Mary Jane Miller received
9 that duty, that position, for directorship. When she
10 came on board, the first thing that she said to me when
11 Debbie introduced her to me was, "How did you get in
12 this position?" Negative. It was not a nice question
13 or anything. It was very negative.
14 It was just Debbie, Jane and myself in my office.
15 So to the point that I just said, "Debbie" and pointed
16 to Debbie. And then Debbie was squirming and said,
17 "Margaret so graciously volunteered to come and work in
18 this office, and we advertised the position." And when
19 she told her all of that, I knew I wasn't going to get
20 the position. So the next thing I knew, the office I
21 had held in the Budget Office was next to the director
22 of it. When that took place, the next thing I knew, I
23 was being shipped from that office and put in with
24 someone else that had their own office as well. And
25 that was Emily Thomas. And I'm not sure why Emily's

Page 33

1 name is on your paperwork. I was put into her office.
2 Later, after I was moved from my office to her
3 office, I checked to see the status of the position that
4 I had applied for. And it was cancelled. Now, mind
5 you, I'm on detail. So then, Donna Brannen said, "Oh,
6 it was cancelled." And I said Oh, I said, "why?" Oh,
7 she just said it was cancelled. So then, I talked to
8 Debbie. Debbie said, "Jane had the right to select the
9 people that she wanted." That's what I got from Debbie,
10 a quote. She could have selected from all of us who
11 applied, but she cancelled the job because I had
12 applied.
13 Q. Okay. Now, is this that 2005?
14 A. Yes.
15 Q. So, this is your allegation #4 on February 11,
16 2005, you were denied a promotion.
17 A. Right.
18 Q. Okay. So, I just want to make sure. So that
19 position was cancelled, and no one was selected.
20 A. Right. As far as I know. It was cancelled, but
21 she brought someone on who sat at the desk that I was
22 sitting in.
23 Q. Okay. And this was the position that you were
24 detailed at?
25 A. Correct.

MARGARET BRANTLEY

Page 34

1    Q. So they moved you out of the detail, and they
2  brought someone else in?
3    A. They brought someone else in, but I'm not sure
4  what they have her doing. They could have her doing
5  something else, but they did bring somebody else in.
6    Q. Okay, but the main thing is that no one was
7  selected for this position. Is that correct?
8    A. Right.
9    Q. Okay. And it was cancelled?
10   A. Right.
11   Q. What was the title of the position?
12   A. Administrative Officer.
13   Q. Okay. And what grade?
14   A. GS-12.
15   Q. Okay. Do you happen to have a vacancy
16  announcement number?
17   A. I probably can look in my paperwork at home --
18  (Mr. Neal) Oh, Okay -- (Ms. Brantley continues) From
19  that point -- we are not finished with the promotions
20  again, Okay? Or supposed promotion. After my detail
21  was up with Mary Jane, Sally Hampton told me about a
22  position with Robert Middleton. He was the Director of
23  Indian Energy Resource Development. I went to work with
24  him, and he talked about a GS-12 position with my
25  working with him permanently for a GS-12 position. I

Page 35

1  said fine. And my work was so good that he gave me a
2  half a day off, twice.
3       While I was giving him my leave slip, and the
4  date is on that so that is why I am saying leave slip.
5  I had to get the date off it as to when he made this
6  statement. If I continued to work the way I'm working,
7  then he would look at giving me a GS-13.
8    Q. Okay. Now, let me interrupt you for a second.
9  The reason I am interrupting you is it does not appear
10  you filed a claim of discrimination or anything after?
11   A. All of this, this is what I am talking about now,
12  the judge said it wanted include. This is what you are
13  to investigate now.
14   Q. You see, now this is the -- I guess the way that
15  they -- (Ms. Brantley) Yeah. He is saying all of this
16  is going to be accepted -- (Mr. Neal) Okay. Now, what
17  was in your amendment because let me (tape ends).
18   Q. Okay. We are back on the record. I was asking
19  you about your amendments, and you were getting into
20  another promotion opportunity. So tell me a little bit
21  about that?
22   A. Once I was finished with my detail with the
23  Office of Budget, I went to work with Robert Middleton.
24  And he had stated that I could be permanently be working
25  with him as a GS-12, Program Analyst. He even started

Page 36

1  an appraisal form for me. Later, when I was giving him
2  my leave slip for the year, he mentioned to me, if I
3  continued the good work I was doing, then he would look
4  at the possibility of my getting the GS-13. And that is
5  what ended with the promotions so far. But I was later
6  dismissed from his office.
7    Q. Okay. Now, why where you dismissed from his
8  office.
9    A. He claimed that he could no longer trust me. He
10  said that he told me that he did not want a wall going
11  up in my office because in the offices I was sitting in,
12  there was a large refrigerator, two-door. It had water
13  coming out that type of refrigerator, out of the door.
14  And he had a microwave, a coffee pot, and he used a coat
15  closet as his pantry. And I was saying let's put this
16  wall up, so he could have his own little kitchenette
17  because that is what he seemed he wanted. So he asked
18  me why do I need a wall up after I had told him about
19  having a little kitchenette. So, I didn't say any more
20  to him. I went to my boss, since I was on detail for
21  him and told her, Sally (I said my boss because she is
22  the mediator between me and Debbie) and told her what
23  had just taken place.
24       And she said, "Oh, we could put a wall up"
25  because my office had jurisdiction on how to have space

Page 37

1  arranged. So she said, we could put a wall up. Nothing
2  took place at that time. But later when I ran into the
3  guy that could build the wall and the guy that would pay
4  for the wall.
5    Q. Now, is this the part down her where you were
6  denied a petition wall in your office space?
7    A. Yes. Exactly. Exactly.
8    Q. Okay. Go ahead. Keep telling me about that.
9    A. Okay. When I ran into the two guys (Matthew --
10  (Mr. Neal) Spell that last name -- (Ms. Brantley
11  continues) C-R-A-V-A-T-T. He is the one who may have
12  paid for it, or I would have paid for it. Both of our
13  money comes out of the same area. Harry Cold Dog, he is
14  the one who was to build the wall. When I ran into both
15  of them into Matt's office and asked when was my wall
16  going to be put up (because Harry had told me that he
17  had spoke with Bob and Bob was in agreement with the
18  wall going up. So that is when I ran into them (and
19  nothing had taken place) so when I ran into the both of
20  them in Matt's office, I asked when was my wall going
21  up?
22       Harry said well, we are just waiting to see who
23  is going to pay for it. And I said Matt. And Matt
24  said, you can pay for it. So, I said okay. E-mail me
25  and e-mail Bob as to when, how much and the times that

MARGARET BRANTLEY

Page 38

1 they were planning on putting up the wall. And I
2 spelled out both my name and Bob's name for him to
3 e-mail us. And that was on a Wednesday morning I did
4 this.
5     What date? I'm not sure right now. I got it on
6 the paperwork, but I don't have the paperwork before me
7 right now. Then, Thursday morning, Matt came and asked
8 me whether or not I heard from Harry. And I said no.
9 Okay, he is going to contact Harry. So, Thursday
10 morning also, Bob came to me again and said you are
11 doing such a good job, take a half a day off tomorrow.
12 Which would have been Friday. And I said, Bob,
13 remember, I am to be off the whole day Friday. And he
14 said well take it whenever you want to.
15     So, when I came in Monday, Bob came into the
16 office (before I took off my coat) and said, "We got to
17 talk." And I said okay. So I took my coat off and went
18 into his office. And he said didn't I tell you I didn't
19 want a wall up? I said no. What you told me was why do
20 we need a wall up? And I said but Harry told me he had
21 spoke with you, and you were in agreement with the wall
22 going up. He said he never talked to Harry.
23     Well, we need to call Harry and Matt in here
24 because I had told Harry to e-mail both of us as to when
25 this was going to take place. I didn't see any

Page 39

1 indication that the wall was going up when I got back
2 Monday. So, about two o'clock that evening, Harry and
3 Matt came into the office. And Bob proceeded to say
4 that he was getting conflicting information. That is
5 why he called the meeting. Then Harry interjected and
6 said "When I talked with you some time ago," -- speaking
7 of not recently but some time ago -- "you did not seem
8 to be in agreement with the wall going up. And he said
9 you were going to talk it over with Margaret.
10     So I said you did talk with Bob then. And Harry
11 didn't say anything. And so then I said Okay. Now,
12 back up. I said then you told me that you spoke to Bob,
13 and he was in agreement with the wall going up. Harry
14 hesitated to the point that Bob interjected and said, he
15 reached out his hand to him like putting it on his knee,
16 like that type of "reach out." And said, I understand
17 you do good work. Everybody says you do good work.
18     I'm not going to bother your position. I
19 understand you do good work. Matt interjected and said,
20 "I don't think he does good work." So, Bob went back
21 again and said, "everybody but Matt thinks you do good
22 work". Harry asked with whom should he speak regarding
23 Bob's office? Bob said speak to him. Harry said okay.
24 He never answered the question. He shook Bob's hand.
25 He shook my hand and left.

