# EXHIBIT EIGHT

# STATEMENT ON THE STATUS OF AFRICAN-AMERICAN EMPLOYMENT AT THE DEPARTMENT OF THE INTERIOR

Good Morning, Mr. Chairman and members of the Committee. I want to thank you for allowing me to testify before you today. Although I am an employee of the Department of the Interior, I am here today as the representative of the National Association for the Advancement of Black Federal Employees (NAABFE). NAABFE was formed by African-American employees of the Interior in 1994. Its mission is to address the status of African-American employment within the Department.

The employees we represent, are deeply concerned by the lack of equal opportunity within the Department of the Interior. The Department's long standing resistance to adhere to the spirit and intent of Equal Employment Opportunity (EEO) laws and regulations has caused severe underrepresentation, and in some instances a conspicuous absence of African Americans within employment categories and levels.

Throughout the years, the Department's EEO program has been the focus of numerous Congressional inquiries, audits and evaluations by regulatory agencies, and the media. All appear to have reached the same incontrovertible conclusion - the Department, through its employment practices, has systematically excluded African Americans as a class, and those practices continue to perpetuate the effects of past discrimination. The legacy, is a work force that in no way reflects the diversity of our nation, and a Department that will be

1

ill prepared to enter the next century and deal with the challenges and opportunities that a more diverse society will present.

We believe the following statistics reflect what many years of institutional racism has created. These percentages should be compared to the national civilian labor force percentage of **10.4**. This percentage has been used by the Office of Personnel Management as a representational standard. All but two of the major federal agencies, the Department of Agriculture and the Department of the Interior, have met and exceeded this standard.

As of June 30, 1997, out of a total employment population of 74, 827, African Americans represented **6.1%**, or 3,357 of the 53,400 permanent employees and **2.4%**, or 514 of the 21,427 temporary employees within the Department (See Exhibit 1). While African Americans are underrepresented in most administrative and professional occupations, underrepresentation is particularly severe at the higher grade levels. A recent article in the Washington Post (July 21, 1997) identified the Department as the whitest of all" federal agencies at the GS-13 and above levels.
At the GS-13 through GS-15 levels, out of a total of over 9,100 employees, African Americans represent **3.8%** or 346
(See Exhibit 1a).

This condition has persisted despite a net growth in the Department over the last ten years. According to an annual report published by the Equal Employment Opportunity Commission (EEOC), the representation of African-Americans from 1986 to 1995 flatlined between **5.9%** and **6.0%**, despite a net increase of over 5,000

2

employees during this period (See Exhibit 2). We contend this is due to an unwritten quota policy of "replacement only" where African American employment is concerned.

The same EEOC report ranked the Interior **last** out of 42 federal departments and agencies in its employment of African Americans (See Exhibit 3).

As the statistics demonstrate, the institutional discrimination that has produced and perpetuated this underrepresentation of African Americans is evident in the representational statistics within every agency of the Department (See Exhibit 4A-E), some far worse than others. For instance, within the Bureau of Land Management African American males represent only **1.2%** or 101 of the total population of 8,418; in the Bureau of Reclamation, African American men are **1.3%**, or 73 and African American women are **1.5%** or 88, out of a total population of 5,612; and within the Office of the Solicitor, African American men are **1.1%** or 4, out of a total population of 365.

African Americans are also severely underrepresented in most and conspicuously absent in many of the Department's mission critical occupations. Mission critical occupations are typically the most highly populated, they are directly related to an agency's mission, and they offer the greatest career opportunities. Agency specific examples include: Park Management positions within the National Park Service in which African Americans men represent **3.7%** or 119 and African American women represent **1.7%** or 55 out of a total population of 3,220; General Biologist positions within the U.S. Fish

3

and Wildlife Service in which African American males represent **.5%** or 5 and African American women **1.2%** or 12, out of a total population of 973, and Range Management Specialists within the Bureau of Land Management, where African Americans, men and women, represent **0%** out of a total population of 392 (See Exhibit 5).

Equally disturbing, has been the loss of African-Americans at the SES level, and within the Departmental personnel and EEO offices. Some of this loss is attributable to downsizing and reductions in force, both of which have had a disproportionate impact on African Americans.

