# EXHIBIT TEN

Page 1

1   IN THE MATTER OF:

2   _____

3

4       MARGARET R. BRANTLEY

5           Complainant,

6                                           COMPLAINT NO.

7                                           OS-03-017

8       vs.

9

10      OFFICE OF THE SECRETARY, ASSISTANT SECRETARY OF

11  INDIAN AFFAIRS

12          Respondent.

13  _____,

14

15

16          TRANSCRIPT OF PROCEEDINGS in the above-entitled

17  cause of action, of the examination of Robert Middleton,

18  before the EEO Investigator, Eddie Neal, on the 2nd day

19  of September, 2005, beginning at the hour of 11:34 a.m.

20

21

22

23  BY:  Sandy Oddone

24

25

Page 2

PROCEEDINGS

BY: Eddie Neal

Good morning, my name is Eddie Neal and I'm the EEO Investigator assigned to investigate the allegations of discrimination filed by Miss Margaret R. Brantley. For the record, today is Friday, September 2, 2005. The time is approximately 11:34 a.m.

The claims that I will be investigating are being read from an acceptance letter which is date-stamped July 6, 2005. Consisting of the overall claim of discrimination that she's alleged, is that she was discriminated against on the basis of race, African-American, color, black, sex, female. Her age at the time was 55 and reprisal for her prior EEO activity.

A lot of these claims, there are actually seven allegations. A lot of them really don't pertain to you because some happened in 1989. Some happened in 2002. Reading her statement, it appears that she came to your office sometime in April 2005.

I'm going to focus on the one that appears that she actually mentioned you, which she was denied a partition wall in her office space.

What I'd like to do before we proceed any further is

Page 3

to first allow you an opportunity to identify yourself for the record and spell your name as well.

A. Sure. It's Robert W. Middleton M-I-D-D-L-E-T-O-N. I'm Director of the Office of Indian Energy and Economic Development.

Q. Okay. Mr. Middleton let me also administer an oath. Do you swear or affirm under the penalty of perjury that the information you are about to provide will be the truth, the whole truth and nothing but the truth to the best of your ability or recollection?

A. I do.

Q. Okay. Now what is your series and grade associated with that title?

A. I'm an SES and we're just banded now 00.

Q. Okay. And how long have you been in your current position?

A. I've been in this position officially since October 2004.

Q. Okay. Because Miss Brantley alleges discrimination based upon certain basis, every person I speak with, I have to get comparable information. For example, your race for the record will be?

A. Caucasian.

Q. And your skin color?

A. White.

Page 4

Q. Okay. We know your gender is male. Your age and date of birth?

A. My date of birth is 5/27/48. That would make me 57 years old.

Q. Okay. Now did you have any knowledge of any prior EEO activity that Miss Brantley might have been involved before I contacted you today?

A. I did not.

Q. Okay. Now I understand from speaking with Miss Brantley that at some point she was detailed to your office. Is that an accurate statement?

A. That's correct. When my office was actually physically being put together, which started in January of 2005, I was approached by some folks who were with the Assistants to Deputy's Secretary for management because they knew that I would be staffing up an office, and indicated to me that Margaret Brantley was someone who was going to be cycling out of a, I believe a detail that she was on at that time and would be available.

I agreed to talk with her, which I did. And then after talking with her, I felt that she was someone who would start, could start filling my office staff out very nicely. I asked her if she would come over on a detail while we were officially getting the office formalized.

Page 5

Q. Okay. Now I understand at some point she described it as a kitchenette in the office space. Tell me about what items were in there that such as the refrigerator and what other items.

A. First I have to clarify this, that we're actually sitting in swing space, which is temporary quarters, as we're waiting for the building renovation to take place. We're scheduled I heard the other day to now move out of here in March of '06, to move back in the permanent space.

When I was assigned the two offices that I was assigned, because we're space limited here, one of the offices, my outer office, it was a fairly good-sized office, already had a refrigerator in there. I had a microwave, which I brought from another job and we have a coffeepot and that's -- those are the items that are in the other office, the outer office.