Page 40

1     That was the end of the meeting. Oh, no I take
2 that back. Bob had said, "Margaret pushed this, didn't
3 she because she wanted this wall going up?" That is
4 what he told Harry. And Harry didn't answer that one
5 either. And I just said. Yes, I wanted the wall up.
6 That is all I said. So that is what happened.
7     So, the next day, Bob called me in the office,
8 and said he spoke with Sally and he spoke with Debbie
9 and told them that he could no longer work with me. And
10 that I was to be moving soon. And I just said fine and
11 left his office. So that was the end of my tenure with
12 Bob.
13     Q. Okay. Now, let me stop you right there. Since
14 we are on this wall. So, why do you feel that
15 discrimination occurred?
16     A. Bob was told prior to my coming on board that I
17 had a case in. I don't know all that he was told. But
18 he told me when I went on the interview that Sally had
19 told him about my discrimination suit. Bob was in the
20 process of trying to get some money out of Debbie. So,
21 I am thinking that Debbie, in order for him to get the
22 money, he felt that he needed to cater to Debbie. So
23 that is why he agreed to my coming on board. And
24 thinking he is telling me all these things about getting
25 promoted and all that other stuff because he knew the

Page 41

1 situation that I was trying to get a GS12-13. Okay?
2     Once he probably found out that he didn't have to do
3 that, I think he no longer wanted me there. So, he
4 found some type of reasoning behind this to get rid of
5 me. So this is what happened. I feel that he just felt
6 that he didn't want me there because I don't know what
7 reason because I did my work to the point that he gave
8 me two half-days off for doing a good job. So the
9 discrimination is there because of the fact that I think
10 he was just trying to assist Debbie with the claim of my
11 not being able to do work or whatever. Not being
12 trusted or whatever. I have no idea. But as far as
13 discrimination is concerned, I just put it all together.
14     Q. Okay. Look. Let me ask this question just
15 because of what I am hearing. Okay. Now, Mr. Middleton
16 was aware that you had an EEO complaint existing when he
17 allowed you to come to his office. Is that correct?
18     A. Right.
19     Q. And it is obvious that he probably knew that part
20 of your complaint was asking for a promotion. Is that
21 correct?
22     A. Correct.
23     Q. Okay. So, assuming that he knew that and he
24 accepted you into his office, then my question is why
25 would he put you out of his office because of those

MARGARET BRANTLEY

Page 42

1  reasons when those were the reasons that he accepted you
2  into his office?
3      A.  To get in good with Debbie.  That's just like,
4  okay, I can help you hurt her stressfully because I am
5  definitely stressed and mentally.  Okay?  They have a
6  way of consolidating their efforts of harassment.  And
7  this was definitely one of those ways.
8      Q.  Okay.  Not to cut you off, but it sounds like the
9  two of you, you and Mr. Middleton got along until this
10  wall incident occurred.
11      A.  Right.  He is probably looking for -- oh, before
12  then, let me back up.  I had a jury-duty case I had to
13  go on.  And here is where the trust issue came up before
14  then.  I had a jury-duty case.  And I told him that I
15  had to go on jury duty on such-and-such a date.  I'll
16  give him the paperwork when I return.  He said if I
17  can't trust you with that, what can I trust you with?
18          And that struck me as very odd then.  So,
19  then now he comes up with the wall bit, and now he is
20  saying he can't trust me?  It was something he was just
21  waiting to find, some type of reason, for him to be able
22  to dismiss me.  But because he had agreed to take me to
23  work with him.  He could not find any reason.  So this
24  was one of them to do what he wanted to do or however he
25  wanted to do to harass me.  Retaliate and harass me and

Page 43

1  whatever word I am missing to use in a situation of this
2  nature.
3      Q.  Okay.  All right.  So it seems like we have
4  covered your claim one, your claim four, and your claim
5  seven.  Let's go back to your claim two.  You have been
6  denied communication access such as e-mail service since
7  March 2002.  Tell me a little bit about that.
8      A.  When I was working with Diane Murth, Diane had --
9  (Mr. Neal) Diane?  What is her last name? -- (Ms.
10  Brantley continues) Murth, M-U-R-T-H.  I could not
11  e-mail anyone.  Any e-mails I received, I had to give
12  them up.  Woody Hopper -- well, we would have to go back
13  -- that is the situation.  Okay?  I have to go back in
14  order to tell you about nepotism in order to get to
15  Diane.  The reasoning behind the e-mail situation is
16  because of the fact that I am being stripped of my
17  duties.  Right now, today (as of today), I am not doing
18  any work.
19      Q.  Okay.  Let's talk about this e-mail for a little
20  bit.  Was anyone else in the office e-mail?
21      A.  No.
22      Q.  So, no one else did not lose e-mail access?
23      A.  No.
24      Q.  And this had nothing to do with, I know for a
25  period anyone dealing with the Bureau of Indian Affairs?

Page 44

1      A.  No.  This does not have anything to do with that.
2      Q.  Okay.  Okay.  Well, go ahead and proceed.  You
3  said you had to go back in order to come up to tell me
4  how this applied.
5      A.  Okay.  That deals with nepotism.  That deals with
6  me being stripped of all my duties.  That deals with
7  Woody Hopper.  I have to go back to when James McDivitt
8  was my boss.  Back to 2002.  Velma Mason.  I'll start
9  with Velma Mason.  She -- (Mr. Neal) You said Velma,
10  V-E-L-M-A? -- (Ms. Brantley continues) She came to me
11  as the administrative officer and asked me for do I know
12  of anyone that would be able to assist her for two weeks
13  at a low-grade, and she needed them the following week.
14  I told her no, I do not.  That is such a short notice
15  for anyone to be able to accommodate her at that short
16  notice.
17          I said, well, wait a minute.  Let me check.  So
18  then I checked.  My daughter is a realtor.  So I didn't
19  tell her I said, let me check.  So anyway, I told her
20  there may be someone.  Let me get their resume, give it
21  to her.  She can look it over and talk with the person
22  and see whether or not she is of interest to her.
23          When I gave her the resume.  She looked it over.
24  She talked with my daughter.  And then when she told me
25  that she wanted her, I told her it was my daughter.

Page 45

1      Q.  Were the last names the same?
2      A.  No.  So she had said that she wanted her to work
3  with her.  She called Donna Brannen and told Donna
4  Brannen that she wanted this child to work with her.
5  And it would be at a GS-06, and she is to start that
6  Monday, whatever that Monday was, March the 24th.  Okay?
7  When Michelle came on board, there was no one there to
8  greet her.  So she ended up calling me.  I went down and
9  picked her up from the front desk, took her up to
10  personnel to Donna Brannen.
11          Donna Brannen prior to told me that she had a
12  general position description that she had prepared for this
13  child because of the fact that it was only for two weeks
14  at a GS-06.  When I took her up to Donna Brannen, Donna
15  Brannen then tells me she doesn't have a PD.  I said
16  well I'll have to go get one.  As administrative
17  officer, I had to go get one.  From another department,
18  another bureau, National Park Services is where I got it
19  from.  So I took it back down to Velma Mason and told
20  her that she needs to look this over and see how she can
21  adjust this position description to suit her needs.
22  While we were down working, Michelle (is my daughter's
23  name, Michelle Steele) she -- (Mr. Neal) S-T-I-L-L --
24  (Ms. Brantley continues) No.  S-T-E-E-L-E, Steele.
25          She was being sworn in.  She got sworn in.  They

MARGARET BRANTLEY

Page 46

1 brought her back down to do the work. She started
2 xeroxing for Velma because she had talked with Velma,
3 and she started doing some work. Woody Hopper and Donna
4 Brannen came down together. Woody Hopper started
5 pointing his finger at me and Shelley and Dr. Mason.
6 Pointing to me, he said, "You go with Donna Brannen."
7 He pointed to my daughter and said "You are coming with
8 me." He pointed to Velma and told her to stay in her
9 office.
10    I said, "What is going on?" They wouldn't answer
11 any of my questions. So as I was going with Velma,
12 Woody had my daughter, and he wanted to know how did she
13 came about to being hired? Well, anyway, let's go with
14 my part first.
15    Q. Okay. Well, let me get you back on track.
16 Because the nepotism is not part of this, but -- (Ms.
17 Brantley) Yes it is -- (Mr. Neal) Because it says you
18 were denied communication access. Where is the nepotism
19 part in your allegations of discrimination?
20    A. Because it's there. That is the beginning of my
21 complaint. That is the whole beginning of my 2003
22 complaint. And this is what the judge knows because I
23 told him again on the phone. He says all of this is
24 going to be included. And because of the nepotism is
25 the reason why I was denied e-mail, being able to do

Page 47

1 anything. And he also knows that I am not doing any
2 work right now. So he said all of this is to be
3 included.
4    Q. So this happened in 2002. So, you haven't been
5 doing any work since 2002.
6    A. I haven't done any work since August of 2003.
7    Q. But I thought you were in Mr. Middleton's office
8 in?
9    A. Yes, I was detailed to them. But I soon got away
10 from them. If you notice what I said. Shortly
11 thereafter, I was let go. And then my detail was up for
12 120 days. None of my administrative work was being
13 done.
14    Q. Okay. So who is doing your job right now?
15    A. It started out between Daphne Burwald, Iris
16 Winston, Matt Cravatt, Sally Hampton. I don't know what
17 Juan is doing. Juan is Black. But he, I don't even
18 need to mention him. Who else is doing my work?
19    Q. Okay. So who took your duties away?
20    A. Woody Hopper and I have to say Debbie because she
21 is still allowing it to happen. She is taking more
22 duties away.
23    Q. Okay. So, your duties were taken away after that
24 meeting that day between you, your daughter and Dr.
25 Mason, from that incident?