In 1993 there were **17** African Americans at the SES level out of a population of 256. While modest, this representation had taken years to achieve. By 1997, this number had declined to **13** out of 196. Because of the severe underrepresentation of African Americans at the next lower levels, GS-15 and GS-14, and the absence of any effective recruitment programs at this level, we feel that this number will continue to decrease.

In 1976, the political leadership at Interior began a concerted effort to recruit African Americans into the Departmental Office of Personnel. This Office is key because it is where personnel policies are formulated and interpreted for the Department. At that time, there were no African American personnel specialists within this office. By 1993 there were **9**. By 1997, this number had decreased to **1**. This loss occurred at the same time new employees were being hired into the personnel office. For example, in 1996 there were

4

seven new hires into this office at the GS-13 and above levels - all of the selectees were white.

A similar decrease has occurred within the Departmental EEO office and agency EEO offices. These offices, traditionally understaffed, were among the first targeted for downsizing. Because the EEO offices have also been one of the few offices to hire a significant number of minorities and women, the loss of EEO staff only served to exacerbate the Department's poor EEO profile. In 1993 there were 267 EEO specialists Departmentwide and 30 within the Departmental Office for Equal Opportunity. By June 30, 1997, there were approximately 147 EEO specialists Departmentwide, a decrease of over **40%,** and 10 in the Departmental EEO Office, a decrease of over **66%**.

Most distressing of all, however, is the comparison between new hires and separations that have occurred within the general schedule in the last five years. Between 1992 and June 30, 1997, there were approximately 7,110 new hires into the Department. Of that number African Americans represented **6.0%** or 426. During the same time period approximately 18,188 people left the Department. Of that number, African Americans represented **6.6%** or 1,198.

Even more dramatic is the same comparison at entry levels GS-5 and GS-7. Typically, those hired into the government at the GS-5 or GS-7 level are new college graduates whose major qualifies them for a career in one of the administrative or professional occupations. During this same five year time frame there were 1,388 new hires at the GS-5 level and 723 at the GS-7 level. At the GS-5 level African

5

Americans represented **8.7%** or 121. At the GS-7 level African Americans represented **4.7%** or 34 of the new hires. However, during the same period, there were 2,446 separations at the GS-5 level and 1,832 at the GS-7 level. African Americans represented 9.6 percent, or 235 of those separated at the GS-5 level and 12.8 percent or 234 or those separated at the GS-7 level. As evidenced by these numbers, the rate of African Americans leaving the Department far exceeded the rate of African Americans hired into the Department. (See Exhibits 6a through 6c).

We believe one explanation for this is the work environment facing African American employees. Very early in their employment, many realize there is no future for them at the Department of the Interior. This message is driven home in a variety of ways, some more overt than others. Among the more glaring examples are the incidents of racial intolerance and harassment that have increased in recent years.

There is a story at the Department about an incident that occurred in the late 1930s during the construction of the Hoover Dam. As the story goes, white employees of the Bureau of Reclamation who were involved in this construction project came to accept an old black dog as their mascot. They named this dog "old nigger", and thought so highly of him, that upon his death they placed a plaque at the site of the dam with the inscription to "ole nig". This plaque remained for quite sometime, until it was finally removed in the 1960s. Unfortunately, as the following case studies reveal, not much has changed since then.

6

Case Study Number One - A newly hired black male employee of a regional office of the U.S. Fish and Wildlife Service, was continually subjected to various forms of harassment by his first level supervisor throughout most of his first year of employment. Just prior to terminating him in December 1996, days before Christmas, his first and second level supervisor presented the man with a "certificate" (See Exhibit 7 for a copy of the document). This certificate, prepared on government time and with government equipment, contained shocking racial language clearly intended to demean this young black man. An EEO counselor later found a copy of this document, which resulted in the man being promptly rehired. To date, we know of no disciplinary action taken against either supervisor.

Case Study Number Two - In 1992, an African American female employee of the Minerals Management Service confronted her white male manager after being informed that this manager had referred to her as a "Mississippi nigger". When she asked him if this were true, he allegedly responded by saying, "would it make you feel better if I called you a "good Mississippi nigger." Initially, officials within the Minerals Management Service resisted taking any action, stating that it was her word against his. It wasn't until 1997 that officials of the Minerals Management Service decided to suspend this manager for three (3) days.