Q. Okay. And where was she situated at that time?

A. When she was working for me?

Q. Yes.

A. We, actually we had no furniture so we moved some new furniture in and she was in the outer office, also.

Q. Okay. Now was there ever a conversation that Miss Brantley held with you about putting a wall up?

A. Yes.

Page 6

1    Q. Tell me a little bit about that.
2    A. Well, one day she had come in and we were talking
3    about how to arrange the office so that it would become
4    workable for everyone. That office is also where my
5    doorway is for me to come into my office. She mentioned
6    that there was a possibility of putting a wall up that
7    would split her office into two not equal halves, but
8    two portions. One of which is where the refrigerator
9    and the microwave and coffeepot would be. The other
10   would be where her desk would reside.
11       At that time, I indicated to her that I'd need
12   more information on it. I wasn't inclined to do it.
13   Then the conversation was dropped. I didn't hear
14   anything for a couple of months.
15   Q. Okay. Now I see in her thing she mentions the
16   name Matt Cravett and Harry Coldough.
17   A. Right.
18   Q. What was their involvement in this?
19   A. The -- I was sitting in my office one evening
20   about 5:30 or 6:00, I had a meeting in here. Some
21   workmen came into the outer office and they were doing
22   some things. I thought they were just doing some
23   general repairs. Then I saw one of the workmen take out
24   a tape measure and start measuring.
25       I excused myself from the meeting. I went out

Page 7

1    and asked what was happening. They said they were there
2    to put up a wall. I asked them who had authorized that,
3    because I certainly had not. They said that Margaret
4    Brantley had done that and that they had talked with
5    Harry who, I'm not exactly sure what his job title is,
6    but he is the person who directs all of the contractors
7    or some of the contractors that come in and do the work,
8    facilities work in the building. Harry had full signed
9    off on it and said that they could come and do it.
10       When I asked Harry, because I sent the workmen
11   away. I said, "no, we're not doing this," primarily
12   because we're in swing space. Putting up a wall would
13   have cost 15 hundred dollars. I can't justify spending
14   15 hundred dollars for somewhere between six months and
15   a year when we're going to move out of here.
16       Harry gave me a phone call later that evening and
17   asked what was going on. I said, "well, there's a
18   change to put a wall in." And I said, "well, I didn't
19   want a wall."
20       He relayed to me that Margaret had indicated to
21   him that I, in fact, did want a wall put up and that she
22   had used my name as acting to have a wall put into the
23   office. He said that he had been in a meeting with Matt
24   Cravett, who is the in the Assistant Secretary's for
25   Indian Affairs Office. He's our facilities guy, our

Page 8

1    space guy in the office. So, I told Harry, "no, sorry
2    that he had brought the workmen in." It turned out that
3    they were going to put up walls in other offices so it
4    was okay. No, we didn't want a wall in. Then the
5    conversation was dropped.
6    Q. Okay. Now in her statement that she submitted,
7    she indicates that Harry had spoke to you prior to
8    coming in to build a wall and that she told Harry to
9    e-mail both of you the cost and the date that the wall
10   would be put up. Is that an accurate statement?
11   A. I believe she was mistaken. Harry never talked
12   to me. We never received any e-mails. I never even had
13   knew actually prior to the telephone conversation the
14   evening of when I had sent the workers away.
15   Q. Okay. Now what happened after that situation,
16   because according to her -- what she said and what she
17   submitted was after that, you then wanted her removed
18   from the office.
19   A. After I had gathered this information and found
20   out that Matt had been involved, I decided I wanted to
21   find out exactly what the situation was. So, I called a
22   meeting where I had Matt and Harry and Margaret there.
23   I talked to all of them. I asked them what the
24   situation was. As it turns out, Margaret had
25   inaccurately relayed the thought that I was in desire to