Page 48

1    A. No. No. My duties were taken away after James
2 McDivitt left. James McDivitt was my boss.
3    Q. Now, you said McDivitt left in 2003?
4    A. Right. Woody Hopper became my boss after
5 McDivitt left, and he stripped me of all my duties
6 because of the nepotism incident.
7    Q. Okay. The nepotism incident happened in March of
8 2002?
9    A. Exactly. No, in 2000, when was it? 2004? (Mr.
10 Neal) Well, you see something is wrong here -- (Ms.
11 Brantley continues) Wait a minute, 2004 the nepotism
12 incident happened, I think -- (Mr. Neal) Well, maybe
13 this letter is wrong. It says you have been denied
14 communication access such as e-mail service since March
15 2002 -- (Ms. Brantley continues) Okay. Yes. Okay I
16 understand what happened. When they moved me from my
17 office, and they moved me up to 1800 G, I had access to
18 nothing. Okay. That is what happened. They had not
19 connected me to anything because they connected
20 themselves, all the offices, to the Bureau of Indian
21 Affairs.
22    My work and all my connections came from the
23 Department, Office of the Secretary. The Department as
24 a whole, okay? Therefore, hooking me up to the Bureau,
25 I still would not have been able to deal with any of

Page 49

1 them because I don't deal with them. I deal with the
2 employees. When I get information from the Department,
3 I give it to the employees. I cannot get information
4 from the employees because I am not hooked up to the
5 Department anymore because they moved me up to 1800 G.
6    That is what happened. And I kept asking for
7 hook up, and I never got it until -- When did I get it?
8 I got some type of -- they ended up bringing a computer
9 up there. Everybody else was hooked up. Okay? Just
10 me, it was just my position because of the position I
11 was in that was not hooked up. I am trying to think
12 when I got hooked up. I have an e-mail somewhere that
13 tells me when I got hooked up. I'll have to get that to
14 you, what date. But it was after Diane Murth came on
15 board some time after because she kept asking m am I
16 hooked up yet?
17    Q. Okay. Now, did they provide a reason why you
18 could not be hooked up?
19    A. No. I kept asking McDivitt because McDivitt is
20 my boss now, at this time. And I say now because in
21 2002 -- Like I said, officially, I was under the Office
22 of Audit and Evaluation. Right? They ended up sending
23 that office to 1800 G. I was then under McDivitt, James
24 McDivitt. I think it was 2001, early 2002 or something
25 like that. So, McDivitt left. I'm getting confused

MARGARET BRANTLEY

Page 50

1   now. But that is the reason why I was not hooked up to
2   any emails. And then later after I got e-mails, I was
3   told after I got back to the building, we ended up
4   coming back to Main Interior. Then I was denied not to
5   be able to do any e-mails at all.
6       Q. Okay. Now, were there any other employees from
7   your division or your office located at 1800 G Street?
8       A. No. Yes. Yes. Yes. That I worked for? I
9   mean, question me again.
10      Q. Okay. No I was just wondering whether there were
11  any other?
12      A. There was no one in my status.
13      Q. Well, no. Not your status, I'm just trying to
14  see if any of your co-workers were also located at that
15  particular building?
16      A. Yes. Co-workers as far as the people I work
17  with -- (Mr. Neal) Yes. As an administrative officer,
18  yes. Other offices, there were four offices that were
19  assigned up there. And I had the Office of
20  Administrative Services up there. And I am the only
21  person in the Office of Administrative Services. Okay?
22      Q. Okay. Let me get to the rest of my question
23  first. Now, did the other people that worked there, did
24  they have e-mail access?
25      A. Yes.

Page 51

1       Q. Okay. Did you have a computer?
2       A. Yes.
3       Q. So, how were they able to connect and you were
4   not?
5       A. If they connect me to the Bureau, it would not
6   have done me any good because of the fact that nothing
7   that the Bureau had to say applied to me.
8       Q. Okay. How were the other people connected? Were
9   they connected to the Bureau?
10      A. They were connected to the Bureau, and they
11  talked among themselves. Now, my position is to tell
12  them what the department is saying and relay any
13  information that I have.
14      Q. Okay. So, when you say you didn't have e-mail
15  service, you didn't have e-mail service at the
16  department level, but you had it at the Bureau level?
17      A. No. I didn't have any. You can't hook me to one
18  or the other. Okay. If you hook me to the Bureau,
19  there is nothing I can get from the Bureau. That is
20  what I am saying. But they didn't hook me to the
21  Bureau, either. No. I didn't have either.
22      Q. Okay. Okay. Now, I think this may also tie in
23  with your next allegation. Your allegation number three
24  that says your office was taken away. You were not
25  given proper facilities to do your work. And you were

Page 52

1   made to walk three blocks to perform your duties.
2       A. Exactly.
3       Q. Okay. Well, tell me about that also because
4   somehow or another the two might link together.
5       A. Well, when the Office of Audit and Evaluation
6   went up to 1800 G, I was to remain. You can speak with
7   Jerry Fiely on this. I was to remain at the office
8   because all my work was there at the deparment. So, I
9   was to remain at the department. James McDivitt, I
10  don't know what happened. He just said, "Everybody go"
11  just like that. I guess he got mad about something. I
12  told him, I said I was to remain there.
13      All my work is here. It's going to be a
14  hardship on me because the majority of the people I work
15  with are here. I work with the Assistant Secretary. I
16  have to come over here every day in order to do my work.
17  And I said also, I don't have the departmental hook up.
18  They were talking about it was going to cost $25,000, or
19  something like that, In order for me to get hooked up
20  with the department from up there to here. So, he ended
21  up saying, "Well, once everything gets settled, I'll
22  bring you back." Like that, you know. And I said, Oh.
23  Uh, huh.
24      You know, I have to walk three blocks every day.
25  Now, mind you other offices were up there. And some of

Page 53

1   the people had to walk back to Main Interior. But they
2   didn't have to do it every day like I did. Therefore, I
3   had to come over to the deparment. Not only to see the
4   offices that I was working with under the Assistant
5   Secretary for Indian Affairs, but I had to go to the
6   department level and go to Budget, Procurement,
7   Telecommunications, Finance, you name it, I had to do
8   it. And walking, carrying my coat because I didn't have
9   any space over here.
10      Q. Okay. Now, when you were moved to 1800 G Street,
11  I think I heard you say that there were some other
12  people that he moved as well. How many people did he
13  move?
14      A. Four offices.
15      Q. So, he moved four offices all at the same time?
16      A. I was the last one to be ordered to go.
17      Q. Okay. Now, what was his rationale for moving the
18  four offices as well as you?
19      A. I don't know. Cheaper space, I guess. But we
20  all are not there any more. So, I don't what it was. I
21  don't know what the rational was.
22      Q. Okay. But you were not the only person impacted.
23      A. No. I was the only person impacted severely.
24      Q. Okay. And it says your allegation #5, on January
25  12 or 13, 2005, you were requested to pack office

MARGARET BRANTLEY

Page 54

1   supplies in spite of your previously injured back which
2   you re-injured while packing. Tell me a little bit
3   about that.
4       A. I had taken my back out, and while I was out
5   convalescing under the doctor's care, Sally called me.
6   And this is dealing with the Mary Jane incident when she
7   came on board and didn't want me in her office. And she
8   asked how did I get my position. And I had to move from
9   the office next to her and move into the office of Emily
10  Thomas. Everyone had their own office. And Sally
11  called me and asked me if I could come in the next day
12  to come and pack and I told her no. That I probably
13  could try and do it Monday, but I'm still under the
14  doctor's care.
15      So I came in Monday trying to pack because Mary
16  Jane no longer wants me there. So while packing, I had
17  to try to be careful, a paper fell, and I went to catch
18  it. And that is how I re-injured the back again. And
19  took it out again. But I was still taking the medicine
20  and everything that I had at home. But I had to stay, I
21  think I stayed home, another day or two after that. If
22  not, I could stoke myself up and came in sick because I
23  didn't have to do any work or whatever. But I had to
24  lay on a heat pad, too, once I got home.
25      I'm not sure. I think I did stay home a few days

Page 55

1   after that.
2       Q. Okay. Now, who was it that told you to pack?
3       A. Sally Hampton. She said I was going to have help
4   from Matthew Cravatt. But when I got there, no boxes
5   were in the room. And the guys who moved me came early
6   that morning when I got there. I said look I don't even
7   have any boxes, so nothing is packed up. So that is
8   what happened.
9       Q. Okay. Now, you probably told me, but where were
10  you moving from and where were you moving to?
11      A. I was moving from the office next door to Mary
12  Jane Miller who is the new director now who did not want
13  me working with her, who also cancelled the job that I
14  had applied for as administrative officer GS-12 in her
15  office. From next to her to another room with Emily
16  Thomas next to that room I was in. And she did not need
17  the room. She ended up making my room a conference
18  room. We already had a conference room. So, she had
19  them move the table out of the conference room that was
20  already established along with a polygraph phone into
21  the room. And she turned around and asked me, before
22  she did this, what are we going to do with this room?
23  And I felt that was a needle or a slap in my face saying
24  "We don't know what we are going to do with the room,
25  but you are not going to be in it.

Page 56

1       That type of thing. This is the attitude. This
2   is the mentality of these people. So, I said, I don't
3   know, and I just left. I'm trying to keep my cool. But
4   that is what happened. So I re-injured myself packing
5   boxes to move from the office that Mary Jane no longer
6   wanted me in that was close to her.
7       Q. Okay. Your allegation #6, on or about January
8   24, 2005, you were denied a private office and denied a
9   key to your office. Tell me about that.
10      A. Okay. The office I had was private. This was
11  still with Mary Jane. The office I had was private, and
12  everybody else had their own private office. The key to
13  the office, now it's a conference room, and I had my
14  files in there because of the fact that I could not take
15  them into the office in which I was being assigned with
16  someone else. So they stayed in there. So I needed the
17  key to the office. Karen Needy came to me and said Mary
18  Jane does not want me to have a key to this conference
19  room.
20      I said it's a conference room and my files are in
21  there. She says she doesn't want you to have a key to
22  it. She told that to me twice. So I am denied. And
23  Karen is Mary Jane's secretary. She only wanted Karen
24  to have a key to the conference room.
25      Q. Okay. Now, tell me, why do you feel your age