Case Study Number Three - In March 1995, an EEOC administrative judge found the National Park Service had racially harassed an African American women at one of the Service's regional offices. A white male co-worker of the woman had referred to her as a "lazy black bitch" and "fucking nigger" on a number of occasions. These

7

statements were made in the presence of their supervisor, who chose to do nothing. After over a year and a half of adamantly refusing to take any disciplinary action against the co-worker or supervisor, the Park Service reluctantly agreed to issue both a letter of reprimand, the lowest form of formal disciplinary action.

Case Study Number Four - African American employees of the Office of the Secretary, Interior's Service Center, (located at the Main Interior Building, Washington, D.C.) were subjected to racial harassment in August 1997 when a Klu Klux Klan poster was prominently displayed in the mechanic's work room. The KKK poster announced an upcoming Klan gathering in Bowie, Md.

In 1996 there were over 700 hundred complaints of employment discrimination in process against the Department. On average, these complaints take approximately 565 days to process, or over three times longer than the statutory time frame of 180 days.
Too often, complaints of discrimination are accompanied by complaints of reprisal and retaliation by complainants alleging they experienced an adverse employment action as a result of filing an EEO complaint. Fear of reprisal is very real at the Department. Recently, an African American SES employee, who had agreed to serve as an agent in a class action complaint against the Department, withdrew his name citing incidents of reprisal he felt were directly related to his involvement in the class.

Rights have little meaning, if one is in fear of exercising them. If someone at the SES level can be intimidated, one only has to wonder about the chilling effect this has on lower graded employees.

8

We recognize these problems have evolved over many years and will take time to correct. However, the time to begin is long overdue. We, along with other employee groups have provided the Secretary of the Interior and/or his designees with specific recommendations to correct these inequities on a number of occasions since his arrival in 1993. We believe the problem is not that the Department does not know how to effect the changes needed, but that the Department is disinclined to make these changes.

The recommendations provided can be summarized in four points: (1) the establishment of EEO goals and timetables designed to eliminate the severe underrepresentation of African Americans within five years, and a system to monitor the achievement of these goals, (2) the development and implementation of an accountability system that rewards EEO progress and punishes non-compliance, (3) the development of centralized recruitment and training programs at the entry, mid and senior levels that create applicant pools of African American candidates, and (4) the implementation of a policy that ensures incidents of racial discrimination and harassment are dealt with expeditiously, in a manner designed to send a message to others who might be inclined to engage in similar behavior.

We know the problems we have described are not unique to the Department, but are symbolic of a larger issue involving the structure of federal equal opportunity programs. Bureaucracies do not suffer change well, they are best at maintaining the status quo. We believe, for the equal opportunity program to function effectively it must be able to carry out its responsibilities independent of influences by the Department or agency it represents. Similar, to the Inspector

9

General's role, the role of the EEO office should be to monitor and ensure compliance with established laws and regulations. The existing structure does not permit this, in fact it impedes any change.

Therefore, we respectfully recommend that Congress initiate legislation that will enable federal EEO officials to more effectively carry out their enforcement role. The EEO Act of 1972 made clear the Congressional intent was to eliminate any remaining vestige of racial discrimination within the federal government's policies and programs. We suggest that Congress can play a key role through its agency appropriations committees, in ensuring that intent becomes a reality. We only have to look at the example provided by NASA in the mid 1970s. It was not until the Congressional appropriations committee for NASA made it clear, that NASA's future funding would be contingent upon demonstrable EEO progress, that we finally saw our first minority and woman astronaut.

We need your intervention, if EEO within the Department of the Interior and federal government is to be more than just a hollow promise. We thank you for holding these hearings, and for listening to our concerns.