Page 9

1    have this partition put up. Both Matt and Harry
2    thinking that they were responding to my request, were
3    willing to go along with that.
4        At that point, I realized that apparently
5    Margaret would not have my trust or I would not feel
6    comfortable giving her the responsibility of working in
7    my office since she was actually was just on detail and
8    hadn't been officially transferred, I just relayed back
9    to her home office that I was no longer interested in
10   bringing Margaret on as an employee.
11   Q. Okay.
12   A. So she moved back.
13   Q. Okay. Now prior to that incident, did the two of
14   you have any discussions about you bringing her on as a
15   permanent employee?
16   A. That was the intent. We talked about her coming
17   to work for me. We had just asked to come over on
18   detail, while we were formalizing my office. Actually,
19   my office was not formalized until April 14, by
20   secretarial order. I didn't actually have any
21   positions. I didn't have any money until that point, so
22   she was working on detail. But we had discussed the
23   fact that when the office became formal, there might be
24   an opportunity for her to come over, as a lateral.
25   Q. Okay. Now I'm going to read another thing that

Page 10

1  she wrote, because I asked you did you have any
2  knowledge about any prior EEO activity. This is what
3  she says, she says, "before I was detailed to
4  Mr. Middleton, Sally told me that he may be looking for
5  an Administrative Officer, GS12. I told her I would
6  like to speak to him, and she said, "let me talk with
7  him first". She did and Mr. Middleton called me and
8  requested a meeting with me. When we met, he told me
9  that Sally told him I have a complaint in and do I want
10 to tell him about it. I gave him a jest about the
11 situation and asked him if would allow me to detail. He
12 said he would think about it.
13    A. Well, actually, that's standard operating
14 procedure. For after we discussed, for me to think a
15 little bit about it. Afterward, I offered her to come
16 in. I don't recollect. I don't recollect at all Sally
17 telling me that she had an EEO complaint.
18    I do remember that I was told, I don't think it
19 was by Sally, I think it was somebody else saying that
20 Margaret had had some problems. I assumed that it was
21 personality conflict problems. So I was asking her
22 about any issues that she may have. She may in fact
23 have told me that at one time she filed an EEO
24 complaint. I didn't really realize it was still active.
25    Q. Okay. Now, let me see, she says, "the coat

Page 11

1  closet was also used as a pantry. The film that
2  bothered me." Did she ever come to you and indicate
3  that any of that was a problem?
4     A. No. I'm not sure what she meant by "pantry." We
5  kept bottled water in there. I think I had some
6  unopened soup cans in there, but that was it.
7     Q. Okay. Now what was the size of the space that
8  she's referring to?
9     A. It's larger than a standard office.
10    Q. Okay. Now had anyone been in that office working
11 in that place, prior to Miss Brantley occupying that
12 space?
13    A. It was empty when I got here. There was no
14 furniture, no.
15    Q. Oh, okay.
16    A. Except for the refrigerator.
17    Q. Okay. All right. This is just a standard
18 question I have. Did her race, color, gender, age, or
19 any of her prior EEO activity have anything with you
20 moving her from the office space?
21    A. Nothing at all. I have worked with and worked
22 for and have had work for me, people of all races and
23 colors. As a matter of fact, after Margaret was moved
24 back to her home office, I have brought in and hired
25 another person who is African-American, female and of

Page 12

1  about the same age.
2     Q. Okay. Well, all right. Well, I have no further
3  questions. Is there anything you'd like to add that
4  maybe I didn't ask or anything you'd like to elaborate
5  upon that I did ask that you think may be of assistance
6  to me during my investigation?
7     A. The only thing I'd like to elaborate on is, I
8  think, two things. Number one, is that it's clear that
9  Margaret mischaracterized my desire to have the
10 partition put in. No one asked my approval, either
11 verbally or in writing via e-mail. It was totally a
12 surprise to me that the workmen showed up and I sent
13 them off.
14    I also would like to emphasize the fact that this
15 partition was going to cost 15 hundred dollars to put
16 in. It was going to be put in temporary space that we
17 are expected to move out in another six months, which
18 would have been wasteful, obviously, of taxpayer
19 dollars.
20    It would not have been something that I would
21 have approved in any event. I think that, ultimately,
22 the responsibility for this really lies with Margaret
23 because she wanted the partition and tried to work the
24 system to have that partition put in. It backfired on
25 her.

Page 13

1     Q. Okay. All right. Well, based upon that comment,
2  the time is now approximately 11:49 a.m. That will
3  conclude this portion of the interview. I want you to
4  hold and make sure the tape took.
5     A. Okay.