Page 57

1   played a factor in all of this?
2       A. Now, there is something you didn't ask me, and we
3   have to back up. The position I am in, no other Blacks
4   were there in the position, no other Blacks within a
5   status position that I held. I held the position of
6   Administrative Officer for the Assistant Secretary of
7   Indian Affairs. I did a very good job prior to Woody
8   Hopper's accusation of nepotism, Woody's and Donna
9   Brannen's accusation, knowing that it wasn't nepotism.
10  My color is dark in complexion. I was the only Black
11  female in this type of position. The only aged person
12  in this position. So, my age, my color, my race, my
13  gender, all of this, and I am the only Black person,
14  dark in complexion, sitting up in a conference with the
15  Assistant Secretary and all the directors having a
16  meeting with them. And it was frowned upon.
17      So they had to find a way of getting me out of
18  this position. And this is how they did it. Now, mind
19  you, too, I received $24,000+ dollars plus a quality
20  step increase for my work. So it is not my work. But
21  the reason why I am in the position I'm in now with no
22  work to do.
23      Q. Okay. Well, let me ask this. Because you said
24  that it was frowned upon with you being in a meeting
25  with all of those individuals. Has anyone ever made any

MARGARET BRANTLEY

Page 58

1  comments or has anything ever come back to you that was
2  allegedly said about your race or your skin colon or
3  anything about you being in those meetings?
4      A. I'm trying to think who said it. I can't
5  remember who said it. I have a bad tendency of trying
6  to dismiss a lot of things that happened to me until it
7  comes up again because I cry. Like if I hurt my arm on
8  a wall, I'll hollar "ouch" right then and there, and
9  then later I'll look at it and say, "how did I do that?"
10  You know, one of those types of things because I dismiss
11  the pain. I'm sorry. It's a thing of my being, like I
12  said, a status position, not just a position. It's a
13  thing of my being seen that they did not approve of.
14      Later they ended hiring a whole lot of African
15  Americans in the front office. And they soon got rid of
16  all of them out of that area because they looked and saw
17  all these African Americans there, and they said, "Oh my
18  gost, get rid of them." And I heard them say that.
19      Q. Now. When you say who heard them say that, who
20  is them?
21      A. Who was it at the time? Beth Terranova hired
22  them, and she is white. And they were all low grades,
23  like GS-04 and maybe two GS-10 or something like that.
24  Debbie Clark was mad with Beth because she hired them.
25  So, Beth fell out of favor with Debbie Clark. She is

Page 59

1  still out of favor, I think because of that.
2      Q. But who was it that said, "get rid of them"?
3      A. I don't know. I'm trying to think. I'm trying
4  to think. I don't want to lie on no one. I can't
5  recall exactly who said it. But they started getting
6  rid of them. And they got rid of all of them. I don't
7  have to say who did it because I can't say right now who
8  did it because there was a concensus between Debbie
9  Clark and Woody Hopper. I'll just say those two. But
10  they got rid of them.
11      Q. Now, do you know why they got rid of them?
12      A. I feel they got rid of them because of the fact
13  of their color. That is just like what I was saying
14  about the conference meeting. I was the only one
15  sitting up there in the conference room. Now, Woody was
16  known as a "hatchet person" or whatever, I don't know.
17  Some other people know what name they gave him. But I
18  heard "hatchet person." But once they brought him on
19  board is when I started having problems. I guess they
20  couldn't figure out how to get rid of me without him.And
21  then they trump up a charge on nepotism to get rid of
22  me.
23      Q. Okay. All right. Well, have you spoken to
24  anyone about the fact that you're not doing any -- (Ms.
25  Brantley) Yes -- (Mr. Neal continues) Okay. And who did

Page 60

1  you speak with and when?(tape stops) -- (Mr. Neal
2  continues) Okay. Who did you tell about that?
3      A. I told the judge. I told Debbie Clark. In fact,
4  let me talk about that. I went to Debbie and I told
5  Debbie about the PD that Jim McDivitt and I had
6  generated. And she said she didn't know anything about
7  that. And she said, well, give it to me. I can
8  incorporate it into the duties you are doing now.
9      In other words, she'll just add some of the
10  duties to my GS-11, and not give me a higher grade. So
11  I never gave it to her. That's how she said it to me.
12  I asked Sally for some work. I told her I had nothing
13  to do, and would she give me some work. So, she gave me
14  some spreadsheets to do. Sally stated that she had
15  spoke with Debbie, and Debbie had said. I don't know
16  what she really said, but she said that she spoke to
17  Debbie.
18      I wanted to take training, and I was being denied
19  training. And Debbie told her for me to take classes
20  that's related to my job. Everything is related to my
21  job as an administrative officer. So Sally said she
22  asked Debbie what is her job? She said financial
23  analyst. Now, my title is administrative officer. So
24  she told her to tell me to take financial financial
25  analyst courses. So that's when she started giving me

Page 61

1  some spreadsheets to do.
2      I did those spreadsheets. I finished those. I
3  did a powerpoint presentation. I never worked in Exel,
4  and I never worked in powerpoint, but they gave those
5  duties to me. And I was able to complete them. So,
6  that is what is going on. I did not give Debbie the PD
7  because Diane Murth had taken some of the duties out of
8  the PD and added it to, so I have an accretion of
9  duties, now.
10      If you get an accretion of duty, you should get a
11  higher grade. She took some of the duties out of the
12  GS-12-13 position and added it to the GS-11 position
13  that was already established. And just added it to it,
14  no grade to it, and called it an accretion of duties.
15  And Donna helped her do that. So, Donna Brannen, I
16  think she is a white racist. And for some reason, she
17  has it out for me. For what reason, I cannot tell you
18  because I had to work closely with her. And I can work
19  with anyone regardless of what they do.
20      But she did not want me working with her for some
21  reason. And they allowed that to happen. In fact, I do
22  not, like I said, I do not do any personal, I do not do
23  anything. One of the director's came to me and said
24  that the men's bathroom is stopped up. Get it fixed.
25  To the budget for some of the offices. And now they

MARGARET BRANTLEY

Page 62

1  have split all of my duties up to all these people and
2  first there were about seven to eight people they split
3  it to. And then, now, I don't know how many people it
4  is. But I have none of them.
5      Q. Okay. All right. Well, we've covered a lot, and
6  it looks like we've covered all seven of your
7  allegations. Is there anything else that you would like
8  to add that maybe I didn't ask or is there anything you
9  would like to add that I did ask that you would like to
10  elaborate upon?
11      A. Yes, there is. But I want to submit to you a
12  write-up that I need to give to you. It is something
13  that's going to be like an affadavit, too. So you can
14  look it over and abstract from it or just attach it to.
15      Q. Okay. Now is there anything in there that is
16  different from what you've said?
17      A. Yes, because we did not go over the nepotism
18  part.
19      Q. Oh. I thought you went over the nepotism. Well,
20  go ahead and tell me -- (Ms. Brantley) We did not finish
21  the nepotism. We did not finish any of that part, and
22  that is the main part -- (Mr. Neal) Well, tell me more
23  about your nepotism. Hold on. Let me interrupt you
24  now. I'm not going to stop you from submitting the
25  document. I just want to know if there was anything

Page 63

1  different. You can still submit it to me, but you can
2  tell me about the nepotism as well.
3      A. Okay. Velma Mason wanted to have somebody for
4  two weeks. I got my daughter. She was sworn in. She
5  actually did some work. Donna had to call Woody because
6  Woody wouldn't have known anything about anything.
7  Donna called Woody, and I assumed she told him about
8  nepotism because Michelle put on her paperwork my name
9  as her mother. When Woody came down and did all this
10  pointing and we ended up discussing the situation, he
11  and I.
12      He wouldn't answer any of my questions. He asked
13  me if I knew what nepotism was. And I told him what it
14  was. And I said, "is there any meaning other than this
15  that I don't know about?" He didn't answer me. I said,
16  "you're not going to hire Michelle Steele to work with
17  Velma Mason are you?" He said, "I don't know, yet." So
18  later, he fired her after I finished talking with him,
19  and after he talked with Michelle.
20      And I guess he talked to Velma (Dr. Mason). And
21  then while Dr. Mason and I was getting something
22  together, Michelle came back to the office and said that
23  he fired her. And I said, "what?" And then Woody came
24  and ordered my daughter out of the building. And my
25  daughter used to work there before, so she belongs to

Page 64

1  the credit union, so he couldn't order her out of the
2  building. He ordered me out of the building. Now, all
3  my work is here in the building. I told him all my work
4  was in the building.
5      "You either leave this building right now, or I'm
6  going to take you to McDivitt." I said, "Let's go." So
7  we went to McDivitt. By the time we went into
8  McDivitt's office, and Woody said, "I suggest you tell
9  her to get out of this building, now." And by the time
10  I turned to McDivitt, Woody walked out of the building.
11  So, I turned to McDivitt and said, "Do you know what is
12  going on?" He said, "something about nepotism." I said
13  you know this is not nepotism, don't you?"
14      He didn't say anything. So, I said, "Oh, so
15  you're not going to say anything, huh? So, he didn't
16  say anything. I said, "Do I have to leave this
17  building?" He said, "No. You don't have to leave the
18  building, but don't work with Velma Mason anymore." And
19  I said okay. I didn't even question it.
20      I didn't say a word. So then he says, "But no,
21  you can go ahead and do your work in the building." So
22  then, I had to go back down because I left my stuff with
23  Velma. So I told Velma that I am not to work with her
24  anymore. And that she is to contact I or McDivitt. Can
25  I tell her to contact him? He said yes. So I told

Page 65

1  Velma to contact McDivitt if she needed any work. Velma
2  ended up contacting McDivitt.
3      McDivitt ended up giving me the question to
4  answer, the project to do. Not the project that
5  Michelle was doing, but whatever else she had that she
6  needed some answers to. So, I gave the information back
7  to McDivitt. And McDivitt says, you give it to her.
8  Like that, you know. So, I said, huh. So I looked at
9  him.
10      And so then, I did'nt give it to her, really. I
11  just told him to go ahead and give it to her. So, he
12  said, you go ahead. And he said it again. So, I just
13  went on and gave it to her then because I didn't want to
14  be written up for insubordination. So then he said, as
15  I was ready to go out the door, "you can start working
16  with her again." Now, mind you, my daughter has been
17  fired. And first he tells me, "Not to work with Velma
18  Mason."
19      Now he is telling me to work with her because my
20  daughter is no longer working with me. And Woody is
21  fine. So, then I started working with Velma. They gave
22  the position that Michelle was to do to Daphne Berwald
23  to do. Now, she was a GS-11. Now, mind you, this
24  position was a GS-06. They gave it to Daphne Berwald to
25  do.