10

# DEPARTMENT OF THE INTERIOR
# AFRICAN AMERICAN REPRESENTATION
# WITHIN THE CIVILIAN LABOR FORCE (CLF)



Source: Department of the Interior, Office of Equal Opportunity                    Exhibit 1

TABLE I-8

FEDERAL AGENCY TREND SUMMARY FOR AGENCIES WITH 500 OR MORE EMPLOYEES
FOR 1986 – 1995

| YEAR | TOTAL ALL NUMBER | TOTAL FEMALE NUMBER | % | WHITE FEMALE NUMBER | % | BLACK MALE NUMBER | % | BLACK FEMALE NUMBER | % | HISPANIC MALE NUMBER | % | HISPANIC FEMALE NUMBER | % | ASIAN AMERICAN / PACIFIC ISLANDER MALE NUMBER | % | ASIAN AMERICAN / PACIFIC ISLANDER FEMALE NUMBER | % | AMERICAN INDIAN / ALASKAN NATIVE MALE NUMBER | % | AMERICAN INDIAN / ALASKAN NATIVE FEMALE NUMBER | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HOUSING AND URBAN DEVELOPMENT | | | | | | | | | | | | | | | | | | | | | |
| 1986 | 11,274 | 5,953 | 53.75 | 3,196 | 27.98 | 954 | 8.42 | 2,268 | 21.02 | 284 | 2.55 | 322 | 3.03 | 99 | 0.93 | 118 | 1.23 | 42 | 0.43 | 49 | 0.30 |
| 1987 | 12,199 | 6,711 | 55.01 | 3,539 | 29.01 | 1,011 | 8.29 | 2,567 | 21.04 | 299 | 2.45 | 372 | 3.05 | 135 | 1.11 | 163 | 1.34 | 54 | 0.44 | 70 | 0.49 |
| 1988 | 12,625 | 7,066 | 55.97 | 3,693 | 29.25 | 1,049 | 8.31 | 2,735 | 21.66 | 304 | 2.41 | 388 | 3.07 | 129 | 1.02 | 178 | 1.41 | 52 | 0.41 | 72 | 0.57 |
| 1989 | 12,921 | 7,356 | 56.93 | 3,787 | 29.31 | 1,071 | 8.29 | 2,871 | 22.22 | 318 | 2.46 | 434 | 3.36 | 133 | 1.03 | 183 | 1.41 | 52 | 0.40 | 81 | 0.57 |
| 1990 | 13,084 | 7,542 | 57.64 | 3,830 | 29.27 | 1,053 | 8.05 | 2,972 | 22.71 | 319 | 2.44 | 474 | 3.62 | 145 | 1.11 | 185 | 1.41 | 53 | 0.41 | 81 | 0.62 |
| 1991 | 13,878 | 8,097 | 58.34 | 4,180 | 30.12 | 1,091 | 7.86 | 3,115 | 22.45 | 352 | 2.54 | 509 | 3.67 | 158 | 1.14 | 208 | 1.50 | 57 | 0.41 | 81 | 0.58 |
| 1992 | 13,407 | 7,802 | 58.19 | 3,996 | 29.81 | 1,062 | 7.92 | 3,028 | 22.59 | 346 | 2.58 | 492 | 3.67 | 155 | 1.16 | 202 | 1.51 | 52 | 0.39 | 85 | 0.61 |