MARGARET BRANTLEY

Page 66

1  So now, I just didn't feel like being bothered,
2  really, with working with anybody. So, I still worked
3  with them, but I didn't feel like it. My mentality was
4  sharp.
5  Q. Now what year was this that this occurred?
6  A. This was 2004. McDivitt left in 2004, I believe.
7  Q. Because at first, you said he left in 2003.
8  A. Okay. I'm not sure which year now.
9  Q. Let me tell you another reason why I asked this.
10 You just said that at the time Daphne was a GS-11. But
11 earlier, and maybe it's just the dates (and that is why
12 we need to get these dates right) because at one point,
13 you were telling me that they moved Daphne to a
14 different position and made her a GS-12.
15 A. Right. Daphne got her GS-12 just recently.
16 Okay?
17 Q. Okay. Now, you said in 2004, they moved her and
18 gave her a GS-12.
19 A. They moved her upstairs in 2004.
20 Q. So, did this happen before she got her promotion?
21 A. Yes.
22 Q. Okay. Go ahead. I'm sorry. I didn't mean to
23 interrupt you.
24 A. Okay. Once McDivitt left in July or June (I
25 forgot when he left) of 2004, I believe. No. No. He

Page 67

1  left in July of 2003. Now I am getting confused by my
2  dates. July of 2003, McDivitt had to leave. I can get
3  the dates for you when he left. They should be in the
4  record somewhere.
5  When he left, they put Woody Hopper as my boss.
6  Now, if you look at the organizational chart, McDivitt,
7  then me and then the staff, everybody under there. Now
8  its Woody, me and the staff. When I say "staff" its all
9  the other offices, not staff, but just all the other
10 offices. So because of the nepotism incident, Woody
11 strips me of my status position with him that I would
12 have been able to get a GS-12-13 under. He put me not
13 only under a director, but put me under a director's
14 division. And they put Diane Murth over top of me. And
15 then all my duties started dissipating from then.
16 So that is the nepotism they accused me of. And
17 that was the way they were able to strip me of my status
18 position as Administrative Officer for the Assistant
19 Secretary.
20 Q. Okay. Now, let me ask this because I keep
21 hearing you say nepotism. Is there some type of policy
22 in the agency where two people of the same family cannot
23 work together?
24 A. Evidently not because if you look at the
25 department in the office in which I work, you would have

Page 68

1  found two sisters, one sister is supervising another, a
2  husband and wife working in the same office, same Bureau
3  on the same floor next door to one another.
4  Q. Okay. I'm going to ask you to identify those
5  people for the record.
6  A. For the record, you have Janine Brooks
7  supervising her sister Gail.
8  Q. Hold on. Let me interrupt you one second more.
9  Are any of these people, were they under Woody's
10 supervision?
11 A. Yes.
12 Q. So, they were under Woody.
13 A. They are under Woody's supervision and under
14 McDivitt's supervision.
15 Q. Okay. Go ahead and finish then.
16 A. Under the Assisant Secretary's supervision.
17 Q. Now also when you identify them, tell me their
18 race and their approximate age, if you happen to know.
19 A. They are Indian, and the ages are younger than I
20 am. I don't know their ages. I have no idea. And then
21 there is Jeanne Maybee and her husband Peter Maybee.
22 Q. How are they spelling their last names?
23 A. M-A-Y-B-E-E. They work for the Bureau of Indian
24 Affairs, and they were supervised under Woody,
25 definitely under Woody, because Woody was the Director

Page 69

1  of Human Resources for the Bureau, not the Office of the
2  Secretary, but the Bureau of Indian Affairs. And they
3  are under the Bureau of Indian Affairs. That is why I
4  am questioning why Donna would call him.
5  Q. Hold on, there. Help me a little bit. Was he
6  over the Bureau? Oh, that's right. You said he was the
7  Assistant Secretary or Assistant something.
8  A. No. Back up. Woody was the Director of Human
9  Resources for the Bureau of Indian Affairs. But
10 officially, he was the Office of the Secretary employee
11 doing the work of Director for the Bureau of Indian
12 Affairs during the nepotism part. Okay? When McDivitt
13 left, he became the Deputy Assistant Secretary for
14 Management that McDivitt once held, my boss.
15 Q. Okay. Now, so these other people that you are
16 talking about, they are Bureau of Indian Affairs
17 employees?
18 A. Right.
19 Q. But what about for the Office of the Secretary,
20 where were any family members working there?
21 A. Yes. But I got to find out who they are. Other
22 people know who they are. They just told me. I said, I
23 know. And they started naming all these people. And I
24 really have to go back and ask who was who.
25 Q. Why did Woody say this was nepotism?

MARGARET BRANTLEY

Page 70

1    A. He didn't. He never said it. But he asked me
2  the question, "Do you know what nepotism is?"
3    Q. Did he do anything to Dr. Mason?
4    A. No.
5    Q. What is Dr. Mason's race?
6    A. Indian.
7    Q. What is her approximate age?
8    A. She is also a little younger than me. I think
9  she is younger than I am. So, she is about 56 or 57.
10    Q. So nothing was done to her? None of her duties
11  were stripped?
12    A. No.
13    Q. Okay. Did you ever ask him why your duties were
14  stripped?
15    A. No.
16    Q. Okay. Anything else you want to tell me about
17  this nepotism?
18    A. The fact that my daughter did do some work.
19  Under this authority, I want that to be on the record as
20  well. She came to work because I want compensation for
21  her.
22    Q. The document you have. How many pages is it,
23  approximately?
24    A. Maybe 12.
25    Q. Would you like to fax that to me or would you

Page 71

1  rather mail it?
2    A. I could fax it to you. I could fax it to you --
3  (Mr. Neal) I'll give you my fax number when we go off
4  the record. And you can fax it to me.
5    Q. Is there anything else you would like to add that
6  maybe I didn't ask?
7    A. Yes. Well, I guess you don't need to ask about
8  training and stuff because I said I was stripped of all
9  of my duties. And I have been denied training.
10    Q. Okay. Now, are there any other documents you
11  want to submit other than this 12-page document?
12    A. Yes. I can submit the PD, the e-mails that
13  McDivitt and I had addressed regarding the position
14  description. And if not, I could give them to you
15  later. I have the position description, I think, of the
16  job in which McDivitt and I generated and the position
17  description where Diane Murth added some duties that
18  showed the accretion of duties.
19    Q. Here is what I'll do then. I think I have your
20  e-mail address, but at the end of this, I'll get your
21  e-mail address. I'll send you all my contact
22  information, and you can just mail me everything. And
23  if you have that 12-page document, if you have it via
24  e-mail, you can e-mail me that also, but you can still
25  mail it. That way, I'll have the signed copy as well.

Page 72

1    A. Okay. I'll probably end up faxing that to you,
2  as soon as possible.
3    Q. Now, is there anything else that you would like
4  to add that maybe I didn't ask or anything else you
5  would like to elaborate upon?
6    A. They have promoted everybody. Everybody has been
7  promoted. And now they are looking at promoting them
8  again. Daphne is looking to get into GS-13. Iris is
9  looking to get into GS-13. Now, I've trained Daphne and
10  Iris.
11    Q. What is Iris' last name?
12    A. Winston. She was the secretary at the time there
13  was a GS-09 that took my office when I was forced to go
14  up to 1800 G. She is now a GS-12. When she came on
15  board, I did the paperwork.
16    Q. What is her race?
17    A. She is African-American. 1995 was when the --
18  came about. Oh, yes we didn't go back that far. I need
19  to go back from 1988 up until now because we did not
20  talk about Patricia Rogers' Office. And I only
21  mentioned a case with Linda Richardson finding out and
22  then started treating me badly. Once they find out that
23  I have a case, then I was started to be treated badly.
24  Before, everything is fine until they find out that I
25  had a case in. And then, once they find out, then I am

Page 73

1  treated the way I am being treated now. So this is what
2  has been going on.
3    With the timeframe, as soon as they find out,
4  this is what happens. Linda Richardson found out about
5  the case that I had with Graphics. And Graphics found
6  out, well, they knew because I had just settled
7  basically, and coming from the library, and coming from
8  under Nancy Davis, and prior to that was the settlement
9  of my case. So, they all knew and Sally could tell Bob
10  about the situation that I have a case in. And all of it is
11  interlocking, and it has been systemic in nature as to
12  their actions towards me. I have individuals asking me,
13  "what did you do to these people?" "Your work is good
14  and everything." But they just are constantly not
15  promoting me. And others see this, and it's
16  embarrassing and stressful. Extremely stressful.
17    Q. Okay. All right. Well -- (Ms. Brantley) No. We
18  didn't do all of it from the time that I settled the
19  last case up until today is what I have been going
20  through -- (Mr. Neal) Okay. Now, is it contained in
21  that document that you are going to send to me?
22    A. Yes. I started from, one second -- (Mr. Neal)
23  Well, let's reference that document also, so that we
24  keep saying that document. Reference it by the title
25  and date so that we'll know what that document it is

MARGARET BRANTLEY

Page 74

1  when I attach it to this transcript.
2      A.  Okay.  I am calling it my Affidavit.  And as far
3  as the date, I am bringing it from 1989 -- (Mr. Neal)
4  No.  What I am talking about is there a date on that
5  document, like the date you signed it -- (Ms. Brantley)
6  Oh, I haven't signed it yet -- (Mr. Neal) Okay, so it
7  will be dated today -- (Ms. Brantley) Yes.  It will be
8  dated today -- (Mr. Neal) Okay.  August 25th, 2005 --
9  (Ms. Brantley) Right -- (Mr. Neal) Okay.
10     Q.  Is there anything else you would like to add?
11     A.  No.  I can't think of anything right now.
12         Well, based upon that comment, the time is now
13  approximately 12:45 p.m.  And that will conclude this
14  portion of the interview.
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNTIY COMMISSION
WASHINGTON FIELD OFFICE

| | |
|---|---|
| MARGARET R. BRANTLEY, ) | |
| ) | |
| Complainant, ) | EEOC Hearing No. 100-2204-00917X |
| ) | |
| v. ) | Agency Case No. OS-03-017 |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| ) | |
| Agency. ) | |

## COMPLAINANT'S AFFIDAVIT

I, Margaret R. Brantley, swear or affirm under the penalties of perjury the following:

1. I am of sound mind and am at least 21 years of age.

2. I brought these EEO complaints because I have not been promoted for the past fifteen (15) years while other employees similarly situated doing similar work are higher graded and received promotions.