| 1993 | 12,885 | 7,510 | 58.28 | 3,819 | 29.64 | 1,030 | 7.99 | 2,935 | 22.78 | 325 | 2.52 | 480 | 3.73 | 156 | 1.21 | 193 | 1.50 | 48 | 0.37 | 84 | 0.63 |
| 1994 | 12,455 | 7,321 | 58.78 | 3,686 | 29.59 | 1,003 | 8.05 | 2,899 | 23.28 | 316 | 2.54 | 466 | 3.74 | 154 | 1.24 | 192 | 1.54 | 47 | 0.38 | 83 | 0.64 |
| 1995 | 11,130 | 6,614 | 59.42 | 3,287 | 29.53 | 901 | 8.10 | 2,660 | 23.90 | 284 | 2.55 | 424 | 3.81 | 144 | 1.29 | 168 | 1.51 | 42 | 0.38 | 75 | 0.67 |
| INTERIOR | | | | | | | | | | | | | | | | | | | | | |
| 1986 | 55,141 | 18,143 | 32.90 | 12,830 | 23.27 | 1,658 | 3.01 | 1,674 | 3.04 | 1,247 | 2.26 | 789 | 1.43 | 457 | 0.83 | 281 | 0.51 | 3,681 | 6.68 | 2,569 | 4.35 |
| 1987 | 54,681 | 18,180 | 33.25 | 12,809 | 23.42 | 1,669 | 3.05 | 1,662 | 3.04 | 1,242 | 2.27 | 821 | 1.50 | 453 | 0.83 | 280 | 0.51 | 3,665 | 6.70 | 2,608 | 4.66 |
| 1988 | 55,806 | 18,936 | 33.93 | 13,425 | 24.06 | 1,670 | 2.99 | 1,645 | 2.95 | 1,270 | 2.28 | 850 | 1.52 | 465 | 0.83 | 293 | 0.53 | 3,713 | 6.65 | 2,723 | 4.77 |
| 1989 | 56,766 | 19,589 | 34.51 | 13,894 | 24.48 | 1,670 | 2.94 | 1,701 | 3.00 | 1,329 | 2.34 | 925 | 1.63 | 461 | 0.81 | 310 | 0.55 | 3,656 | 6.44 | 2,759 | 4.88 |
| 1990 | 57,562 | 20,188 | 35.07 | 14,273 | 24.80 | 1,686 | 2.93 | 1,790 | 3.11 | 1,387 | 2.41 | 991 | 1.72 | 457 | 0.79 | 332 | 0.58 | 3,665 | 6.37 | 2,802 | 4.87 |
| 1991 | 59,583 | 21,355 | 35.84 | 15,082 | 25.31 | 1,771 | 2.97 | 1,883 | 3.16 | 1,460 | 2.45 | 1,111 | 1.86 | 461 | 0.77 | 358 | 0.60 | 3,717 | 6.24 | 2,921 | 4.90 |
| 1992 | 62,028 | 22,670 | 36.55 | 16,010 | 25.81 | 1,824 | 2.94 | 1,970 | 3.18 | 1,540 | 2.48 | 1,191 | 1.92 | 496 | 0.80 | 384 | 0.62 | 3,788 | 6.11 | 2,921 | 4.90 |
| 1993 | 62,832 | 23,141 | 36.83 | 16,305 | 25.95 | 1,842 | 2.93 | 1,996 | 3.18 | 1,552 | 2.47 | 1,203 | 1.91 | 537 | 0.85 | 408 | 0.65 | 3,788 | 6.11 | 3,115 | 5.02 |
| 1994 | 63,090 | 23,127 | 36.66 | 15,908 | 25.21 | 1,787 | 2.83 | 1,913 | 3.03 | 1,533 | 2.43 | 1,159 | 1.84 | 524 | 0.83 | 398 | 0.63 | 3,848 | 6.12 | 3,229 | 5.14 |