3. The Agency has taken numerous actions against me as reprisal for my protected activities, including removing me from office, being detailed repeatedly, not being given meaningful work assignments and denied access to computer programs that were required for my job duties.

4. I am aware that all of my supervisors are aware of my EEO history and complaints; these actions are in direct retaliation for my protected activities.

## With Regards to Claim #1

5. In 1995, I was transferred back to the Director's office under the Assistant Secretary for Indian Affairs.

21

6. All other Administrative Officers who worked as Assistant Secretaries were GS-12 or 13 and then promoted to the 13 and 14 levels.

7. Other Directors' administrative personnel were GS-12 level and performed the same job duties as I.

### With Regards to Claim #2

8. In or about 2000, the Agency switched the LAN computer system from the Office of Secretary network to the BIA (Bureau of Indian Affairs) network.

9. Most of my contacts and assignments came from the Office of the Secretary and I needed access to that network to contact the employees at the Office of the Secretary as they dictated the rules and regulations for me to follow.

10. I complained to Jerry Fiely, James McDivitt, Dianne Murth, and Woody Hopper, who did not do anything to help me.

11. In 2002, dumb terminal internet hookup was installed into the Human Resources office which allowed access to the Internet.

12. However, I was unable retrieve/input my work including budget, contracts, and telecommunication, because my supervisors would not allow the software needed to be placed on the dumb terminal for me to do so.

### With Regards to Claim #3

13. In 2001, my cubicle was taken away and I was moved from my office in the Main Building to the G Street Office.

14. Prior to being moved, I was told by my supervisor, Jerry Fiely, that I would not be moved because I was working for the assistant secretary.

15. When I was forcibly moved to G Street, I was given inadequate work facilities as I was not given the computer access I needed to do my job which caused me to have

22

to walk 3 blocks everyday between the Main building and the G Street Office, several times a day on occasion, in each direction, in order to do my job.

16. Jerry Fiely was my supervisor from about 1998-99- to 2001 and would be able to testify about my office move, my work assignments, about my walking everyday to do my work, how I had to train others, and about my GS levels as compared to others doing similar work.

### With Regards to Claim #4

17. Mr. Christenson told me to apply for his administrative officer position he needed to fill because I would make a good candidate.

### With Regards to Claim #5

18. In January, 2005, I was out of work and under a doctor's care due to a back injury.

19. I was called at home by Ms. Sally Hampton and told that I was being moved out of my office. I was asked to come in the following day to pack my belongings. Ms. Hampton asked me to do this under the direction of Ms. Clark.

20. I replied that I could not come in to work due to my back injury, but would try to come the following Monday.

21. The next Monday, I went to work and began to pack up my belongings from my former office when I re-injured my back.

### With Regards to Claim #6

22. On January 24, 2005, Ms. Hampton told me that my office was being moved and that I would share an office with Ms. Emily Thomas.

23. Ms. Miller ordered the move because she wanted to make my former office into a conference room.

24. The office already had a full conference room with a television, speaker phone, table and chairs.

23

25. The conference room had been used for meetings and parties in the past.

26. All of the other administrative officers had their own offices.

27. After I was moved, Ms. Miller refused to give me a key to the new conference room, my former office, even though I needed it in my job capacity as administrative officer.

<u>With Regards to Claim #7</u>

28. My detail with Ms. Miller ended in or about March, 2005.

29. I was scheduled to go back to my old office under Ms. Clark.

30. Before I returned to my old office, I was told by Sally Hampton that Mr. Middleton was looking for an administrative officer.

31. The space I was to occupy had a refrigerator, coffee pot, microwave, pantry for food, and a closet with a sink in it.

32. I spoke to Mr. Middleton about putting up a wall and he asked me why it was necessary.

33. I spoke to Ms. Hampton about the fact that my office was also a kitchen and told her about my conversation with Mr. Middleton and she said that I could get a partition wall built.

34. When I came to the office, I was placed in the room with all of the above mentioned kitchen items.

35. Mr. Harry Coldough then came to measure the room, and asked me where to put a door.  I replied that I did not think that Mr. Middleton wanted the wall.

36. Ms. Coldough told me that he had spoken with Mr. Middleton and that he was in agreement with the wall going up and I said "OK" and told hime where to place the door.

24

37. A few days later, I ran into Mr. Coldough in Matt Cravatt's office and asked when the wall was going to be put up.  Mr. Coldough and Mr. Cravatt said they were waiting to see who was going to pay.

38. I told him that Matt would pay, but Matt replied that I could pay.  I said "OK" and I told Harry in from tof Matt to email me and Mr. Middleton with the cost, date of the work to be done, and price.  I even spelled out our names to Harry.

39. When I returned to work on Monday, Me. Middleton had in meeting in which I was told that he could no longer trust me.

40. I requested a meeting with Mr. Cravatt, Mr. Coldough, Mr. Middleton and myself.

41. After that meeting, Mr. Middleton told my supervisor that he could no longer work with me.

42. Mr. Matt Cravatt, the space manager, has knowledge with regards to the conversations between Mr. Coldough, Mr. Middleton and me.

43. Since this incident, I have not been given any meaningful work or assignments.

25

I hereby declare under penalty of perjury that the foregoing is based upon my personal knowledge and is true and correct.

Ms. Margaret R. Brantley _____  1/3/06
                                                    Date

Margaret R. Brantley           )
Complainant              )
                                  )
           v.                )        Agency Case Number: OS-03-017
                                  )
Department of the Interior    )
Defendant                 )

## AFFIDAVIT

**I Margaret R. Brantley, an African American, age 57, do solemnly swear what I say below is true.  I am presently an Administrative Officer, GS-341-11 and have been a GS-11 since 1988.  I am now working in the Office of the Secretary/Office of the Assistant Secretary – Indian Affairs.  Debbie Clark, Deputy Assistant Secdretary for Management is present my first line supervisor of record.  The following discrimination, reprisal actions, racial moves do to color, and disparate treatments are systemic in nature since 1989.   As you will see I have been denied training, awards, promotions, work, status position, I was humiliated, lied on, had office space taken from me for no real reason, and placed in a kitchen setting.  I have been made to train individuals (for fear of being wrote up for insubordination).  I had to see counselors for stress.  Had an employee for whom I supervised taken from me**

**Office of the Assistant Secretary-Policy Management Budget**

**Administrative Specialist/
From:  1989 to 1995**

I settled my discrimination complaint in 1987 receiving one grade with the promise of another if my work was satisfactory done. .  I was reassigned to the Office of Acquisition and Property Management as a GS-9 under Nancy Davis were I was taught to be an Administrative Specialist.  Nancy Davis was that of an Administrative Officer GS-12 at that time.  The training was on equal footing with Ms. Davis (white female).  I performed all the duties Ms Davis performed on the GS-12 level while I was a GS-9..  The training was for me to become Administrative Specialist in the Library under this office.  Nancy and I worked for the Director of the Office of Acquisition and Property Management, Shortly after the training was over, I received GS-11 in 1988. This was the last of my settlement agreement since filing in 1980. The following year, I requested a GS-12 and was told that I could not receive a GS-12 because Nancy Davis was the GS-12.

In 1988/1989, the Library was split from the Office of Acquisition and Property Management.  Since my taught to work for the Library as their Administrative Specialist under Phillip Haymond, I went with that office.

I requested again to be promoted to that of a GS-12 and this time was told I could not get a GS-12 because I now worked for a Division.  While working in the Library,  I interview and hired and received an assistant and I had my own office.  Sue Ellen Sloca a Division

Chief within the Library under Mr. Haymond disliked me. She wanted my assistant and Ms. Soloca went to Mr. Haymond and requested the assistant that was assigned to me (Ms Yvette Graham) Mr. Haymond gave the assistant to Sue Ellen and I was subsequently removed from my office. The office I was assigned to in the Library when I was split from the Office of Acquisition and Property Management was located in the back of the Library and the only office located in that area. Ms Davis assisted me with getting this office for and Administrative Officer and Specialist needed the space. In 1990, the Library went A-76(contracted out) and I then went to work with the Executive Secretariat shortly thereafter I was asked to go and work with the Combine Fe4deral Campaign out of the building at 21st & M Street, NW. When that tour of duty was over, I came back to the Main Interior Department to the Executive Secretariat and in 1991, I was assigned to the Office of Graphics. In the office of graphics I started to receive cash awards. I received in 1992 $1,000.00. Patricia Rogers was my immediate supervisor. Lisa Mahan a close friends of both Victor Trillings Ms. Rogers immediate supervisor and she was close friends with Albert Camacho, Victor Trillings immediate supervisor. They all knew of my discrimination suite. Lisa was not pleased that I joined her office and began lying on me to Patricia Rogers who did nothing to her but questioned me and when I requested a meeting with Ms Rogers and Lisa it never happened. I filed a discrimination suite on this. Lisa Mahan was allowed to get away with lying, etc. because she is close friend with both Victor Trillings and Albert Camacho supervisors over our immediate supervisor Patricia Rogers (African American). During my tenure with the Graphics office, I requested a details out of the office into the National Park Service's Office of EEO were I worked for over a year. I worked under the Director, Sandra McCrary. I believe the reason I did not get to stay with the EEO office was because it did a reorganization. I was then faced with going back to the Graphic office. I then requested a detail to the Office of Environmental Justice Task Force which was set up by the Department of the Interior under the Directorship of Robert Faithful. During this period, Lisa Mahan insisted I report to the graphic office as well. So I worked both places for 5 months before I was the only one RIFed from the Graphics Office.