| 1995 | 60,269 | 22,048 | 36.58 | 15,247 | 25.30 | 1,748 | 2.90 | 1,848 | 3.07 | 1,471 | 2.44 | 1,085 | 1.80 | 512 | 0.85 | 386 | 0.64 | 4,707 | 7.46 | 3,749 | 5.94 |
| JUSTICE | | | | | | | | | | | | | | | | | | | | | |
| 1986 | 64,880 | 24,244 | 37.36 | 15,285 | 23.66 | 3,974 | 6.12 | 7,102 | 10.94 | 3,699 | 5.70 | 1,401 | 2.16 | 455 | 0.70 | 322 | 0.50 | 229 | 0.33 | 134 | 0.11 |
| 1987 | 66,007 | 25,594 | 38.77 | 16,105 | 24.40 | 3,925 | 5.95 | 7,481 | 11.33 | 3,757 | 5.69 | 1,512 | 2.29 | 498 | 0.75 | 352 | 0.53 | 236 | 0.36 | 144 | 0.10 |
| 1988 | 72,886 | 28,643 | 39.30 | 17,997 | 24.69 | 4,231 | 5.80 | 8,158 | 11.19 | 4,674 | 6.41 | 1,910 | 2.62 | 617 | 0.85 | 479 | 0.66 | 232 | 0.32 | 99 | 0.22 |
| 1989 | 77,898 | 29,715 | 38.15 | 18,416 | 23.64 | 4,953 | 6.36 | 8,575 | 11.01 | 5,054 | 6.49 | 2,058 | 2.64 | 696 | 0.89 | 549 | 0.70 | 266 | 0.34 | 117 | 0.15 |
| 1990 | 79,565 | 31,061 | 39.04 | 19,359 | 24.33 | 5,028 | 6.32 | 8,717 | 10.96 | 5,183 | 6.51 | 2,252 | 2.83 | 752 | 0.95 | 594 | 0.75 | 256 | 0.32 | 139 | 0.17 |
| 1991 | 86,603 | 34,316 | 39.62 | 21,457 | 24.78 | 5,466 | 6.31 | 9,445 | 10.91 | 5,716 | 6.60 | 2,629 | 3.04 | 807 | 0.93 | 623 | 0.72 | 271 | 0.31 | 162 | 0.19 |
| 1992 | 92,082 | 36,586 | 39.73 | 23,043 | 25.02 | 5,805 | 6.30 | 9,773 | 10.61 | 6,321 | 6.86 | 2,863 | 3.11 | 932 | 1.01 | 721 | 0.78 | 277 | 0.30 | 186 | 0.18 |
| 1993 | 93,407 | 36,965 | 39.57 | 23,131 | 24.76 | 6,006 | 6.43 | 9,795 | 10.49 | 6,563 | 7.03 | 3,001 | 3.21 | 1,027 | 1.10 | 846 | 0.91 | 306 | 0.33 | 186 | 0.19 |
| 1994 | 93,364 | 36,426 | 39.02 | 22,615 | 24.22 | 6,151 | 6.59 | 9,664 | 10.35 | 6,845 | 7.33 | 3,059 | 3.28 | 1,111 | 1.19 | 883 | 0.95 | 358 | 0.38 | 205 | 0.22 |
| 1995 | 98,017 | 37,932 | 38.70 | 23,581 | 24.06 | 6,597 | 6.73 | 9,878 | 10.08 | 7,527 | 7.68 | 3,273 | 3.34 | 1,270 | 1.30 | 977 | 1.00 | 440 | 0.45 | 223 | 0.23 |