**Immediate Office of the Secretary of the Interior Department**

**Staff Assistant**
**From November to November 1995**

I was RIFed in November 1995 to go to work for the fourth largest person in the Department – BJ Thronberry (white).

To work for the Immediate Office of the Secretary, questions are asked before one works in that area as to the background. Just before I was to report to Ms. Thronberry, I received a phone call from Holly Tomlinson, Management Analyst in the immediate office of the Secretary. Ms. Tomlinson asks me if I would take the position that Beverly Bland was to take during the RIF so they can keep Ms Bland. I asked if I had a choice as to where I wanted to go and Ms. Tomlinson said no. I, in turned, told Ms. Tomlinson that I wanted to proceed with the original plans. I went to work with BJ and after a month I was told by Holly Tomlinson that I would be reporting to the office where

28

Beverly Bland was to go and did I need her to to get boxes to pack for me. I told her I would get my own boxes and I did.

**Assistant Secretary – Indian Affairs**

**Administrative Officer**
**From November 1995 to Present**

November 1995, I went to the Office of Audit and Evaluation. The Office were Beverly Bland was originally was to report do to my bump rights.

I am now working under Linda Richardson, the "Director" Office of Audit and Evaluation for the Assistant Secretary-Indian Affairs. I was told that the only reason I was in the area of Audit and Evaluation was the Assistant Secretary-Indian Affairs did not have the funds for the position. Everything is seemed "OK" because I have not asked for a promotion.

My discrimination case of investigation came in regarding the Graphics office while I was working in the Office of Audit and Evaluation. Robin Friedman, Interiors Attorney told his friend, Linda Richardson (white) my immediate supervisor that I had filed a discrimination complaint and Linda began treating me differently (avoid talking with me, giving an award to the whole office except me and not allowing me training. I requested a promotion was told I did not perform at the GS-12 level. I was given more duties than I had in the position description given to me. So I had to file on her. When Linda Richardson retired, Jerry Fiely served in the Acting Director until Debbie Clark was brought to work with the Assistant Secretary-Indian Affairs.as Chief Financial Officer and as Director of Audit & Evaluation. I recrived $5000.00 from Jerry Fiely and the training I requested. I continued to serve under Jerry Fiely until the move to 1800G Street, NW. I had e-mail to perform my work until the office converted to the Bureau of Indian Affairs LAN. I did not get e-mail again till August 2003. Jerry office was moving and I was told I now fell under James McDivitt, Deputy Assistant Secretary-Indian Affairs. It was now felt that the Assistant Secretary-Indian Affairs now had the funds and an office account was set up for my office (account number 5025). I was the only person in this account until James McDivitt's salary was taken out of it.. I was to remain in the Main Interior Building. Later McDivitt told me that he wanted me to go to 1800G Street NW. I told McDivitt that it would be a hardship on me for all my work was with the employees here in the Main Interior building. My office was turned over to Iris Winston a GS-9 Secretary, furniture and all. Iris Winston was assigned to do some of my duties by Debra Clark so I had to train her to do those duties. Mind you, I did not have e-mail of any sort. I had to walk 3 blocks every day to check with the office of Budget, procurement, finance, personnel, space, the Assistant Secretary's office and other Director offices that did not have to move to 1800G Street. I was giving and getting assignment. The Department basically directed my position. The weekly Assistant Secretary's meeting I sat in on was to find out what was upcoming that called for my attention and I even participated a few times in discussions.

29

I requested a promotion from McDivitt and he seemed to be assisting me with it.  Mr. McDivitt told "Pearl" an auditor in the Fish and Wildlife Service Personnel Office and I together that I would head the office of Administrative Services and I would be handling all the offices under the Assistant Secretary-Indian Affairs as well as continue to serve the Assistant Secretary.  I was told this early by McDivit alone. McDivitt also told me that I would have an office at 1800G Street and one was set up for me until Kathy Kogut felt I should not have and office because I was not a higher grade and her staff was.  I never got the office it was used for the IT group if and when they had to come and fix computers for the staff at 1800G.

I told Mr. McDivitt that my counter part also under the Assistant Secretary-Indian Affairs Bureau of Indian Affairs was Debra Maddox and SES.  Mr. McDivitt stated that he could not give me a SES position but he could get me a GS-12/13.  .

Mr. McDivitt asked me to generate a Position Description for the GS-12/13 and submit it to him and I did.  I understand it was given to Donna Brannon, the personnel management specialist for the Office of the Assistant Secretary-Indian Affairs who also is a contractor.  I found out later that for some reason Donna did not give Mr. McDivitt advice on the position description but gave it back to him and told him "it was too vague".  I heard no more about the position to the GS-12/13 until Mr. McDivitt called me at 1800G Street one day and told me to come to the Main Interior Department for I was to have an audit.  I told him that I had not prepared for an audit and the person should come to me.  I was told to come.  When I got to the Main Interior building for the audit, the person from Fish and Wildlife Service was not there.  We waited for a several minutes if not an hour.  The person name is "Pearl" the last name I don't remember.  Mr. McDivitt informed me that he did not trust Donna Brannon so he asked Carolyn Cohen to assist him.  When I called "Pearl" about the results she told me that she had given them to Carolyn Cohen and that it was not an audit but to see if the position should be were it was?  After several request for a copy of the audit, I have not received it yet.

McDivitt retired and Woodrow Hopper, Director of Personnel on the Bureau of Indian Affairs side was assigned as Deputy Assistant Secretary for Management.  When Mr. Hopper was Director of Personnel on the Bureau of Indian Affairs side he was called by Donna Brannon and I assumed Donna Brannon told him that I was committing "Nepotism".

Background on accusation of "Nepotism":

Dr. Velma Mason, Director-Office of Alcohol and Substance Abuse Prevention came to me and ask if I knew someone who would be able to work "2-weeks" for a low grade. and I would like them to stated work next week I could not think of anyone here in the building so I thought about my daughter who was a realtor.  I told my daughter Michelle Steele about the situation of Dr. Mason and she asked me to see if I could get someone else.  I could not so I asked her again.  I told Dr. Mason that there is someone who may be interested and that she may talk with here and she if you feel you can walk with her.  Dr. Mason did speak with Michelle Steele and found out that she wanted here

30

to work with her. I told Dr. Mason that I would get here resume'. When I received Michelle Steele's resume', I presented it to Dr. Mason as my daughter. Dr. Mason presented it to Donna Brannon and told her that she want to hire Michelle as a GS-6. I spoke with Donna and told her that Dr. Mason did not have a position description ready for the GS-6 and Donna told me that she had a generic GS-6. I told this to Dr. Mason and as far as I was concerned everything was fine Dr. Mason was getting a person for the project she needed help with on such a short notice to me.

When Michelle Steele reported to work, no one answered the guards calls so I was then called and went down to take her to personnel to Donna Brannon. Donna met with Michelle and told her she could not fine her papers for the last time Michelle had worked in Interior and that she would have to take a GS-5. Michelle said no then Donna stated that she did not have a GS-6 position description. I told Donna that Dr. Mason had said that Mrs. Steele was to receive a GS-6 and that I would get a GS-6 position for her(Donna) so I left and Michelle proceeded to be sworn in. I was able to get a GS-6 position description from National Park Service and took it to Dr. Mason to fine out exactly what she wanted Ms Steele to do during the two week tenure. While we were getting that together, Brenda Butler brought Michelle down sworn it and ready to work. Michelle went in to talk with Dr. Mason and Michelle even did Xeroxing and I continued to work on the position description when both Donna Brannon and Woodrow Hopper the Director Office of Personnel for the Bureau of Indian Affairs. Donna, Dr. Mason and I are with the Office of the Secretary. If something was wrong either James McDivitt or I should have been contacted by Donna Brannon. Not Mr. Hopper. Mr. Hopper pointing to me saying "you go with Donna" pointing to my daughter "you come with me" and told Dr. Mason "you stay in your office". As I was going with Donna I asked her what was wrong and she stated "Woody will tell you" I said they are not going to let Michelle work with Dr. Mason are they. I got no answer. I sat in Donna area for about an hour before Woody came up to talk with me. He was evil. He asked me how did Michelle come to work here and I told him. He asked if I knew what "Nepotism" was and I told him and asked was there another meaning that I knew nothing about and he did not answer. He fired my daughter and ordered me to leave the building and told me if I don't leave we would take it to McDivitt so I told Mr. Hopper "lets go" when we got to McDivitt's office, Mr. Hopper shouted "I suggest you tell her to leave the building" when I went to ask Woody did he tell McDivitt the situation Mr. Hopper had left the room. I asked McDivitt did he know what was going on and he said "something about "Nepotism" I said you know that was not nepotism don't you. McDivitt said nothing so I said so you are not going to answer and he said no. McDivitt also told me that I did not have to leave the building but do not do any work for Dr. Mason's office. Woody did not like the fact that I was still in the building.