Source: Equal Employment Opportunity Commission Report Fiscal Year Ending 1995

- 38 -

Exhibit 2

- 250 -

TABLE I-19

RANKING AS A PERCENT OF TOTAL WORK FORCE
BY RACE, NATIONAL ORIGIN AND GENDER
FOR FEDERAL AGENCIES WITH 500 OR MORE EMPLOYEES

| AGENCY OR DEPARTMENT | BLACK | RANK | HISPANIC | RANK | ASIAN AMERICAN / PACIFIC ISLANDER | RANK | AMERICAN INDIAN / ALASKAN NATIVE | RANK | WOMEN | RANK |
|---|---|---|---|---|---|---|---|---|---|---|
| AGENCY FOR INTERNATIONAL DEVELOPMENT | 27.18 | 14 | 3.21 | 28 | 3.14 | 18 | 0.43 | 30 | 46.74 | 21 |
| AGRICULTURE, DEPARTMENT OF | 9.68 | 40 | 4.90 | 17 | 2.03 | 32 | 2.43 | 3 | 41.31 | 28 |
| AIR FORCE, DEPARTMENT OF THE | 9.76 | 39 | 9.29 | 4 | 2.92 | 22 | 1.06 | 8 | 32.49 | 37 |
| ARMY, DEPARTMENT OF THE | 14.24 | 32 | 5.40 | 14 | 3.37 | 15 | 1.11 | 7 | 37.22 | 33 |
| COMMERCE, DEPARTMENT OF | 17.74 | 28 | 2.64 | 32 | 4.47 | 7 | 0.45 | 27 | 43.96 | 24 |
| DEPARTMENT OF DEFENSE - SUMMARY | 13.93 | 33 | 5.79 | 12 | 5.17 | 4 | 0.94 | 10 | 36.44 | 36 |
| EDUCATION, DEPARTMENT OF | 36.79 | 5 | 3.91 | 24 | 2.99 | 21 | 0.68 | 22 | 60.66 | 6 |
| ENERGY, DEPARTMENT OF | 11.79 | 36 | 5.00 | 16 | 3.61 | 13 | 1.27 | 6 | 38.70 | 31 |
| ENVIRONMENTAL PROTECTION AGENCY | 17.98 | 25 | 4.02 | 23 | 4.13 | 9 | 0.45 | 26 | 49.34 | 18 |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | 47.85 | 2 | 11.16 | 2 | 2.48 | 27 | 0.66 | 24 | 66.27 | 2 |
| FEDERAL COMMUNICATIONS COMMISSION | 29.44 | 10 | 2.81 | 31 | 3.94 | 12 | 0.35 | 31 | 51.43 | 16 |
| FEDERAL DEPOSIT INSURANCE CORPORATION | 15.85 | 31 | 3.09 | 29 | 2.15 | 31 | 0.52 | 25 | 44.24 | 23 |
| FEDERAL EMERGENCY MANAGEMENT AGENCY | 19.59 | 24 | 2.06 | 38 | 1.37 | 40 | 0.34 | 32 | 32.30 | 38 |
| FEDERAL TRADE COMMISSION | 23.19 | 21 | 1.45 | 42 | 2.68 | 26 | 0.11 | 42 | 52.06 | 15 |
| GENERAL SERVICES ADMINISTRATION | 27.43 | 13 | 4.35 | 19 | 3.28 | 16 | 0.68 | 21 | 42.10 | 27 |
| GOVERNMENT PRINTING OFFICE | 57.38 | 1 | 2.27 | 36 | 0.79 | 41 | 0.17 | 38 | 39.50 | 30 |
| GOVERNMENT WIDE (CPDF) | 16.92 | 29 | 5.82 | 11 | 3.98 | 10 | 1.79 | 4 | 43.69 | 25 |
| HEALTH & HUMAN SERVICES, DEPARTMENT OF | 17.93 | 26 | 2.60 | 33 | 3.52 | 14 | 16.95 | 1 | 61.91 | 3 |
| HOUSING & URBAN DEVELOPMENT, DEPT. OF | 31.99 | 9 | 6.36 | 8 | 2.80 | 23 | 1.05 | 9 | 59.42 | 8 |
| INTERIOR, DEPARTMENT OF | 5.97 | 42 | 4.24 | 21 | 1.49 | 38 | 13.01 | 2 | 36.58 | 35 |
| INTERSTATE COMMERCE COMMISSION | 36.59 | 6 | 2.44 | 35 | 0.54 | 42 | 0.81 | 13 | 49.59 | 17 |
| JUSTICE, DEPARTMENT OF | 16.81 | 30 | 11.02 | 3 | 2.29 | 29 | 0.68 | 23 | 38.70 | 32 |

(Source): Equal Employment Opportunity Commission Report Fiscal Year Ending 1995

Exhibit 3

# DEPARTMENT OF THE INTERIOR
# AFRICAN AMERICAN REPRESENTATION
# PERMANENT WORK FORCE BY BUREAU

**BUREAU OF INDIAN AFFAIRS**
Work Force = 5,308



African American Males = 5
0%

African American Females = 4
0%

**BUREAU OF LAND MANAGEMENT**
Work Force = 8,418



African American Males = 102
1.2%

African American Females = 214
2.5%

Source: Department of the Interior, Office of Equal Opportunity                Exhibit 4-A

## BUREAU OF RECLAMATION
### Work Force = 5,612



African American Males = 73 — 1.3%
African American Females = 88 — 1.6%

## MINERALS MANAGEMENT SERVICES
### Work Force = 1,662



African American Males = 59 — 3.5%
African American Females = 97 — 5.8%

Source: Department of the Interior, Office of Equal Opportunity

Exhibit 4-B

## NATIONAL PARK SERVICE
Work Force = 14,122



African American Males = 998
7.1%

African American Females = 611
4.3%

## OFFICE OF SURFACE MINING
Work Force = 625



African American Males = 17
2.7%

African American Females = 61
9.8%

Source: Department of the Interior, Office of Equal Opportunity

Exhibit 4-C

### OFFICE OF THE SECRETARY
### Work Force = 780



African American Males = 59
7.6%

African American Females = 130
16.7%

### OFFICE OF THE SOLICITOR
### Work Force = 365



African American Males = 4
1.1%

African American Females = 28
7.7%

Source: Department of the Interior, Office of Equal Opportunity

Exhibit 4-D