Mr. James McDivitt, Deputy Assistant Secretary for Management retired in July 2003. Mr. Hopper was put as Acting Deputy Assistant Secretary for Management now my immediate supervisor. He moved me under Debbie Clark then Chief Financial Officer who placed me under Diane Murth, Assistant to Debbie Clark in August 2003 stripping me of my status position which prevent me from becoming that of a GS-12/13. Because of the incident of "Nepotism" I did not receive a cash award for that year. Daphne

31

Berwald did. When Diane Murth was assigned by Woody and Debbie to over see the Office of Administrative Services, they also brought on Daphne Berwald- Secretarial Assistant and Karen Needy, Secretary. Less than Half the offices I was working for was given to Daphne to handle. I had to teach her what and how to perform my task. I had to teach Diane Murth as well. If I did not teach them I would have been wrote up for insubordination. Woody and Debbie would ask Daphne to do assignments and Daphne would have to ask me to tell her to whom to speak and how to go about getting the information she needed to get the job done and she got the awards not me. Shortly after Diane Murth became my supervisor Woody had given Diane Murth a project to do. Woody had Kathy Kogut, Woody subordinate ask me directly about a job that he had given to Diane Murth to handle my now supervisor. Diane Murth retired in July 2004, before she left, she gave me my performance ratings. She told me that I may use my rating to look for another job. After Diane's retirement, Woodrow Hopper called Daphne Berwald and told her to bring all her belongings and work in the office where Denise Desidero  sat and that Daphne would do some work for him and run the front office. Some time later, before Daphne moved into that office, Debbie Clark came down and told both Daphne and me that a position will be advertised as an Administrative Officer, GS-12/13 and both Daphne and I should apply. The position will be seated where Denise Desidero sat and that position would run the front office. I said "since that position is Daphne's can I still be promoted"? Debbie stated that it is only one position.   Daphne moved into the position.

Woodrow Hopper was made to leave his position. Debbie Clark was now my immediate supervisory. I was later told by Debbie that I am being detailed to the Office of Budget and that the position I was going into would be advertised and that I may apply for it if I wanted along with all others. I did apply. I asked Debbie Clark why was I being detailed and she stated that Karen Needy who was now assigned as secretary in the Budget office was out with her sick mother and Juanita Mullen who left and was that of an Administrative Officer and it was felt that I would be best qualified to do the job. I worked under Victor Christensen. Mr. Christensen (African American) was Acting Budget Director under Debbie Clark. The Director's position was advertised and Mr. Christensen did not get the position as he hoped. Mary Jane Miller got the job. Debbie Clark introduced me to Mary Jane Miller by bringing her into my office. The first Mary Jane asked was did I do time cards and I again told her no that Karen Needy did them. I said again because I met Mary Jane in the hall with Iris Winston and she asked them then that question and both Iris and I told her who handles time cards. The second question presented negative was "How did you get in this position" I pointed to Debbie and said "Debbie" and Debbie  said I graciously volunteered to work in this office. The office I was working in was next door to the office Mary Jane Miller was to use. I had sprained by back and was out under doctor's care when I received a call from Sally Hampton telling me that I was being moved and could I come in to pack up my belongings the next day. I told her no that I may be able to come in Monday. I did report to work on January 12th, or 13th to pack and as I was packing a paper fell and I went to catch it and re-injured my back and had to stay out longer. After I moved into the other office with a co-worker, I checked on the position I had applied for and was told that "it was cancelled". Later while talking with Debbie, she told me that Mary Jane had the write to select her own

3ᒪ

employees. I said that is true. I went on to ask Debbie "what can I do to get a promotion". She did not tell me. I mentioned that the position that McDivitt and I generated and she said that should would take the duties and add the duties my present position description so I said nothing else to her because she implied that she would only add the duties without promotion. Diane had also taken duties from the PD that McDivitt and I generated and attached to the position description already assigned to me.
When my detail was up in the Office of Budget Management, Mary Jane Miller came to me and asked me to get some information for her. I did and when I gave her the information, I remained her that my detail was up. Mary Jane, ask"why are you still here"? I stated that I was hoping that she would allow me to stay until they got my office ready and she said oh yes. They are going to be giving you assignments? I said yes and she left.

March 6, 2005:--Detailed to the Office of Indian Energy Resource Development under Robert Middelton:

Before I was detailed to Mr. Middelton, Sally told me that he may be looking for an Administrative Officer GS-12. I told her I would like to speak to him and she said let me talk with him first. She did and Mr. Middleton called me and requested a meeting with me. When we met he told me that Sally told him I have a complaint in and do I want to tell him about it. I gave him a jest of the situation and asked him if he would allow me the detail and he said he would think about it. I told Sally what Mr. Middelton said to me and she stated "she had to tell him about my case". Mr. Middelton's office was just being set up. I saw that there was a refrigerator, a coffee pot and microwave in the area where he wanted me to sit so I suggested that we have a wall build to place the items in its own area like a Kitchenette. Mr. Middelton looked at me and said "Why do we need a wall. I looked at him and did not say anything else. I talked with Sally and told her of Middelton's conversation and she said we can have a wall build. I had talked with Matt Cravett and he had stated that the refrigerator would be going to another office that had space for such a large refrigerator. Some time passed and Mr. Middelton would have guest to me with him and come into my area and hollow back into his office asking the guest what type of beverage that wanted. The coat closet was also used as a pantry. The films bothered me. I went by to Sally Hampton my intermediate supervisor of record and who had charge of space and asked her to fine me another office before I made Mr. Middelton mad. Sally stated that there is no other space available and she did not mention the wall again, I had jury duty and I told Mr. Middelton that I would let him see the papers. Mr. Middelton stated "If I can't trust you on that what can I trust yon on"? Later, I ran into Harry Colclough the individual in charge of building walls and I asked him about wall building and how much it would cost. He told me after looking at the area. Week or so later Harry came back to the office and asked where did I want the door to the wall and I told him and I told him that I did not believe that Mr. Middelton wanted the wall built. Harry stated that he had talked with Mr. Middelton and Mr. Middelton agreed with the wall going up. I said "Oh" "OK". Some time passed and I did not hear anything about the wall. I was working hard for Mr. Middelton's office and Mr. Middelton ask me was I working hard and I said yes and he said I agree take the

33

afternoon off.  So I did.  Sometime passed regarding the wall going up.  I went into Matt Cravatt's office for something and Harry was with Matt.

I asked them both when was my wall going up.  Harry said he was just waiting to see who was paying and I said Matt and Matt said I (me) could pay I said OK our money come out of the same pot.  That was on Wednesday, April 20, 2005.  I told Harry to e-mail both me and Mr. Middelton as to when and the cost of the wall being built and spelled out both Middelton and Brantley for Harry to e-mail us.  Thursday, April 21, 2005, Matt came to the office checking if I had heard from Harry and I said no.. That morning Mr. Middeltong told me again that since I am working hard I may take a half day on Friday.  I reminded Mr. Middelton that I would be off all day Friday on annual leave and he said take it whenever I want.  I left for home Thursday after 4:00pm.  When I returned to work on Monday,  April 25, 2005, before I took off my coat, Mr. Middelton meet me in my office and told me "we got to talk" I took off my coat and picked up a pad and pen and went into his office.  Mr. Middelton stated "I can no longer trust you"!  Didn't I tell you that I did not want a wall built?  I stated "no you did not".  I said what you said was "Why did we need  a wall built" I and told him that Harry told me that he had spoken with you and you were in agreement with the wall going up.  Then Mr. Middelton stated he never spoke with Harry  I told Mr. Middelton, how I told Harry to e-mail us both as to the cost and date the wall was going up and Middelton question "did I get the e-mail" I said no  did you?  He said no.  I told Mr., Middelton that he needed to call both Matt and Harry into this meeting and he said he would.  I told Mr. Middelton that I did not want to work in a kitchen. and Mr. Middelton stated that "you are lucky that you are not sharing an office".  Matt and Harry came to the meeting around 2:00pm.  Mr. Middelton stated that he called the meeting because he was getting conflicting information.  Harry stated that "when I spoke with you some time ago you did not seem to be in agreement with the wall going up that you were going to talk it over with Margaret" once Harry finished, I said "now back up" "did you not tell me that when you spoke to Mr. Middelton he was in agreement with the wall going up"?  Before Harry answered  Mr. Middelton reached out his hand and stated "Everyone says you do good work I am not going to bother your position because you do good work"  Matt replied "I don't think he do good work"  then Mr. Middelton said "Everyone but Matt thinks you do good work"  Margaret pushed this didn't she because she wanted the wall" I told Mr. Midelton "yes I want the wall"  Harry asked Middelton who should he go to regarding his office and Middelton said him.  Harry got up shook Mr. Middelton's hand and my hand and left.  Tuesday , April 26, 2005,  Mr. Middelton call me into his office and told me that he had told both Sally Hampton and Debbie Clark that he could not work with me and that I would be moving out.  I said "fine".  I was moved back into my old office I once shared with Daphne Bewald (Indian) and now sharing with Sean Malloy(white male).

Prior to April 25, 2005, Mr. Middelton and I had discussed my working with him and receiving a GS-12.  He gave me a rating appraisal filled in by Victor Christenson, and he even spoke of the possibility of my receiving a GS-13 if I keep of the good work and my "keep pleasing me" (him).

34

Around the 27th of June, Mr. Middelton was in Sally's office and my office is adjacent to Sally, Mr. Middelton spoke to me like nothing ever happened.  Mr. Middelton was like Jackal and Hide.

All my duties have been taken away from me and disbursed among several co-workers.  I was asked to give Juan Price some information because he is "learning".

On July 12, 2005, I was denied training to the Blacks in Government Conference by Debbie Clark because she stated "the conference was for supervisors and managers"

I was told some years ago I had to take the training for "EEO for Supervisors and Managers for I was a manager because I was an Administrative Officer.

**Remedies:**

Attorney Fees
Retroactive promotion to 1989 for the GS-12
Back Pay from 1989 to 1995 for the GS-12
Retro active promotion to 1995 to present for the GS-13
Back Pay from 1995 to present for the GS-13
Promotion to the GS-14
Compensatory damages
Mental anguish damages
Leave restored
Six months stress leave
One Year Sabbatical

35